# In the United States Court of Appeals for the Fourth Circuit

ELLENOR ZINSKI, *Plaintiff-Appellee,*

v.

LIBERTY UNIVERSITY, INC., *Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Virginia
(6:24-cv-00041) (Moon, J.)

**BRIEF FOR THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS; NATIONAL ASSOCIATION OF EVANGELICALS; THE LUTHERAN CHURCH-MISSOURI SYNOD; THE ETHICS & RELIGIOUS LIBERTY COMMISSION OF THE SOUTHERN BAPTIST CONVENTION; AND JEWISH COALITION FOR RELIGIOUS LIBERTY AS *AMICI CURIAE* SUPPORTING APPELLANT AND REVERSAL**

R. Shawn Gunnarson
Christopher A. Bates
Jarom M. Harrison
Catherine L. Grantham
KIRTON | McCONKIE
36 South State Street
Suite 1900
Salt Lake City, UT 84111
(801) 328-3600
sgunnarson@kmclaw.com

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE
FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate *amicus curiae* must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

Nos. 25-1228 (Lead), 25-1581 (Member)
Caption: *Zinski v. Liberty University, Inc.*

Pursuant to FRAP 26.1 and Local Rule 26.1,

The Church of Jesus Christ of Latter-day Saints; National Association of Evangelicals; The Lutheran Church-Missouri Synod; The Ethics & Religious Liberty Commission of the Southern Baptist Convention; and Jewish Coalition for Religious Liberty,

who are *amici curiae*, make the following disclosure:

1. Are any *amici* a publicly held corporation or other publicly held entity? **NO**

2. Do *amici* have any parent corporations? **NO**

3. Is 10% or more of the stock of any *amici* owned by a publicly held corporation or other publicly held entity? **NO**

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? **NO**

5. Are any *amici* a trade association? **N/A**

6. Does this case arise out of a bankruptcy proceeding? **NO**

7. Is this a criminal case in which there was an organizational victim? **NO**

*/s/ R. Shawn Gunnarson*                                   August 7, 2025

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

IDENTITY AND INTEREST OF *AMICI CURIAE* .................................. 1

SUMMARY OF ARGUMENT ................................................... 1

ARGUMENT ........................................................... 4

    I. TITLE VII EXEMPTS LIBERTY UNIVERSITY FROM ZINSKI'S CLAIM OF
       EMPLOYMENT DISCRIMINATION ..................................... 4

       A. Title VII's Section 702 exemption shields a religious
          employer from all of Title VII when the employer
          dismisses an employee for religious reasons...................... 4

       B. The district court's decision dramatically departs from a
          textualist reading of Section 702...................................... 12

    II. THE DISTRICT COURT'S RELIANCE ON SECOND-HAND LEGISLATIVE
       HISTORY IS UNNECESSARY AND UNCONVINCING......................... 16

    III. SECTION 702 APPLIES TO LGBT CLAIMANTS LIKE ZINSKI NO LESS
       THAN OTHER EMPLOYEES OF A RELIGIOUS ORGANIZATION......... 21

CONCLUSION ....................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Bostock v. Clayton Cnty.*,
 590 U.S. 644 (2020) .................................................................. *passim*

*Carcieri v. Salazar*,
 555 U.S. 379 (2009) .......................................................................... 12

*Cawthorn v. Amalfi*,
 35 F.4th 245 (4th Cir. 2022) ............................................................. 6

*Corp. of the Presiding Bishop of The Church of Jesus Christ of Latter-day Saints v. Amos*,
 483 U.S. 327 (1987) .............................................................. *passim*

*EEOC v. Pac. Press Publ'g Ass'n*,
 676 F.2d 1272 (9th Cir. 1982) ................................................ 16, 18

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
 565 U.S. 171 (2012) .......................................................................... 11

*Kennedy v. St. Joseph's Ministries, Inc.*,
 657 F.3d 189 (4th Cir. 2011) ............................................................ 8

*Kingdomware Tech., Inc. v. United States*,
 579 U.S. 162 (2016) ............................................................................ 7

*Kisor v. Wilkie*,
 588 U.S. 558 (2019) ............................................................................ 5

*Lown v. Salvation Army, Inc.*,
 393 F. Supp. 2d 223 (S.D.N.Y. 2005) ............................................. 5

*Mims v. Arrow Fin. Servs., LLC*,
 565 U.S. 368 (2012) ............................................................................ 6

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
  775 F.2d 1164 (4th Cir. 1985) .......................................... 16, 18

*Robinson v. Shell Oil Co.*,
  519 U.S. 337 (1997) ........................................................ 14

*Sackett v. EPA*,
  598 U.S. 651 (2023) ........................................................ 17

*South Carolina v. United States*,
  907 F.3d 742 (4th Cir. 2018) ............................................. 6

*United States v. Abdelshafi*,
  592 F.3d 602 (4th Cir. 2010) ............................................. 6

*United States v. Craft*,
  535 U.S. 274 (2002) ........................................................ 18

*United States v. Fraley*,
  538 F.2d 626 (4th Cir. 1976) ............................................. 17

*United States v. Thompson-Riviere*,
  561 F.3d 345 (4th Cir. 2009) ............................................. 14

*Zinski v. Liberty Univ., Inc.*,
  2025 WL 1005818 (W.D. Va. Apr. 3, 2025) ............................... *passim*

## Legislative Materials

110 Cong. Rec. 9122 (Apr. 27, 1964) ....................................... 19

118 Cong. Rec. 946 (Jan. 24, 1972) ........................................ 20

## Statutes and Rules

42 U.S.C. § 2000e(b) ....................................................... 23

42 U.S.C. § 2000e(j) ....................................................... *passim*

42 U.S.C. § 2000e-1 ............................................................. 7

42 U.S.C. § 2000e-1(a) .................................................. *passim*

42 U.S.C. § 2000e-2(e)(1) .............................................. 23, 24

42 U.S.C. § 2000e-2(g)(1) ..................................................... 23

42 U.S.C. § 2000e-3(b) .......................................................... 1

42 U.S.C. § 2000e-5(f)(3) ....................................................... 6

Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 253 (1964) ........... 7

Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103 (1972) ................................................................. 7–8

**Other Authorities**

Carl H. Esbeck, *Federal Contractors, Title VII, and LGBT Employment Discrimination*, 4 OXFORD J.L. & RELIGION 368 (2015) ........................... 5

Harvard Law School, The Antonin Scalia Lecture Series: A Dialogue with Justice Elena Kagan on the Reading of Statutes, YOUTUBE (Nov. 25, 2015) ........................................................................ 5–6

Kelly Main, *Top Small Business Statistics*, Forbes (Jan. 31, 2024) ...... 23

R. Shawn Gunnarson, James C. Phillips, & Christopher A. Bates, *Religious Employment and the Tensions between Liberty and Equality*, BYU L. REV. (forthcoming 2025) .......................................... 4–5

SUTHERLAND STATUTORY CONSTRUCTION (Norman Singer & Shambie Singer eds., 7th ed. 2024) ......................................................... 9

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED (1961) ............................................... 8

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici* are religious organizations representing millions of Americans. We cherish different religious beliefs and hold nuanced views on the proper policy mix for ensuring freedom and equality for all Americans. But we are united in our commitment to defending the religious freedom of churches, religious schools, and other faith-based organizations. Religious freedom for all Americans will be dangerously curtailed unless this Court affirms the right of religious organizations to choose employees whose conduct and beliefs are in harmony with their religion.

## SUMMARY OF ARGUMENT

An express statutory exemption should decide this case. Section 702 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1(a),[2] exempts a religious employer from Title VII when an employment decision turns on the

---

[1] The parties have consented to the filing of this *amicus* brief. Pursuant to Federal Rules of Appellate Procedure 29(a)(4)(E), *amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici* or their counsel have made any monetary contributions to fund the preparation or submission of this brief.

[2] *See* Pub. L. 88-352, § 702, 78 Stat. at 255. Section 702 is codified at 42 U.S.C. § 2000e-1(a), but its public law version appears in a section of its own and not in a subsection. For that reason, referring to the exemption as "section 702(a)" is incorrect. Liberty University also cites Section 703, 42 U.S.C. § 2000e-3(b), but this brief addresses only Section 702.

employer's religious beliefs, observances, or practices. Liberty University, a religious institution, terminated Zinski's employment because transitioning from male to female is inconsistent with the University's religious standards as expressed in its published Doctrinal Statement. Those undisputed facts mean that the exemption applies, and Zinski's complaint should be dismissed.

Liberty University is entitled to the Section 702 exemption. A close reading of the statutory text shows that the exemption shields a religious employer from all of Title VII when it makes judgments about whether an employee fits the employer's religious beliefs, observances, or practices. Indeed, Congress adopted Section 702 for the purpose of "alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Corp. of the Presiding Bishop of The Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987).

Yet the district court insisted on reading the exemption narrowly as granting permission only for a religious employer to select employees based on what the court called "religion *qua* religion." *Zinski v. Liberty Univ., Inc.*, 2025 WL 1005818, at *15 (W.D. Va. Apr. 3, 2025). That phrase

appears nowhere in the text of Section 702. Yet under its narrowing construction, the court ruled that Liberty remains subject to Title VII for removing a transgender employee—even when the decision rests entirely on religious criteria. The district court's gloss exposes Liberty University to the very harm Congress sought to avoid— "interference" with Liberty's ability "to define and carry out [its] religious mission[]." *Amos*, 483 U.S. at 339.

Legislative history lacks the persuasive power assigned it by the district court. Section 702's unambiguous text offers no reason to reach for legislative history as an interpretive aid. Displacing the plain meaning of statutory text is wrong in principle. Not only that, but the legislative history cited by the district court consists of second-hand accounts in circuit court decisions that do not establish the lower court's flawed statutory interpretation. Plus, the district court overlooked significant passages of legislative history showing that Congress deliberately shaped Section 702 to lift the burdens of Title VII from religious employers when they are engaged in choosing employees suitable to carry out the employer's religious mission.

Nor are LGBT employees like Zinski entitled to different legal treatment than any other claimant seeking to circumvent one of Title VII's express exemptions. Zinski can no more sue Liberty University for its implementation of religious employment standards than Zinski could sue a small business with fewer than 15 employees. All of Title VII—exemptions and prohibitions alike—should be applied as written. The decision below should be reversed.

## ARGUMENT

I. **TITLE VII EXEMPTS LIBERTY UNIVERSITY FROM ZINSKI'S CLAIM OF EMPLOYMENT DISCRIMINATION.**

A. **Title VII's Section 702 exemption shields a religious employer from all of Title VII when the employer dismisses an employee for religious reasons.**

The district court wrongly rebuffed Liberty University's defense under Section 702. *Zinski*, 2025 WL 1005818, at *1. Section 702 exempts religious employers from liability under Title VII insofar as they make employment decisions for religious reasons. A textualist interpretation of Section 702 shows why that is so. *See generally* R. Shawn Gunnarson, James C. Phillips, & Christopher A. Bates, *Religious Employment and the Tensions between Liberty and Equality*, BYU L. REV. (forthcoming

2025), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5183766 (describing a textualist interpretation of Section 702 and the reasons for adopting it); Carl H. Esbeck, *Federal Contractors, Title VII, and LGBT Employment Discrimination*, 4 OXFORD J.L. & RELIGION 368, 378 (2015) (interpreting the exemption's plain text to "extend[] to all employment positions and 'any activities of religious organizations, regardless of whether those activities are religious or secular in nature'") (quoting *Lown v. Salvation Army, Inc.*, 393 F. Supp. 2d 223, 247 (S.D.N.Y. 2005)).

The Supreme Court "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020). That interpretive method, known as textualism, reigns at the Court. *See, e.g.*, *Kisor v. Wilkie*, 588 U.S. 558, 622 (2019) (Gorsuch, J., concurring in the judgment); *see also* Harvard Law School, The Antonin Scalia Lecture Series: A Dialogue with Justice Elena Kagan on the Reading of Statutes, YOUTUBE (Nov. 25, 2015) (saying that "we're all textualists now."), *available at* https://www.youtube.com/watch?v= dpEtszFT0Tg (last visited

July 29, 2025). It also reflects this Court's own approach. *See South Carolina v. United States*, 907 F.3d 742, 758 (4th Cir. 2018) (the "lodestar of statutory interpretation remains 'ordinary, contemporary, common meaning' of text") (quoting *United States v. Abdelshafi*, 592 F.3d 602, 607 (4th Cir. 2010)).

Therefore, deciding whether Section 702 applies properly begins with its text. *See Cawthorn v. Amalfi*, 35 F.4th 245, 257 (4th Cir. 2022).

(a) **Inapplicability of subchapter to certain aliens and employees of religious entities**

> This subchapter shall not apply to an employer with respect to the employment of aliens outside any State, or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1(a).

Standing at the threshold of Section 702 is the phrase, "This subchapter shall not apply." *Id. Subchapter* denotes all of Title VII. *See, e.g.*, *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 380 (2012) (equating "Title VII's language" with a jurisdictional authorization "under this subchapter" (quoting 42 U.S.C. § 2000e-5(f)(3)). *Shall* expresses a mandate. "Unlike the word 'may,' which implies discretion, the word 'shall' usually

connotes a requirement." *Kingdomware Tech., Inc. v. United States*, 579 U.S. 162, 171 (2016) (citations omitted). Its section heading describes Section 702 as the "[*i*]*napplicability* of subchapter to …employees of religious entities." 42 U.S.C. § 2000e-1(a) (emphasis added). These textual cues establish that Title VII cannot apply when Section 702 applies.

Section 702 provides that any "religious corporation, association, educational institution, or society" qualifies for the exemption. *Id.* The parties "do not dispute" that Liberty University is a religious educational institution covered by Section 702. *Zinski*, 2025 WL 1005818, at *12.

Section 702 then says that the exemption applies when a religious organization's employees "perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42 U.S.C. § 2000e-1(a). Note that *activities* is unqualified. In the 1964 Act, Congress limited the exemption to the employees of a religious organization engaged in "*religious* activities" but later adopted amendments striking the adjective. *Compare* Civil Rights Act of 1964, Pub. L. No. 88-352, tit. VII, § 702(a), 78 Stat. 253, 255 (codified at 42 U.S.C. § 2000e-1 (1964)) (limiting exemption to employees engaged in "religious activities"), *with* Equal Employment Opportunity Act of 1972,

Pub. L. No. 92-261, § 3, 86 Stat. 103, 104 (1972) (amending § 702 to remove the adjective "religious" and extend the exemption to all activities of religious organizations). Unlike the ministerial exception, Section 702 covers every employee of a covered religious organization. Each employee "perform[s] work" that is "*connected with* the carrying on ... of [the religious organization's] activities." 42 U.S.C. § 2000e-1(a) (emphasis added).

We then come to the key phrase of Section 702. It shields a religious employer that acts "with respect to the employment of individuals of a particular religion." *Id.* Each term should be considered separately.

*Employment* denotes the entire range of activities comprising the employment relationship. The 1961 edition of *Webster's Third New International Dictionary* defined *employment* as "work ... in which one's labor or services are paid for by an employer." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED 743 (1961). As this Court has explained,

> if Congress had wished to limit the religious organization exemption to hiring and discharge decisions, it could clearly have done so. Instead, it painted with a broader brush, exempting religious organizations from the entire 'subchapter' of Title VII with respect to the 'employment' of persons of a 'particular religion.'

*Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 194 (4th Cir. 2011).

Title VII's definition of *religion* further reinforces Section 702's breadth. That definition, adopted by congressional amendment, applies everywhere the word appears in Title VII. Under the statute, "[t]he term 'religion' includes *all aspects of religious observance and practice, as well as belief*." 42 U.S.C. § 2000e(j) (emphasis added). By embracing "*all* aspects" of both "religious observance and practice," the definition removes any suggestion that Title VII treats religion primarily as a matter of religious belief. *Id.* (emphasis added). Both *observance* and *practice* denote religious conduct, and their placement at the beginning of the definition emphasizes them. The word *includes* expands the definition beyond its enumerated elements. *See* 2A SUTHERLAND STATUTORY CONSTRUCTION § 47.7 (Norman Singer & Shambie Singer eds., 7th ed. 2024). It follows that "a particular religion" in section 702(a) means at least "particular" religious observances, practices, and beliefs. 42 U.S.C. § 2000e-1(a).

Notice too that the definition is silent on the topic of religious group identity. Title VII does not define religion in terms of religious affiliation, membership, or denomination. Instead, the words Congress chose—*observance*, *practice*, or *belief*—include but also reach beyond group identity to encompass all dimensions of religion. *See id.* § 2000e(j).

This express definition of *religion* clarifies the scope and applicability of Section 702. What it means to undertake employment decisions "with respect to the employment of individuals of a particular religion," *id.* § 2000e-1(a), becomes clear when *religion* is understood to "include[] *all* aspects of religious observance and practice, as well as belief," *id.* § 2000e(j). (emphasis added). Reading Section 702 in light of this definition reveals that the exemption lifts the entire burden of Title VII from a religious employer that makes an employment decision based on whether an "individual[]" is "of" that employer's "particular religion." *Id.* § 2000e-1(a). The word *of* suggests a person who follows or belongs to a particular faith. When a religious employer makes that determination, Title VII authorizes it to consider the full range of religious criteria, including (but not limited to) religious observance, practice, and belief. *Id.* § 2000e(j).

Section 702 emphatically does not give religious employers *carte blanche* to discriminate. When a religious organization dismisses an employee for reasons unrelated to its particular religion, a religious employer is no less subject to Title VII than any other employer.

But the breadth of Title VII's definition of *religion* means that Section 702 applies even when a religious employer's judgment about a particular employee's fit with the employer's religion results in the disparate treatment of a member of a protected class. Respected faith communities hold sincere beliefs and practices concerning the nature and importance of marriage, the appropriate expression of sexuality, and the origin and meaning of gender identity. Title VII's definition of religion reaches all these topics, so long as they involve religious observance, practice, or belief. *See id.* When that happens, Section 702 exempts the religious organization from Title VII. A contrary reading not only conflicts with the statutory text but also yields absurd results. A Catholic diocese could be liable for dismissing a priest who marries. *Cf. Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 206 (2012) (noting that the private plaintiff and the United States conceded at oral argument that "a Roman Catholic priest who is dismissed for getting married could not sue the church and claim that his dismissal was actually based on a ground forbidden by the federal antidiscrimination laws" (citation omitted)). A Christian school with traditional beliefs about sexuality could not remove a female teacher engaged in an adulterous relationship.

These and similar situations (from the employer's perspective) are serious departures from the observances, practices, and beliefs that form the employer's "particular religion." 42 U.S.C. § 2000e-1(a). Forcing a religious organization to retain such an employee anyway would be an intolerable burden on the employer's exercise of religion.

A rigorously textualist interpretation of Section 702 should decide this case. Unless a statute is genuinely unclear—which Section 702 is not—a court "must apply the statute according to its terms." *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009). Liberty University's termination of Zinski rests exclusively on its determination that Zinski does not fit the University's "particular religion." 42 U.S.C. § 2000e-1(a). Section 702 entirely exempts Liberty University from liability for that choice.

## B.    The district court's decision dramatically departs from a textualist reading of Section 702.

The district court shunned a textualist interpretation of Section 702, calling it "unsound." *Zinski*, 2025 WL 1005818, at *19. In the court's view, "the statutory text is ambiguous as to the meaning of 'a particular religion.'" *Id.* The court defended that conclusion even while acknowledging that "the most textually faithful" reading of the statute is the one we have described—that Section 702 "appl[ies] when seeking to employ a

person of a certain religion, and there is no limitation on the range of that discrimination so long as it is religiously motivated." *Id.* at *15. Despite this, the court deemed the phrase "of a particular religion" ambiguous because another interpretation—that Section 702 covers "only discrimination based on that person's religion *qua* religion"—was "not beyond the pale." *Id.*

Without legal authority it considered definitive, the district court believed itself free "to weigh the imperfect arguments above, alongside the potential legal and social consequences of our decision." *Id.* at *19. And in the end, the district court concluded that Section 702 "must be narrowly construed so as to permit discrimination only on the basis of an employee's espoused religious belief or practice, such that religious employers have no license to discriminate on the basis of any other protected class." *Id.* at *19. It followed, for the court, that "[d]iscrimination on the basis of transgender status is sex discrimination, even if religiously motivated." *Id.* at *13. But that conclusion incorrectly presumes that Title VII shields other protected classes from the ambit of Section 702 when the statute says no such thing. The point of Section 702 is to permit a

religious employer to choose employees suitable for the employer's religious mission, even when Title VII might deem that choice unlawful discrimination if made by a non-religious employer.

The district court's logic is further flawed because Section 702 is not ambiguous. This Court has said that "[w]e determine the 'plainness or ambiguity of statutory language … by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *United States v. Thompson-Riviere*, 561 F.3d 345, 354–55 (4th Cir. 2009) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). Just because a phrase plucked from a larger statutory context can be given an alternative interpretation is an inadequate reason for rejecting a textualist reading of Section 702.

Section 702, moreover, is hardly "inconclusive as to the meaning of persons 'of a particular religion.'" *Zinski*, 2025 WL 1005818, at *14. That phrase becomes clear when augmented by the statute's definition of *religion*—"all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). A person "of a particular religion," *id.* § 2000e-1(a), is a person whose own "religious observance and practice, as well as be-

lief" matches the employer's. *Id.* § 2000e(j). Contrary to the decision below, there is no puzzle about "*whose religion is it anyway.*" *Zinski*, 2025 WL 1005818, at *14. The employer's religion is the focal point because it is the employer who decides which "individuals" are genuinely "of" the employer's "particular religion." 42 U.S.C. § 2000e-1(a).

Supreme Court precedent confirms that reading: Section 702 serves "the legitimate purpose of alleviating significant governmental interferences with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 339. That purpose is fatally undermined by the district court's reading of Section 702. *Zinski*, 2025 WL 1005818, at *19.

The district court disregarded well-known religious concerns by contending that "transgender status is not a characteristic ordinarily subsumed within the terms religious belief, practice, or observance." *Id.* at *14. But as with many traditional faiths who believe God created humans as male or female, transgender status *is* a religiously significant matter for Liberty University, as its Doctrinal Statement declares. *Id.* at *14. And resisting the ordinary meaning of "religious belief, practice, or observance"—by speculating that the phrase, when adopted by Congress,

"did not likely encompass an employee's sex or transgender status"—
mires the court in self-contradiction. *Id.* That approach is utterly incon-
sistent with *Bostock*'s interpretive method, which gave *sex* a meaning
that no one in 1964 would have imagined. *See* 590 U.S. at 660. Because
Zinski's claim depends on *Bostock*'s literalist interpretation of Title VII,
its definition of religion must be read the same way—according to the
statutory text.

Because Section 702's key phrase "of a particular religion" is not
ambiguous, the district court erred by wandering from Title VII's text.

## II.  THE DISTRICT COURT'S RELIANCE ON SECOND-HAND LEGISLATIVE HISTORY IS UNNECESSARY AND UNCONVINCING.

Having convinced itself that Section 702 is ambiguous, the district
court resorted to legislative history. But instead of reviewing Title VII's
history directly, the court recited legislative history found in *Rayburn v.
General Conference of Seventh-Day Adventists*, 775 F.2d 1164 (4th Cir.
1985) and *EEOC v. Pacific Press Publishing Ass'n.*, 676 F.2d 1272 (9th
Cir. 1982). From these decisions, the court concluded that "Congress in-
tentionally drew a line between discrimination based upon religion and

discrimination that strays into other protected classes," exempting religious employers from the former but not the latter. *Zinski*, 2025 WL 1005818, at *17.

That conclusion is incorrect for at least four reasons.

First, legislative history should never have entered into the analysis. The Supreme Court has emphasized that "signals from legislative history cannot rebut clear statutory text." *Sackett v. EPA*, 598 U.S. 651, 701 (2023). This Court has followed the same principle. *See United States v. Fraley*, 538 F.2d 626, 628 (4th Cir. 1976) ("Consultation with the law's history is … a needless exploration, for the statute itself speaks with vigor and clarity."). The district court itself conceded that "the most textually faithful" interpretation of Section 702 is that "none of Title VII's prohibitions … apply when seeking to employ a person of a certain religion, and *there is no limitation on the range of that discrimination so long as it is religiously motivated.*" *Zinski*, 2025 WL 1005818,  at *15 (emphasis added). Just because the court imagined an alternative interpretation "not beyond the pale" does not justify leaning on legislative history. *Id.*

Second, *Pacific Press* and *Rayburn* don't support the district court's gloss on Section 702. That Congress rejected an unqualified exemption

for religious employers, *see Pac. Press*, 676 F.2d at 1276–77; *Rayburn*, 772 F.2d at 1167, says little about the exemption Congress ultimately adopted. The Supreme Court has warned that "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *United States v. Craft*, 535 U.S. 274, 287 (2002) (cleaned up). That warning is trenchant here.

Third, *Pacific Press*—the linchpin of *Rayburn*'s legislative history and the district court's—does not so much as cite Title VII's definition of *religion* in 42 U.S.C. § 2000e(j). That glaring omission fatally undercuts the notion that "Congress intentionally drew a line between discrimination based upon religion and discrimination that strays into other protected classes." *Zinski*, 2025 WL 1005818, at *17. Only by ignoring Title VII's express definition of *religion* could the district court deny that the critical phrase "individuals of a particular religion," 42 U.S.C. § 2000e-1(a), encompasses far more than what the court labeled "discrimination based on that person's religion *qua* religion." *Zinski*, 2025 WL 1005818, at *15. Given Title VII's broad definition of religion, a religious school like Liberty University is no less religious when choosing employees who comply with the institution's religious standards than when conducting

worship services. *See* 42 U.S.C. § 2000e(j) (defining "religion" as including "*all* aspects of religious observance and practice, as well as belief") (emphasis added). Giving *religion* a truncated meaning defies the words Congress chose.

Fourth, even if legislative history were relevant, the district court's reliance on second-hand accounts in *Pacific Press* and *Rayburn* led the court to overlook evidence that Congress adopted Section 702 "to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Amos*, 483 U.S. at 335. A few statements illustrate the point.

During Senate debates on the 1964 Act, Senator Case expressed the concern that religious societies "might not be permitted to continue employment for their purposes, of only members of their particular faith, for the strengthening, preservation, and continuation of their faith." 110 CONG. REC. 9122, 9129 (Apr. 27, 1964). He added that "[t]heir very existence, perhaps, depends upon their being able to do so." *Id.*

Eight years later, Congress took up amendments to the 1964 Act—including important amendments to Section 702. Senator Ervin explained that an amendment sponsored by him and Senator Allen "would

strike out the word 'religious'" before *activities* so that all activities of a religious employer would be covered by the exemption. 118 CONG. REC. 946, 948 (Jan. 24, 1972). According to Ervin, this change would "remove religious institutions in all respects from subjugation to the EEOC." *Id.* In a later colloquy, Ervin colorfully explained, "I am trying to take the political hands of Ceasar off all religious corporations, off all religious associations, and off all religious societies." *Id.* at 1982 (Feb. 1, 1972). Congress agreed and adopted the amendment.

The decision below missed these and similar statements, which show that Congress deliberately shaped Section 702 to lift the burdens of Title VII from religious organizations when they make religious judgments about which employees are suitable for carrying a religious employer's religious mission. For all these reasons, the district court's reliance on *Pacific Press* and *Rayburn* wrongly elevates selective bits of legislative history above the statute itself. That misreading of Section 702, resulting in the denial of a complete defense to Liberty University, is reason enough to reverse.

**III.** **SECTION 702 APPLIES TO LGBT CLAIMANTS LIKE ZINSKI NO LESS THAN OTHER EMPLOYEES OF A RELIGIOUS ORGANIZATION.**

The district court suggested that LGBT claims are uniquely shielded from Section 702 because Title VII creates a "bright-line rule of *no but-for sex discrimination* in the workplace," regardless of the reason for the disputed employment action. *Zinski*, 2025 WL 1005818, at *19; *see also id.* at *18 ("Where sex is one but-for cause of discrimination, that amounts to a statutory violation—no matter the motivation or confluence of motivations.").[3] That is wrong. Section 702 applies to claims brought by LGBT claimants like Zinski on the same terms as any other employees of a religious organization. There is no carve-out for LGBT claims, or sex discrimination claims more generally. Section 702 applies across the board to all claims brought by employees of religious organizations where the disputed employment action was made for a religious reason. Nothing in *Bostock* remotely suggests otherwise. To the contrary, *Bostock* expressed the Court's commitment to "preserving the promise of the free

---

[3] Under *Bostock*, claims of discrimination based on sexual orientation or gender identity are sex discrimination claims because the employee's sex was a but-for cause of the alleged discrimination. *See* 590 U.S. at 655–62.

exercise of religion" and specifically highlighted the "express statutory exception for religious organizations" in Section 702. 590 U.S. at 681–82.

Again, under Section 702 Liberty University is exempt from Zinski's claim of employment discrimination because Liberty University terminated Zinski's employment for deliberately flouting the University's religious standards. Zinski's decision to transition genders violated the University's convictions that men and women are created by God as biologically male or female and that denying one's birth sex contravenes God's law. *Zinski*, 2025 WL 1005818, at *2, *12.

That result is no less valid because Liberty University fired Zinski for identifying as transgender rather than for violating the University's religious standards in some other way. *Any* claim of employment discrimination by an employee of a religious organization is barred under Title VII if the employer can show it made the disputed employment decision for a religious reason. That principle applies to all employees of religious organizations, including members of otherwise protected classes.

Numerous exemptions in Title VII demonstrate that the statute is not an unqualified guarantee of employment equality. Rather, members

of protected classes are guaranteed equal employment opportunity *insofar as the statute prescribes*. Besides providing a broad exemption for religious employers, Title VII also exempts (1) employers with fewer than 15 employees; (2) jobs for which religion, sex, or national origin is a "bona fide occupational qualification" (BFOQ); (3) workplace decisions based on seniority or merit systems; (4) denial of employment for lack of a security clearance; and (5) preferential treatment of Native Americans by businesses operating on or near a reservation. 42 U.S.C. § 2000e(b); *id.* § 2000e-2(e)(1), (g)(1).

Each of these exemptions means that a member of a protected class cannot bring a viable employment discrimination claim under Title VII. The exemption for small businesses is particularly far-reaching. By one estimate, over *5.4 million* businesses in the United States have fewer than 20 employees. Kelly Main, *Top Small Business Statistics*, Forbes (Jan. 31, 2024), https://www.forbes.com/advisor/business/small-business-statistics/#sources_section.

Title VII's exemptions show Congress adopted a complex scheme that guarantees employment equality as a general matter but also safe-

guards countervailing interests. One of those interests is the need of religious employers to select employees who are committed to the employer's religious mission—an interest embodied in Section 702. Members of the Supreme Court have recognized that religious organizations often use employment decisions as "a means by which a religious community defines itself." *Amos*, 483 U.S. at 342 (Brennan, J., concurring in the judgment). The district court's insensitivity to Liberty University's use of shared religious standards to build religious unity risks the very harm that Congress adopted Section 702 to avoid—that Liberty's "process of self-definition would be shaped in part by the prospects of litigation." *Id.* at 344.

From this holistic perspective, Section 702 resembles other exemptions in Title VII. The small business exception serves the interest in promoting and protecting the vitality of small businesses. The BFOQ exception enables employers to make otherwise unlawful discriminatory choices when doing so is "reasonably necessary to the normal operation of th[eir] particular business." 42 U.S.C. § 2000e-2(e)(1). Likewise, Section 702 bolsters the interest of religious employers in pursuing their religious mission.

That in turn means the exemptions—including Section 702—apply across the board to all claimants. Just as an LGBT claimant cannot bring a viable Title VII claim against a business with fewer than 15 employees, or against an employer entitled to the BFOQ exception, an LGBT claimant cannot bring a viable claim against a religious employer whose adverse employment decision rests on a religious judgment that the claimant does not fit the employer's "particular religion." *Id.* § 2000e-1(a). Section 702 operates no differently than Title VII's other exemptions for LGBT claimants, nor are such claimants entitled to a special carveout from the exemption.

The district court missed this essential point. Invoking *Bostock*, the court below reasoned that because it held that sex discrimination occurs whenever sex is "one but-for cause of discrimination," and that "discharge based upon transgender status" is sex discrimination, "it follows that the same should be true for religious employers." *Zinski*, 2025 WL 1005818, at *18–*19 (citing *Bostock*, 590 U.S. at 656–57).[4]

---

[4] Actually, Section 702 suggests to the contrary that Title VII does not apply to a religious employer when *religion* is the "but-for cause of discrimination." *Zinski.* at *18.

Not so. The pertinent question under Section 702 is not whether a religious employer that terminates an employee "based upon transgender status" has engaged in sex discrimination. Instead, the question is whether the religious employer acted within its authority by discharging the claimant for a religious reason. That the alleged discrimination can be framed as sex discrimination makes no difference. Section 702 shields religious employers from *all* discrimination claims where the adverse employment action was taken for a religious reason—including from claims of sex discrimination.

That is why the district court's statement that "a religious motivation does not trump the bright-line rule of *no but-for sex discrimination in the workplace*," *id.* at *19, has things exactly backwards. It's a religious employer's religious motivation that *triggers* Section 702. Just as a company's low employee count triggers the small business exemption, or the existence of valid business needs triggers the BFOQ exemption. Again, Section 702 operates no differently than any of the other Title VII exemptions. An employer that satisfies the exemption's conditions is free

from liability for sex discrimination as completely as a small business or an employer with a BFOQ.[5]

The district court's reliance on *Bostock* is further misplaced given *Bostock*'s express limitation on its holding. "The *only* question before us," the *Bostock* Court emphasized, "is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" 590 U.S. at 681 (emphasis added). "Whether other policies and practices might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases." *Id.* Liberty University did not terminate Zinski "*simply* for being … transgender." *Id.* It terminated Zinski because identifying as transgender is contrary to the observances, practices and beliefs of its religion. That religious judgment is entirely lawful under Section 702.

---

[5] The district court also quoted *Bostock*'s statement that "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." 590 U.S. at 660; *see Zinski*, 2025 WL 1005818, at *18. Although true as a general matter, that statement sweeps too broadly when it comes to religious employers. Liberty University would not have terminated Zinski's employment except for its conviction that an employee who disputes the unity of gender identity and birth sex is unsuitable to help Liberty pursue its religious mission.

In brief, Section 702 must be applied as written. Because Liberty University is a religious educational institution and because it determined that Zinski is not "of" its "particular religion," 42 U.S.C. § 2000e-1(a), Liberty University is wholly exempt from Title VII. *Bostock* does not hold otherwise. Certainly, it does not warrant departing from the principle that Section 702 applies to LGBT claimants like Zinski on the same terms as any other employees of a religious organization.

## CONCLUSION

For these reasons, we urge the Court to reverse and to remand with instructions to grant Liberty University's motion to dismiss.

August 7, 2025

Respectfully submitted,

*/s/ R. Shawn Gunnarson*
R. Shawn Gunnarson
Christopher A. Bates
Jarom M. Harrison
Catherine L. Grantham
KIRTON | MCCONKIE
36 South State Street
Suite 1900
Salt Lake City, UT 84111
(801) 328-3600
sgunnarson@kmclaw.com

*Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of FRAP 29(a)(5) and FRAP 32(a)(7)(B) because, excluding the parts of the document exempted by FRAP 32(f), this document contains 5,360 words.

This document complies with the typeface requirements of FRAP 29(a)(4)(A), FRAP 32(a)(5), and FRAP 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Dated: August 7, 2025

*/s/ R. Shawn Gunnarson*
R. Shawn Gunnarson

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system on August 7, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: August 7, 2025

*/s/ R. Shawn Gunnarson*
R. Shawn Gunnarson

*Counsel for Amici Curiae*