# United States Court of Appeals
### *for the*
# Fourth Circuit

ELLENOR ZINSKI,

*Plaintiff-Appellee,*

— v. —

LIBERTY UNIVERSITY, INC.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA AT LYNCHBURG
IN CASE NO. 6:24-CV-00041-NKM-CKM, HONORABLE
NORMAN K. MOON, SENIOR U.S. DISTRICT COURT JUDGE

## BRIEF OF *AMICI CURIAE* PROFESSORS STEPHANIE BARCLAY, ROBERT F. COCHRAN, DAVID F. FORTE, RICHARD GARNETT, DOUGLAS LAYCOCK, MICHAEL W. MCCONNELL AND ROBERT J. PUSHAW IN SUPPORT OF APPELLANT

VINCE EISINGER
CRANFILL SUMNER LLP
5440 Wake Park Boulevard, No. 300
Raleigh, North Carolina 27607
(919) 828-5100
veisinger@cshlaw.com

*Attorney for Amici Curiae*

CP COUNSEL PRESS    (800) 4-APPEAL • (813317)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ ii

INTEREST OF AMICI CURIAE ........................................................ v

INTRODUCTION AND SUMMARY OF ARGUMENT ....................... 1

ARGUMENT ................................................................................... 3

    I.    The Church Autonomy Doctrine Historically Protected Religious Institutions from Government Interference ........................ 3

        A.    The History of Government Interference with Religion............. 3

        B.    The First Amendment Was Adopted to Protect Church Autonomy.......................................................................... 8

        C.    Civil Courts During and After the Founding Era Enforced Church Autonomy ...................................................... 12

    II.    The Church Autonomy Doctrine Prohibits Government Intrusion into Liberty's Decision to Terminate Plaintiff's Employment ........................................................................ 16

        A.    The Church Autonomy Doctrine Extends to Internal Affairs Beyond Ministerial Status ............................................ 16

        B.    Liberty's Employment Decisions Based on Religious Reasons Are Protected .............................................................. 22

CONCLUSION ................................................................................ 26

CERTIFICATE OF COMPLIANCE .................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ammons v. N. Pac. Union Conf. of Seventh-Day Adventist,*
    139 F.3d 903 (9th Cir. 1998)............................................................. 16-17

*Bell v. Presbyterian Church,*
    126 F.3d 328 (4th Cir. 1997)...................................................................19

*Billard v. Charlotte Cath. High Sch.,*
    101 F.4th 316 (4th Cir. 2024)................................................... 16, 17, 20

*Bryce v. Episcopal Church in the Diocese of Colo.,*
    289 F.3d 648 (10th Cir. 2002)................................................... 16, 19, 22

*Chase v. Cheney,*
    58 Ill. 509 (Ill. 1871)................................................................... 13, 15

*EEOC v. Catholic Univ. of Am.,*
    83 F.3d 455 (D.C. Cir. 1996) ....................................................... 17, 19

*German Reformed Church v. Commonwealth,*
    3 Pa. 282 (Pa. 1846)...............................................................................14

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC,*
    565 U.S. 171 (2012)............................................................... *passim*

*Hutchison v. Thomas,*
    789 F.2d 392 (6th Cir. 1986)..................................................................25

*Jones v. Wolf,*
    443 U.S. 595 (1979)...............................................................................25

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.,*
    344 U.S. 94 (1952).................................................................................17

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022).................................................................................2

*NLRB v. Roman Catholic Bishop of Chicago,*
    440 U.S. 490 (1979)....................................................................... 2, 20, 21

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    591 U.S. 732 (2020)................................................................... *passim*

*Paul v. Watchtower Bible & Tract Soc'y of N.Y.*,
   819 F.2d 875 (9th Cir. 1987)...................................................20

*Rayburn v. Gen'l Conf. of Seventh-Day Adventists*,
   772 F.2d 1126 (4th Cir. 1985)..............................................19

*Shannon v. Frost*,
   42 Ky. 253 (Ky. 1842)................................................... 14, 15

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*,
   41 F.4th 931 (7th Cir. 2022)............................ 20, 23, 24, 25

*State v. Farris*,
   45 Mo. 183 (Mo. 1869).......................................................14

*Watson v. Jones*,
   13 Wall. 679 (1872) ................................................. *passim*

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972).........................................................22

## Statutes & Other Authorities:

1 Anson Phelps Stokes, *Church and State in the United States* 678 (1950)............11

42 U.S.C. § 2000e(j) ..................................................... 23, 24

42 U.S.C. § 2000e-1(a) ....................................................23

Athanasius G. *Sirilla, The "Nonministerial"* Exception,
   90 Notre Dame L. Rev. 393 (2023) ..................................24

Branton Nestor, *Judicial Power and Church Autonomy*,
   100 Notre Dame L. Rev. (forthcoming 2025) ............................ *passim*

Harold J. Berman, *Law and Revolution: The Formation of
   the Western Legal Tradition* 98 (1983) ................................4

Jason J. Muehlhoff, *A Ministerial Exception For All Seasons*,
   45 Harv. J. L. & Pub. Pol'y 465 (2022)...............................17

Lael D. Weinberger, *The Origins of Church Autonomy:
   Religious Liberty After Disestablishment* .................................... *passim*

Lael Weinberger, *The Limits of Church Autonomy*,
   98 Notre Dame L. Rev. 1253 (2023) ........................... 18, 25

Luke W. Goodrich, *Religious Hiring Beyond the Ministerial Exception*,
   101 Notre Dame L. Rev. (forthcoming 2026) ................................................ 18, 21

*Reflections on Hosanna-Tabor*,
   35 Harv. J. L. & Pub. Pol'y 821 (2012) ................................................................10

*Religious Freedom, Church-State Separation, and the Ministerial Exception*,
   106 Nw. U. L. Rev. Colloquy 175 (2011) ........................................................3, 4

*Richard W.* Garnett, *'The Freedom of the Church': (Towards) an Exposition,
   Translation, and Defense*,
   21 J. Contemp. Legal Issues 33 (2013) ................................................................18

*Towards a General Theory of the Religion Clauses:
   The Case of Church Labor Relations and the Right to Church Autonomy*,
   81 Colum. L. Rev. 1373 (1981) ............................................................................14

W. Cole Durham & Robert Smith,
   1 Religious Orgs. & the Law § 5:16 (2017) ........................................................25

# INTEREST OF *AMICI CURIAE*[1]

*Amici* are professors Stephanie Barclay, Professor of Law at Georgetown Law School; Robert F. Cochran, Professor Emeritus at the Caruso School of Law at Pepperdine University; David F. Forte, Emeritus Professor of Law at Cleveland State University; Richard Garnett, Paul J. Schierl/Fort Howard Corporation Professor of Law at the University of Notre Dame Law School; Douglas Laycock, the Robert E. Scott Distinguished Professor Emeritus at the University of Virginia School of Law and the Alice McKean Young Regents Chair Emeritus at the University of Texas School of Law; Michael W. McConnell, the Richard and Frances Mallery Professor at Stanford Law School; and Robert J. Pushaw, the James Wilson Endowed Professor of Law at the Caruso School of Law at Pepperdine University. *Amici* are legal scholars whose research and writing focuses on religious liberty.

---

[1] Counsel for *amici curiae* states pursuant to Fed. R. App. P. 29(a)(4)(E) that (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and (3) no person, other than *amici curiae* or their counsel, contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief pursuant to Fed. R. App. 29(a)(2).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The church autonomy doctrine protects the "right of religious institutions to decide for themselves, free from state interference, matters of church government, as well as those of faith and doctrine." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020) (cleaned up). Religious institutions—not civil courts—decide matters of religious doctrine. And religious institutions—not plaintiffs—determine matters of church government, leadership, and discipline. Such protections are deeply rooted in our constitutional tradition and fundamental to our country's scheme of religious freedom. Constitutional text, history, and tradition confirm church autonomy's centrality to the Religion Clauses ratified by the Framers and passed down to Americans today.

Plaintiff asks this Court to radically curtail this fundamental liberty and adjudicate a quintessentially religious question: whether a religious institution like Liberty University, Inc. ("Liberty") will employ applicants who knowingly and openly violate the religious institution's religious teachings and beliefs. That is a striking request—and this Court should decline this invitation to decide Liberty's religious doctrine and religious personnel decisions.

As Liberty has shown, its hiring and firing decisions are based on a sincere religious belief regarding a moral principle necessary for employees within the religious institution, including sharing Liberty's religious mission. Decisions about

these kinds of internal religious matters are protected by the church autonomy doctrine as defined by the Supreme Court in *NLRB v. Roman Catholic Bishop of Chicago*, 440 U.S. 490, 507 (1979); *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 182 (2012); and *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 746–47 (2020).

We submit this *amicus* brief to amplify why reversal of the district court's decision is not only mandated by those Supreme Court precedents, but also by the original understanding of the First Amendment, which the Supreme Court has consistently relied on in adjudicating such disputes. *See, e.g.*, *Our Lady*, 591 U.S. at 747–48; *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535–36 (2022). We also note that the ministerial status of the Liberty employee is irrelevant because, for Liberty, important aspects of employment decisions are religious and concern matters of internal faith, doctrine, and discipline.

This is not a hard case, but it is an important one. Unless protected, religious groups will be prevented from structuring and governing their communities in accordance with their beliefs and moral principles. The alternative would allow litigants to use secular courts to force secular values on religious institutions—inevitably leading to the kind of strife and conflict that the First Amendment was designed to prevent. The Framers knew from experience how destructive such existential contests become, and they therefore protected the freedom of religious

groups to operate without government intrusion. A faithful application of the First Amendment, as they understood it, requires reversal.

## ARGUMENT

### I. The Church Autonomy Doctrine Historically Protected Religious Institutions from Government Interference.

The church autonomy doctrine has long protected the "right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor*, 565 U.S. 171, 186 (2012) (cleaned up). The church autonomy doctrine must be interpreted by reference to history and tradition. *Id.* at 181–85; *Our Lady*, 591 U.S. at 748. Such historical practices demonstrate that the church autonomy doctrine enshrined in the First Amendment was designed to end the long and abusive pattern of government interference with religious institutions, including over matters of doctrine and personnel.

#### A. The History of Government Interference with Religion.

The conceptual foundations for church autonomy are ancient. But for most of Western history, the union—or at least the interdependence—of throne and altar was common. It was not until the Investiture Crisis of the 11th century that something like a legal notion of a "freedom of the church" began to emerge. *See, e.g.*, Thomas C. Berg et al., *Religious Freedom, Church-State Separation, and the Ministerial Exception*, 106 Nw. U. L. Rev. Colloquy 175, 179 (2011). The

Investiture Crisis arose out of a disagreement between the Pope and the Holy Roman Emperor over who would select bishops. Only after some fifty years of civil war in Germany did Emperor Henry V agree to "guarantee[] that bishops and abbots would be freely elected by the church alone." Harold J. Berman, *Law and Revolution: The Formation of the Western Legal Tradition* 98 (1983). Yet the Church's victory was in some ways more formal than actual, as monarchs often exercised *de facto* control over the election process and ecclesiastical matters more generally.

English kings similarly attempted to control the Church. For example, when Pope Gregory VII insisted on his clergy's celibacy, William I (1028–87) saw the situation "from a more worldly point of view" and granted dispensations to the English priests. E.F. Churchill, *The Dispensing Power of the Crown in Ecclesiastical Affairs*, 38 L. Q. Rev. 297, 298 (1922). And while William's successor, Henry I (1068–1135), eventually agreed to enforce the requirement of celibacy of the clergy, he too dispensed with the requirement for any offending priest willing to "pay the price of his protection." *Id.* Thus, as Florence of Worcester recounted, "all went home and the decrees stood for nought; all held their wives by the King's leave as they had done before." *Id.*

The English nobility correctly saw such royal intermeddling in Church affairs as a threat to their own prerogatives. So, at Runnymede in 1215, the English barons demanded and the King accepted in the Magna Carta that "'the English church shall

be free, and shall have its rights undiminished and its liberties unimpaired.'"
*Hosanna-Tabor*, 565 U.S. at 182.

The question of who, exactly, was in charge of the Church came to a head during the reign of Henry VIII. Henry's court officials failed to secure a papal annulment of his marriage to Queen Catherine of Aragon so that the King could marry Anne Boleyn. Facing a politically fraught decision, Rome delayed its answer. Enraged, Henry took matters into his own hands. With the aid of Parliament and his ecclesial allies, Henry was declared supreme head of the English Church in 1534. *See* Act of Supremacy of 1534, 26 Hen. VIII, ch. 1; *see also* Act in Restraint of Annates of 1532, 25 Hen. VIII, ch. 20.

This union of civil and religious authority under a single autocrat resulted in bloodshed. In the years after the Act of Supremacy, the major parties in the profound religious disagreements each sought to wield civil power. Many of England's leading statesmen and clergy met violent ends at the hands of royal executioners. As C.S. Lewis observed in *English Literature in the Sixteenth Century Excluding Drama* 200–01 (1954), "Behind every system of sixteenth-century thought, however learnedly it is argued, lurks cruelty and Ogpu"—*i.e.*, the secret police.

This entanglement of English politics and theology eventually contributed to the outbreak of the English Civil War in 1642 and the trial and execution of Charles I in 1649. Following the restoration of the monarchy in 1660, Charles II's

government reenacted his father's persecutions, ordering all ministers to pledge their allegiance or face being labeled seditious and removed from their positions. Similarly, teachers of many stripes "were required to 'conforme to the Liturgy of the Church of England' and not 'to endeavour any change or alteration' of the church." *Our Lady*, 591 U.S. at 748 (quoting Act of Uniformity of 1662, 14 Cha. II, ch. 4); *see also* Corporation Act of 1661, 13 Cha. II. St. 2, ch. 1 (requiring communion in the Church of England as condition for holding elected office); Test Act of 1673, 25 Cha. II, ch. 2 (requiring all government officers to take oaths that included rejecting the Catholic doctrine of transubstantiation).

The effects were profound. Following the restoration, England imprisoned, exiled, or otherwise suppressed thousands of Catholics and Protestant non-conformists, including Baptist minister John Bunyan, who wrote *Pilgrim's Progress* while in prison for preaching without a license.

These coercive policies led to John Locke's famous argument for religious tolerance. As he explained, it was "necessary" to "distinguish exactly the Business of Civil Government from that of Religion." John Locke, *A Letter Concerning Toleration* 12 (Goldie ed. 2010) (1690). Failure to recognize the distinction between civil and religious authority, he warned, would result in endless "controversies" between those whose priority was "Mens Souls" and those responsible for "the Commonwealth." *Id.* Government is "constituted only for preserving and

advancing" life, liberty, and property, while the church attends to "the Salvation of … souls." *Id.* at 13, 15. Members of a church join it "free[ly]" and it "follows that the Right of making its Laws" must "belong to" the church itself. *Id.* at 16.

Locke's argument made a lasting impact. After the Glorious Revolution, England moderated its approach by passing the Act of Toleration of 1689 (1 Will. & Mary, ch. 18), granting non-conforming Protestants limited freedom of worship if they swore allegiance to the Crown. But the Act of Toleration was only a halfway reform. Protestant nonconformists were still prohibited from holding public office, and the statute completely excluded Roman Catholics and non-trinitarians from its protections. *See* Michael D. Breidenbach, *Our Dear-Bought Liberty: Catholics and Religious Toleration in Early America* (2021). Many who disagreed with the state on matters of religion continued to face state interference with church government and other forms of persecution and suppression. *See, e.g.*, 4 William Blackstone, *Commentaries on the Laws of England* 55 (8th ed. 1778). The Crown still appointed the leadership of the established Church of England, and the rank-and-file clergy were still appointed under government authority.

Beginning with the Pilgrims' departure for New England in 1620, many religious dissenters in Great Britain chose to leave rather than suffer under the Crown's heavy-handed interference. In the ensuing decades, thousands of "Puritans fled to New England, where they hoped to elect their own ministers and establish

their own modes of worship." *Hosanna-Tabor*, 565 U.S. at 182. "William Penn, the Quaker proprietor of what would eventually become Pennsylvania and Delaware, also sought independence from the Church of England," and "[t]he charter creating the province of Pennsylvania [in 1681] contained no clause establishing a religion." *Id.* at 183. Maryland was founded as a haven for Roman Catholics from the discriminatory policies of the Crown. Nathan S. Chapman & Michael W. McConnell, *Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* 36 (2023).

Still, many colonial governments continued to exercise varying degrees of "control over doctrine, governance, and personnel of the church." *Id.* at 18. In particular, colonists were often subject to laws giving government authorities "the power to appoint and discipline clergy" and "laws governing doctrine." *Id*. at 19. These "principal means of government control" resulted, predictably, in "protest[s] against government control of religion," including "attack[s] on the establishment . . . from ***within*** the church." *Id.* at 19–20 (emphasis added).

## B. The First Amendment Was Adopted to Protect Church Autonomy.

It was "against this background that the First Amendment was adopted." *Our Lady*, 591 U.S. at 748. Establishment had created conflict, and "the founding generation sought to prevent a repetition of these practices in our country" by setting a firm boundary: the First Amendment's prohibition on laws "respecting an

8

establishment of religion or prohibiting the free exercise thereof." *Id.* at 746. The First Amendment removed government authority from the center of religious debates—rejecting "government control over doctrine, governance, and personnel" of any religious institution. Chapman & McConnell, *supra*, 187. Gradually, states began dismantling their religious establishments. *Id.*; *see Disestablishment and Religious Dissent: Church-State Relations in the New American States 1776–1833* (Carl H. Esbeck & Jonathan Den Hartog eds., 2019).

The Framers understood this prohibition on government power over religious institutions to be necessary to prevent the abuses historically stemming from state control. Disestablishment sought "to distinguish exactly the [b]usiness of [c]ivil [g]overnment from that of [r]eligion, and to settle the just [b]ounds that lie between the one and the other." John Locke, *A Letter Concerning Toleration* 12 (Goldie ed. 2010) (1689).

Perhaps most famously, James Madison skewered the contention that a "Civil Magistrate is a competent Judge of Religious truth" as "an arrogant pretension falsified by the contradictory opinions of Rulers in all ages, and throughout the world." James Madison, *Memorial and Remonstrance Against Religious Assessments*, in 8 *The Papers of James Madison* 295, 301 (Rutland et al. eds., 1973). While the theological and political reasons for rejecting government control over religious institutions varied, they broadly maintained that (1) civil government

lacked authority over religious institutional matters (a non-establishment principle), and (2) religious institutions were entitled to freedom from interference by civil government in their internal ecclesiastical matters (a free-exercise principle).  *See, e.g.*, Chapman & McConnell, *supra*, 27–32, 42–49 (tracing the arguments over establishments); Lael D. Weinberger, *The Origins of Church Autonomy: Religious Liberty After Disestablishment*, https://tinyurl.com/3k5yhrza, at 12–32 (2024); Branton Nestor, *Judicial Power and Church Autonomy*, 100 Notre Dame L. Rev. (forthcoming 2025), available at https://tinyurl.com/yc8pwm4r.

Unlike previous attempts to preserve the freedom of the church, the Framers' novel step of imposing a structural, constitutional restraint on government limited government interference with religion.  This was reflected by early "episode[s]" in federal constitutional practice.  *Hosanna-Tabor*, 565 U.S. at 184–85.

For example, when the first Roman Catholic Bishop in the United States, John Carroll, asked then-Secretary of State Madison for advice on who should be appointed to head the Catholic Church in New Orleans, Madison refused, responding that he should not take part in the decision because the "selection of [religious] functionaries ... is entirely ecclesiastical."  Letter from James Madison to John Carroll (Nov. 20, 1806), in *The Records of the Am. Catholic Historical Soc'y. of Phila.*, 20:63, at 63–64 (1909); *see also* Michael W. McConnell, *Reflections on Hosanna-Tabor*, 35 Harv. J. L. & Pub. Pol'y 821, 830 (2012).  Madison withheld

comment not because he lacked an opinion, but because he did not believe that his opinions should be shared in his official capacity as Secretary of State. Madison was consistent in his views on the freedom of the church as President—as the Supreme Court has noted, he refused to allow a secular charter to strip an institution of its religious autonomy. *See Hosanna-Tabor*, 565 U.S. at 184–85.

As President, Thomas Jefferson advanced similar religious autonomy principles. For example, when he was informed in 1804 that local authorities had barred entry into a Catholic church in the Orleans Territory in response to a dispute over control of the parish, he complained that this "was an error. On our principles all church-discipline is voluntary; and never to be enforced by the public authority." Kevin Pybas, *Disestablishment in the Louisiana and Missouri Territories*, in *Disestablishment and Religious Dissent: Church-State Relations in the New American States 1776–1833*, at 273, 281–82.

Jefferson penned another letter a few days later in response to a missive from Ursuline Nuns who ran an orphanage and Catholic school in New Orleans. Jefferson assured the nuns that the Louisiana Purchase would not undermine their "broad right of self-governance and religious liberty," despite Catholic France ceding control over the territory to the non-Catholic United States. *Id.* at 281 (quoting Jefferson); *see also* 1 Anson Phelps Stokes, *Church and State in the United States* 678 (1950). Jefferson explained that "[t]he principles of the constitution … are a sure guaranty

to you that [your property and rights] will be preserved to you sacred and inviolate, and that your institution will be permitted to govern itself according to [its] own voluntary rules, without interference from the civil authority." Pybas, *supra*, at 281 (quoting Jefferson). Like Madison, "Jefferson also saw church-state separation as guaranteeing the autonomy, independence, and freedom of religious organizations— not just churches but religious schools as well." Berg, *supra*, at 182–83.

### C. Civil Courts During and After the Founding Era Enforced Church Autonomy.

"Given this understanding of the Religion Clauses—and the absence of government employment regulation generally—it was some time before questions about government interference with a church's ability to select its own ministers" and to manage its "ecclesiastical" affairs "came before the courts." *Hosanna-Tabor*, 565 U.S. at 185. When such cases arose, civil courts "confirm[ed] that it was impermissible for the government to contradict a church's determination of who can act as its ministers." *Id.* Civil courts more broadly held that "'whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of the church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them.'" *Id.* (quoting *Watson v. Jones*, 13 Wall. 679, 727 (1872)). Such decisions "'radiate[d] … a spirit of freedom for religious organizations, an independence from secular control or manipulation.'" *Id.* (cleaned up).

The church autonomy doctrine historically protected the "right of religious institutions to decide for themselves, free from state interference, matters of church government, as well as those of faith and doctrine." *Id.* at 186 (cleaned up); *see also* *Watson*, 13 Wall. at 727 ("questions of discipline, or of faith, or ecclesiastical rule, custom, or law"). Over religious questions, civil courts traditionally could "exercise no jurisdiction." *Id*. at 733.

*First*, the church autonomy doctrine shielded questions of religious doctrine from civil courts. These doctrinal questions included (i) what theological doctrine to embrace, (ii) what religious practices to inculcate, (iii) what ecclesiastical government structure to adopt (and what religious positions to create), and (iv) what theological and moral standard to require of church leaders and members. *See, e.g.*, Weinberger, *supra*, at 23–32; Nestor, *Church Autonomy*, *supra*, manuscript at 15–32. When a religious institution authoritatively interpreted religious doctrine, the civil court could not exercise judicial power to review or reverse that religious decision—instead, such a religious determination was "final" and "binding" on civil courts. *Watson*, 13 Wall. at 727; *see also, e.g.*, *Chase v. Cheney*, 58 Ill. 509, 535–38 (Ill. 1871) (questions of "ecclesiastical cognizance"); Nestor, *Church Autonomy*, *supra*, manuscript at 17–32 (collecting cases).

*Second*, the church autonomy doctrine shielded questions of ecclesiastical governance and discipline from civil courts. Such protection included the church's

authority (i) to determine who would lead and serve the church, (ii) to decide who would be part of the religious institution, and (iii) to take necessary actions—including firing and expelling—church leaders and members in order to safeguard the faith and mission of the religious institution. *See, e.g.*, Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Colum. L. Rev. 1373 (1981); Weinberger, *Origins of Church Autonomy*, *supra*, at 23–32; Nestor, *Church Autonomy*, *supra*, manuscript at 15–32. When a religious institution resolved questions of "church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them," the civil court could "exercise no jurisdiction" to review or reverse the ecclesiastical decision. *Watson*, 13 Wall. at 733; *see also State v. Farris*, 45 Mo. 183, 197–201 (Mo. 1869); *German Reformed Church v. Commonwealth*, 3 Pa. 282, 289–91 (Pa. 1846); *Shannon v. Frost*, 42 Ky. 253, 258–62 (Ky. 1842); Nestor, *Church Autonomy*, *supra*, manuscript at 17–32 (collecting cases).

The church autonomy doctrine historically provided such protection for religious institutions in order to protect free-exercise and non-establishment principles. *Hosanna-Tabor*, 565 U.S. at 184; *see also, e.g.*, Weinberger, *Origins of Church Autonomy*, *supra*, at 15–19; Nestor, *Church Autonomy*, *supra*, manuscript at 17–32. Such principles are implicated where, for example, a lawsuit threatens to

interfere with a religious institution's determination of who should advance its religious mission.

The church autonomy doctrine followed from free-exercise principles—protecting the freedom of religious institutions from civil courts. Early courts maintained that the church autonomy doctrine "secured religious liberty from the invasion of the civil authority," and that civil courts could "exercise no jurisdiction" over such ecclesiastical matters lest they violate the "full and free right" of religious institutions. *Watson*, 13 Wall. at 728, 730, 733; *see also, e.g.*, *Chase*, 58 Ill. at 535–38 ("freedom of religious profession and worship"); *Shannon*, 42 Ky. at 258–59 ("religious liberty"). Such free-exercise principles—a deep protection for religious institutions—were one foundation for church autonomy in early American practice. *See, e.g.*, Weinberger, *Origins of Church Autonomy*, *supra*, at 15–19; Nestor, *Church Autonomy*, *supra*, manuscript at 17–32 (collecting cases).

The church autonomy doctrine also followed from non-establishment principles—keeping civil courts from appointing religious personnel or determining religious doctrine. Early courts often framed such non-establishment concerns in terms of both civil court competence and civil court authority. Such non-establishment principles—a structural constraint on civil court power—were another basis for the church autonomy doctrine. *See, e.g.*, Weinberger, *Origins of Church Autonomy*, *supra*, at 15–19; Nestor, *Church Autonomy*, *supra*, manuscript at 17–32

(collecting cases); *see also Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 325 (4th Cir. 2024) (noting that church autonomy "operates structurally … to 'categorically prohibit[ ] federal and state governments from becoming involved in religious leadership disputes.'").

*       *       *

The church autonomy doctrine remedied the long and abusive pattern of government control over religious institutions. It provides an important protection for a religious organization's autonomy in decisions about "theological controversy, church discipline, ecclesiastical government, [and] the conformity of members" to required standards, free from state interference. *Watson*, 13 Wall. at 733.

## II. The Church Autonomy Doctrine Prohibits Government Intrusion into Liberty's Decision to Terminate Plaintiff's Employment.

The present case presents a dispute about religious organizations' right to determine religious criteria for its employees, which fits easily within the protection of church autonomy.

### A. The Church Autonomy Doctrine Extends to Internal Affairs Beyond Ministerial Status.

Church autonomy cases establish that the doctrine broadly safeguards religious institutions' right to govern their own internal affairs whenever their actions are "based on religious doctrine." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656–60, 658 n.2 (10th Cir. 2002); *see also Ammons v. N.*

*Pac. Union Conf. of Seventh-Day Adventist*, 139 F.3d 903 (9th Cir. 1998). "[A] long line of Supreme Court cases … affirm the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 462 (D.C. Cir. 1996) (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)); *see also Billard*, 101 F.4th at 332 (First Amendment protected Catholic school's decision to fire a lay teacher). The church autonomy doctrine therefore protects decisions of religious organizations that are based on religious grounds, whether or not any affected employees are ministers.

The "ministerial exception" is just one application of "the general principle of church autonomy," *Our Lady*, 591 U.S. at 746, albeit one that has historically been one of the most litigated areas of church autonomy, *see, e.g.*, Jason J. Muehlhoff, *A Ministerial Exception For All Seasons*, 45 Harv. J. L. & Pub. Pol'y 465, 467 (2022). The ministerial exception rests on protecting "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady*, 591 U.S. at 747 (emphasis added). This includes "internal management decisions that are essential to the institution's central mission." *Id.* at 746. What is special about ministers is that decisions concerning them are protected *even when the decision is not based on religious grounds*. But decisions based on religious grounds are protected with respect to all employees, not just those who qualify as ministers. *See*

Luke W. Goodrich, *Religious Hiring Beyond the Ministerial Exception*, 101 Notre Dame L. Rev. (forthcoming 2026) (manuscript at 102) ("[T]he church autonomy doctrine and its mission-based hiring protection[] . . . ask[], first, whether the employer is religious, and, second, whether the employment decision was based on an employee's religious qualifications or adherence to the organization's religious mission."), https://ssrn.com/abstract=5343993.

To be sure, church autonomy is not a magic wand that religious institutions can wave to avoid any law they don't like, and the distinction between what falls under the church autonomy doctrine and what doesn't is not easily reduced to a bright-line rule with respect to non-ministers. *See* Richard W. Garnett, *'The Freedom of the Church': (Towards) an Exposition, Translation, and Defense*, 21 J. Contemp. Legal Issues 33, 50 (2013); Lael Weinberger, *The Limits of Church Autonomy*, 98 Notre Dame L. Rev. 1253 (2023).

But the church autonomy doctrine's protections are "broad" and well-established. *Our Lady*, 591 U.S. at 747. They include matters such as "fundamental beliefs (*e.g.*, doctrine, dogma, polity, governance, and canon law), core ministry (matters of worship, ritual, liturgy, counseling, confession, teaching, and humanitarian care), and core administrative functions (the selection, supervision, and discipline of personnel, church membership decisions, administration of property, and control of finances)." W. Cole Durham, Jr.,

*Religious Autonomy at the Crossroads*, in *Law, Religion, and Freedom: Conceptualizing a Common Right* 265–67 (W. Cole Durham, Jr. et al., eds., 2021) (emphases added); *see also Our Lady*, 591 U.S. at 747.

This Court has held that religious institutions' "employment decisions may be subject to Title VII scrutiny" *only* "where the decision does not involve the church's spiritual functions." *Rayburn v. Gen'l Conf. of Seventh-Day Adventists*, 772 F.2d 1126, 1171 (4th Cir. 1985); *see also Hosanna-Tabor*, 565 U.S. at 190 ("valid and neutral" employment discrimination laws do not apply to "an internal church decision that affects the faith and mission of the church itself"). Thus, what matters is whether the religious institution is taking an "ecclesiastical" action or a "purely secular" one. *Bell v. Presbyterian Church*, 126 F.3d 328, 331 (4th Cir. 1997) (citation modified); *see also Bryce*, 289 F.3d at 657, and *Catholic University*, 83 F.3d at 466. A dispute "rooted in religious belief," *Bryce*, 289 F.3d at 657, is by definition not "purely secular." If the action is "ecclesiastical," the church autonomy doctrine bars state interference.

The Supreme Court in *Our Lady* left no doubt that the church autonomy doctrine broadly protects "internal management decisions that are essential to the institution's central mission." 591 U.S. at 746. This Court's most recent church autonomy precedent faithfully applied this directive in the context of the ministerial exception: "The ministerial exception protects religious institutions in their dealings

19

with individuals who perform tasks so central to their religious mission—even if the tasks themselves do not advertise their religious nature." *Billard v. Charlotte Catholic High School*, 101 F.4th 316, 332 (4th Cir. 2024). And because "judges cannot be expected to have a complete understanding and appreciation of the role played by every person who performs a particular role in every religious tradition," a "religious institution's explanation of the role of such employees in the life of the religion in question is important." *Our Lady*, 591 U.S. at 757; *see also id.* at 765 (Thomas, J., concurring) ("[W]e should defer to [religious] groups' good-faith understandings of which individuals are charged with carrying out the organizations' religious missions.").[1]

Enforcing certain religious standards among employees, regardless of formal ministerial status, is often integral to a religious institution's ability to define its doctrines and moral standards and to communicate those beliefs to its members and next generation. The Supreme Court made this clear in *NLRB v. Catholic Bishop of Chicago*, shielding religious schools from government interference with managing

---

[1] Other Circuits have previously recognized this principle. *See Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 941 (7th Cir. 2022) ("What an employee does involves what an employee is entrusted to do, not simply what acts an employee chooses to perform. […] But an employee is still a minister if she fails to adequately perform the religious duties she was hired and entrusted to do."); *Paul v. Watchtower Bible & Tract Soc'y of N.Y.*, 819 F.2d 875, 878 n.1 (9th Cir. 1987) (church autonomy doctrine protects the decision to exclude someone as a matter of church law or policy).

their lay teachers. 440 U.S. 490 (1979). In that case, unions filed petitions with the National Labor Relations Board ("NLRB") seeking to represent only the lay teachers employed by a group of schools operated by two Catholic corporations. *Id.* at 493. The church schools objected to the unions' petitions, arguing in relevant part that the First Amendment precluded NLRB's jurisdiction over these employees. *Id.* After the Board granted the unions' petitions, the church schools sued.

The Supreme Court observed that if the National Labor Relations Act granted NLRB jurisdiction over church schools, it would be forced to decide "serious First Amendment questions" about NLRB's jurisdiction over lay teachers employed by these schools. *Id.* at 504. Even though the unions sought to organize only lay teachers, the Board's inquiries would "implicate sensitive issues that open the door to conflicts between clergy-administrators" and government. *Id.* at 503. Because religious schools, by their very nature, "involve substantial religious activity and purpose" (*id.* at 503 (quotation omitted)), the Board would have to decide whether the "challenged actions were mandated by [schools'] religious creeds," "involv[ing] inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission" (*id.* at 502). *See also* Goodrich, *Religious Hiring* (manuscript at 58) (describing the Court's decision as "recogniz[ing] that church autonomy includes the freedom to select employees who are fully aligned with the organization's religious mission").

Other federal courts recognize the constitutional protection afforded to a church's management of its employees, regardless of their formal ministerial status. For example, in *Bryce v. Episcopal Church*, a female youth minister who participated in a civil commitment ceremony with another woman sued her church under Title VII, alleging that church members later made offensive remarks at various church meetings and in church documents. 289 F.3d at 657–58. The Tenth Circuit bypassed the specific ministerial question, holding that the church's actions were protected by the general principle of autonomy over "church governance and doctrine protected by the First Amendment." *Id.* at 658. The court "[found] this inquiry [into the ministerial exception] unnecessary … because Bryce's claims are based solely on communications that are protected by the First Amendment under the broader church autonomy doctrine." *Id.* at 658 n.2. The court explained that objections to religious organizations' "personnel decision[s]" are constitutionally protected when "the alleged misconduct is rooted in 'religious belief.'" *Id.* at 657 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)).

## B.    Liberty's Employment Decisions Based on Religious Reasons Are Protected.

The district court failed to acknowledge that Liberty's hiring decisions are based on a sincerely held religious belief. Because of Title VII's exemption for religious employers, Liberty is entitled to make religiously motivated hiring decisions.

***Title VII.***  Absent reversal by this Court, Title VII's religious exemption is a dead letter, so long as a plaintiff can artfully plead that the religious organization's decision was not *religious* discrimination but rather *religiously motivated* sex discrimination.  Where a religious entity (like Liberty) terminates an employee based on the employee's religious beliefs and conduct (including sexual ethics), that religious determination is shielded under the statutory exemption for religious hiring decisions.

The district court agreed that Liberty is a religious organization entitled to protection by Title VII. JA066.  That Liberty's "adherence to [religious] doctrine produces a form of sex discrimination," as defined by the Supreme Court's interpretation of Title VII, "does not make the action less religiously based." *Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring).

This is dispositive.  Title VII expressly provides that "[t]his subchapter shall not apply to … a religious corporation … with respect to the employment of individuals of a particular religion."  42 U.S.C. § 2000e-1(a).  It is not just the religious discrimination provision that does not apply; nothing in Title VII applies.  "Any temptation to limit this exception to authorizing the employment of coreligionists … is squelched by the definitional clause in § 2000e(j)," providing that "religion" includes "'*all* aspects of religious observance and practice, as well as belief.'"  *Starkey*, 41 F.4th at 946 (Easterbrook, J. concurring) (quoting 42 U.S.C.

§ 2000e(j) (emphasis added)). Thus, Title VII ensures that a "religious [organization] is entitled to limit its staff to people who will be role models by living the life prescribed by the faith, which is part of 'religion' as § 2000e(j) defines that word." *Id.* A Title VII religious exemption that does not exempt a religious organization's employment decisions made for religious reasons is no religious exemption at all.

*Church Autonomy.* Even if Title VII did not exempt religious observance and practice, the First Amendment protects Liberty's practices. The "principles of the First Amendment" protect "religious freedom." *Hosanna-Tabor*, 565 U.S. at 187. This freedom protects church authority over "internal management decisions that are essential to the institution's central mission." *Our Lady*, 591 U.S. at 746; *see also, e.g.*, Weinberger, *Origins of Church Autonomy*, *supra*, at 15–19; Nestor, *Church Autonomy*, *supra*, manuscript at 17–32; Athanasius G. Sirilla, *The "Nonministerial" Exception*, 90 Notre Dame L. Rev. 393, 406 (2023). If the First Amendment did not protect employers like Liberty—the freedom of a religious institution to require its religious agents to adhere to its religious standards— religious organizations would often not be able to pursue or to protect their religious missions.

The district court did not reach the issue of extending "neutral principles" as an exception to church autonomy. Such an extension would allow for allegedly "neutral principles" (*e.g.*, Title VII) to sweep away church autonomy (*e.g.*, control

over religious hiring) when "facially discriminatory" hiring policies are in place (*e.g.*, sexual prohibitions for religious employees). Should this court reach the issue of "neutral principles," it should decline to extend the exception for three reasons.

*First*, the Court should recognize the appropriate place for "neutral principles." When the Supreme Court has used this term, it has done so in a way that it believed would *protect* religious autonomy, not undermine it. The Supreme Court has invoked neutral principles in disputes over church land and property use, where it views "neutral principles" as working "to protect religious autonomy" by "assuring that secular courts would intervene in religious affairs only when the religious community itself had expressly stated in terms accessible to a secular court how a particular controversy should be resolved." W. Cole Durham & Robert Smith, 1 Religious Orgs. & the Law § 5:16 (2017); *see also Jones v. Wolf*, 443 U.S. 595 (1979) (cautioning that civil courts still "must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body").

*Second*, the "neutral principles" exception would swallow the rule of church autonomy. *See* Weinberger, *The Limits of Church Autonomy*, *supra*, at 1277–79. Essentially every lawsuit against a religious institution, with clever pleading by clever plaintiffs, could be adjudicated by "neutral principles." *See, e.g.*, *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986) ("The 'neutral principles' doctrine has never been extended to religious controversies in the areas of church government, order and discipline, nor should it be.").

*Third*, Supreme Court precedent on church autonomy has already rejected the idea that "valid and neutral" employment discrimination laws trump "internal church decision[s] that affect[] the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190 (rejecting application of neutral employment law to church decisionmaking); *Our Lady*, 591 U.S. at 736–38 (same).

## CONCLUSION

The church autonomy doctrine, together with other constitutional and statutory protections for religious organizations, provides critical protections for religious institutions in our constitutional system. Such protections safeguard "the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Our Lady*, 591 U.S. at 737. The district court erred, and this Court should reverse.

Dated: August 08, 2025        Respectfully submitted,

*/s/ Vince Eisinger*
Vince Eisinger
CRANFILL SUMNER LLP
5420 Wade Park Boulevard, #300
Raleigh, NC 27607
(919) 863-8703
veisinger@cshlaw.com

*Attorney for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the parts

of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure

statement, table of contents, table of citations, statement regarding oral

argument, signature block, certificates of counsel, addendum, attachments):

This document contains <u>5,971</u> words.

2.    This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface
using Microsoft Word in 14-point <u>Times New Roman</u>

Dated:  August 08, 2025                    Respectfully submitted,


<u>*/s/ Vince Eisinger*         </u>
Vince Eisinger
CRANFILL SUMNER LLP
5420 Wade Park Boulevard, #300
Raleigh, NC 27607
(919) 863-8703
veisinger@cshlaw.com

*Attorney for Amici Curiae*