## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ELLENOR ZINSKI,
*Plaintiff-Appellee,*

v.

LIBERTY UNIVERSITY, INC.,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Virginia
Case No. 6:24-cv-00041-NKM-CKM

## BRIEF OF CARDINAL NEWMAN SOCIETY, ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL, AMERICAN ASSOCIATION OF CHRISTIAN SCHOOLS, ASSOCIATION OF CLASSICAL CHRISTIAN SCHOOLS, ASSOCIATION FOR BIBLICAL HIGHER EDUCATION, AND INTERNATIONAL ALLIANCE FOR CHRISTIAN EDUCATION AS AMICI CURIAE SUPPORTING APPELLANT AND REVERSAL

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Daniel J. Grabowski
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy.
Lansdowne, VA 20176
(571) 707-4655
dgrabowski@ADFlegal.org

Rory T. Gray
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
rgray@ADFlegal.org

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-1228</u>    Caption: <u>Zinski v. Liberty University, Inc.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Cardinal Newman Society, Ass'n of Christian Schools Int'l, American Association of Christian Schools,</u>
(name of party/amicus)

<u>Ass'n of Classical Christian Schools, Ass'n for Biblical Higher Education, Int'l Alliance for Christian Educ.</u>

who is <u>Amici curiae</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ Daniel J. Grabowski                    Date:    August 8, 2025

Counsel for: Amici Curiae

Print to PDF for Filing

# TABLE OF CONTENTS

Corporate Disclosure Statement ............................................................ -1-

Table of Authorities .................................................................................. ii

Interest of Amici Curiae ........................................................................... 1

Introduction .............................................................................................. 2

Argument .................................................................................................. 3

I.  Title VII protects religious organizations' religious
    employment decisions. ...................................................................... 3

    A.  Title VII's text is plain. ............................................................ 4

    B.  Caselaw supports the plain text. ............................................. 8

    C.  Nothing the district court said changes the plain text. ....... 13

II. If Title VII is ambiguous, the constitutional-avoidance canon
    applies ............................................................................................. 21

    A.  The church-autonomy doctrine allows religious
        organizations to make religious employment decisions. ...... 21

    B.  Constitutional avoidance supports reading Title VII to
        protect religious organizations' religious employment
        decisions. ................................................................................ 25

Conclusion .............................................................................................. 26

Certificate of Compliance ..................................................................... 28

Certificate of Service ............................................................................ 29

# TABLE OF AUTHORITIES

**Cases**

*Biden v. Nebraska,*
    600 U.S. 477 (2023) ........................................................................ 14

*Billard v. Charlotte Catholic High School,*
    101 F.4th 316 (4th Cir. 2024) ................................................ passim

*Bondi v. VanderStok,*
    145 S. Ct. 857 (2025) ....................................................................... 3

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ................................................................. 15, 16

*Bouldin v. Alexander,*
    82 U.S. (15 Wall.) 131 (1872) ..................................................... 24

*Bryce v. Episcopal Church in the Diocese of Colorado,*
    289 F.3d 648 (10th Cir. 2002) ..................................................... 23

*Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry
    Review Commission,*
    605 U.S. 238 (2025) ............................................................... 22, 23

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day
    Saints v. Amos,*
    483 U.S. 327 (1987) ....................................................................... 25

*Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.,*
    450 F.3d 130 (3d Cir. 2006) ......................................... 9, 10, 11, 17

*EEOC v. Fremont Christian School,*
    781 F.2d 1362 (9th Cir. 1986) ..................................................... 10

*EEOC v. Mississippi College,*
    626 F.2d 477 (5th Cir. 1980) ......................................................... 9

*EEOC v. Pacific Press Publishing Ass'n,*
    676 F.2d 1272 (9th Cir. 1982) ..................................................... 10

*Fitzgerald v. Roncalli High School, Inc.*,
73 F.4th 529 (7th Cir. 2023).............................. 6, 8, 18, 19

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
565 U.S. 171 (2012) .................................... 18, 20, 21, 23

*Huntsman v. Corp. of the President of the Church of Jesus Christ of
Latter-Day Saints*,
127 F.4th 784 (9th Cir. 2025)........................................22

*Jennings v. Rodriquez*,
583 U.S. 281 (2018) ........................................26

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in
North America*,
344 U.S. 94 (1952) .........................................23

*Kennedy v. St. Joseph's Ministries, Inc.*,
657 F.3d 189 (4th Cir. 2011) .................................. passim

*Little v. Wuerl*,
929 F.2d 944 (3d Cir. 1991)........................................9, 12

*NLRB v. Catholic Bishop of Chicago*,
440 U.S. 490 (1979) .........................................26

*Our Lady of Guadalupe School v. Morrissey-Berru*,
591 U.S. 732 (2020) .................................... 21, 23

*Rayburn v. General Conference of Seventh-Day Adventists*,
772 F.2d 1164 (4th Cir. 1985) .............................. 4, 12, 15

*Republic of Hungary v. Simon*,
145 S. Ct. 480 (2025) .........................................17

*Seattle's Union Gospel Mission v. Woods*,
142 S. Ct. 1094 (2022) .................................... 20, 23, 24

*Spencer v. World Vision, Inc.*,
633 F.3d 723 (9th Cir. 2011) ........................................5

*Starkey v. Roman Catholic Archdiocese of Indianapolis, Inc.*,
    41 F.4th 931 (7th Cir. 2022) ................................................... passim

*United States v. Chaudhri*,
    134 F.4th 166 (4th Cir. 2025) ................................................ 3, 14, 15

*United States v. Hansen*,
    599 U.S. 762 (2023) ...................................................................... 25

*United States v. Simms*,
    914 F.3d 229 (4th Cir. 2019) ........................................................... 7

*Watson v. Jones*,
    80 U.S. (13 Wall.) 679 (1871) ................................................... 23, 24

*Zinski v. Liberty University*,
    777 F. Supp. 3d 601 (W.D. Va. 2025) ..................................... passim

## Statutes

42 U.S.C. § 12113 ................................................................................. 7

42 U.S.C. § 2000e ............................................................................. 4, 5

42 U.S.C. § 2000e-1 ................................................................... 4, 5, 6, 7

42 U.S.C. § 2000e-2 ............................................................................ 4

## Other Authorities

Helen M. Alvaré, *Church Autonomy After* Our Lady of Guadalupe
    School*: Too Broad? Or Broad as It Needs to Be?*, 25 Tex. Rev.
    L. & Pol. 319 (2021) ...................................................................... 19

Helen M. Alvaré, *Religious Freedom After the Sexual Revolution*
    (Catholic University of America Press, 2022) ................................. 19

# INTEREST OF AMICI CURIAE[1]

This case is about whether a religious university can ensure that its staff share its religious beliefs and mission. Liberty University fired Jonathan Zinski after he said that he identified as a woman, was undergoing hormone-replacement therapy, and was going to legally change his name to Ellenor, all in conflict with Liberty's Christian faith. The dispute is whether Title VII and the Constitution allow religious organizations to hire and retain only employees that profess and act according to their religious beliefs. Amici have a strong interest in that issue.

Amici are six associations of religious schools: the Cardinal Newman Society, the Association of Christian Schools International, the American Association of Christian Schools, the Association of Classical Christian Schools, the Association for Biblical Higher Education, and the International Alliance for Christian Education. Each works to help its member schools live out their faith and cultivate it within their students. And so each has an interest in the Court clarifying that religious schools can hire and retain only coreligionists—employees that share and act according to the schools' faith. Otherwise, religious schools will be unable to truly live out their faith or effectively pass it on to their students.

---

[1] No counsel for a party authored this brief in whole or in part. No person other than amici and their counsel made any monetary contribution intended to fund preparing or submitting this brief. And all parties consent to its filing.

# INTRODUCTION

The government has no business telling a church who gets to be a member. A church decides whether a person believes and acts according to its tenets. That decision is inherently religious. In the same way, a religious organization gets to decide who it employs when the decision is religious. The organization can hire only employees who believe and act according to its religious beliefs. And it can fire employees who fail to believe and act according to those beliefs. If the decision is grounded in religious doctrine, the government has no business telling a religious organization that its choice of paid representative is wrong.

Title VII's plain language is clear on that. Congress expressly exempted religious organizations from Title VII's substantive provisions when an employment decision is religious. It "intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 194 (4th Cir. 2011) (citation omitted). For good reason—our Constitution requires nothing less. The church-autonomy doctrine flowing from the Religion Clauses includes religious organizations' right to employ only coreligionists. That means even if there's ambiguity in Title VII, the constitutional-avoidance canon supports reading the exemption to cover all religiously based employment decisions.

That's a good thing. A religious organization has the right to be religious not only in name but in practice too. That means Liberty here has the right to ensure that its employees act consistent with the University's Christian faith. It can truly strive to live out its faith. And it can have a fighting chance to pass along that faith to its students.

## ARGUMENT

Title VII's text is clear. Religious organizations have the right to make employment decisions based on religion. Even the district court recognized that reading as "the most textually faithful." *Zinski v. Liberty Univ.*, 777 F. Supp. 3d 601, 627 (W.D. Va. 2025). Yet it wrongly disregarded that reading. There's no reason to stray from Title VII's plain text. And if any ambiguity exists, the constitutional-avoidance canon resolves it.

## I. Title VII protects religious organizations' religious employment decisions.

As with all statutes, interpreting Title VII starts with its text. A court looks to "the words Congress enacted consistent with their ordinary meaning" to determine the plain text. *Bondi v. VanderStok*, 145 S. Ct. 857, 871 n.4 (2025) (citation modified). If the text is plain, the job is done. *United States v. Chaudhri*, 134 F.4th 166, 177 (4th Cir. 2025). If ambiguous, then—and only then—may a court consider other tools, like legislative history. *Id.*

### A. Title VII's text is plain.

Title VII prohibits employment decisions based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). But there are exemptions. At issue here is Section 2000e-1(a), which says that "[t]his subchapter shall not apply" to religious organizations "with respect to the employment of individuals of a particular religion."[2] And Title VII defines religion to include "*all* aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j) (emphasis added).

Parse that out. First, the ordinary meaning of "[t]his subchapter shall not apply" is that all of Title VII does not apply. *Kennedy*, 657 F.3d at 192 (reading the "subchapter" as "§ 2000e"). It cannot mean "something less than" that. *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 946 (7th Cir. 2022) (Easterbrook, J., concurring). That means Title VII's substantive prohibitions on making employment

---

[2] Covered religious organizations expressly include an "educational institution." *Id.* But there is also a separate exemption for religious educational institutions. Section 2000e-2(e) says, "it shall not be an unlawful employment practice for" a religious educational institution "to hire and employ employees of a particular religion." The overlap exists because of an amendment. Originally, the first exemption covered only employees performing work connected to the organization's "religious activities." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1167 (4th Cir. 1985). So the second exemption for just religious schools was initially broader. But in 1972, Congress amended the first exemption, deleting the "religious" qualifier. *Id.* The result is religious schools have two exemptions doing the same thing.

decisions based on race, religion, sex, and national origin do not apply if the exemption's criteria are met—"all of Title VII drops out." *Id.*

Second, the employer must be a religious organization. It must qualify as a "religious corporation, association, educational institution, or society." 42 U.S.C. § 2000e-1(a). That's a critical question that courts need to wrestle with. *E.g.*, *Spencer v. World Vision, Inc.*, 633 F.3d 723, 724 (9th Cir. 2011) (per curiam) (considering whether an entity is "organized for a religious purpose," primarily engages in that purpose, and is a nonprofit). If an organization doesn't qualify as religious, then the exemption is inapplicable.

Third, the organization must be acting "with respect to the employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). Of course, "with respect to the employment of" covers all decisions related to employment—hiring, firing, and everything in between. *Kennedy*, 657 F.3d at 192. That is, it does so provided the decision goes to employing individuals "of a particular religion." That means exactly what it sounds like: if the employer is making an employment decision based on religion, then Title VII does not apply. And religion includes "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). So if the employer makes an employment decision based on religious observance, practice, or belief, none of Title IV's prohibitions apply. Full stop.

Indeed, the phrase "of a particular religion" speaks to the employer's particular religion. Context makes clear that the "focus is on a religious employer's ability to perform its religious activities." *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, 535 (7th Cir. 2023) (Brennan, J., concurring). So the exemption is aimed at the employer choosing employees who adhere to its religious beliefs. The word "particular" itself "hints at a religious employer's selectivity in employment." *Id.*

Plus, exempting all employment decisions based on religion is the only reading that makes sense, given the sentence structure. Any attempt to limit the parts of Title VII from which the employer is exempted is grammatically suspect. Congress did not place the "with respect" clause next to the "[t]his subchapter" clause. That would have suggested a limit on what parts of the subchapter were being exempted. But Congress didn't do that. Instead, it placed the "with respect" clause after listing the exempt religious organizations—suggesting no limit on the whole subchapter's inapplicability. In short, the ordinary meaning is that Title VII does not apply to religious organizations' employment decisions based on religious reasons.

That ordinary meaning is confirmed by comparing the statutory language to other language both within the exemption and outside it. Look within first. Section 2000e-1(a) covers more than just religious employers. Before getting into such employers, it says that "[t]his subchap-

ter shall not apply to an employer with respect to the employment of aliens outside any State." 42 U.S.C. § 2000e-1. But courts rightly have not interpreted that sentence to mean only the part of Title VII prohibiting discrimination based on national origin is inapplicable when it comes to aliens. *Starkey*, 41 F.4th at 947 (Easterbrook, J., concurring). Courts have understood the language "to mean what it says: *none* of Title VII's substantive rules applies to aliens covered by" the exemption. *Id.* So too here. What "is true for the alien exemption must be true for the religious exemption as well." *Id.*

Now look outside the exemption. Considering "a materially identical clause in another statute" can shed light on Title VII. *United States v. Simms*, 914 F.3d 229, 234 (4th Cir. 2019). And the religious exemption in the ADA is a materially identical clause: "[t]his subchapter shall not prohibit a religious" organization "from giving preference in employment to individuals of a particular religion." 42 U.S.C. § 12113(d)(1). Religious employers get to prefer individuals of a particular religion despite the ADA's substantive ban on disability discrimination. The exemption applies to more than just discrimination based on religion—it has to. There is no substantive provision in the ADA prohibiting religious discrimination. In the same way, Title VII's religious exemption applies to more than just discrimination on the basis of religion. It applies to *all* of Title VII's substantive provisions. All employment decisions are exempt if the decision is made for a religious reason.

Decisions made for non-religious reasons are not exempt. "The decision must itself be religious, as that word is defined in Title VII." *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). For example, a religious organization cannot make an employment decision based on sex unrelated to religious observance, practice, or belief. *Id.* That falls outside the exemption. But if an employment decision is religious, the religious employer gets to make it. The text is plain.

## B. Caselaw supports the plain text.

Courts and judges aplenty agree with that interpretation. Judges Easterbrook and Brennan from the Seventh Circuit have well explained the plain-text reading. And Judge King from this circuit has endorsed the same view. *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 335 (4th Cir. 2024) (King, J., concurring in part). As Judge Brennan put it: "when a covered employer demonstrates that an adverse employment decision was made because the relevant individual's beliefs, observances, or practices did not conform with the employer's religious expectations, the exemption would apply and bar a Title VII claim on that employment decision." *Fitzgerald*, 73 F.4th at 536 (Brennan, J., concurring). But a pretext inquiry could "apply to the employer's proffered religious rationale" to determine whether the employer "honestly believed the reason it has offered to explain the discharge." *Id.* at 536–37 (citation omitted).

Likewise, the Third and Fifth Circuits have followed the plain text. In *Little v. Wuerl*, the Third Circuit held that "it does not violate Title VII's prohibition of religious discrimination for a parochial school to discharge a Catholic or a non-Catholic teacher who has publicly engaged in conduct regarded by the school as inconsistent with its religious principles." 929 F.2d 944, 951 (3d Cir. 1991). Put differently, if the decision is religious, the religious organization has the right to make it.

The court was even more explicit in *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130 (3d Cir. 2006). There, it held that the religious exemption barred a teacher's sex-discrimination claim. It mattered not that the *claim* wasn't religious discrimination. *Id.* at 139. Under the exemption, religious employers get to "create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Id.* at 141 (citation omitted). But that was only because the decision was religiously based. Not "all claims of gender discrimination against religious employers are impermissible"— only those premised on "a religious justification." *Id.* at 142.

In the same vein, the Fifth Circuit rejected a sex-discrimination claim against a religious employer. *EEOC v. Miss. Coll.*, 626 F.2d 477, 485 (5th Cir. 1980). It construed the religious exemption "broadly to exclude from the scope of the act any employment decision made by a religious institution on the basis of religious discrimination." *Id.* at 487. If the employment decision is religious, Title VII does not apply.

To be sure, some courts have disagreed. The Ninth Circuit has held that the exemption applies only to *claims* of religious discrimination, suggesting that, even if the employer provides a religious reason, other claims fall outside the exemption's scope. *EEOC v. Pac. Press Publ'g Ass'n*, 676 F.2d 1272, 1274–77 (9th Cir. 1982); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1364–66 (9th Cir. 1986). But such decisions are not grounded in Title VII's text.

And what about this Court? The short answer is that it hasn't decided yet whether the exemption covers all religious organizations' employment decisions with a religious basis. Still, it has discussed the exemption. Consider three cases. In *Billard*, the majority did not reach the statutory issue—only Judge King did. And he would have followed the plain language. *Billard*, 101 F.4th at 335 (King, J., concurring in part). Instead, the majority resolved the case on the ministerial exception. *Id.* at 333 (majority op.). But it made several points about Title VII's religious exemption.

First, the majority noted that interpreting the exception to cover all decisions based on a religious reason would "be wide-ranging indeed," covering all employees. *Id.* at 327. No doubt, that's true. But it is no reason to ignore the plain text. Besides, how could a religious organization "create and maintain communities composed solely of individuals faithful to their doctrinal practices" if all employees were not covered? *Curay-Cramer*, 450 F.3d at 141 (citation omitted).

Second, the *Billard* majority claimed the broad interpretation would "deprive those employees not only of Title VII's protections against religious discrimination, but also Title VII's protections against sex discrimination and, at least presumptively, those against race and national-origin discrimination, as well." *Billard*, 101 F.4th at 328. But that's inaccurate. Under the exemption's plain text, religious employers may make religious decisions even if those decisions implicate sex, race, and national origin. But they may not otherwise discriminate in violation of Title VII. All agree, "sex discrimination unrelated to religious doctrine falls outside" the exemption's scope. *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring).

Third, the majority stated that no "federal appellate court in the country has embraced the school's argument that Title VII permits religiously motivated sex discrimination by religious organizations." *Billard*, 101 F.4th at 328. But the Third Circuit in *Curay-Cramer*, for example, held just that. 450 F.3d at 141.

And fourth, the majority noted that "Title VII's religious exemptions, though statutory, are also constitutionally inspired." *Billard*, 101 F.4th at 329. Correct. And the exemption's constitutional underpinnings confirm the plain text. More on that below.

Next, turn to this Court's decision in *Rayburn*. There, the Court explained that the exemption "may fairly be construed to prohibit some forms of state involvement in ecclesiastical decisions of employment."

*Rayburn*, 772 F.2d at 1166. Religions organizations "may base relevant hiring decisions upon religious preferences." *Id.* But they may not "make those same decisions on the basis of race, sex, or national origin." *Id.* That coheres well to the plain text. Employment decisions without a religious basis are still subject to Title VII's substantive provisions. But those based on religion are not.

Finally, consider the Court's decision in *Kennedy*. There, the Court held that the exemption covered employment decisions beyond just hiring and firing. 657 F.3d at 192. In doing so, it reiterated that the exemption "does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin." *Id.* Again, that in no way conflicts with the plain-text reading. Instead, parts of *Kennedy* point right towards that reading.

For starters, the Court made clear that the "subchapter" refers to all of Title VII—"that is, § 2000e." *Id.* Next, it agreed with the Third Circuit that the purpose of the exemption is to "enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's 'religious activities.'" *Id.* at 194 (quoting *Little*, 929 F.2d at 951). Then, again echoing the Third Circuit, the Court explained that the exemption "reflects a decision by Congress that the government interest in eliminating religious discrimination by

religious organizations is outweighed by the rights of those organizations to be free from government intervention." *Id.* (citation modified).

All told, the caselaw supports the plain language of Title VII's religious exemption—including this Court's cases. And none of those cases suggest a reason to stray from that language.

### C. Nothing the district court said changes the plain text.

Nothing the district court said justifies departing from the text. But before jumping into what the court got wrong, consider what it got right. The district court correctly held that Liberty qualifies as a religious organization under the exemption. *Zinski*, 777 F. Supp. 3d at 622. And the court correctly interpreted "this subchapter" to mean "all of Title VII." *Id.* at 626. So far so good. But after that, not so much.

First, the district court held that "of a particular religion" was ambiguous. It reasoned that there were two "reasonable" interpretations. *Id.* at 626–27. On the one hand, the court said the clause could mean "that religious organizations can discriminate on any basis—sex, race, what have you—so long as the discrimination is motivated by a desire to employ people of a particular religion." *Id.* at 626. And on the other, the phrase could mean "that religious organizations can discriminate only on the basis of a person's *religion*, as distinguished from other criteria upon which discrimination cannot be based, *i.e.*, race, sex, national origin." *Id.* But then the district court gave away the game. It expressly

recognized that the former "is the *most textually faithful*: none of Title VII's prohibitions ("this subchapter") apply when seeking to employ a person of a certain religion, and there is no limitation on the range of that discrimination so long as it is religiously motivated." *Id.* at 627 (emphasis added).

If that interpretation is the most textually faithful, then the inquiry is done. *Chaudhri*, 134 F.4th at 177. Courts are to determine "the best interpretation of the text"—the "most natural" or "most plausible reading of the statute." *Biden v. Nebraska*, 600 U.S. 477, 511, 520 (2023) (Barrett, J., concurring). If one reading stands above the rest, the text is plain. Only in select circumstances should a court "adopt an inferior-but-tenable reading." *Id.* at 509 (referencing the constitutional-avoidance canon). And such circumstances are wholly absent here. So the district court should have gone with the "most textually faithful" reading. *Zinski*, 777 F. Supp. 3d at 627.

Besides, the district court's other possible reading is not a "reasonable" one at all. *Id.* The alternative reading cannot be squared with "[t]his subchapter" referring to all of Title VII. It disregards the sentence structure separating the "[t]his subchapter" clause from the "with respect" clause. And it does not explain why a different reading applies to either the alien language in the same exemption or to the materially identical language in the ADA religious exemption. Title VII's religious exemption is unambiguous.

Second, the district court thought that the legislative history supports the reading that only religious-discrimination claims are exempt. *Zinski*, 777 F. Supp. 3d at 627–29. Because the text is plain, the court was wrong to turn to legislative history. *Chaudhri*, 134 F.4th at 177. Even still, the legislative history does not support that reading.

True, the original version of Title VII "passed by the House in 1964 excluded religious employers from coverage altogether" but the version that became law did not. *Rayburn*, 772 F.2d at 1167. Also true, Congress broadened the exemption in 1972 to include employees performing work connected to any of the organization's activities, instead of just religious activities, while rejecting "proposals to broaden further the scope of the exemption." *Id.* But both developments suggest only that Congress did not intend to *fully* exempt religious organizations from Title VII. And that coheres with the plain-text reading. Religious organizations are exempt from Title VII when the employment decision is religiously based—and only then. If the decision is not based on religion, then a religious organization cannot discrimination based on race, sex, or national origin. The legislative history supports Liberty's interpretation of Title VII, not the district court's.

Third, the district court thought that *Bostock v. Clayton County*, 590 U.S. 644 (2020), supported its narrow reading of the exemption. *Zinski*, 777 F. Supp. 3d at 630. This rationale is a puzzling one. The Su-

preme Court in *Bostock* itself responded to the fear that its interpretation of "sex" to include homosexual and transgender status "may require some employers to violate their religious convictions." 590 U.S. at 681. It noted its deep concern "with preserving the promise of the free exercise of religion enshrined in our Constitution." *Id.* And the Court explained that in Title VII "Congress included an express statutory exception for religious organizations." *Id.* at 682. To be sure, the Court left to future cases how the exemption applies. *Id.* But the implication of its discussion was that Title VII's religious exemption may well protect employers from violating their religious convictions. Yet under the district court's narrow reading, the exemption does not.

Even so, in the district court's view, *Bostock*'s but-for-causation reasoning was relevant to the meaning of the exemption. *Zinski*, 777 F. Supp. 3d at 630. Yet that makes sense only if one assumes the unnaturally narrow textual reading. If the exemption excludes only religious-discrimination claims and not all discrimination claims based on a religious reason, then when a religious organization discriminates based on sex, sex remains a but-for cause even if backed up by a religious reason. But under the plain-text reading, if a religious organization has a religious basis for discriminating based on sex, then Title VII does not apply—no matter whether sex is a but-for cause. In other words, *Bostock*'s but-for causation cannot shed light on which reading is right.

Fourth, the district court turned to policy to support its narrow reading. Of course, "policy concerns" cannot "surmount the plain language of the statute." *Republic of Hungary v. Simon*, 145 S. Ct. 480, 497 (2025) (citation omitted). And the district court's policy analysis shows why.

To start, the district court claimed that its holding maintained the proper balance between the competing objectives of stopping discrimination in the workplace and allowing a religious organization to ensure its workforce conforms to its faith. *Zinski*, 777 F. Supp. 3d at 632. But that balance is for Congress to strike, not a court. And this Court and others have recognized that Congress "intended the explicit exemptions to Title VII to enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices." *Kennedy*, 657 F.3d at 194 (citation omitted). If a religious organization cannot make an employment decision based on religion when that decision also implicates race, sex, or national origin, then it cannot ensure its workforce conforms to its faith. *See Curay-Cramer*, 450 F.3d at 141. That does not support Title VII's policy; it flouts it.

No matter, thought the district court, the ministerial exception alone can ensure religious organizations' ability to craft a workforce of like believers. *Zinski*, 777 F. Supp. 3d at 632. But however broad that exception is, it does not apply to all employees. And Congress intended

religious organizations to craft communities "*solely* of individuals faithful to their doctrinal practices." *Kennedy*, 657 F.3d at 194 (emphasis added) (citation omitted). The ministerial exception alone is not enough.

In like manner, the district court worried that the ministerial exception would be redundant under the plain-text reading. *Zinski*, 777 F. Supp. 3d at 632. But that makes no sense. Whether a statute affords overlapping or more protection than the Constitution is no grounds to read the statute narrowly. Indeed, "Title VII's religious exemptions, though statutory, are also constitutionally inspired." *Billard*, 101 F.4th at 329. It makes sense for there to be overlap. Besides, the two are not redundant. For qualifying employees, the ministerial exception goes beyond the plain-text reading of Title VII's religious exemption. It protects *all* employment decisions regarding ministers, not just religiously based decisions. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 194–95 (2012). So while it applies to fewer employees than Title VII's exemption, the ministerial exception is broader in scope for those employees.

Finally, the district court reasoned that the plain-text reading would "allow employers to achieve all manner of discrimination under the banner of religion." *Zinski*, 777 F. Supp. 3d at 632. Far from it. Religious employers are exempt from Title VII only if a decision is based on religion. *Starkey*, 41 F.4th at 946 (Easterbrook, J., concurring). And that basis cannot be mere pretext. *Fitzgerald*, 73 F.4th at 536 (Brennan,

J., concurring). A court could conduct a constitutionally permissible pretext inquiry to determine whether the employer "honestly believed the reason it has offered to explain the discharge." *Id.* at 536–37 (citation omitted). Religious employers don't have free rein to discriminate. Their narrow, statutory right is to make religious employment decisions.

That is a good thing. Allowing a religious organization to hire and retain only employees that share and live out its faith is the only way the organization can truly be religious. Keep in mind, an organization is no more than its members. If its members believe or act contrary to its faith, then the organization itself falls short. That means the organization is not truly living out its faith. And it means the organization is less likely to succeed in its goals. Empirical evidence shows "that religious institutions adopting employment practices requiring personal witness in word and deed—in order to express, preserve, and transmit their faith, doctrine, and/or religious mission—are more likely to succeed in their religious aims than institutions that do not." Helen M. Alvaré, *Church Autonomy After* Our Lady of Guadalupe School*: Too Broad? Or Broad as It Needs to Be?*, 25 Tex. Rev. L. & Pol. 319, 355 (2021). That's not a surprise, because business organizations work the same way. Helen M. Alvaré, *Religious Freedom After the Sexual Revolution* 87–106 (Catholic University of America Press, 2022) (collecting empirical evidence showing that the success of any organization—religious or secular—depends on employees' shared mission and values).

So if Liberty cannot ensure that its employees believe and act consistent with the University's faith, Liberty will be unable to truly live out its faith or effectively pass that faith along to its students. No doubt, a "religion cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses." *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring). The "messenger matters." *Id.* In the same way, a religious school cannot depend on its employees to effectively model and pass on the faith to its students if the employee's conduct doesn't measure up.

And where would that leave religious schools? Down the line, it could well leave them nonexistent. Forcing "religious organizations to hire" employees "who do not share their religious views would undermine not only the autonomy of many religious organizations but also their continued viability." *Seattle's Union Gospel Mission v. Woods*, 142 S. Ct. 1094, 1096 (2022) (mem) (Alito, J., respecting denial of cert.). And that's a problem. Our pluralistic society is better for having religious organizations, especially when such organizations so often are committed to serving the poor, the homeless, the unwelcomed, the unwanted, and the imprisoned. Less religious organizations—or less effective religious organizations—is good for no one.

## II.  If Title VII is ambiguous, the constitutional-avoidance canon applies.

Now assume that the district court was right to go beyond Title VII's plain text. It was still wrong to hold that the religious exemption covers only religious-discrimination claims and not all employment decisions based on a religious reason. If the exemption is ambiguous, the constitutional-avoidance canon comes into play. And that canon supports reading the exemption broadly because the narrow reading violates the church-autonomy doctrine.

### A.  The church-autonomy doctrine allows religious organizations to make religious employment decisions.

The Constitution guarantees religious organizations the right to hire and retain only coreligionists. That right falls within church autonomy—a doctrine the Supreme Court has long recognized as flowing from both Religion Clauses.

Church autonomy in part protects "independence in matters of faith and doctrine and in closely linked matters of internal government." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020). It stems from the Free Exercise Clause's protection for a religious group to "to shape its own faith and mission" and from the Establishment Clause's protection against government involvement in "ecclesiastical decisions." *Hosanna-Tabor*, 565 U.S. at 188–89. In other words, it springs from the joint recognition of the Religion Clauses' that

"church and state are 'two rightful authorities,' each supreme in its own sphere." *Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 257 (2025) (Thomas, J., concurring).

That dual authority has "deep roots in the history of Western civilization." *Id.* And those roots are what undergird the religion clauses. "Henry VIII and Parliament rejected that ancient tradition when they established the Church of England. But American patriots reclaimed it through religious dissent, a Revolution, and the Second Great Awakening." *Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784, 803 (9th Cir. 2025) (en banc) (Bumatay, J., concurring). And having separate spheres of authority was the Founders' view. They believed that "the federal government lacked authority over religious matters." *Id.* at 806. For example, Madison thought that religion was "exempt from the authority of the Society at large" and so also from "the Legislative Body." *Id.* at 807 (citation omitted). Likewise, "early American decisions justified protections for church autonomy in part based on the need to respect religious institutions' legitimate and distinct sphere of authority." *Cath. Charities*, 605 U.S. at 258 (Thomas, J., concurring).

A church's distinct sphere of authority gives it exclusive control to decide matters involving "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson v. Jones*, 80 U.S.

(13 Wall.) 679, 733 (1871). For such decisions, they have complete "independence from secular control or manipulation." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). That's the source of the ministerial exception—a "component of" church autonomy. *Our Lady*, 591 U.S. at 746. Because the employment of ministers necessarily implicates religion, that exception protects religious organizations' right to hire or fire their ministers for any reason. *Hosanna-Tabor*, 565 U.S. at 194–95. But "the guarantee of church autonomy is not so narrowly confined" to just that. *Seattle's Union*, 142 S. Ct. at 1096 (Alito, J., respecting denial of cert.).

For example, it "gives religious institutions the right to define their internal governance structures without state interference." *Cath. Charities*, 605 U.S. at 255 (Thomas, J., concurring). Similarly, it gives such institutions the right to employ only coreligionists. Religious organizations may make employment decisions based on religious reasons without governmental interference. *See Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 656–57, 660 (10th Cir. 2002) (holding that church autonomy "extends beyond the specific ministerial exception" and protects "a personnel decision based on religious doctrine"). They may make such decisions based on whether an employee believes and acts according to the organization's faith.

Importantly, like the plain-text reading of Title VII's religious exemption, that right differs from the ministerial exception. The latter totally shields a religious organization's decision when it comes to ministers. But when it comes to other employees, church autonomy protects *only* religiously based decisions. Put differently, the ministerial exception flowing from church autonomy protects a religious organization's right to fire a minister for any reason without government interference. It covers fewer employees but with a broader scope. The coreligionist exception flowing from church autonomy protects a religious organization's right to fire *any* employee without government interference but *only* when the decision is based on religion. It covers all employees but with a narrower scope: there must be a religious reason.

That protection logically follows from a church's separate sphere of authority that includes ensuring "conformity of the members of the church to the standard of morals required of them." *Watson*, 80 U.S. at 733. The government has no business telling a church "who ought to be members of the church." *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139–40 (1872). Courts cannot "revise or question ordinary acts of church discipline, or of excision from membership." *Id.* at 139. And if that goes for churches, it goes for other religious organizations too. *See Seattle's Union*, 142 S. Ct. at 1096 (Alito, J., respecting denial of cert.) ("The religious organizations protected include churches, religious schools, and religious organizations engaged in charitable practices . . . .").

In some cases, the only way a religious organization can ensure that employees conform to the required moral standards of its faith is to fire those who don't. And if a religious organization has the right to do that, then it also has the right to decide not to hire employees who fail to conform in the first place. Provided the decision is based on a religious reason, the religious organization has the right to make it.

To be sure, that's a broad principle. But it is one required by our Constitution. And there are two key limitations baked in. First, the organization must qualify as religious. Some organizations, like for-profits perhaps, may not qualify. *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 344–45 (1987) (Brennan, J., concurring). Second, the employment decision must actually be based on religion—and that religious basis must be sincere and not pretextual. Yet if it is, the religious organizations alone can make it. Our Constitution requires nothing less.

### B. Constitutional avoidance supports reading Title VII to protect religious organizations' religious employment decisions.

Because the Constitution protects religious organizations' right to make religious employment decisions, the Court should read Title VII's religious exemption to protect the same. At a minimum, that reading is "fairly possible." *United States v. Hansen*, 599 U.S. 762, 781 (2023).

Even the district court admitted as much. It recognized that reading Title VII to protect a religious organization's right to make religiously based employment decisions is the "most textually faithful." *Zinski*, 777 F. Supp. 3d at 627. And the narrow reading does more than just raise "serious constitutional doubts." *Jennings v. Rodriquez*, 583 U.S. 281, 286 (2018). That reading would violate the Constitution. So if there's any ambiguity in the exemption's language, the constitutional-avoidance canon resolves it.

This Court has already noted that "Title VII's religious exemptions, though statutory, are also constitutionally inspired." *Billard*, 101 F.4th at 329. And the Supreme Court has already employed the constitutional-avoidance canon to not flout church autonomy. *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 507 (1979). Here should be no different.

*   *   *

Liberty fired an employee because his actions conflicted with its faith. It fired him for a religious reason. Both Title VII and the Constitution protect its right to do just that.

## CONCLUSION

The Court should reverse.

Respectfully submitted,

*/s/ Daniel J. Grabowski*

John J. Bursch
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

Rory T. Gray
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Rd. NE
Suite D-1100
Lawrenceville, GA 30043
(770) 339-0774
rgray@ADFlegal.org

Daniel J. Grabowski
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy.
Lansdowne, VA 20176
(571) 707-4655
dgrabowski@ADFlegal.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because this brief contains 6,030 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: August 8, 2025

*s/ Daniel J. Grabowski*
Daniel J. Grabowski
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*s/ Daniel J. Grabowski*
Daniel J. Grabowski
*Counsel for Amici Curiae*