———————————————————————

# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

———————————————————————

ELLENOR ZINSKI,

*Plaintiff-Appellee,*

v.

LIBERTY UNIVERSITY,

*Defendant-Appellant.*

———————————————————————

On Appeal from the United States District Court
for the Western District of Virginia, Case No. 6:24-cv-00041-NKM-CKM

———————————————————————

## Brief of *Amici Curiae*
## Brigham Young University,
## Brigham Young University–Hawaii,
## Brigham Young University–Idaho, and Ensign College
## in Support of Defendant-Appellant and Reversal

———————————————————————

Steven M. Sandberg
David M. Andersen
Aaron M. Worthen
Brigham Young University
Office of General Counsel*
A-357 ASB
Provo, UT 84602
(801) 422-4722

Counsel for *Amici Curiae*

———————————

* BYU Office of General Counsel appreciates the contributions of our student law clerks Ashlyn McNeely, Brennan Beddoes, Cynthia Beck, and Derek Johnson, who assisted with the research and writing of this brief.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION AND SUMMARY OF THE ARGUMENT.................. 3

ARGUMENT ........................................................................ 6

   I.   Title VII Does Not Apply to a Religious Employer's Decisions Based on Religious Observance, Practice, or Belief. ......................... 6

  II.  Title VII's Religious Exemptions May Also Be Interpreted to Distinguish between Status/Identity and Conduct/Belief...........10

      A.   Amici's Religious Tenets and the Key Distinction between Status/Identity and Conduct/Belief. .....................................11

      B.   Distinguishing Status/Identity from Conduct/Belief Is Supported by Supreme Court Precedent. .............................14

      C.   Distinguishing Status/Identity from Conduct/Belief Is Also Supported by Scientific Research. .................................17

      D.   The District Court Wrongly Conflated Zinski's Status/Identity with Zinski's Conduct/Belief. ......................18

      E.   *Bostock* Supports the Distinction between Status/Identity and Conduct/Belief. .....................................21

  III.  The First Amendment Bars Courts from Interfering with Sincere Religious Decisions Based on Conduct or Belief................23

      A.   The Church Autonomy Doctrine Prohibits Courts from Interfering with Religious Schools' Application of Their Own Religious Beliefs and Standards to Their Employees. .............24

      B.   The Freedom of Association Allows Religious Schools to Employ Only Those Who Accept Their Religious Beliefs and Adhere to Their Religious Standards. ...........................27

CONCLUSION....................................................................30

# TABLE OF AUTHORITIES

**CASES**

*303 Creative LLC v. Elenis*, 600 U.S. 570 (2023) ...................................15

*Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571
(N.D. Tex. 2021) ........................................................................ 9

*Bob Jones Univ. v. U.S.*, 461 U.S. 574 (1983) ..........................................16

*Bostock v. Clayton County* 590 U.S. 644 (2020)...........................21, 22, 23

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000)................................28, 29

*Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023)................... 9

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993)...........15

*Christian Legal Society v. Martinez*, 561 U.S. 661 (2010) .....................16

*Corp. of Presiding Bishop of Church of Jesus Christ
of Latter-day Saints v. Amos*, 483 U.S. 327 (1987) ............................17

*Curay-Cramer v. Ursuline Acad. of Wilmington*, 450 F.3d 130
(3d Cir. 2006) ........................................................................ 8

*EEOC v. Mississippi*, 626 F.2d 477 (5th Cir. 1980) ................................ 8

*EEOC v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795
(4th Cir. 2000) ........................................................................25

*Fulton v. City of Philadelphia*, 593 U.S. 422 (2021) ...........................15

*Hall v. Baptist Memorial Health Care Group*, 215 F.3d 618
(6th Cir. 2000) ........................................................................ 8

*Hosanna-Tabor Evangelical Lutheran Church and School
v. EEOC*, 565 U.S. 171 (2012) ...........................................................27

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*,
344 U. S. 94 (1952)...................................................................24

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) ...........................10

*Kennedy v. St. Joseph's Ministries*, 657 F.3d 189 (4th Cir. 2011) ......7, 10

*Lawrence v. Texas*, 539 U.S. 558 (2003) ....................................................16

*Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991) ...............................7, 8, 10

*Masterpiece Cakeshop v. Colo. Civ. Rights Comm'n*,
584 U.S. 617 (2018)...................................................................15

Memorandum Opinion, J. Moon, Feb. 21, 2025, Dkt. 37 ................. passim

*New Hope Family Services v. Poole*, 966 F.3d 145 (2d Cir. 2020) ............29

*Obergefell v. Hodges*, 576 U.S. 644 (2015) ..............................................16

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) ...............23

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020) ...............................................................25
*Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l*
*Presbyterian Church*, 393 U.S. 440 (1969) ..........................27
*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) .....................27, 28
*Serbian E. Orthodox Diocese v. Milivojevich*,
426 U.S. 696 (1976) .............................................................24
*Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) .........................26, 28, 29
*Thomas v. Review Bd. of Ind. Employment Sec. Div.*,
450 U.S. 707 (1981) .............................................................27
*United States v. Skrmetti*, 145 S. Ct. 1816 (2025) .................................15
*Watson v. Jones*, 80 U.S. 679 (1871) ...............................................24

## STATUTES

Title VII of the Civil Rights Act of 1964 § 701(j),
42 U.S.C. § 2000e(j).............................................................3, 6
Title VII of the Civil Rights Act of 1964 § 702(a),
42 U.S.C. § 2000e-1(a)..........................................................3, 6
Title VII of the Civil Rights Act of 1964 § 703(e)(2),
42 U.S.C. § 2000e-2(e)(2) .....................................................3, 6

## OTHER AUTHORITIES

*2024 Best Colleges*, WALL ST. J., https://www.wsj.com/rankings/
college-rankings/best-colleges-2024........................................ 1
Ariella Tabaac & Tarynn Witten, *Trans\* People and Religion/*
*Spirituality*, SAGE ENCYCLOPEDIA OF LGBTQ STUDIES (Jan. 2016) .......18
BYU News, *BYU Is One of the Top Universities in the Nation*,
https://news.byu.edu/byu-is-one-of-the-top-universities-
in-the-nation-according-to-new-wall-street-journal-rankings.............. 1
BYU, *Church Educational System Honor Code*,
https://policy.byu.edu/view/
church-educational-system-honor-code ...............................................14
BYU, *Ecclesiastical Conditions of Employment and University*
*Standards Policy*, https://policy.byu.edu/ .............................................14
GENERAL HANDBOOK: SERVING IN THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS ("General Handbook") § 38.6.23 (2025),
https://www.churchofjesuschrist.org/
study/manual/general-handbook ......................................................12

Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People*, NHS ENGLAND (Apr. 2024)....................17

Jack Turban, et al., *Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States*, LGBT HEALTH, Vol. 8, No. 4 (2021) ....................................17

Jeremy C. Wang, et al., *The Association between Religiosity and Resilience Among Young Trans Women*, PLOS ONE, 18(7) (July 31, 2023).........................................................18

John T. Melcon, *Thou Art Fired: A Conduct View of Title VII's Religious Employer Exemption*, 19 RUTGERS J. L. & RELIGION 280 (2018) ..............................................................20

Robert D'Angelo, et al., *One Size Does Not Fit All: In Support of Psychotherapy for Gender Dysphoria*, LGBT HEALTH, Vol. 8, No. 4 (2021).........................................................17

Russell M. Nelson, *Choices for Eternity*, The Church of Jesus Christ (May 15, 2022). ...................................................12

*The Family: A Proclamation to the World*, The Church of Jesus Christ, https://www.churchofjesuschrist.org/study/scriptures/ the-family-a-proclamation-to-the-world/ ......................................11, 12

*Transgender: Understanding Yourself*, The Church of Jesus Christ, https://www.churchofjesuschrist.org/topics/transgender/understanding ..13

W. Justin Dyer & Jenet J. Erickson, *Mental Health at Religious and Non-religious Universities: Examining the Role of Student Religiousness and Sexual/Gender Minority Identity*, J. AFFECTIVE DISORDERS, Vol. 342 (Dec. 1, 2023).................................................18

Zeki Bayraktar, *Iatrogenic Gender Dysphoria and Harm Cycle in Gender Affirming Care*, J. SEX & MARITAL THERAPY, Vo. 51, No. 4 (2025)........17

## INTEREST OF THE *AMICI*[1]

*Amici* are private, nonprofit, faith-based institutions of higher education established by The Church of Jesus Christ of Latter-day Saints (the "Church of Jesus Christ"). *Amici* Brigham Young University ("BYU") in Provo, Utah; Brigham Young University–Hawaii ("BYUH") in Laie, Hawaii; Brigham Young University–Idaho ("BYUI") in Rexburg, Idaho; and Ensign College ("Ensign") in Salt Lake City, Utah, each were founded and are guided and supported by the Church of Jesus Christ. BYU, BYUH, BYUI, and Ensign (the "CES Institutions") are part of the Church Educational System ("CES"), whose mission is to develop disciples of Jesus Christ who are leaders in their homes, the Church, and their communities. The CES Institutions have a combined enrollment of over 100,000 students, and each institution has a different focus. BYU, for example, is recognized for its religious mission (described below), its academic rigor (top 20 ranking in the Wall Street Journal's *Best Colleges 2024*[2]), and its athletic program

---

[1] The parties have consented to the filing of this *amicus* brief. No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than the *amici curiae*, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief.

[2] *2024 Best Colleges*, WALL ST. J., https://www.wsj.com/rankings/college-rankings/best-colleges-2024; *see also* BYU News, *BYU Is One of the Top Universities in the Nation*, https://news.byu.edu/byu-is-one-of-the-top-universities-in-the-nation-according-to-new-wall-street-journal-rankings.

(member of the Big 12 with many NCAA champion athletes and teams).

*Amici* affirm that the U.S. Constitution and federal law protect the freedom of religious schools to employ only those who uphold their religious tenets and religious standards of conduct. *Amici* value the divine identity of all individuals as children of God. At the same time, *Amici* seek to build communities of faith comprising employees and students by aligning with the principles and values of the restored gospel of Jesus Christ (i.e., beliefs) and also by establishing religious behavioral standards for members of their community to follow (i.e., conduct).

*Amici* respectfully assert that the Constitution and federal law prohibit courts from forcing a religious school to employ those whose beliefs or conduct contradict the sincerely held religious tenets and conduct standards of the school. When a religious school takes an adverse employment action based on an employee's failure to adhere to the school's sincerely held religious tenets and conduct standards, the school is not engaging in unlawful discrimination but is instead exercising freedoms protected by the Constitution and federal statutes.

*Amici* respectfully ask this Court to reverse the district court's order denying defendant/appellant Liberty University's ("Liberty") motion to dismiss the claims of plaintiff/appellee Ellenor Zinski ("Zinski").

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The district court misconstrued both the text and the purpose of Title VII. That statute expressly "shall not apply" to religious schools "with respect to the employment of individuals of a particular religion."[3] Title VII broadly defines religion to include "all aspects of religious observance and practice, as well as belief."[4] Nothing in Title VII suggests its religious exemptions cease to apply if a claimant alleges some other form of discrimination (e.g., sex). Liberty's decision to terminate Zinski for Zinski's failure to comply with Liberty's religious standards and beliefs, as described in its doctrinal statement, means Title VII "shall not apply" to Liberty's decision.

The plain text of Title VII's religious exemptions should be the foundation for how they are read and applied. An *amicus curiae* brief by The Church of Jesus Christ of Latter-day Saints and other religious organizations articulates that approach, and we endorse it. But even if this Court is inclined to conclude that the Title VII religious exemptions do not extend to every religious-based employment decision, they should

---

[3] Title VII of the Civil Rights Act of 1964 ("Title VII") §§ 702(a), 703(e)(2), 42 U.S.C. §§ 2000e-1(a), 2000e-2(e)(2).

[4] Title VII § 701(j), 42 U.S.C. § 2000e(j).

at least be read to distinguish between a claimant's status/identity and a claimant's conduct/belief. That distinction is critical to how many religious schools apply their sincerely held religious tenets and is supported by both precedent and science.

The district court conflated status/identity with conduct/belief by wrongly assuming that when "Liberty terminated [Zinski]'s employment at the university because she underwent a sex transition from man to woman" (i.e., conduct), this necessarily meant that "Liberty fired Zinski because of her transgender status."[5] But Liberty did not fire Zinski because of who Zinski is (i.e., status). Rather, Liberty terminated Zinski because of what Zinski did (i.e., conduct) and what Zinski believes— namely, Zinski's refusal to adhere to Liberty's statement of faith and religious rules. By conflating Zinski's status/identity with Zinski's conduct/belief, the district court misapplied Title VII.

The First Amendment also protects a religious school's sincere religious employment decisions under the church autonomy doctrine and the freedom of association. Under the church autonomy doctrine, religious

---

[5] Memorandum Opinion, J. Moon, Feb. 21, 2025, Dkt. 37 ("District Court Order"), at 1. The district court used the phrase "transgender status" 31 times in its opinion.

communities have the right to define their own doctrine and to discipline community members. The freedom of association further guarantees religious organizations the right to associate only with those who agree with their religious message. The district court misapplied these doctrines by conflating status/identity with conduct/belief, by weighing into and misconstruing Liberty's religious doctrine about sin, and by refusing to recognize a religious school's right to discipline employees who do not accept its religious beliefs and do not adhere to its religious standards.

For these reasons, the district court's order should be reversed and Zinski's claims should be dismissed.

# ARGUMENT

## I. Title VII Does Not Apply to a Religious Employer's Decisions Based on Religious Observance, Practice, or Belief.

The district court relied on a false dichotomy between "sex discrimination" and "religious discrimination"—a dichotomy that Title VII nowhere supports. Regardless of the type of discrimination alleged, the plain language of Title VII's religious exemptions allows a religious employer to make an employment decision that an employee is not "of" its "particular religion," broadly defined to include "observance and practice, as well as belief"[6]:

- **Section 702(a):** "This subchapter shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion. . . ."[7]
- **Section 703(e)(2):** "[I]t shall not be an unlawful employment practice for a [religious] university, or other educational institution, . . . to hire and employ employees of a particular religion. . . ."[8]

Thus, Title VII "shall not apply," and it is "not . . . unlawful," when a religious university "hire[s] and employ[s] [only] employees" who adhere to "particular" "religious observance[s,] practice[s], as well as belief[s]."[9] The

---

[6] 42 U.S.C. § 2000e(j).

[7] Title VII § 702(a), 42 U.S.C. § 2000e-1(a). "Subchapter" in this section refers to subchapter VI of chapter 21 of Title 42 to the U.S. code, which is all of Title VII.

[8] Title VII § 703(e)(2), 42 U.S.C. § 2000e-2. The same section also exempts employment decisions where religion "is a bona fide occupational qualification."

[9] 42 U.S.C. §§ 2000e(j), 2000e-1(a), 2000e-2.

plain meaning of these exemptions is that a religious university has an unqualified right not to employ an employee who does not accept or adhere to particular religious conduct or beliefs.

This textualist approach is most consistent with the plain language of the statute, with the Supreme Court's approach to statutory texts, and with prior decisions from this Court and its sister courts.[10] In *Kennedy v. St. Joseph's Ministries*, this Court held that Title VII gives religious employers the right to "create and maintain communities composed solely of *individuals faithful to their doctrinal practices*" and to "employ only persons whose *beliefs and conduct* are consistent with the employer's religious precepts."[11] Accordingly, this Court concluded that Section 702 permitted a Catholic institution to discharge a non-Catholic employee for not wearing the appropriate Catholic attire, which was "a matter of religious principle" for the employee.[12]

Several other cases establish that Title VII gives religious employers the right to make employment decisions based on an employee's religious

---

[10] The textualist approach is likewise expressed in the *amicus* brief of The Church of Jesus Christ of Latter-day Saints, et al.

[11] 657 F.3d 189, 194 (4th Cir. 2011) (quoting *Little v. Wuerl*, 929 F.3d 944, 951 (3rd Cir. 1991 (emphasis added))).

[12] *Id.* at 191–94.

conduct or belief, even if the employee claims that a decision is sex discrimination. For example, in *Curay-Cramer v. Ursuline Acad. of Wilmington*, the Third Circuit held that Section 702 barred a sex discrimination claim brought by a female teacher who was dismissed for engaging in pro-choice advocacy in violation of Catholic teachings.[13] Earlier, in *Little v. Wuerl*, the Third Circuit held that a religious employer that fired an employee for marital conduct inconsistent with the Catholic faith was exempt from Title VII.[14] The Sixth Circuit, in *Hall v. Baptist Memorial Health Care Group*, similarly concluded that Section 702 allowed a Baptist college to fire an employee after she was ordained a minister in a conflicting church that taught there is no inherent inconsistency between a homosexual lifestyle and Christianity.[15]

In *EEOC v. Mississippi College*, the Fifth Circuit held that if a religious institution made the challenged employment decision on the basis of an individual's religion (i.e., observance, practice, or belief), then Section 702 bars further inquiry—even if the employee alleges sex discrimination.[16]

---

[13] 450 F.3d 130, 141 (3d Cir. 2006). While this and other cases were decided prior to *Bostock*, as outlined below, the holding would be the same post-*Bostock* because the employment decision was based on belief and conduct and not status.

[14] 929 F.3d 944, 951 (3d Cir. 1991).

[15] 215 F.3d 618, 623 (6th Cir. 2000).

[16] 626 F.2d 477, 485 (5th Cir. 1980).

More recently, the Fifth Circuit affirmed in relevant part a district court's determination that "Title VII does not apply to religious employers when they employ individuals based on religious observance, practice, or belief."[17] In that case, the lower court dismissed sex discrimination claims brought against a church that prohibited employees from entering into same-sex marriage or engaging in homosexual or transgender conduct.[18]

Disregarding Title VII's definition of religion, which includes "all aspects of religious observance and practice, as well as belief," the district court in the present case concluded that "Sections 702 and 703 provide only narrow exemptions for the religious employer to discriminate on the basis of an employee's espoused belief."[19] The district court's narrowing of the religious exemptions to "belief" and its complete exclusion of "religious observance and practice" would lead to an illogical result: a religious employer would have the right to favor applicants who profess to believe in the employer's religious doctrines (e.g., on marriage, gender, or sexual intimacy), but the employer could do nothing to enforce its religious beliefs and standards when an employee acts contrary to those religious

---

[17] *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 590 (N.D. Tex. 2021), *aff'd in part, rev'd in part Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 936 (5th Cir. 2023).

[18] *Id.*

[19] District Court Order at 40–41.

doctrines. Of course, the free exercise of religion encompasses both belief and conduct.[20] The district court's interpretation undermines the purposes of the Title VII religious exemptions, which also encompass both belief and conduct: to give religious employers the right to "create and maintain communities composed solely of individuals faithful to their doctrinal practices" and to "employ only persons whose beliefs and conduct are consistent with the employer's religious precepts."[21]

Hence, adopting a "straightforward reading" of Title VII's religious exemptions, a religious employer applying its own religious observances, practices, *or* beliefs is "entitled to fire [an employee] without regard to any of the substantive rules of Title VII."[22] Precedent thus shows that Title VII's religious exemptions should be interpreted according to their plain text.

## II. Title VII's Religious Exemptions May Also Be Interpreted to Distinguish between Status/Identity and Conduct/Belief.

Even if this Court is inclined to conclude Title VII's religious exemptions do not extend to *every* religious-based employment decision,

---

[20] *See, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (holding that the free exercise of religion includes "not only the right to harbor religious beliefs inwardly and secretly" but also the right of religious observers "to live out their faiths in daily life through the performance of (or abstention from) physical acts").

[21] *Kennedy v. St. Joseph's Ministries*, 657 F.3d 189, 194 (4th Cir. 2011) (quoting *Little v. Wuerl*, 929 F.3d 944, 951 (3rd Cir. 1991)).

[22] *Starkey v. Roman Catholic Diocese of Indianapolis, Inc.*, 41 F.4th 931, (7th Cir. 2022) (Easterbrook, J., concurring).

at a minimum, the Court should distinguish between a claimant's status/identity and a claimant's conduct/belief. Although this Court might read Title VII to protect a person's status/identity, religious employers would still have the right to make employment decisions based on an employee's conduct or belief,[23] a distinction that is not only recognized by many religious educational institutions but also supported by legal precedent and science.

## A. Amici's Religious Tenets and the Key Distinction between Status/Identity and Conduct/Belief.[24]

Identity, conduct, and belief are core but distinct concepts to *Amici*. The Church of Jesus Christ teaches that "[a]ll human beings—male and female—are created in the image of God," and "[e]ach is a beloved spirit son or daughter of heavenly parents, and, as such, each has a divine nature and destiny."[25] Also, "[g]ender is an essential characteristic of

---

[23] Of course, religious employers are free to make employment distinctions based on an employee's *religious* status/identity. The reference to "status/identity" herein refers to one's membership in a protected class other than religion (e.g., sex).

[24] These statements of Church doctrine reflect *Amici's* current, good faith understanding of the doctrine and policy of the Church of Jesus Christ, based on scripture, Church publications, and other sources. *Amici* acknowledge that the Church possesses the sole ecclesiastical authority to establish, modify, explicate, and apply Church doctrine in particular circumstances.

[25] *The Family: A Proclamation to the World*, The Church of Jesus Christ, https://www.churchofjesuschrist.org/study/scriptures/the-family-a-proclamation-to-the-world/ (the "Family Proclamation").

individual premortal, mortal, and eternal identity and purpose."[26] The Church of Jesus Christ defines gender as "biological sex at birth."[27] A key purpose of mortality is "to obtain a physical body and gain earthly experience to progress toward perfection and ultimately realize [our] divine destiny as heirs of eternal life."[28]

In his seminal address, *Choices for Eternity*, Russell M. Nelson, a prophet and apostle and president of the Church of Jesus Christ and chairman of the CES Board of Trustees, admonished members to understand their "true identity" as (1) children of God, (2) children of the covenant, and (3) disciples of Jesus Christ.[29] He cautioned that no other identifier should "displace, replace, or take priority over" "these three paramount and unchanging identifiers."[30] He also taught that, even given our divine identity, "righteous choices in mortality," including "which laws we are willing to obey," will ultimately determine whether we will fulfill our "unlimited, divine potential."[31] Hence, what we choose

---

[26] *Id.*

[27] GENERAL HANDBOOK: SERVING IN THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS ("General Handbook") § 38.6.23 (2025), https://www.churchofjesuschrist.org/study/manual/general-handbook.

[28] Family Proclamation, *supra* note 25.

[29] Russell M. Nelson, *Choices for Eternity*, The Church of Jesus Christ (May 15, 2022).

[30] *Id.*

[31] *Id.*

to believe (i.e., our beliefs) and what we choose to do (i.e., our conduct) are distinct from who we are (i.e., our status or identity).

These same religious distinctions apply in the context of individuals who identify as transgender. The Church of Jesus Christ recognizes that "[s]ome people feel their inner sense of gender does not align with their biological sex at birth," and those who identify as transgender "are children of God and have divine worth" and "should be treated with sensitivity, kindness, compassion, and Christlike love."[32] The Church of Jesus Christ teaches that "[f]eelings of gender incongruence are *not* a measure of [an individual's] faithfulness."[33] Church leaders also "counsel against pursuing surgical, medical, or social transition away from one's biological sex at birth," and that taking such actions "will result in some Church membership restrictions."[34] But the Church of Jesus Christ also teaches that "worthy individuals who do not pursue surgical, medical, or social transition away from their biological sex at birth may enjoy all the privileges of Church membership."[35] Thus, within the Church of Jesus

---

[32] General Handbook, *supra* note 27, § 38.6.23 (2025).
[33] *Transgender: Understanding Yourself*, The Church of Jesus Christ (emphasis in original), https://www.churchofjesuschrist.org/topics/transgender/understanding.
[34] General Handbook, *supra* note 27, § 38.6.23 (2025).
[35] *Id.*

Christ, individuals' choices and conduct determine outcomes rather than their internal feelings, status, or identity.

The CES Institutions' Honor Code states that members of their campus communities "voluntarily commit to conduct their lives in accordance with the principles of the gospel of Jesus Christ," including personally "striving to deepen faith" and committing to "live a chaste and virtuous life."[36] Thus, the Honor Code regulates belief and conduct, not identity. The CES Institutions require employees who are members of the Church of Jesus Christ not only to follow the Honor Code but also to "hold and be worthy to hold a current temple recommend" (a higher standard of belief and conduct required to enter temples), which ensures employees align with the teachings and practices of the Church of Jesus Christ.[37]

### B. Distinguishing Status/Identity from Conduct/Belief Is Supported by Supreme Court Precedent.

The Supreme Court has repeatedly recognized the difference between (1) status-based discrimination (e.g., "because of sex"); and (2) decisions based on belief or conduct. For example, in *Bray v. Alexandria Women's*

---

[36] BYU, *Church Educational System Honor Code*, https://policy.byu.edu/view/church-educational-system-honor-code.

[37] BYU, *Ecclesiastical Conditions of Employment and University Standards Policy*, https://policy.byu.edu/.

*Health Clinic*, the Court held that "'women seeking abortion' is not a qualifying class" despite recognizing that only women could become pregnant.[38] Similarly, in *303 Creative LLC v. Elenis*, the Court held that a business owner could "provide her website and graphic services to customers regardless of their . . . sexual orientation" while refusing to make websites conveying messages "inconsistent with her belief that marriage should be . . . between one man and one woman."[39] The Court has recognized this same distinction in cases involving a baker's refusal to make a cake for a gay wedding[40] and a religious foster agency's refusal to place children in homes with unmarried or same-sex couples.[41]

Most recently, the Court's decision in *United States v. Skrmetti* confirms that regulating conduct associated with gender transition does not inherently constitute discrimination based on transgender status.[42] In *Skrmetti*, the Court upheld a law that prohibits prescribing puberty

---

[38] 506 U.S. 263, 270–71 (1993) (rejecting civil rights claim based on alleged sex discrimination by protestors at abortion clinics).

[39] 600 U.S. 570, 580 (2023) (holding that compelling a web designer to create expressive content that contradicted beliefs violated First Amendment).

[40] *Masterpiece Cakeshop v. Colo. Civ. Rights Comm'n*, 584 U.S. 617, 626 (2018) (recognizing the baker's willingness to make and sell goods to gay customers, but not cakes for same sex weddings).

[41] *Fulton v. City of Philadelphia*, 593 U.S. 422, 530 (2021) (recognizing the religious foster agency did not object to certifying gay or lesbian individuals as single foster parents or to placing gay or lesbian children).

[42] 145 S. Ct. 1816, 1831 (2025).

blockers and hormones for minors experiencing gender dysphoria, gender identity disorder, or gender incongruence.[43] The Court held that the statute did not "classify on the basis of transgender status," but instead regulated a specific course of medical treatment for minors pursuing gender transitioning.[44] *Skrmetti* addressed a regulation of specific conduct.

In each case, the Supreme Court recognized the difference between a protected class (e.g., sex) and conduct or belief often associated with that class. The only modern instances in which the Court has conflated status and conduct are distinguishable cases involving *government* prohibitions on same-sex conduct[45] and marriage,[46] a *public* university enforcing an all-comers policy for clubs,[47] and a religious university attempting to define conduct by *racial* status itself.[48]

---

[43] *Id.* at 1826–27.

[44] *Id.* at 1833.

[45] *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring) ("[The] law is targeted at more than conduct. It is instead directed toward gay persons as a class.").

[46] *Obergefell v. Hodges*, 576 U.S. 644, 675 (2015) (applying *Lawrence* and holding that marriage is a fundamental right and that a law prohibiting same-sex marriage "serves to disrespect and subordinate [gays and lesbians]").

[47] *Christian Legal Society v. Martinez*, 561 U.S. 661, 688 (2010) (commenting that it was "daunting labor" to require a public university to determine "whether a student organization cloaked prohibited status exclusion in belief-based garb").

[48] *Bob Jones Univ. v. U.S.*, 461 U.S. 574, 604 (1983) (holding that the government had a compelling interest in eradicating racial discrimination by removing a school's tax-exempt status for its policy of expelling students who date or marry outside their race).

In all other cases addressing this important distinction, the Court has been clear: when a private religious actor makes decisions based on religious conduct and belief, rather than on status, no unlawful discrimination occurs.[49]

## C. Distinguishing Status/Identity from Conduct/Belief Is Also Supported by Scientific Research.

The distinction between status/identity and conduct/belief is also supported by scientific research. Not all who identify as transgender pursue gender transitioning. According to one survey of 27,715 respondents who identified as transgender, 38% had never undergone any kind of gender transition.[50] Several recent studies have concluded that gender transitioning may be harmful to those with gender dysphoria (especially for minors), with psychotherapy being a better alternative.[51] Other studies have found more positive outcomes for those who identify

---

[49] *See, e.g.*, *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 341 (1987) (upholding Title VII religious exemption as a defense to discrimination claims brought by an employee who was fired for failing to qualify for a church temple recommend).

[50] Jack Turban, et al., *Factors Leading to "Detransition" Among Transgender and Gender Diverse People in the United States*, LGBT HEALTH, Vol. 8, No. 4 (2021).

[51] *See, e.g.*, Zeki Bayraktar, *Iatrogenic Gender Dysphoria and Harm Cycle in Gender Affirming Care*, J. SEX & MARITAL THERAPY, Vo. 51, No. 4 (2025); Hilary Cass, *Independent Review of Gender Identity Services for Children and Young People*, NHS ENGLAND (Apr. 2024); Robert D'Angelo, et al., *One Size Does Not Fit All: In Support of Psychotherapy for Gender Dysphoria*, LGBT HEALTH, Vol. 8, No. 4 (2021).

as transgender and who choose to maintain their religiosity.[52] Each of these studies shows it is reasonable to distinguish between transgender status/identity and transgender conduct/belief.

Thus, a religious school's application of its rules governing gender transitioning does not automatically discriminate on the basis of sex.

## D. The District Court Wrongly Conflated Zinski's Status/Identity with Zinski's Conduct/Belief.

The district court arrived at the wrong result by repeatedly conflating Zinski's status/identity with Zinski's conduct/belief. From the start of its opinion, the district court equated "Liberty terminat[ing] [Zinski's] employment . . . because she underwent a sex transition from man to woman" with "Liberty fir[ing] Zinski because of her transgender status."[53] Later, the court misconstrued Liberty's argument that it "terminate[d] an employee whose manifested conduct and beliefs are fundamentally at odds with its religious mission" to be the same as terminating Zinski because of "her transgender status."[54] The district court wrongly suggested that it was

---

[52] *See, e.g.*, W. Justin Dyer & Jenet J. Erickson, *Mental Health at Religious and Non-religious Universities: Examining the Role of Student Religiousness and Sexual/Gender Minority Identity*, J. AFFECTIVE DISORDERS, Vol. 342 (Dec. 1, 2023); Jeremy C. Wang, et al., *The Association between Religiosity and Resilience Among Young Trans Women*, PLOS ONE, 18(7) (July 31, 2023); Ariella Tabaac & Tarynn Witten, *Trans\* People and Religion/Spirituality*, SAGE ENCYCLOPEDIA OF LGBTQ STUDIES (Jan. 2016).

[53] District Court Order at 1.

[54] *Id.* at 8 n.2 (adding the bracketed phrase "[i.e., her transgender status]").

undisputed that Liberty terminated Zinski on the basis of Zinski's "transgender status,"[55] using that phrase 31 times in its opinion.[56]

The district court failed to acknowledge that individuals' "attractions or status generally do not preclude them from employment at Liberty, but rather it is their actions."[57] Liberty's sincere religious belief is that "[a]ctive and unrepentant patterns of sin, including sinful behaviors regarding sexual expression and/or gender expression [are] incompatible with [Liberty's] Christian workplace."[58] Liberty did not terminate Zinski because of "transgender status," but because Zinksi's "efforts . . . to transition . . . through hormones and a new name" violated Liberty's doctrinal statement and religious mission.[59] By equating Zinski's beliefs and conduct with Zinski's transgender status, the district court effectively held that the law could be used to force Liberty to continue to employ someone who acted contrary to Liberty's religious standards and beliefs.

The conflation of status/identity with conduct/belief also led the district court to incorrectly suggest that ruling in Liberty's favor would

---

[55] *Id.* at 1.
[56] *Id. passim.*
[57] Exh. B to Liberty's Memo in Support of Motion to Dismiss, Dkt. 12-2.
[58] *Id.*
[59] *Id.*

necessarily give religious employers a "free license to discriminate" if "the religious institution can show that its view . . . is a sincerely held religious belief."[60] To rule in Liberty's favor, this Court need not recognize a right permitting religious employers to engage in status-based discrimination any time they are motivated by sincere religious belief. Rather, the Court could simply rely on the distinction between an employer that discriminates against an employee because of a protected status (e.g., sex) versus an employer who takes an employment action based on an employee's nonadherence to particular religious beliefs or standards of conduct. This position neither condones all religiously motivated class-based discrimination nor wrongly limits Title VII's religious exemptions to allow only a preference for members of the same church.[61]

Like Liberty, *Amici* do not take adverse employment action against individuals simply because of their status or identity as a matter of policy. But *Amici* also exercise their statutory right and constitutional freedom to employ only those who uphold *Amici*'s sincerely held religious beliefs and adhere to *Amici*'s religious standards of conduct.

---

[60] District Court Order at 40.

[61] John T. Melcon, *Thou Art Fired: A Conduct View of Title VII's Religious Employer Exemption*, 19 RUTGERS J. L. & RELIGION 280 (2018).

### E. *Bostock* Supports the Distinction between Status/Identity and Conduct/Belief.

Relying on *Bostock v. Clayton County,*[62] the district court wrongly concluded that "a religious motivation does not trump the bright-line rule of *no but-for sex discrimination* in the workplace."[63] In the district court's view, "where transgender status *is involved*, sex discrimination follows," even if the employer applies religious belief or conduct standards.[64] This misreading of *Bostock* would eviscerate the Title VII religious exemptions any time sexual orientation or transgender status is "involved."

While the *Bostock* Court was not applying the religious exemptions afforded by Sections 702 and 703, and none of the employers raised religious freedom on appeal, the Court specifically emphasized that religious employers in these types of cases could avail themselves of the religious protections afforded by Title VII, the First Amendment, and RFRA.[65] If the *Bostock* Court had intended to interpret Title VII to require religious institutions to employ an individual whose beliefs or conduct contradict their faith-based standards, the Court would not have

---

[62] 590 U.S. 644 (2020).
[63] District Court Order at 37 (emphasis in original).
[64] *Id.* (emphasis added).
[65] *Bostock*, 590 U.S. at 681.

so clearly highlighted the breadth and scope of those religious protections. If affirmed, the district court's proposed rule would negate the rights highlighted in *Bostock*, by rendering Title VII's religious exemptions obsolete any time "transgender status is involved," even if the employment decision was based solely on religious conduct or belief.[66]

When viewed in the context of a religious employer such as Liberty, *Bostock* reaffirms the legal distinction between status/identity and conduct/belief. In each of the three cases decided in *Bostock*, "[a]n employer fired a long-time employee . . . for no reason other than the employee's homosexuality or transgender *status*."[67] The Court noted that "the only question before us is whether an employer [may] fire[] someone *simply for being homosexual or transgender*."[68] Deciding only that question, the Court held that Title VII's prohibition on discrimination "because of sex" includes "discriminat[ion] against a person for *being* homosexual or transgender."[69]

The *Bostock* Court emphasized that the rationale for its holding was "[n]ot because homosexuality or transgender status are *related to sex in some vague sense* . . . , but because to discriminate on these grounds requires

---

[66] District Court Order at 37.
[67] 590 U.S. at 653 (emphasis added).
[68] *Id.* at 651, 681 (emphasis added).
[69] *Id.* at 660.

an employer to intentionally treat individual employees differently *because of their sex*."[70] Citing one of its prior Title VII decisions, the Court noted that it did not "concern itself with . . . whether something in addition to sex contributed to the discrimination, *like the plaintiff's conduct*."[71] Thus, the Court acknowledged that status and conduct are distinct matters. And nowhere in *Bostock* did the Court suggest that Title VII requires a religious employer to employ someone who refuses to align with particular religious beliefs or conduct standards. Rather, *Bostock* suggested the exact opposite: employers may not engage in discrimination based on transgender status, but they may be free to regulate religious observance, practice, or belief.

## III. The First Amendment Bars Courts from Interfering with Sincere Religious Decisions Based on Conduct or Belief.

The district court misapplied the First Amendment doctrines of religious autonomy and freedom of association, which guarantee religious organizations the right to define their own doctrine, discipline their members, and determine with whom they will or will not associate.

---

[70] *Id.* at 661.

[71] *Id.* at 664 (emphasis added) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)).

## A. The Church Autonomy Doctrine Prohibits Courts from Interfering with Religious Schools' Application of Their Own Religious Beliefs and Standards to Their Employees.

The church autonomy doctrine allows religious institutions to define their own doctrine and discipline members of their community without court interference. Because courts are "incompetent judges of matters of faith, discipline, and doctrine," the Supreme Court prohibits courts from interfering with "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them."[72] Grounded in both the Free Exercise Clause and the Establishment Clause, this doctrine allows religious organizations (1) to "decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine"[73]; and (2) "to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters," which "civil courts shall not disturb."[74]

More recently, the Supreme Court declared that the church autonomy doctrine guarantees religious organizations "independence in matters of

---

[72] *Watson v. Jones*, 80 U.S. 679, 727 (1871).

[73] *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952).

[74] *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976).

faith and doctrine and in closely linked matters of internal government."[75]

Although recent Supreme Court cases have applied a subset of the church autonomy doctrine, known as the ministerial exception, the Court has made clear that the doctrine applies to more than just ministers.[76]

The district court misconstrued the church autonomy doctrine first by suggesting that it applies only if the employee has a "spiritual function."[77] But the case cited by the district court for that proposition was specifically referencing only the ministerial exception.[78] The Supreme Court has never suggested that the doctrine applies only to ministerial employees and instead has repeatedly suggested that the doctrine is far broader, applying to "matters of faith and doctrine" as well as "internal discipline" and "conformity of the members of the church to the standard of morals."[79] The fact that a member of a religious school community is an employee does not nullify the church autonomy doctrine or prevent the religious school from requiring adherence to religious beliefs and standards.

---

[75] *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020).

[76] *Id.* at 747 (recognizing that "none [of the Court's prior church autonomy cases] was exclusively concerned with the selection or supervision of clergy").

[77] District Court Order at 68–69.

[78] *Id.* (citing *EEOC v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 801 (4th Cir. 2000)).

[79] *See supra* notes 72–76.

The district court also misapplied the church autonomy doctrine by suggesting that this is a "purely secular dispute," which does not require "questioning the contours of Liberty's espoused 'faith and doctrine.'"[80] A dispute involving a university's application of its religious standards is not "purely secular." Indeed, the district court expressly weighed in on the relative importance of different "sins" to Liberty and suggested that the only real religious burden on Liberty is that it "may be seen as a hypocrite."[81] In rejecting similar reasoning, the Second Circuit held that a district court improperly "devalue[d]" an employer's religious interests by suggesting the only burden on religious freedom in requiring compliance with a nondiscrimination law was the "danger that others could call the [religious employer and its owner] hypocrites."[82]

By denying the religious nature of the dispute, the district court erroneously minimized the religious burden imposed on Liberty by not being able to apply its own statement of faith to Zinski. A court's "determination of what is a 'religious' belief or practice" must "not . . . turn

---

[80] District Court Order at 68–69.

[81] *Id.* at 64–65 (suggesting that the only real burden on Liberty's religion is that "Liberty may be seen as a hypocrite" for employing Zinski, and commenting that "the same could be said for Liberty's employment of any other type of person who 'sins' despite Liberty's opposition to sin in general").

[82] *Slattery v. Hochul*, 61 F.4th 278, 290 (2d Cir. 2023).

upon a judicial perception of the particular belief or practice in question."[83] Courts also may not "interpret[] . . . particular church doctrine and the importance of those doctrines to the religion."[84] Here, the district court invaded Liberty's religious autonomy by weighing in on a religious question and rejecting Liberty's application of its own religious standards.

**B. The Freedom of Association Allows Religious Schools to Employ Only Those Who Accept Their Religious Beliefs and Adhere to Their Religious Standards.**

The First Amendment also protects the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion."[85] The freedom of association is especially crucial to the free exercise of religion because "the First Amendment . . . gives special solicitude to the rights of religious organizations."[86] There is "no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept

---

[83] *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981).
[84] *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 450 (1969).
[85] *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984).
[86] *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 189 (2012).

members it does not desire."[87] Accordingly, "the forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints."[88]

The district court questioned whether this freedom of association applies in the employment context.[89] But the Supreme Court has never suggested otherwise, and other courts have recognized the freedom of association in the employment context. For example, in *Slattery v. Hochul*, the Second Circuit upheld a faith-based crisis pregnancy center's claim for violation of its freedom of association rights after the State of New York prohibited employers from taking adverse employment action based on an employee's "reproductive health decision making" (e.g., having an abortion).[90] The court held that "forc[ing] [religious employers] to associate with employees or prospective employees whose actions indicate that they do not share their views" is a "severe burden" on the employer's expressive association rights, which subjects the law to a

---

[87] *Jaycees*, 468 U.S. at 623.
[88] *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000).
[89] District Court Order at 68–69.
[90] 61 F.4th 278 (2d Cir. 2023).

strict scrutiny analysis.[91] Likewise, forcing Liberty to employ someone who opposes its religious views or refuses to adhere to its religious standards would be a severe burden on Liberty's free exercise of religion.

The district court's analysis also misconstrued the Supreme Court's decision in *Boy Scouts of America v. Dale*.[92] Conflating its freedom of association analysis with a ministerial exception analysis, the district court focused on the respective roles of Dale and Zinski in inculcating the values of their organizations.[93] Yet, *Dale* did not focus on the scoutmaster's role in the Boy Scouts but rather his mere "presence" therein and his avowed disagreement with the organization's policy against same-sex relationships.[94] The Court concluded that merely having Dale present would "force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior."[95] Likewise, Zinski's presence at Liberty, opposition to Liberty's beliefs, and noncompliance with Liberty's standards,

---

[91] *Id.* at 287–90; *see also New Hope Family Services v. Poole*, 966 F.3d 145, 179 (2d Cir. 2020) (upholding religious adoption agency's freedom of association claim that challenged state law requiring placement of children with same-sex couples, in part because the agency could have to discipline employees who shared the agency's beliefs).

[92] 530 U.S. 640.

[93] District Court Order at 64–65.

[94] *Dale*, 530 U.S. at 655–56.

[95] *Id.* at 653.

would force Liberty to communicate a message that gender transitioning is acceptable behavior for members of its school community.

## CONCLUSION

The district court misconstrued Title VII, conflated status/identity with conduct/belief, and misapplied First Amendment protections. Under both Title VII and the First Amendment, religious schools have the freedom to establish and maintain communities of faith comprising individuals who share religious beliefs and adhere to religious standards of conduct. The district court's denial of Liberty's motion to dismiss Zinski's claims should be reversed.

Date: August 8, 2025

Respectfully submitted,

*/s/ David M. Andersen*

Steven M. Sandberg
David M. Andersen
Aaron M. Worthen
Brigham Young University
Office of General Counsel
A-357 ASB
Provo, UT 84602
(801) 422-4722
steve.sandberg@byu.edu
david_andersen@byu.edu
aaron_worthen@byu.edu

Counsel for *Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,365 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

*/s/ David M. Andersen*

Counsel for *Amici Curiae*

# DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Local Rule 26.1,

> Brigham Young University,
> Brigham Young University–Hawaii,
> Brigham Young University–Idaho, and
> Ensign College

who are *amici curiae*, make the following disclosure:

1. Are any *amici* a publicly held corporation or other publicly held entity? **NO**

2. Do *amici* have any parent corporations? **NO**

3. Is 10% or more of the stock of any *amici* owned by a publicly held corporation or other publicly held entity? **NO**

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? **NO**

5. Are any *amici* a trade association? **N/A**

6. Does this case arise out of a bankruptcy proceeding? **NO**

7. Is this a criminal case in which there was an organizational victim? **NO**

*/s/ David M. Andersen*

Counsel for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I certify that on August 8, 2025, the foregoing document was served

on all parties or their counsel of record through the CM/ECF system.


*/s/ David M. Andersen*

Counsel for *Amici Curiae*