CONSOLIDATED NOS. 25-1228(L), 25-1581

# In the United States Court of Appeals for the Fourth Circuit

ELLENOR ZINSKI,

*Plaintiff-Appellee,*

v.

LIBERTY UNIVERSITY, INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Western District of Virginia at Lynchburg
No. 6:24-cv-00041-NKM-CKM; Hon. Norman K. Moon

**BRIEF OF THE COUNCIL FOR CHRISTIAN COLLEGES & UNIVERSITIES, THE ASSOCIATION FOR BIBLICAL HIGHER EDUCATION, AND EIGHT RELIGIOUS COLLEGES AND UNIVERSITIES AS *AMICI CURIAE* SUPPORTING DEFENDANT-APPELLANT**

Joy Mosley
COUNCIL FOR CHRISTIAN
COLLEGES & UNIVERSITIES
20 M Street SE, Suite 350
Washington, DC 20003
Telephone: (202) 546-8713

Gene C. Schaerr
Joshua J. Prince
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amici Curiae*

AUGUST 8, 2025

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

Nos. 25-1228(L), 25-1581  Caption: Zinski v. Liberty University, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Council for Christian Colleges & Universities; The Association for Biblical Higher Education; Cedarville University;
(name of party/amicus)
Jacksonville College; Oakland City University; Pensacola Christian College; Pillar College; Regent University;
Southern Wesleyan University; and Walsh University

who is _____ Amici Curiae _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.　Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?　☐YES ☑NO
If yes, identify entity and nature of interest:

5.　Is party a trade association? (amici curiae do not complete this question)　☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.　Does this case arise out of a bankruptcy proceeding?　☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.　Is this a criminal case in which there was an organizational victim?　☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Gene C. Schaerr _____　Date: _____08/08/2025_____

Counsel for: ___Amicus Curiae___

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES ..................................................iv

INTRODUCTION, INTEREST, AND SOURCE OF AUTHORITY
   OF *AMICI CURIAE* ...................................................1

STATEMENT ...................................................................4

SUMMARY OF ARGUMENT ...............................................5

ARGUMENT ....................................................................7

  I.    Liberty's Interpretation of Title VII's Religious Exemption
      Is Constitutionally Required. .........................................8

      A.   The Religion Clauses allow religious schools to decide
          what standards of belief and conduct determine
          community membership. ......................................8

      B.   If Title VII imposed liability here, it would
          unconstitutionally punish Liberty for exercising its
          constitutional rights. .......................................14

  II.   Many of the Unique Benefits of Religious Colleges and
      Universities Would Be Lost Without Protections Like Title
      VII's Religious Exemption. ..........................................17

      A.   Religious colleges and universities bring unique
          benefits to higher education. ..............................17

      B.   Those unique benefits flow, in part, from the ability of
          religious colleges to ensure that community members
          are fully aligned with their religious missions. ..............28

CONCLUSION ................................................................29

CERTIFICATE OF COMPLIANCE .......................................31

ADDENDUM: List of *Amici Curiae* ....................................32

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Askew v. Trs. of Gen. Assembly of Church of the
    Lord Jesus Christ of the Apostolic Faith Inc.*,
    684 F.3d 413 (3d Cir. 2012) ................................................ 14

*Billard v. Charlotte Cath. High Sch.*,
    101 F.4th 316 (4th Cir. 2024) ............................................. 15

*Bouldin v. Alexander*,
    82 U.S. (15 Wall.) 131 (1872) ...................................... 2, 5, 12

*Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus.
    Rev. Comm'n*, 145 S. Ct. 1583 (2025) ........................... 10, 13

*Corp. of Presiding Bishop of Church of Jesus Christ of
    Latter-day Saints v. Amos*, 483 U.S. 327 (1987) ........... 11, 16

*Demkovich v. St. Andrew the Apostle Par.*,
    3 F.4th 968 (7th Cir. 2021) ................................................ 16

*EEOC v. Catholic Univ. of Am.*,
    83 F.3d 455 (D.C. Cir. 1996) .............................................. 16

*EEOC v. Roman Cath. Diocese of Raleigh*,
    213 F.3d 795 (4th Cir. 2000) .............................................. 13

*EEOC v. Townley Eng'g & Mfg. Co.*,
    859 F.2d 610 (9th Cir. 1988) ................................................ 9

*Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v.
    Seminole Tribe of Fla.*, 824 F. App'x 680 (11th Cir. 2020) .......... 13

*Farnsworth v. Storrs*,
    59 Mass. (5 Cush.) 412 (1850) ............................................ 11

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021) ........................................................... 15

*Groff v. DeJoy*,
    600 U.S. 447 (2023) ........................................................... 15

*Harmon v. Dreher*,
  17 S.C. Eq. (Speers Eq.) 87 (1843) ...................................................... 11

*Jones v. Wolf*,
  443 U.S. 595 (1979) ........................................................................... 14

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church*,
  344 U.S. 94 (1952) ............................................................................. 8

*Korte v. Sebelius*,
  735 F.3d 654 (7th Cir. 2013) ............................................................... 9

*Larson v. Valente*,
  456 U.S. 228 (1982) ........................................................................... 10

*McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*,
  980 F.3d 1066 (5th Cir. 2020) ..................................................... 13, 28

*Natal v. Christian & Missionary All.*,
  878 F.2d 1575 (1st Cir. 1989) .............................................................. 3

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
  591 U.S. 732 (2020) ......................................................................... 2, 8

*Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*,
  819 F.2d 875 (9th Cir. 1987) ............................................................... 9

*Shannon v. Frost*,
  42 Ky. (3 B. Mon.) 253 (1842) ........................................................... 11

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ........................................................................... 15

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
  450 U.S. 707 (1981) ........................................................................... 15

*Watson v. Jones*,
  80 U.S. (13 Wall.) 679 (1871) ..................................................... 5, 12, 13

*Zinski v. Liberty Univ., Inc.*,
  777 F. Supp. 3d 601 (W.D. Va. 2025) ................................................... 4

*Zinski v. Liberty Univ., Inc.*,
  No. 6:24-cv-00041, 2025 WL 1001163 (W.D. Va. Apr. 3, 2025) ........... 4

**Statutes**

20 U.S.C. § 1011a ................................................................... 27

42 U.S.C. § 2000e-1 ............................................................ 1, 15

Higher Education Opportunity Act of 2008,
    Pub. L. No. 110-315, 122 Stat. 3078
    (codified as amended at 20 U.S.C. § 1001 *et seq.*) ............................... 18

**Other Authorities**

154 Cong. Rec. H7661 (July 31, 2008) ................................... 19

154 Cong. Rec. H7668 (July 31, 2008) ................................... 19

*About JTS*,
    Jewish Theological Seminary .............................................. 18

*About Liberty*,
    Liberty Univ. .................................................................... 25

*Abraham Kuyper: A Centennial Reader*
    (James D. Bratt ed., 1998) .................................................. 18

*Campus Ministry, Mission Trips*,
    Cath. Univ. of Am. ............................................................ 21

Council for Christian Colls. & Universities,
    *The Case for Christian Higher Education* (2020) .............................. 21

Council for Christian Colls. & Universities,
    *The Case for Christian Higher Education* (Jan. 2018) ......................... 27

*Deuteronomy* 10:19 (RSV) ..................................................... 19

*Enrollment Servs., Deferring or Leaving School*,
    Brigham Young Univ. ......................................................... 21

Carl H. Esbeck,
    *An Extended Essay on Church Autonomy*,
    22 Fed. Soc'y Rev. 244 (2021) ............................................. 10

*Exodus* 22:20 ........................................................................ 20

*Faith & Service, Service Opportunities*,
Messiah Univ. ........................................................................ 21

*Faith Engagement, With Our Community*,
Andrews Univ. ...................................................................... 21

Fed. Student Aid,
*Experimental Sites Initiative: Annual Summary Report*
(Dec. 31, 2024) ............................................................... 22, 23

*Galatians* 5:9 (NIV) ............................................................ 2, 28

Richard W. Garnett,
*A Hands-Off Approach to Religious Doctrine: What
Are We Talking About?*, 84 Notre Dame L. Rev. 837 (2009) ............... 9

*The Gap Year Experience: A Life-Changing Opportunity*,
Princeton Rev. ...................................................................... 22

*James* 1:27 .......................................................................... 20

Avi Lazerson,
*Holiness and Judaism*, Jewish Mag. (Jan. 2001) ...................... 25

*Luke* 12:15 (ESV) .................................................................. 20

*Matthew* 25:35-40 ................................................................ 20

*Matthew* 25:40 (King James) .................................................. 19

*Matthew* 5:14 ...................................................................... 25

Michael McConnell,
*The Origins and Historical Understanding of Free
Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) .................... 13

*Mosiah* 2:17 (Book of Mormon) .............................................. 19

Niche,
*2025 Safest College Campuses in America* .......................... 23, 24

Off. Commc'ns & Pub. Engagement,
 *Liberty University Announces Record Enrollment:*
 *Over 16,000 on Campus, 124,000 Online,*
 Liberty Univ. (Sept. 23, 2024) ........................................... 26

Elizabeth Weiss Ozorak,
 *Love of God and Neighbor: Religion and*
 *Volunteer Service Among College Students,*
 44 Rev. Religious Rsch. 285 (2003) .................................... 21

R. Michael Paige et al.,
 *Study Abroad for Global Engagement:*
 *The Long-Term Impact of Mobility Experiences,*
 20 Intercultural Educ. S29 (2009) ...................................... 22

Richard Pérez-Peña,
 *Muslims From Abroad Are Thriving in Catholic Colleges,*
 N.Y. Times (Sept. 2, 2012) ................................................. 24

Press Release,
 U.S. Dep't of Educ., *U.S. Department of Education*
 *Announces Expansion of Second Chance Pell Experiment*
 *and Actions to Help Incarcerated Individuals Resume*
 *Educational Journeys and Reduce Recidivism*
 (Apr. 26, 2022) ..................................................................... 23

*Proverbs* 27:17 (NIV) ............................................................... 28

*The Qur'an* 16:90 (Sahih Int'l) ................................................ 19

*The Qur'an* 17:26 ..................................................................... 20

Regent Univ.,
 *Regent University Named #1 Safest College Campus*
 *in Virginia,* Regent Univ. News (July 22, 2021) ................ 24

*Sahih al-Bukhari* 6416 ............................................................. 25

Ellen B. Stolzenberg et al.,
 *Undergraduate Teaching Faculty: The HERI*
 *Faculty Survey 2016–2017,*
 Higher Educ. Rsch. Inst. at UCLA (2019) ......................... 26

viii

Kathryn A. Tuttle,
*The Effects of Short-term Mission Experienced
on College Students' Spiritual Growth and Maturity*,
4 Christian Educ. J. 123 (2000) ........................................................... 21

U.S. Dep't of Educ.,
*Institutions Selected for Participation in the
Second Chance Pell Experiment in the 2016-2017
Award Year* (July 8, 2016) ................................................... 23

U.S. Dep't of Educ., Experimental Sites Initiative,
*New Institutions Invited to Participate in the Second
Chance Pell (SCP) Experiment* (Apr. 24, 2020) .................................. 23

U.S. Dep't of Educ., Experimental Sites Initiative,
*New Institutions Invited to Participate in the
Second Chance Pell (SCP) Experiment* (Apr. 26, 2022) ...................... 22

James R. Vanderwoerd & Albert Cheng,
*Sexual Violence on Religious Campuses*,
47 Canadian J. Higher Ed. 1 (2017) ................................................... 24

Tad Walch,
*BYU Sees Dramatic Jump in Number of Returned
Missionaries*, Deseret News (Apr. 4, 2016, 9:40 AM) .......................... 21

## INTRODUCTION, INTEREST, AND
## SOURCE OF AUTHORITY OF *AMICI CURIAE*[1]

Congress continued a long national tradition of deferring to religious organizations on matters that go to the heart of their missions when it codified Title VII's religious exemption, which allows religious organizations to require employees to be members of the organization's faith. 42 U.S.C. § 2000e-1(a). Ellenor Zinski, by suing Liberty University ("Liberty") after being terminated for living contrary to Liberty's religious convictions, invites this Court to break new ground by scrutinizing a core matter of religious governance: Liberty's decision to part ways with a person who lives contrary to the fundamental principles of Liberty's religious community. This Court should reject Zinski's invitation by holding that the religious exemption, properly understood, allows a religious institution to separate from anyone living contrary to the institution's sincere religious beliefs.

As Liberty shows, broader First Amendment principles, together with the statutory text, compel that reading of the religious exemption.

---

[1] No counsel for a party authored any part of this brief. No party, party's counsel, or person other than *amici*, its members, or its counsel made a monetary contribution to fund the brief's preparation or submission. This brief is filed with the consent of all parties.

The First Amendment's church-autonomy doctrine as articulated, for example, in *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 747 (2020), shields religious institutions from judicial scrutiny of their decisions not just as to their leaders and teachers, but also as to their membership. *See, e.g.*, *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139-40 (1872). And rightly so: A religious community's membership, no less than its ministers, has a powerful impact on the community's development and the furtherance of its doctrine and missions. *See Galatians* 5:9 (NIV) ("A little yeast works through the whole batch of dough.").

As a religious university, Liberty University enjoys the same legal protections under Title VII as churches. Liberty seeks to educate the next generation in Christian values, and it thus has the same interests as a church in maintaining cohesiveness and unity of message and practice on beliefs fundamental to its biblical, Christian identity. And it has promised both its students and their families that the school community will adhere to those theological understandings.

Because religious schools like Liberty will be deprived of their ability to shape their communities if Title VII forbids them from

2

removing rogue employees, this case is critical to *Amici*, who represent a wide swath of American religious higher education. *Amici* include the Council for Christian Colleges & Universities ("CCCU"), which represents some 140 faith-based institutions in the United States, the Association for Biblical Higher Education, which comprises a network of 160 institutions of biblical higher education, and the eight specific religious colleges and universities listed in the Addendum. *Amici* have a strong interest in protecting their First Amendment right to create—free from governmental interference—a community of students, staff, and faculty aligned with their unique religious missions.

And like Liberty, *Amici* cannot achieve their sacred goals unless they can require all employees to uphold the religious standards governing campus life. The risk of Title VII liability poses an existential threat to such efforts. And, but for the religious exemption, Title VII would impermissibly thrust courts "into a maelstrom of Church policy, administration, and governance" whenever a religious school fires an employee for violating the school's religious beliefs. *Natal v. Christian & Missionary All.*, 878 F.2d 1575, 1578 (1st Cir. 1989). To prevent these harms, the Court should hold that Liberty has the unqualified right to

terminate employees who, in word or deed, flout Liberty's religious convictions. The First Amendment demands as much.

## STATEMENT

Ellenor Zinski, an employee at Liberty University, disclosed that Zinski identified as transgender and was undergoing hormone replacement therapy. *See Zinski v. Liberty Univ., Inc.*, 777 F. Supp. 3d 601, 610 (W.D. Va. 2025). In response, Liberty fired Zinski because continued employment was inconsistent with the school's religious beliefs as articulated in its doctrinal statement. *Id.* at 611. Zinski sued, alleging unlawful sex discrimination under Title VII. *Id.*

Liberty unsuccessfully moved to dismiss, asserting—among other things—Title VII's statutory religious exemption, the Religious Freedom Restoration Act, and the First Amendment's guarantees of expressive association and church autonomy. *Id.* at 611-12. Although the district court denied the motion, it also granted Liberty's later motion to certify the court's non-final order because of the importance of the statutory and constitutional questions Liberty raised. *See Zinski v. Liberty Univ., Inc.*, No. 6:24-cv-00041, 2025 WL 1001163, at *1 (W.D. Va. Apr. 3, 2025).

## SUMMARY OF ARGUMENT

*Amici* agree with Liberty on the proper understanding of the Title VII religious exemption. They write separately to emphasize and expand on two points.

*First*, the Religion Clauses of the First Amendment forbid civil courts from exercising jurisdiction over ecclesiastical matters, including decisions about standards for members or leaders of churches and other religious communities. *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 733 (1871). The church-autonomy doctrine does not apply *only* to would-be ministers. It also applies to all disciplinary decisions based on religious standards affecting members of religious institutions, including religious colleges.

Indeed, for centuries, the Supreme Court has recognized that courts cannot "decide who ought to be members of the church" or whether those excluded "have been regularly or irregularly cut off." *Bouldin*, 82 U.S. at 139-40. Because religious colleges, like churches, exist to further religious missions, that same principle applies to them. The Religion Clauses thus forbid courts from asking the questions Zinski's case necessarily asks this Court to consider: Liberty's religious decision

5

regarding Zinski's continued membership in its religious community. And principles of constitutional avoidance caution against interpreting Title VII to allow such entanglement with Liberty's religious decisions.

*Second*, interpreting Title VII to allow religious institutions to make decisions on membership also furthers society's powerful interest in preserving a robust religious higher-education community. Religious colleges offer students distinctive opportunities for community service, increased physical and emotional safety, and greater philosophical and political diversity than most non-religious institutions. Thus, the mere existence of religious colleges and universities provides significant benefits to higher education generally. Without the ability to ensure mission alignment by removing from the community those who oppose fundamental aspects of that mission, religious higher-education institutions would be far less likely to provide those unique benefits.

After all, if the Court were to agree with Zinski that Title VII's religious exemption does not allow Liberty to fire employees who oppose its mission, religious schools would face a Hobson's choice: abandon core religious beliefs or face significant liability. Adopting Liberty's

understanding of the exemption will, by contrast, ensure that religious colleges can continue providing their many societal benefits.

## ARGUMENT

*Amici* agree with Liberty (at 9-23) that Title VII's religious exemption, standing alone, bars Zinski's claims. *Amici* write separately to emphasize two key points. *First*, the First Amendment's church-autonomy doctrine, which applies with full force to religious colleges and universities, bars Zinski's claims and is supported by the text of Title VII's religious exemption. *Second*, the many benefits that religious colleges and universities confer would be seriously impaired (if not lost) if the government could impose liability on those schools when they— consistent with their religious beliefs and practices—terminate an employee whose influence could harm the religious community that those schools foster. The Court should thus find that Zinski's claims are barred—whether under the plain text of Title VII or as a matter of constitutional avoidance.

I.   **Liberty's Interpretation of Title VII's Religious Exemption Is Constitutionally Required.**

Zinski's proposed reading of Title VII's religious exemption would allow the civil courts to second-guess a religious organization's decision to dismiss members for violating its religious teachings—a decision fully protected by the Religion Clauses. To avoid the conflict between Title VII and the First Amendment's key religious protections, the Court should reject Zinski's interpretation.

A.   **The Religion Clauses allow religious schools to decide what standards of belief and conduct determine community membership.**

Though Liberty is correct on the proper interpretation of Title VII's religious exemption, the fact that Zinski was a member of a religious community and was ousted for failure to abide by the community's norms is sufficient to bar judicial consideration of Zinski's claims.

1. Recently, the Supreme Court (re)affirmed that "[t]he First Amendment protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady of Guadalupe Sch.*, 591 U.S. at 737 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952)). This doctrine, known

as the church-autonomy doctrine, protects churches and religious colleges alike. *See EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 620 n.15 (9th Cir. 1988).

As the Ninth Circuit has rightly explained, "Courts generally do not scrutinize closely the relationship among members (or former members) of a church." *Paul v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 819 F.2d 875, 883 (9th Cir. 1987). Rather, "[c]hurches are afforded great latitude when they impose discipline on members or former members." *Id.* The need to defer to religious organizations on such matters stems from the practical understanding that "secular tribunals 'lack the power to answer some questions—religious questions—whose resolution is, under an appropriately pluralistic political theory, left to other institutions.'" *Korte v. Sebelius*, 735 F.3d 654, 678 (7th Cir. 2013) (quoting Richard W. Garnett, *A Hands-Off Approach to Religious Doctrine: What Are We Talking About?*, 84 Notre Dame L. Rev. 837, 861 (2009)).

By forbidding judicial scrutiny of religious decisions, moreover, the church-autonomy doctrine reduces the risk that, through such scrutiny, courts will flout the Establishment Clause's "clearest command" that the government not prefer one religion over another. *Cath. Charities Bureau,*

*Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 145 S. Ct. 1583, 1591 (2025) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)). After all, though judicial scrutiny of a religious community whose beliefs *conform* to prevailing secular orthodoxies is itself forbidden by the First Amendment, at least communities with such conforming beliefs can face such scrutiny secure in the knowledge that they are unlikely to face civil liability for implementing them. But religious groups that reject one aspect or another of secular orthodoxy lack that practical protection. And for that and other reasons, the church-autonomy "doctrine has long entailed the rule that the judiciary must avoid issues that cause it to probe into the religious meaning of religious words, practices, or events" altogether. Carl H. Esbeck, *An Extended Essay on Church Autonomy*, 22 Fed. Soc'y Rev. 244, 254 (2021).

2. No matter is more ecclesiastical than the question of what standards of religious conduct and belief define who can, and who cannot, be members of a religious community. As Justice Brennan recognized, "For many individuals, religious activity derives meaning in large measure from participation in a larger religious community" that "represents an ongoing tradition of shared beliefs." *Corp. of Presiding*

10

*Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 342 (1987) (Brennan, J., concurring in the judgment). The question of who can help form or shape those beliefs, either as a leader, a teacher, an ordinary member, or (as here) an employee is solely for the organization to decide.

This is no new principle. By as early as 1850, the Massachusetts Supreme Judicial Court recognized that the "powers and privileges" of religious organizations had been "established by long and immemorial usage." *Farnsworth v. Storrs*, 59 Mass. (5 Cush.) 412, 415 (1850). Included in those long-established powers were the "authority to deal with . . . members" who violate the community's norms, and "to administer proper punishment by way of rebuke, censure, suspension and excommunication." *Id.* Many other courts have also recognized the authority of religious organizations to decide such questions without judicial interference. *See Shannon v. Frost*, 42 Ky. (3 B. Mon.) 253, 258 (1842) ("This Court, having no ecclesiastical jurisdiction, cannot revise or question ordinary acts of church discipline or excision."); *Harmon v. Dreher*, 17 S.C. Eq. (Speers Eq.) 87, 120 (1843) ("It belongs not to the civil

11

power to enter into or review the proceedings of a Spiritual Court" of a religious group "of which [the person] was a voluntary member.").

State courts were not alone: The Supreme Court recognized the complete autonomy of religious organizations over membership decisions more than 140 years before it formally recognized that the "ministerial exception" protects the rights of religious organizations to choose their ministers. In *Watson v. Jones*, the Supreme Court held that courts could "exercise no jurisdiction" over "a matter which concerns theological controversy, church discipline, ecclesiastical government, *or* the conformity of the members of the church to the standard of morals required of them." 80 U.S. (13 Wall.) at 733. Mere months later, the Court stated expressly what it had implied in *Watson*—that courts "cannot decide who ought to be members of the church, nor whether the excommunicated have been regularly or irregularly cut off." *Bouldin*, 82 U.S. (15 Wall.) at 139-40.

As Justice Thomas recently recognized, one reason for this constitutional protection is that "those 'who unite themselves to [a religious] body do so with an implied consent to' its internal system of 'government, and are bound to submit to it.'" *Cath. Charities Bureau,* 145

S. Ct. at 1596 (Thomas, J., concurring) (quoting *Watson*, 80 U.S. (13 Wall.) at 729). Another is that religious organizations are "supreme in [their] own sphere," such that while "temporal matters [are] subject to civil courts' jurisdiction," "spiritual matters [are] subject to ecclesiastical jurisdiction" alone. *Id.* at 1596-97 (first citing Michael McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1496-97 (1990); and then citing *McRaney v. N. Am. Mission Bd. of S. Baptist Convention, Inc.*, 980 F.3d 1066, 1076-78 (5th Cir. 2020) (Oldham, J., dissenting)).

For religious organizations, employment decisions are spiritual matters that—as this Court has recognized—"[t]he Supreme Court has always safeguarded." *EEOC v. Roman Cath. Diocese of Raleigh*, 213 F.3d 795, 800 (4th Cir. 2000). To quote the Eleventh Circuit, "[M]atters of church governance, administration, and membership" are "part and parcel of ecclesiastical concerns." *Eglise Baptiste Bethanie De Ft. Lauderdale, Inc. v. Seminole Tribe of Fla.*, 824 F. App'x 680, 683 (11th Cir. 2020) (unpublished). And even though courts *can* address some issues involving religious organizations—such as property disputes—by applying neutral principles of law, *Jones v. Wolf*, 443 U.S. 595, 602

13

(1979), as the Third Circuit has correctly held, there is "no neutral principle of law that could assist in evaluating whether a member lives his or her life in a manner consistent with church doctrine." *Askew v. Trs. of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413, 419 (3d Cir. 2012). Such issues, then, are left exclusively to religious organizations, free from governmental control.

**B.    If Title VII imposed liability here, it would unconstitutionally punish Liberty for exercising its constitutional rights.**

The consequences of allowing the government to second guess Liberty's employment decision here—grounded as it was in Liberty's religious decision that Zinski's conduct flouted Liberty's religious beliefs—are enormous. If a statute could impose liability on religious organizations for such decisions, those organizations would either have to ignore an employee's flagrant violations of their religious standards or discipline the employee knowing that a lawsuit would follow.

But allowing Title VII to impose such a constant threat to religious organizations would undermine their ability to fulfill all the mandates of their faiths to the best of their ability, forcing them to adopt what they see as second- or third-best employment decisions all to avoid liability. It

14

is thus no exaggeration to say that applying Title VII to an objecting religious organization would not vindicate the statute at all, but would instead result in unlawful religious discrimination that Title VII itself—at least as to employees—forbids. *See* 42 U.S.C. § 2000e-1(a); *Groff v. DeJoy*, 600 U.S. 447, 457 (2023).

Thankfully, the First Amendment does not allow the threat of civil liability to interfere with the exercise of constitutional rights—such as a religious organization's decisions on matters of institutional government. As this Court recognized in *Billard*, "Title VII's religious exemptions, though statutory, are also constitutionally inspired" and "rest[] on constitutional principles." *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 329 (4th Cir. 2024). And, as the Supreme Court has long recognized, it is a First Amendment harm to put a person or religious organization to the choice between practicing religious beliefs and the loss of a benefit or the imposition of a penalty. *E.g.*, *Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021); *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963).

Such protections reflect the existential threat posed by government intrusion into religious questions. As the Seventh Circuit recognized in a

15

recent ministerial exception case, the possibility that a government entity will misunderstand a religious doctrine or practice alone "threatens to fundamentally alter" the way a religious organization operates. *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 980 (7th Cir. 2021) (en banc). That court, together with Justice Brennan, rightly understood that the very "prospect of government intrusion raises concern that a religious organization may be chilled in its free exercise activity." *Amos*, 483 U.S. at 343 (Brennan, J., concurring in the judgment). Accordingly, the First Amendment, properly understood, ensures that the only thing that will influence a religious organization's activities or organizational structure are its beliefs—not the "prospect of future investigations and litigation." *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996).

Here, the rule for which Zinski advocates would flout these foundational principles in a way that risks harming all religious colleges and universities, not to mention churches and other institutions of faith. The solution is for this Court to squarely hold that Liberty's decision to fire an employee living contrary to its religious beliefs and community

16

behavioral standards is a quintessential "matter[] of church government" that the First Amendment places outside the judicial ken.

## II.  Many of the Unique Benefits of Religious Colleges and Universities Would Be Lost Without Protections Like Title VII's Religious Exemption.

There are also strong policy reasons to reject Zinski's overly narrow understanding of the Title VII religious exemption—chief among them being the practical social harms that understanding would create.

### A.  Religious colleges and universities bring unique benefits to higher education.

Beyond academic excellence competitive with secular schools, religious colleges and universities in the Fourth Circuit and nationwide offer students advantages often not as readily available in secular institutions. These include not only the opportunity to study academic disciplines from the standpoint of faith, but also the opportunities to naturally integrate community service into higher education; to enjoy greater physical safety; and to learn in an environment with philosophical and political perspectives generally absent in secular institutions.

1.  The promise a religious college or university makes to students and their families is the opportunity to study academic disciplines of

interest to the student through the lens of faith. For Christian colleges, for example, faith, learning, life, and work all come under "the Lordship of Jesus Christ," as famously discussed by statesman, journalist and theologian Abraham Kuyper.[2]

Religious colleges from other faith traditions also strive for a similar integration of faith and learning.[3] And, for religious students and families, that integration is not only immensely valuable—it is the whole point of religious higher education.

2. Religious colleges and universities offer other benefits as well. Congress recognized one such benefit—helping students integrate community service into their educational pursuits—when it passed the Higher Education Opportunity Act of 2008, Pub. L. No. 110-315, 122 Stat. 3078 (codified as amended at 20 U.S.C. § 1001 *et seq.*). That is one reason why, among other things, that Act requires accrediting bodies to

---

[2] *Abraham Kuyper: A Centennial Reader* 488 (James D. Bratt ed., 1998).

[3] *About JTS*, Jewish Theological Seminary, https://www.jtsa.edu/about-jts (last visited July 31, 2025) ("JTS is a preeminent institution of Jewish higher education, training thoughtful, innovative leaders—rabbis, cantors, educators, lay leaders, and scholars—who strengthen our communities with a vision of Judaism that is deeply grounded in the Jewish past and thoroughly engaged with contemporary society.").

"respect[] the . . . religious missions" of such institutions. 154 Cong. Rec. H7668 (July 31, 2008). Noting that "[t]he time to recognize and encourage an increased commitment to public service" had come, the House Report on this Act specifically mentioned, as a reason for congressional protection, the increasing number of students at religious colleges who serve religious missions or perform other kinds of service. 154 Cong. Rec. H7661 (July 31, 2008). These observations reflect that community service is one important way in which those colleges contribute to society.

Religious colleges foster community service intentionally. Students and professors in these institutions are typically encouraged by their foundational religious texts, traditions, and teachings to take care of the foreigner, the poor, and the needy.[4] And they are consequently more likely to embrace the challenging principle that the value of one's life is

---

[4] *See, e.g.*, *Deuteronomy* 10:19 (RSV) ("Love the sojourner therefore; for you were sojourners in the land of Egypt."); *Matthew* 25:40 (King James) ("Inasmuch as ye have done it unto one of the least of these my brethren, ye have done it unto me."); *The Qur'an* 16:90 (Sahih Int'l) ("Allah orders justice and good conduct and giving to relatives and forbids immorality and bad conduct and oppression."); *Mosiah* 2:17 (Book of Mormon) ("[W]hen ye are in the service of your fellow beings ye are only in the service of your God.").

measured not by what one achieves in a secular occupation, but by how well one serves others.[5]

Thus, for instance, a sociology major in a Jewish college might find inspiration in the Book of Exodus to study and address the plight of refugees from war-torn lands.[6] A student in a Muslim school might be inspired by the Qur'an to investigate the factors influencing immigration, then look for opportunities to serve local immigrants.[7] Or a student at a Catholic law school might be moved by the New Testament to provide *pro bono* assistance to unwed mothers or foster children.[8]

Indeed, studies show that more students at religious colleges devote time in community service than students at secular colleges, public or private. At schools that belong to *Amicus* CCCU, for example, 35.2% of

---

[5] *See, e.g.*, *Luke* 12:15 (ESV) ("[O]ne's life does not consist in the abundance of his possessions.").

[6] *See, e.g.*, *Exodus* 22:20, Chabad.org, https://tinyurl.com/Chabad Exodus (last visited Aug. 8, 2025) ("And you shall not mistreat a stranger, nor shall you oppress him, for you were strangers in the land of Egypt.").

[7] *See, e.g.*, *The Qur'an* 17:26 ("Give . . . to the needy and the wayfarer.").

[8] *See, e.g.*, *Matthew* 25:35-40; *James* 1:27.

students participate in community service compared to only 25.7% of college students generally.[9]

Students at such colleges also often pause their formal educations for domestic or overseas public service.[10] This, too, is by design: Institutional policies and accommodations at religious institutions provide deferment options to encourage such service without detrimentally affecting the student's education.[11]

---

[9] CCCU, *The Case for Christian Higher Education* 2 (2020), https://tinyurl.com/39sjcb4a; *see also* Elizabeth Weiss Ozorak, *Love of God and Neighbor: Religion and Volunteer Service Among College Students*, 44 Rev. Religious Rsch. 285, 289-91 (2003) (religious college students were far more likely to engage in volunteer activity).

[10] *See* Kathryn A. Tuttle, *The Effects of Short-term Mission Experienced on College Students' Spiritual Growth and Maturity*, 4 Christian Educ. J. 123 (2000); Tad Walch, *BYU Sees Dramatic Jump in Number of Returned Missionaries*, Deseret News (Apr. 4, 2016, 9:40 AM), https://tinyurl.com/yc356x6c.

[11] *See Faith Engagement, With Our Community*, Andrews Univ., https://tinyurl.com/3zm8d55r (last visited Aug. 8, 2025) ("Travel the world as a missionary, take leadership roles in vesper services, and engage in community projects."); *Enrollment Servs., Deferring or Leaving School,* Brigham Young Univ., https://tinyurl.com/2tb4r8z8 (last visited Aug. 8, 2025) ("Going on a mission? Or maybe you need to take some time off for other reasons? You can do that!"); *Faith & Service, Service Opportunities*, Messiah Univ., https://tinyurl.com/3ue6nz7s (last visited Aug. 8, 2025) ("Each year, Messiah students collectively volunteer thousands of hours to community service—locally, nationally and around the globe."); *Campus Ministry, Mission Trips*, Cath. Univ. of Am., https://tinyurl.com/4jyasyue (last visited Aug. 8, 2025) ("Students focus

It is also common for students who don't serve traditional (evangelizing) missions to serve as humanitarian volunteers in foreign countries while studying abroad.[12] All such humanitarian work not only benefits the religious groups of which the students are a part, but it also reduces cultural divides between nations and religions. Students and the world community benefit from these ongoing humanitarian activities.

Often, moreover, the schools themselves provide key services to the less fortunate to enhance their surrounding communities. Multiple religious schools, including several schools belonging to *Amicus* CCCU—Campbell University and Indiana Wesleyan University[13]—recently participated in a program administered by the Department of Education that serves to "help incarcerated individuals access educational programs

---

on meeting concrete human needs through corporal works of mercy, combining hands-on support through caregiving or construction projects, with a spirit of charity rooted in the Gospel.").

[12] *See* R. Michael Paige et al., *Study Abroad for Global Engagement: The Long-Term Impact of Mobility Experiences*, 20 Intercultural Educ. S29 (2009); *The Gap Year Experience: A Life-Changing Opportunity*, Princeton Rev., https://tinyurl.com/365fk53s (last visited Aug. 8, 2025).

[13] U.S. Dep't of Educ., Experimental Sites Initiative, *New Institutions Invited to Participate in the Second Chance Pell (SCP) Experiment* (Apr. 26, 2022), https://tinyurl.com/ymf8xkuj; Fed. Student Aid, *Experimental Sites Initiative: Annual Summary Report* (Dec. 31, 2024), https://tinyurl.com/49rmad6w.

. . . to support reentry, empower formerly incarcerated persons, enhance public safety, and strengthen our communities and our economy."[14] Many other religious colleges have also participated in the program.[15]

3. Religious colleges and universities also provide increased physical safety for learning and academic inquiry. For instance, in a 2025 study of campus safety, Concordia University-St. Paul, Molloy University, and Nelson University—all private religious institutions—were named among the top five safest in the nation.[16] Indeed, in that study of the safest universities fourteen of the top twenty-five (or 56%)

---

[14] Press Release, U.S. Dep't of Educ., *U.S. Department of Education Announces Expansion of Second Chance Pell Experiment and Actions to Help Incarcerated Individuals Resume Educational Journeys and Reduce Recidivism* (Apr. 26, 2022), https://tinyurl.com/5azwe8ss; *see* Fed. Student Aid, *supra* note 13.

[15] Fed. Student Aid, *supra* note 13; U.S. Dep't of Educ., Experimental Sites Initiative, *New Institutions Invited to Participate in the Second Chance Pell (SCP) Experiment* (Apr. 24, 2020) (Calvin University, Eastern University, and University of the Southwest), https://tinyurl.com/25datmsk; U.S. Dep't of Educ., *Institutions Selected for Participation in the Second Chance Pell Experiment in the 2016-2017 Award Year* (July 8, 2016) (North Pack University and Nyack University), https://tinyurl.com/nzt59kvb.

[16] Niche, *2025 Safest College Campuses in America*, https://tinyurl.com/85nc523s (last visited Aug. 8, 2025).

were religious.[17] And one important aspect of that enhanced safety for students is that religious colleges consistently report much lower rates of sexual assault than secular schools.[18]

Accordingly, for students and parents concerned about physical safety, religious colleges and universities are an attractive option.[19] And the mere existence of such options in the higher education market helps ensure that other institutions place greater emphasis on student safety.

4. Religious colleges also contribute substantially to the diversity of American higher education. In most religious traditions, the call to faith is a challenge to think and live differently from the rest of society:

---

[17] *Id.* Recently, Regent University, a private religious university in Virginia Beach, was also independently recognized as the safest college campus in the state. Regent Univ., *Regent University Named #1 Safest College Campus in Virginia*, Regent Univ. News (July 22, 2021), https://tinyurl.com/49ha7a54.

[18] *E.g.*, James R. Vanderwoerd & Albert Cheng, *Sexual Violence on Religious Campuses*, 47 Canadian J. Higher Ed. 1, 9 (2017) (multiple studies of secular schools showed average "incidence of unwanted sexual contact at higher rates" than a study of the same topic at religious schools), https://tinyurl.com/bdfp4hka.

[19] Indeed, though there are few American colleges in the Islamic faith tradition, Muslim students are increasingly flocking to universities run by other faiths. *See, e.g.*, Richard Pérez-Peña, *Muslims From Abroad Are Thriving in Catholic Colleges*, N.Y. Times (Sept. 2, 2012), https://tinyurl.com/mrycnyn4.

From Jesus' command that his disciples be "a light [to] the world" to the Islamic command to "[b]e in the world as if you were a stranger or traveler," people of faith are encouraged to transcend the cultures in which they live.[20] Thus, it should come as no surprise that educational institutions founded and run by religious groups offer perspectives and emphases that differ, sometimes dramatically, from those offered by other educational institutions.

Liberty University, for example, offers a "world-class education and Christian foundation" with a "vision of developing Christ-centered men and women with the values, knowledge, and skills essential for impacting the world for Christ."[21] Thus, it invites students to join its distinct way of life in developing themselves as Christ-centered individuals to impact their community and serve Jesus Christ. Liberty's size, with over fifteen

---

[20] *Matthew* 5:14; *Sahih al-Bukhari* 6416, Sunnah.com, https://tinyurl.com/3ay964y4 (last visited Aug. 8, 2025) ("Be in this world as if you were a stranger or a traveler."); *accord* Avi Lazerson, *Holiness and Judaism*, Jewish Mag. (Jan. 2001), https://tinyurl.com/2p8nb3ph (directing Jews to "liv[e] in this world, marrying, procreating, working and at the same time not to be affected by the daily worldly occurrences").

[21] *About Liberty*, Liberty Univ., https://www.liberty.edu/about (last visited Aug. 8, 2025).

colleges and schools—including a law school, medical school, and school of divinity—has led to record high enrollment.[22]

Religious schools differ from secular schools in other ways, too. For example, a recent comprehensive study addressing the political leanings of university faculties confirms that religious colleges and universities provide value in part because they attract professors and students from across the political spectrum. The study found that, at non-religious, public universities, 65.7% of faculty across disciplines self-identify as either "liberal" or "far left," while only 7.8% identify as "conservative" or "far right."[23] By contrast, in protestant religious colleges, only 42.6% identify as "liberal" or "far left," while 25.9% of professors identify as "conservative" or "far right"[24]—still a minority, but nearly four times the percentage of faculty at non-religious institutions.

---

[22] Off. Commc'ns & Pub. Engagement, *Liberty University Announces Record Enrollment: Over 16,000 on Campus, 124,000 Online*, Liberty Univ. (Sept. 23, 2024), https://tinyurl.com/muksws5h.

[23] Ellen B. Stolzenberg et al., *Undergraduate Teaching Faculty: The HERI Faculty Survey 2016–2017*, at 38, Higher Educ. Rsch. Inst. at UCLA (2019), https://tinyurl.com/428n8t93.

[24] *Id.*

As a result, religious colleges are more likely than others to provide students extensive exposure to divergent political views. And that includes not only the more "conservative" views that, for whatever reason, are largely missing in many secular institutions, but also more progressive views leavened by religious perspectives.[25]

The diversity that religious colleges add has long been understood and valued by Congress. As it said in the Higher Education Opportunity Act, "[i]t is the sense of Congress that . . . the diversity of institutions and educational missions is one of the key strengths of American higher education." 20 U.S.C. § 1011a(a)(2). Consistent with that view, Congress emphasized that "individual institutions of higher education have different missions and each institution should design its academic program in accordance with its educational goals." *Id.*

In short, Congress has recognized that viewpoint diversity *among* educational institutions is valuable in higher education. This Court

---

[25] CCCU, *The Case for Christian Higher Education* 12 (Jan. 2018), https://tinyurl.com/4yw2spb5 (noting that 67% of CCCU students report that their courses provide "diverse perspectives (political, religious, racial/ethnic, gender, etc.) 'often' or 'very often,'" compared to a national average of only 56% of students).

27

should follow Congress's lead by recognizing and valuing the diversity that religious schools bring to the broader community.

### B. Those unique benefits flow, in part, from the ability of religious colleges to ensure that community members are fully aligned with their religious missions.

If schools in the Fourth Circuit lose their ability to make their own decisions on the kind of religious matter presented by this case, many benefits that religious colleges provide precisely because of their religious character would be lost. Indeed, as Judge James Ho recently recognized, with religious institutions, as with secular ones, "personnel *is* policy." *McRaney*, 980 F.3d at 1067 (Ho, J., dissenting).

The same is self-evidently true for groups that seek to form a religious community. If community members are not forced to live up to the standards of the community, then religious communities will lose the spiritual glue that has historically held them together and that their sacred texts teach and require them to value.[26] And without that glue, there is a risk that the benefits such institutions offer to the broader community—be it from community service, increased viewpoint

_____

[26] *See, e.g.*, *Galatians* 5:9 (NIV) ("A little yeast works through the whole batch of dough."); *Proverbs* 27:17 (NIV) ("As iron sharpens iron, so one person sharpens another.").

28

diversity, etc.—will fall as well. In short, while the statutory text and the First Amendment all require Liberty's understanding of the Title VII religious exemption, it is also supported by the need to preserve the many societal benefits of religious higher education.

## CONCLUSION

Regardless of whether one shares Liberty's religious beliefs, there are powerful reasons to interpret Title VII to allow Liberty to do what it did here—sever a relationship with an employee who failed to live according to Liberty's religious tenets. Foremost among those reasons is the fact that the First Amendment requires it. Whether for that reason or, as Liberty shows, just as a straightforward reading of the statutory text itself, the Court should conclude that Title VII's religious exemption allows religious organizations to terminate employees who violate the organization's religious beliefs.

August 8, 2025

Respectfully submitted,

*/s/ Gene C. Schaerr*

Gene C. Schaerr
Joshua J. Prince
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com

Joy Mosley
COUNCIL FOR CHRISTIAN
COLLEGES & UNIVERSITIES
20 M Street SE, Suite 350
Washington, DC 20003
Telephone: (202) 546-8713

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limit of Fed. R. App. P. 29(b)(4), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,666 words.

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

Dated: August 8, 2025

# ADDENDUM

## LIST OF *AMICI CURIAE*
### (with links to their mission statements)

### <u>Associations</u>

Council for Christian Colleges and Universities
https://www.cccu.org/institutions/.

Association for Biblical Higher Education
https://www.abhe.org/about-abhe/

### <u>Individual Universities and Colleges</u>

Cedarville University, Cedarville, OH
https://www.cedarville.edu/why-cedarville/mission

Jacksonville College, Jacksonville, TX
https://www.jacksonvillecollege.edu/mission/

Oakland City University, Oakland City, IN
https://www.oak.edu/about/

Pensacola Christian College, Pensacola, FL
https://www.pcci.edu/about/mission-and-purpose.aspx

Pillar College, Newark, NJ
https://www.pillar.edu/meet/mission-vision-faith

Regent University, Virginia Beach, VA
https://www.regent.edu/about-regent/vision-mission/

Southern Wesleyan University, Central, SC
https://www.swu.edu/about/

Walsh University, North Canton, OH
https://www.walsh.edu/mission.html