NOS. 25-1228, 25-1581

# United States Court of Appeals

*for the*

# Fourth Circuit

———————◆———————

ELLENOR ZINSKI,

*Plaintiff-Appellee,*

– v. –

LIBERTY UNIVERSITY, INC.,

*Defendant-Appellant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

## BRIEF OF PLAINTIFF-APPELLEE

PAUL M. FALABELLA
SAMANTHA R. GALINA
BUTLER CURWOOD, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
(804) 648-4848

MATTHEW W. CALLAHAN
WYATT S. M. ROLLA
EDEN B. HEILMAN
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION OF VIRGINIA
P. O. Box 26464
Richmond, Virginia 23261
(804) 644-8022

*Attorneys for Plaintiff-Appellee*

CP COUNSEL PRESS    (800) 4-APPEAL • (813620)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _25-1228_    Caption: _Ellenor Zinski v. Liberty University, Inc._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Ellenor Zinski_
(name of party/amicus)

who is _____Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?          ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?          ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Eden B. Heilman                    Date:     March 25, 2025

Counsel for: Ellenor Zinski

Print to PDF for Filing

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................ iii

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF ISSUES .........................................................1

INTRODUCTION .................................................................2

STATEMENT OF THE CASE .......................................................3

SUMMARY OF ARGUMENT .........................................................7

STANDARD OF REVIEW .........................................................11

ARGUMENT ...................................................................12

    I.    Judicial Restraint Counsels This Court To Dismiss This Appeal as Improvidently Granted and Allow the Case to Proceed in the District Court ...............................................12

    II.    The Ministerial Exception Does Not Apply To Ms. Zinski...............14

    III.    Sections 702 and 703 of Title VII Do Not Exempt Religious Employers From Sex Discrimination Claims Like Ms. Zinski's...................................................................20

        A.    Title VII Bans Sex Discrimination and Religious Discrimination.................................................................21

        B.    Sections 702 and 703 of Title VII, By Their Plain Text, Provide Religious Employers Protection Only Against Claims of Religious Discrimination .........................................21

        C.    The Legislative History of Sections 702 and 703 Confirms That They Provide Religious Employers Protection Only Against Claims of Religious Discrimination.................................................................27

        D.    Under Bostock, the Employer's Motive Is Irrelevant to the Sex Discrimination Inquiry............................................28

    IV.    RFRA Does Not Bar Ms. Zinski's Claims............................32

i

A.  RFRA Does Not Apply to Suits with Only
Private Parties ..................................................................32

1.  Holding that RFRA applies only against
the government is not absurd...........................................34

2.  RFRA's references to "government" do not
include the judiciary or Ms. Zinski................................35

B.  At the motion-to-dismiss stage, Liberty cannot show
that employing Ms. Zinski substantially burdened
its exercise of religion.................................................37

C.  In Any Event, Title VII Is Narrowly Tailored To
A Compelling Government Interest...........................................38

V.  The Ecclesiastical Abstention Doctrine Does Not Bar
Ms. Zinski's Claims Because The Court Does Not
Have To Decide Any Religious Question...........................................41

VI.  The Right to Expressive Association Does Not Bar
Ms. Zinski's Claims ..................................................................44

A.  The right to expressive association does not apply to
employer/employee relationships .............................................44

B.  Even if it the right to expressive association applies to
the employment context, it is limited to employees
whose actions "threaten the very mission" of the
employer—which Ms. Zinski's actions do not........................48

1.  In Any Event, Title VII Is Valid Under *Dale*
and Rational Basis Review .............................................51

CONCLUSION .................................................................................52

REQUEST FOR ORAL ARGUMENT ..................................................54

CERTIFICATE OF COMPLIANCE ......................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Bear Creek Bible Church v. EEOC,*
  571 F. Supp. 3d 571 (N.D. Tex. 2021) ...................................................48

*Bell v. Presbyterian Church (U.S.A.),*
  126 F.3d 328 (4th Cir. 1997) ....................................................... 15, 41

*Belya v. Kapral,*
  45 F.4th 621 (2d Cir. 2022) ..................................................................42

*Billard v. Charlotte Cath. High Sch.,*
  No. 3:17-CV-11, 2021 WL 4037431 (W.D.N.C. Sept. 3, 2021) ............. 9, 27, 35

*Billard v. Charlotte Catholic High School,*
  101 F.4th 316 (4th Cir. 2024) .................................................... *passim*

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ................................................................ *passim*

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) ................................................................ *passim*

*Braidwood Mgmt., Inc. v. EEOC,*
  70 F.4th 914 (5th Cir. 2023) ................................................................48

*Burwell v. Hobby Lobby,*
  573 U.S. 682 (2014) ................................................................. 38, 40

*Chawla v. Transamerica Occidental Life Ins. Co.,*
  440 F.3d 639 (4th Cir. 2006) ................................................................12

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v.
  Martinez,*
  561 U.S. 661 (2010) .............................................................................47

*Christian Legal Soc'y v. Walker,*
  453 F.3d 853 (7th Cir. 2006) ................................................................45

*Comm'r of Internal Revenue v. Brown,*
  380 U.S. 563 (1965) ................................................................. 33, 34

*CompassCare v. Hochul*,
  125 F.4th 49 (2d Cir. 2025) ...................................................... 48, 49, 50

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v.
  Amos*,
  483 U.S. 327 (1987) ...................................................................23

*Curtis v. Propel Prop. Tax Funding, LLC*,
  915 F.3d 234 (4th Cir. 2019) ......................................................11

*Darren Patterson Christian Acad. v. Roy*,
  699 F. Supp. 3d 1163 (D. Colo. 2023) ........................................48

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
  665 F.3d 524 (3d Cir. 2011) ........................................................52

*Dyer v. Smith*,
  56 F.4th 271 (4th Cir. 2022) .......................................................11

*EEOC v. Catholic University of America*,
  83 F.3d 455 (D.C. Cir. 1996).......................................................36

*EEOC v. Freemont Christian Sch.*,
  781 F.2d 1362 (9th Cir. 1986) ................................................. 9, 27

*EEOC v. Miss. Coll.*,
  626 F.2d 477 (5th Cir. 1980) .......................................................26

*EEOC v. Pac. Press Pub. Ass'n*,
  482 F. Supp. 1291 (N.D. Cal. 1979), *aff'd*, 676 F.2d 1272 (9th Cir. 1982).........28

*EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*,
  884 F.3d 560 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) .............................................................. 10, 40

*EEOC v. Roman Cath. Diocese of Raleigh*,
  213 F.3d 795 (4th Cir. 2000)................................................ 17, 39, 42

*EEOC v. Seafarer's Int'l Union*,
  394 F.3d 197 (4th Cir. 2005) .......................................................11

*Erickson v. Pardus*,
  551 U.S. 89 (2007) .....................................................................11

iv

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
   545 U.S. 546 (2005) ....................................................................34

*Fitzgerald v. Roncalli High Sch., Inc.*,
   73 F.4th 529 (7th Cir. 2023) .....................................................16

*Garrick v. Moody Bible Inst.*,
   95 F.4th 1104 (7th Cir. 2024) ...................................................42

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
   617 F.3d 402 (6th Cir. 2010) ................................................ 9, 33

*Hall Baptist Mem. Health Care Corp.*,
   215 F.3d 618 (6th Cir. 2000) .....................................................24

*Hambsch v. Dep't of Treasury*,
   796 F.2d 430 (Fed. Cir. 1986) ...................................................52

*Hankins v. Lyght*,
   441 F.3d 96 (2d Cir. 2006) .............................................. 9, 36, 37

*Hillman v. IRS*,
   263 F.3d 338 (4th Cir. 2001) .....................................................34

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984) ..................................................... 23, 45, 46, 47

*Holt v. Hobbs*,
   574 U.S. 352 (2015) ....................................................................38

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
   565 U.S. 171 (2012) ........................................... 15, 16, 20, 39

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
   515 U.S. 557 (1995) ....................................................................45

*Jacoby & Meyers, LLP v. Presiding Justices, Appellate Div. of the S. Ct. of N.Y.*,
   852 F.3d 178 (2d Cir. 2017) .....................................................46

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*,
   344 U.S. 94 (1952) ....................................................................41

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) ....................................................................24

*Kennedy v. St. Joseph's Ministries, Inc.*,
    657 F.3d 189 (4th Cir. 2011) ...............................................26

*Liberty Univ., Inc. v. Bowes*,
    144 S. Ct. 1030 (2024) ........................................................16

*Liberty Univ., Inc. v. Lew*,
    733 F.3d 72 (4th Cir. 2013) ................................................32

*Listecki v. Off. Comm. of Unsecured Creditors*,
    780 F.3d 731 (7th Cir. 2015) ......................................... 9, 33

*Little v. Wuerl*,
    929 F.2d 944 (3d Cir. 1991) ................................................24

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*,
    584 U.S. 617 (2018) ............................................................46

*Mays v. Sprinkle*,
    992 F.3d 295 (4th Cir. 2021) ......................................... 11, 37

*McClure v. Salvation Army*,
    460 F.2d 553 (5th Cir. 1972) ..............................................26

*Nat'l Treasury Emp. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ..........................................14

*Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*,
    354 F.3d 249 (4th Cir. 2003) ..............................................40

*NLRB v. Cath. Bishop of Chicago*,
    440 U.S. 490 (1979) ............................................................28

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020) .................................................. 16, 19, 20

*Palmer v. Liberty Univ., Inc.*,
    72 F.4th 52 (4th Cir. 2023) ........................................... 15-16

*Prudential Ins. Co. of Am. v. Shenzhen Stone Network Info. Ltd.*,
    58 F.4th 785 (4th Cir. 2023) ..............................................27

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) ..............................................39

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ...............................................................46

*Rayburn v. Gen. Conf. of Seventh-Day Adventists,*
  772 F.2d 1164 (4th Cir. 1985) .................................... *passim*

*Ritter v. Mount St. Mary's Coll.,*
  495 F. Supp. 724 (D. Md. 1980).........................................26

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) ................................................ 45, 46, 51

*Rweyemamu v. Cote,*
  520 F.3d 198 (2d Cir. 2008) ..............................................37

*Serbian E. Orthodox Diocese for U.S.A. & Canada v. Milivojevich,*
  426 U.S. 696 (1976) ...........................................................41

*Slattery v. Hochul,*
  61 F.4th 278 (2d Cir. 2023) ..................................... 48, 49, 50

*Snyder's-Lance, Inc. v. Frito-Lay N. Am., Inc.,*
  991 F.3d 512 (4th Cir. 2021) .............................................27

*St. Mary Cath. Par. in Littleton v. Roy,*
  No. 23-CV-2079, 2024 WL 3160324 (D. Colo. June 4, 2024)...........................48

*Sterlinski v. Cath. Bishop of Chi.,*
  934 F.3d 568 (7th Cir. 2019) .............................................16

*Sturges v. Crowninshield,*
  17 U.S. 122 (1819) ...........................................................34

*Sutton v. Providence St. Joseph Med. Ctr.,*
  192 F.3d 826 (9th Cir. 1999) ......................................... 9, 33

*Trans World Airlines, Inc. v. Hardison,*
  432 U.S. 63 (1977) ...........................................................25

*United States v. O'Brien,*
  391 U.S. 367 (1968) ..........................................................46

*Watson v. Jones,*
  80 U.S. 679 (1871) ...........................................................41

*Wilson v. Ferrell*,
738 F.2d 637 (4th Cir. 1984) ............................................................. 12

*Wisconsin v. Mitchell*,
508 U.S. 476 (1993) ........................................................................... 45

*Ysleta Del Sur Pueblo v. Texas*,
596 U.S. 685 (2022) ........................................................................... 23

**Statutes and Other Authorities:**

U.S. Const., amend. I .................................................................... *passim*

20 U.S.C. § 1681(a)(3) ......................................................................... 23

28 U.S.C. § 1291 ..................................................................................... 1

28 U.S.C. § 1292(b) ........................................................... 1, 7, 12, 14

28 U.S.C. § 1331 ..................................................................................... 1

42 U.S.C. § 12113(d)(2) ........................................................................ 23

42 U.S.C. § 2000bb-1 ............................................................................ 32

42 U.S.C. § 2000bb-1(a) ......................................................... 32, 35, 37

42 U.S.C. § 2000bb-1(b) ............................................................... 33, 36

42 U.S.C. § 2000bb-1(b)(2) .................................................................. 39

42 U.S.C. § 2000bb-1(c) ....................................................................... 32

42 U.S.C. § 2000bb-2(1) ....................................................................... 35

42 U.S.C. § 2000e(j) .................................................................... 24, 25

42 U.S.C. § 2000e-1(a) ............................................................. 21, 22, 23

42 U.S.C. § 2000e-2(a)(1) ........................................................ 21, 22, 25

42 U.S.C. § 2000e-2(e) ......................................................................... 22

42 U.S.C. §§ 2000e-2000e-17 ............................................................... 26

42 U.S.C. § 2000e-2(e), *et seq.* ........................................................ *passim*

Chan Tov McNamarah, *Some Notes on Courts and Courtesy*,
  107 VA. L. REV. Online 317 (2021) ........................................................ 2

H.R. 1946 ............................................................................. 27-28

Legislative History of the Equal Employment Opportunity Act of 1972
  (Comm. Print 1972) ................................................................ 28

Robert W. Tuttle, *Civil Procedure and the Ministerial Exception*,
  86 Fordham L. Rev. 1847 (2018) ......................................................... 17

U.S. E.E.O.C., *Employees & Job Applicants* ................................... 34-35

U.S. E.E.O.C., What You Can Expect After a Charge is Filed ............................. 35

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. § 1331 (federal question). This Court has jurisdiction under 28 U.S.C. § 1292(b).[1]

## STATEMENT OF ISSUES

1. Whether the First Amendment's ministerial exception bars a plaintiff's employment claim at the motion-to-dismiss stage even if that plaintiff has the duties of an ordinary IT professional.

2. Whether Sections 702 and 703 of Title VII exempt Liberty University from Title VII discrimination claims when it terminates an employee because of the employee's sex based on a purportedly religious motivation.

3. Whether the Religious Freedom Restoration Act offers a defense to suits that feature exclusively non-governmental parties.

4. Whether an employer can demonstrate a substantial burden under the Religious Freedom Restoration Act at the motion-to-dismiss stage merely by

---

[1] In its Opening Brief, Defendant-Appellant Liberty University, Inc., asserts 28 U.S.C. § 1291 as one basis for this Court's jurisdiction over this appeal. Def.-Appellant's Opening Br. at 1. The Court hears this interlocutory appeal pursuant to its authority under 28 U.S.C. § 1292(b). Case No. 25-142, ECF 17; *see also* Case No. 25-1228, ECF 24 (denying as moot Ms. Zinski's motion to dismiss Defendant-Appellant's collateral order appeal for lack of jurisdiction). For the reasons stated in her motion to dismiss, Ms. Zinski continues to maintain that this Court lacks jurisdiction over any appeal of the district court's order pursuant to the collateral order doctrine. Case No. 25-1228, ECF 17, 23.

employing a transgender employee, when the plaintiff's allegations claim that she was able to complete her job duties satisfactorily.

5. Whether Title VII's application to Ms. Zinki's sex discrimination case meets strict scrutiny under the Religious Freedom Restoration Act.

6. Whether the ecclesiastical abstention doctrine bars a court from considering a non-ministerial employee's sex discrimination claim where the employee performs no spiritual function and the resolution of the case does not depend on the court deciding religious questions.

7. Whether the First Amendment right to expressive association is implicated in a commercial context such as employment and, if so, whether it provides a constitutional right for a religious university to fire a non-ministerial employee on the basis of sex in violation of Title VII.

## **INTRODUCTION**

Plaintiff-Appellee Ellenor Zinski ("Ms. Zinski") is an IT professional who—despite her[2] glowing performance reviews—was terminated from her employment because she informed her employer that she is transgender. Ms. Zinski brought this

---

[2] Plaintiff-Appellee Ellenor Zinski is a transgender woman who uses the pronouns "she," "her," and "hers" when being referred to in the third person. As such, this brief will use those pronouns to refer to Ms. Zinski. Plaintiff respectfully requests this Court extend Ms. Zinski the courtesy of referring to her using the pronouns that comport with her gender identity. Chan Tov McNamarah, *Some Notes on Courts and Courtesy*, 107 VA. L. REV. Online 317, 334 (2021).

suit against her former employer, Defendant Liberty University, Inc. ("Liberty"), alleging that it violated Title VII of the Civil Rights Act of 1964 ("Title VII") by terminating her on the basis of her sex. Liberty does not dispute Ms. Zinski's factual allegations. Instead, Liberty argues that Ms. Zinski's complaint should be dismissed as a matter of law because Liberty has an absolute right under Title VII, the Religious Freedom Restoration Act, and the First Amendment to fire any of its thousands of employees as long as the termination has any religious reason behind it. Accepting Liberty's radical argument would destabilize decades of settled law, create a split with other circuits, and strip transgender people of basic antidiscrimination provisions.

At a minimum, under this Court's precedent in *Billard v. Charlotte Catholic High School*, 101 F.4th 316 (4th Cir. 2024), this Court should not endorse Liberty's sweeping legal theories before determining whether the case can be resolved based on narrower grounds, including remand to the district court for further proceedings. If this Could does proceed to the merits of this appeal, it should hold that none of Liberty's asserted defenses bar Ms. Zinski's sex discrimination claim and affirm the ruling of the district court.

## STATEMENT OF THE CASE

Ms. Zinski filed a single count lawsuit against Liberty for discrimination on the basis of sex in violation of Title VII. JA12. Ms. Zinski was hired in February

2023 as a full-time Information Services Apprentice at the IT helpdesk at Liberty University. JA10. Liberty University is a nonstock corporation that employs more than 12,000 employees worldwide. JA10. At the time of her hire, Ms. Zinski identified as a transgender woman and was undergoing hormone replacement therapy. JA16.

Ms. Zinski succeeded in her role, assisting students and staff with IT issues, trouble-shooting problems with classroom equipment, and performing computer-related administrative tasks (e.g., refilling printer paper). JA10. She received positive performance reviews and supervisors indicated that she was "doing well and meeting or exceeding all of their metrics." JA10.

On July 8, 2023, Ms. Zinski, on the verge of changing her legal name to "Ellenor," wrote a letter to Liberty notifying them of the name change and explaining that she was transgender and undergoing hormone therapy. JA10, JA16. Ms. Zinski asked for no accommodations from Liberty and noted that her "medical treatment and self-identification as a trans woman do not alter my work performance or professional conduct." JA16.[3]

---

[3] Liberty falsely states in its Opening Brief that Ms. Zinski requested accommodation of her new gender by Liberty. *See* Opening Br. at 4 (claiming Ms. Zinski intended to change name to Ellenor "and be known and called by that name"). This is untrue and has no record support. *See, e.g.,* JA16-17 (in letter from Ms. Zinski to Liberty, making no request to be known or called by her new legal name).

Liberty did not respond to the letter for a month. JA11. During this unresponsive time period, Ms. Zinski experienced great fear and anxiety from not knowing how Liberty would respond. JA11. While touring Liberty's new human resources office with her co-workers, Ms. Zinski became overwhelmed and began crying, racing to the restroom to avoid showing her coworkers how upset she was. JA11. Her anxiety was so great that, on some nights, she vomited. JA11. Despite her emotional turmoil, Ms. Zinski continued working and meeting Liberty's expectations. JA11.

After a month of waiting, Ms. Zinski reached back out to Liberty to inquire about her status there. JA11. Human resources scheduled a meeting with Ms. Zinski for later that day. JA11. When Ms. Zinski arrived at the meeting, she was met by two Liberty executives. JA11. One of them read aloud a letter responding to her letter and then handed it to her, advising her that her employment with Liberty was terminated effective immediately. JA11. The letter advised Ms. Zinski that the reason for her termination was her transition from her sex/gender assigned at birth (male) to the sex/gender that she identified with (female). JA11, JA18-19.

Ms. Zinski's termination led her to feel disbelief, emptiness, and hurt at being ostracized for being transgender, a rejection of who she is on a fundamental, unchangeable level. JA11.

5

On July 29, 2024, Ms. Zinski brought action against Liberty in the U.S. District Court for the Western District of Virginia, alleging that the university's termination of her because of her transgender status was sex-based discrimination in violation of Title VII. JA8-13. On October 3, 2024, Liberty moved to dismiss for lack of subject matter jurisdiction and failure to state a claim. JA14. The motion claimed that Ms. Zinski's case was barred by the First Amendment's ministerial exception, the First Amendment's ecclesiastical abstention doctrine, the First Amendment's right to expressive association, the statutory exemptions from Title VII liability in Sections 702 and 703, and the Religious Freedom Restoration Act.

On February 21, 2025, Senior Judge Norman K. Moon denied Liberty's motion to dismiss. JA24. Judge Moon held that, at the motion-to-dismiss stage, none of Liberty's defenses protected it from Ms. Zinski's sex discrimination claim. JA44-113. The district court held that, though the plaint text of these Sections is ambiguous, legislative history helped resolve that Sections 702 and 703 of Title VII did not bar sex discrimination claims against religious employers, JA50-84; the Religious Freedom Restoration Act did not apply to suits exclusively between private parties and, in any event, Liberty had not shown that Ms. Zinski's continued employment would substantially burden its religious exercise, JA84-88; that Ms. Zinski did not qualify for the First Amendment's ministerial exception because her alleged duties did not meet the Supreme Court's functional test, JA89-93; that the

First Amendment right of expressive association did apply to the employment decisions of religious organizations like Liberty, but the continued employment of Ms. Zinski would create only minimal burdens on that right, JA93-109; and that the First Amendment ecclesiastical abstention doctrine did not apply because Ms. Zinski's case did not require the court to resolve any questions of religious law, JA109-112.

Judge Moon amended his order to certify it for interlocutory appeal under 28 U.S.C. § 1292(b). JA24. On May 23, 2025, this Court granted Liberty an appeal under 28 U.S.C. § 1292(b).

## <u>SUMMARY OF ARGUMENT</u>

Liberty brings this interlocutory appeal of the district court's denial of its motion to dismiss Ms. Zinski's sex discrimination claim. The motion to dismiss asserted five defenses, all rooted in the law of religion. For each defense, Liberty argues for broad and sweeping changes to the existing law. Judicial restraint counsels that, before passing unnecessarily on wide-ranging legal issues like those asserted by Liberty in this case, an Article III court should look for opportunities to avoid deciding them. Because this Court can achieve such an outcome by dismissing this appeal as improvidently granted, it should do so, and allow the case to proceed to final judgment.

In any event, none of Liberty's five defenses bars Ms. Zinski's sex discrimination claim in this case. This Court should prefer first to resolve this case, if possible, on the "well-settled" doctrine of the ministerial exception before addressing defenses with potentially sweeping changes to constitutional law. *Billard*, 101 F.4th at 327-29. The doctrine of constitutional avoidance counsels that this Court next consider Liberty's statutory defenses before addressing its First Amendment defenses. *Id*.

The ministerial exception bars courts from adjudicating disputes over the hiring and firing of employees of religious institutions whose duties involve important religious functions like preaching and religious instruction. While Liberty will have an opportunity to renew its ministerial exception argument at the summary judgment phase, as alleged in the complaint, Ms. Zinski's duties as an IT employee were entirely secular and involved no spiritual functions and her position therefore does not qualify under the narrow category of positions covered by the ministerial exception.

Liberty's first statutory defense is that Sections 702 and 703 of Title VII of the Civil Rights Act of 1984, which allow religious employers like Liberty to engage in religious discrimination in hiring, also permit them to engage in religiously motivated sex discrimination. Yet by exempting employers only with regard to employees "of a particular religion," Sections 702 and 703 are clear that religious

employers are still bound by Title VII's bar on sex discrimination. *See EEOC v. Freemont Christian Sch.*, 781 F.2d 1362, 1365-67 (9th Cir. 1986); *Billard v. Charlotte Cath. High Sch.*, No. 3:17-CV-11, 2021 WL 4037431, at *8–11 (W.D.N.C. Sept. 3, 2021), *rev'd and remanded on other grounds,* 101 F.4th 316 (4th Cir. 2024). Because firing an employee on the basis of their transgender identity is prohibited sex discrimination under *Bostock v. Clayton County*, 590 U.S. 644 (2020), Sections 702 and 703 do not exempt Liberty from Title VII liability for the decision to terminate Ms. Zinski on the basis of her transgender identity.

Liberty's second statutory defense asserts that the Religious Freedom Restoration Act ("RFRA") provides a defense to Ms. Zinski's sex discrimination claim. Liberty's RFRA defense fails for three independent reasons. First, RFRA by its plain terms provides relief only against a "government" and no government is party to this case. *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 737 (7th Cir. 2015); *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999); *but see Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006).

Second, Liberty cannot show at the motion-to-dismiss stage that its religious exercise was substantially burdened. Third, even if Liberty could make out a *prima facie* defense under RFRA in this case, Title VII is narrowly-tailored to the compelling government interest in preventing sex discrimination against Ms. Zinski.

*See EEOC v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 591 (6th Cir. 2018) ("*Harris Funeral*"), *aff'd sub nom. Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020).

Liberty also invokes the ecclesiastical abstention doctrine, which prevents a court from ruling on questions of religious doctrine. This defense fails because Ms. Zinski asks this Court only to decide if Liberty has engaged in sex discrimination in a commercial employment context, an entirely legal inquiry. Without any religious questions to decide, the ecclesiastical abstention doctrine is inapplicable.

Liberty's final constitutional defense is that Title VII's bar on sex discrimination violates its First Amendment right to expressive association, which requires that some legal interference with mission-driven volunteer organizations' abilities to choose their members meet constitutional scrutiny. Because the employer-employee relationship is *not* one of expressive association, the right is categorically inapplicable in the employment context. In addition, the supposedly aggrieved party must demonstrate that including the person as a member actually impaired its ability to express its message, something that Liberty cannot do at the motion-to-dismiss stage. Finally, as under RFRA, Title VII's bar on sex discrimination meets strict scrutiny (and thus meets any other level of scrutiny), so Liberty's claim fails regardless of whether it can be invoked in this context.

10

Throughout its arguments, Liberty seeks to create a scaffold of religious freedom law that leaves religious organizations completely unaccountable to the rule of law and civil society. Permitting religious organizations to insulate themselves from all liability and accountability is dangerous and will end with many vulnerable people hurt and without recourse. Nor are such extreme changes to the law needed to preserve the autonomy and liberties of religious institutions, which are ably protected by existing law. Because these proposed radical expansions have no basis in law, this Court should affirm the district court's order denying Liberty's motion to dismiss.

<u>**STANDARD OF REVIEW**</u>

On an interlocutory appeal of a denial of a motion to dismiss, the Court "employ[s] the usual appellate standard governing motions to dismiss," reviewing "questions of law *de novo* and constru[ing] the evidence in the light most favorable to the non-movant." *Dyer v. Smith*, 56 F.4th 271, 276 (4th Cir. 2022) (quoting *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 242 (4th Cir. 2019) & *EEOC v. Seafarer's Int'l Union*, 394 F.3d 197, 200 (4th Cir. 2005)). The Court "accept[s] as true all well-pleaded allegations and draws all reasonable factual inferences in plaintiff's favor." *Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

## **ARGUMENT**

I.   **Judicial Restraint Counsels This Court To Dismiss This Appeal as Improvidently Granted and Allow the Case to Proceed in the District Court.**

It is an "important aspect of judicial restraint" that a court "avoid deciding more than is necessary to resolve a specific case." *Chawla v. Transamerica Occidental Life Ins. Co.*, 440 F.3d 639, 648 (4th Cir. 2006). This principle counsels that, where an appeal presents difficult issues that could up-end settled expectations and long-standing legal doctrines, the Court should look for a way to "decide less." *Billard*, 101 F.4th at 327. Because the appeal before the Court is one of those cases, this Court should use its authority to dismiss the appeal as improvidently granted and permit the case to proceed in the district court. *See, e.g., Wilson v. Ferrell,* 738 F.2d 637, 638 (4th Cir. 1984) (dismissing interlocutory appeal under section 1292(b) as improvidently granted).

In *Billard*, this Court was confronted with a religious organization that invoked defenses against a plaintiff's Title VII claim under Sections 702 and 703 of Title VII, RFRA, and the First Amendment, all of which Liberty also invokes here. *See* 101 F.4th at 322-23. Noting that "the breadth and novelty of [the defendant's] constitutional defenses" would carry "wide-ranging and unpredictable consequences," this Court inverted the usual rule of constitutional avoidance and decided the case under the "well-settled" doctrine of the ministerial exception. *Id*. at 327-28.

The Sections 702 and 703 defenses in this case present just the same breadth, novelty, and wide-ranging and unpredictable consequences that they did in *Billard*. Not only this, Liberty also asks this Court to adopt huge and unprecedented changes to RFRA and the First Amendment, all of which have the potential to sweep at least as far as redefining Sections 702 and 703. *See, generally, infra*. Collectively, these legal positions asserted by Liberty, if adopted by this Court, would lead to widespread, permanent changes in the legal landscape for hundreds of thousands of people and potentially upend the delicate balance this country has struck between religious freedom and employment law.

Given the interlocutory nature of this case, further developments in the district court could render an appellate decision on Liberty's defenses unnecessary. The parties could settle. No discovery has yet been produced in the district court; further factual development may render one or another of Liberty's defenses dispositive (the same defense that the *Billard* court preferred as grounds for decision, the ministerial exception, is also present in this case). Developments in the district court may lead one party or another to prefer not to appeal the district court's final judgment.

In addition, the Court lacks important information that could emerge through discovery. At the motion-to-dismiss stage, the Court has a limited record with which to consider important issues, such as the burdens asserted by Liberty. Ms. Zinski may develop additional information through discovery to supplement her

allegations. This Court would be deciding critical legal issues without all the relevant information.

"Article III courts should not make decisions unless they have to," *Nat'l Treasury Emp. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996), and this Court does not currently have to make these decisions. This Court should therefore dismiss the appeal as improvidently granted and allow the district court to supervise the creation of a record and entry of a final judgment in the first instance.[4]

## II.    The Ministerial Exception Does Not Apply To Ms. Zinski.

This Court has shown a preference for evaluating religious freedom cases under the "well-settled" ministerial exception where a defendant's other defenses present the possibility of "wide-ranging and unpredictable consequences." *Billard*, 101 F.4th at 327-28. Following this preference, Ms. Zinski turns first to Liberty's ministerial exception argument. Because the district court correctly held that (as alleged in the complaint) Ms. Zinski's job duties at Liberty did not qualify her position for the ministerial exception, this Court should affirm the district court's ruling.

---

[4] As noted above, simultaneous with its appeal under 1292(b), Liberty sought to appeal the holdings in the district court's order under the collateral order doctrine. Case No. 25-1228, ECF 11 (docketing statement). For the reasons stated in Ms. Zinski's Motion to Dismiss for Lack of Jurisdiction, this Court should dismiss that appeal for lack of jurisdiction. Case No. 25-1228, ECF 17 (motion to dismiss for lack of jurisdiction).

14

The ministerial exception prohibits courts from adjudicating disputes "about the appointment and removal of ministers and persons in other positions of similar theological significance" within religious entities. *Bell v. Presbyterian Church (U.S.A.)*, 126 F.3d 328, 331 (4th Cir. 1997). If successfully invoked, the exception provides the employer with immunity from any liability for an employment decision—terminations on any basis, including sex, race, or retaliatory animus, are permitted, regardless of whether they are religiously motivated. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 194–95 (2012) ("*Hosanna-Tabor*").

As this Court and the Supreme Court have both repeatedly held, the ministerial exception "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar." *Hosanna-Tabor*, 565 U.S. at 95 n.4; *accord Billard*, 101 F.4th at 326 (holding that the ministerial exception is a "non-jurisdictional affirmative defense"). Liberty misrepresents the law when it states that "numerous courts, including this Court, have treated the ministerial exception as a jurisdictional bar." Opening Br. at 57. Liberty cites to separate opinions discussing or advocating for such a change in the law, but no holdings of any court to that effect. Indeed, this Court has specifically rejected this argument in a published opinion *against Liberty*, holding that "the ministerial exception is an affirmative defense to liability—not a jurisdictional bar." *Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 68 (4th Cir. 2023) *cert.*

*denied sub nom. Liberty Univ., Inc. v. Bowes*, 144 S. Ct. 1030 (2024). No court has held that the ministerial exception is a jurisdictional bar, nor can it while controlling Supreme Court precedent has held to the contrary. And because it is an affirmative defense, the defendant bears the burden of proving it. *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, 531 (7th Cir. 2023) (citing *Sterlinski v. Cath. Bishop of Chi.*, 934 F.3d 568, 571 (7th Cir. 2019)).

Not all employees of a religious organization qualify for the ministerial exception. The exception is limited to a "narrow category of employees who 'serve as a messenger or teacher of the faith.'" *Billard*, 101 F.4th at 333 (citing *Our Lady of Guadalupe*, 591 U.S. at 752-53). The test is a functional test; "[w]hat matters, at bottom, is what an employee does." *Our Lady of Guadalupe*, 591 U.S. at 753. The Court has looked for "record evidence that [the employee] performed vital religious duties" before holding that such an exception applies. *Id*. at 756-57. While there is no rigid formula to the application of the ministerial exception, the Court has considered whether an employee's title reflects a ministerial role, whether an employee's role required a significant degree of religious training or formal commissioning, whether the employee held themselves out as a minister, and whether the role involved preaching or religious instruction. *Our Lady of Guadalupe* at 750-51 (citing *Hosanna-Tabor* at 177-78, 191-92). This Court, in applying those factors, has noted that the ministerial exception "would not apply to employment

decisions concerning purely custodial or administrative personnel." *EEOC v. Roman Cath. Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000).

As the district court noted, the ministerial exception inquiry is "'highly fact-intensive,' requiring substantial record evidence" and is accordingly "most properly evaluated with the benefit of discovery or more extensive briefing, *i.e.*, at summary judgment." JA46-48 (citing, *inter alia*, *Billard*, 101 F.4th at 333); *see also* Peter J. Smith and Robert W. Tuttle, *Civil Procedure and the Ministerial Exception*, 86 Fordham L. Rev. 1847, 1867 (2018) ("[S]ummary judgment will almost invariably be the appropriate mechanism for deciding whether the [ministerial] exception applies.").

At the motion-to-dismiss stage, considering the limited record and drawing all inferences in Ms. Zinski's favor, the district court correctly found that Ms. Zinski does not qualify under the ministerial exception. The district court recognized that, while there is no "rigid formula" for determining whether an employee qualifies for the ministerial exception, Ms. Zinski would not qualify for the exception "under any formula." JA50. All of the factors the Supreme Court has considered weigh against such a characterization. Ms. Zinski was hired as an IT Apprentice, a secular role staffed in "a department with a secular objective" with no duties related to Liberty's religious mission. JA66. "In her role as IT Apprentice, Zinski assisted students and staff who came to the helpdesk with computer issues, troubleshooted problems with

17

classroom equipment, offered on-call assistance for IT issues that arose during class, and managed technology-related administrative tasks, such as restocking printer paper." JA73 (quoting JA10). "Ms. Zinski's only contact with students concerned IT issues, and a significant portion of her time was spent speaking with other staff." JA73 (quoting JA10). Nowhere in the allegations before the court does the district court find that Ms. Zinski underwent any religious training nor did she hold herself out to the public as a minister. JA66. Nothing in the record suggests that information technology bears a special spiritual significance to Liberty such that tasks like restocking printer paper would qualify as vital religious duties.

Liberty asks this Court to reject the Supreme Court's ministerial exception precedents and apply the ministerial exception to *all* of Liberty's employees, including Ms. Zinski, regardless of the nature of their duties. *See* Opening Br. at 59-62. It is worth emphasizing briefly how broadly such a ruling would transform the ministerial exception: far from the narrow exception adopted by the Supreme Court for spiritual leaders, the exception would be stretched to cover every one of Liberty's 12,000 employees, from janitors to IT professionals to office assistants, regardless of whether they ever participated in a single devotional act or meeting. And because the ministerial exception offers absolute immunity for employment decisions, such a holding would effectively exempt Liberty wholesale from all employment law, not merely Title VII.

18

Liberty's asserted basis for this huge expansion of the ministerial exception in this manner is that Liberty asks all its employees to sign a Doctrinal Statement (the full text of which is not before this Court) and expects that "all employees are to model Scriptures and [Liberty's] sincere religious convictions in all aspects of work." Opening Br. at 61. This Court has already recognized that "[s]ome religious institutions may ask all employees, whatever their roles, to model religious values, and we do not suggest that such an expectation would bring all such employees within the ministerial exception." *Billard.*, 101 F.4th at 332. So while Liberty may choose to label "such a wide group of employees as ministers" in accordance with its own beliefs, Opening Br. at 61, that does not entitle it to bypass the functional inquiry required by the Supreme Court for the ministerial exception. Because while it is true that the "title 'minister'" is not a "necessary requirement" to invoke the exception, "[s]imply giving an employee the title of 'minister' is [also] not enough to justify the exception." *Our Lady of Guadalupe Sch.*, 591 U.S. at 752.

Liberty repeatedly characterizes the factual inquiry required by the Supreme Court's ministerial exception precedents as an inquiry into Liberty's own religious beliefs. *See* Opening Br. at 59. It is nothing of the sort. The question that a court is answering in applying the ministerial exception is a legal one: whether the employee in question is able to take advantage of the legal doctrine of the ministerial exception, not whether the employee is a minister under the religious beliefs of the institution.

19

And while Justice Thomas has argued in separate opinions that courts should "defer to religious organizations' good-faith claims that a certain employee's position is 'ministerial'"[5] when deciding whether or not to apply the exception, this is not the path followed by the Court's majority, which has instead repeatedly held that "[w]hat matters, at bottom, is what an employee does." *Our Lady of Guadalupe*, 591 U.S. at 753. The Court's majority is what controls. Based on that test and on the allegations before this Court, what Ms. Zinski did at Liberty does not qualify her job as an IT professional for the ministerial exception. The Court should therefore affirm the district court's holding that the ministerial exemption does not bar Ms. Zinski's claim at the motion-to-dismiss stage.

## III.    Sections 702 and 703 of Title VII Do Not Exempt Religious Employers From Sex Discrimination Claims Like Ms. Zinski's.

The canon of constitutional avoidance, under most circumstances, counsels that courts prefer to resolve statutory defenses before constitutional ones. *Billard*, 101 F.4th at 327. Therefore, Ms. Zinski turns next to the first of Liberty's two statutory defenses and consider its argument that Sections 702 and 703 of Title VII insulate Liberty from any liability under Title VII, including religiously-motivated sex, race, and national origin discrimination, in addition to religious discrimination.

---

[5] *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 762–63 (2020) (Thomas, J., concurring) (citing *Hosanna-Tabor*, 565 U.S. at 196 (Thomas, J., concurring)).

Because Sections 702 and 703 are unambiguous in leaving religious organizations liable for sex discrimination under Title VII, the district court erred in holding to the contrary. JA73-74. However, it reached the correct result with a recourse to legislative history, correctly holding that Sections 702 and 703 offer a safe harbor to religious organizations only against religious discrimination. JA83-84. This Court should affirm.

A.     Title VII Bans Sex Discrimination and Religious Discrimination.

Title VII of the Civil Rights Act of 1964 prohibits various forms of employment discrimination "because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Terminating an employee because they are transgender falls within the meaning of Title VII's bar on sex discrimination. *Bostock v. Clayton County*, 590 U.S. 644 (2020).

B.     Sections 702 and 703 of Title VII, By Their Plain Text, Provide Religious Employers Protection Only Against Claims of Religious Discrimination.

Section 702 of Title VII states that "[t]his subchapter" (meaning Title VII) "shall not apply to an employer with respect to . . . a religious corporation, association, educational institution, or society with respect to the employment of **individuals of a particular religion** to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." 42. U.S.C. § 2000e-1(a) (emphasis added).

21

Section 703 of Title VII has a parallel provision, stating that "[n]othwithstanding any other provision of this subchapter, . . . it shall not be an unlawful employment practice for a [religious] school, college, university, or other educational institution or institution of learning to hire and employ **employees of a particular religion** . . . ." 42 U.S.C. § 2000e-2(e) (emphasis added).

Liberty, taking its lead from separate opinions that have not commanded a majority of *any* appellate court, argues that Sections 702 and 703 apply to all discrimination claims—not just claims for religious discrimination—because both Sections mention exemptions from "'this subchapter" and "[t]he subchapter referenced is the entire subchapter of Title VII." Opening Br. at 11-13. But that argument fails to account for the limitation expressed by the words "individuals of a particular religion" and "employees of a particular religion." 42 U.S.C. §§ 2000e-1(a), 2000e-2(e). As the district court noted, "[i]f the phrases 'certain employees' and 'of a particular religion' are to have any meaning, we must interpret them to mean that the 'certain employees' who can be discriminated against are strictly those employees who are 'of a particular religion.'" JA77.

Here, the text of Sections 702 and 703 follows naturally from the text of Title VII's underlying prohibition on discrimination, which does not use the phrase "religious discrimination" either. Title VII prohibits discrimination "because of [an] individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

Sections 702 and 703 track that phrasing by carving out an exception "with respect to the employment of individuals of a particular religion." 42 U.S.C. §§ 2000e-1(a), 2000e-2(3). Both provisions focus on the attributes of the "individual," not the motivations of the employer.

By contrast, Defendants fail to identify any text in Sections 702 or 703 referring to the *employer's* religious motivations. In other antidiscrimination statutes, Congress has provided religious organizations exemptions based on the organization's "religious tenets." *See* 20 U.S.C. § 1681(a)(3) (Title IX); 42 U.S.C. § 12113(d)(2) (Americans with Disabilities Act). But Congress did not include the same language in Title VII. *Cf. Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 702 n.2 (2022) ("[R]ather than compare the [statute] to hypothetical language Congress could have used, it seems more appropriate to compare [its] terms to language Congress did use in closely related statutes[.]"). As the district court noted, quoting the Supreme Court, "[w]hen Congress wanted to grant an employer complete immunity [from Title VII], it expressly did so." JA77 (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 77-78 (1984)). "It was open to Congress to exempt from Title VII the religious employer, not simply one basis of employment, and Congress plainly did not." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166–67 (4th Cir. 1985); *see also Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335-36 (1987) (holding that the

23

1972 amendments to Title VII that introduced Sections 702 and 703 "exempted only the religious activities of [religious] employers from the statutory ban on religious discrimination."), *abrogated in part on other grounds by Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 530 (2022).[6]

Liberty also asserts that Sections 702 and 703 provide an exemption for religiously motivated sex discrimination because Title VII defines "religion" to include "all aspects of religious observance and practice, as well as belief.'" Opening Br. at 23 (quoting 42 U.S.C. § 2000e(j)). Liberty invokes this definition to support its imposition of "religious requirements on all employees," including "conformance with all aspects of Liberty's religious convictions[.]" *Id*. To create the impression that this language is relevant to its argument, Liberty quotes just a fragment of the definition. The full definition states that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct

---

[6] Neither *Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991) nor *Hall Baptist Mem. Health Care Corp.*, 215 F.3d 618 (6th Cir. 2000) help Liberty establish any differently, since each applied Section 702 solely as a bar to religious discrimination claims. *See Little* at 951 (discussing the application of "Title VII's prohibition against religious discrimination" to plaintiff's case); *id*. at 947-48 ("Title VII has been interpreted to bar race and sex discrimination by religious organizations towards their non-minister employees."); *Hall* at 621 (noting plaintiff "alleg[ed] that the [defendant] unlawfully terminated her employment based on her religion").

of the employer's business." 42 U.S.C. § 2000e(j). "The intent and effect of this definition was to make it an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977).

Thus, the definition of "religion" simply indicates that protections from religious discrimination include the right to reasonable accommodations for an employee's religious practice. By the same token, Sections 702 and 703's exemption from religious discrimination claims includes an exemption from the requirement to make reasonable accommodations for an employee's religious practice. It does not provide religious organizations with new rights to use *their own* religious beliefs to discriminate based on an employee's race, color, sex, or national origin. After all, the relevant religion referred to in Sections 702 and 703 is the religion of the "individual," not the religion of the employer.

Thus, "the entire 'subchapter' of Title VII", Opening Br. at 23, does not apply to religious organizations with respect to discrimination "because of [an] individual's . . . religion," but *does* apply with respect to discrimination "because of such individual's race, color, . . . sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Such a plain text reading accords with the common-sense view that "Congress did not intend to make the word 'religion' a catch-all for discrimination on the basis of

sex, race, and national origin." JA77; *accord, e.g., Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011); *EEOC v. Miss. Coll.*, 626 F.2d 477, 484 (5th Cir. 1980);[7] *Ritter v. Mount St. Mary's Coll.*, 495 F. Supp. 724, 727 (D. Md. 1980).[8] Congress's choice of the words "this subchapter" can then be understood not as broadening the *classes of persons* against whom a religious employer can discriminate but as emphasizing that none of the *remedies and enforcement provisions* spread across Title VII apply to a religious employer's religious discrimination. Title VII provides for government investigations, state and federal court proceedings, injunctive relief, award of back pay, and many other tools to enforce its antidiscrimination provisions. *See, generally*, 42 U.S.C. §§ 2000e-2000e-17. Having clarified the limited range of the exemptions in Sections 702 and

---

[7] Oddly, Liberty cites this case to support *its* position on the expansive scope of Section 702, Opening Br. at 12, despite the Fifth Circuit's holding that "Congress did not intend that a religious organization be exempted from liability for discriminating against its employees on the basis of race, color, sex or national origin" under Section 702. *Id.* (quoting *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972). The Fifth Circuit's separate determination in *Mississippi College* that the state is deprived of jurisdiction to determine whether a religious institution's religious justification is pretext for a prohibited basis (*id.* at 485) is not relevant to this case, where Liberty concedes it fired Ms. Zinski on the basis of her transgender status.

[8] As with *Mississippi College*, Liberty cites this case in its support, Opening Br. at 15, despite the court's clear holding that "Congress exempted religiously affiliated schools only from religious discrimination" under Section 703. *Ritter v. Mount St. Mary's Coll.*, 495 F. Supp. 724, 727 & n.4 (D. Md. 1980).

703 to individuals "of a particular religion," it is unsurprising that Congress felt the need to specify that, when it came to religious discrimination, religious employers were exempted from Title VII enforcement entirely. Such a reading is the only one that accords with the plain text, unambiguously resolves the scope of the statute, and accords with the precedent of this and other circuits. *See Freemont Christian Sch.*, 781 F.2d at 1365-67; *Billard*, 2021 WL 4037431, at *8–11. This Court is therefore bound to adopt it.

C. The Legislative History of Sections 702 and 703 Confirms That They Provide Religious Employers Protection Only Against Claims of Religious Discrimination.

Even if Sections 702 and 703 were ambiguous about whether or not they exempted religious employers from claims of sex discrimination, the legislative history confirms that these Sections were not intended to provide immunity for sex, race, or national origin discrimination. When confronted with an ambiguous statute, this Court can consider the legislative history. *Prudential Ins. Co. of Am. v. Shenzhen Stone Network Info. Ltd.*, 58 F.4th 785, 796 (4th Cir. 2023) (citing *Snyder's-Lance, Inc. v. Frito-Lay N. Am., Inc.*, 991 F.3d 512, 516 (4th Cir. 2021).

As this Court noted in *Rayburn*, the original bill proposing Title VII passed in the House excluded religious employers from liability under the statute altogether, but the "final version excluded such employers only with respect to discrimination based on religion." 772 F.2d at 1167 (citing Section-by-Section Analysis of H.R.

1946, the Equal Employment Opportunity Act of 1972, reprinted in Legislative History of the Equal Employment Opportunity Act of 1972 (Comm. Print 1972, at 1844, 1845)); *accord EEOC v. Pac. Press Pub. Ass'n*, 482 F. Supp. 1291, 1304 (N.D. Cal. 1979), *aff'd*, 676 F.2d 1272 (9th Cir. 1982) (collecting legislative history). "Given the wording of the statute and the history behind it," this Court concluded that Title VII, "by 'the affirmative intention of the Congress, clearly expressed,' applies to the [sex based] employment decision in this case." *Rayburn*, 772 F.2d at 1167 (quoting *NLRB v. Cath. Bishop of Chicago*, 440 U.S. 490, 501 (1979)).

D.    Under *Bostock*, the Employer's Motive Is Irrelevant to the Sex Discrimination Inquiry.

Liberty repeatedly argues that Sections 702 and 703 protect any act otherwise barred by Title VII "as long as it is religious motivated." JA12-13; *see also* JA16, JA19. As noted above, the statute does no such thing.

The Supreme Court has instead held that the Title VII inquiry is whether the sex of the employee is a "but-for cause" of the termination. *Bostock*, 590 U.S. at 656-57. An event can have more than one "but-for cause," but if one of them is the employee's sex, the employee has a valid claim for sex discrimination. *Id.*

An employer's motive for its sex discrimination is not relevant to the analysis. "An employer's intentional discrimination on the basis of sex is no more permissible when it is prompted by some further intention (or motivation)" than it is if it is not. *Bostock*, 590 U.S. at 664; *id.* at 645 ("[I]t's irrelevant what an employer might call

28

its discriminatory practice, how others might label it, or *what else might motivate it*.") (emphasis added). One of the precedents discussed by the Court emphasizes just how unimportant motive is to the sex discrimination inquiry. In *L.A. Dep't of Water & Power v. Manhart*, for example, an employer sought to award different pension payments to men and women on the basis that women as a class tended to live longer than men. *Id*. at 663. No animus toward men or women was shown, but the differential treatment still sufficed to state a claim for sex discrimination. *Id*. at 663-64. Accordingly, whether Ms. Zinski's termination on the basis of her sex was motivated by Liberty's religious beliefs or not does nothing to affect the validity of her sex discrimination claim.

Liberty concedes in its brief that Ms. Zinski was fired on the basis of both Liberty's perception of her religious beliefs and because she is transgender: "It was the manifestation of Zinski's stated religious beliefs *and* [her] announcement that Zinski was identifying as a gender different than [her] biological and chromosomal reality that compelled Liberty to terminate Zinski's employment." Opening Br. at 28 (emphasis in original); *see also* JA18-19. Sections 702 and 703 bar Ms. Zinski from bringing a religious discrimination claim. They do not bar her sex discrimination claim, however.

Because Ms. Zinski presses only a sex discrimination claim, Liberty's repeated insistence that she is somehow "demand[ing] status as a coreligionist under

Title VII", Opening Br. at 18, is untrue. Nowhere has Ms. Zinski alleged that she is a co-religionist with Liberty nor, under *Bostock*, must she in order to bring a sex discrimination claim. Ms. Zinski's claim in no way relies on being a co-religionist with Liberty, nor has she ever maintained otherwise.

Liberty's hypotheticals fail to illuminate the issue. In Liberty's first hypothetical, Liberty became aware that an employee converted to Islam because she wore a burka and terminated her solely on the basis of her religious conversion. Opening Br. at 29-30. In the second hypothetical, an employee transitioned to a female gender and converted to Islam, and Liberty terminated solely on the basis of her religious conversion. Opening Br. at 30. In both cases, since Liberty hypothesized that the sole cause of the termination was the employee's religion, sex is not a but-for cause of the termination. The employees would therefore have no sex discrimination claim, regardless of how the religious conversions came to Liberty's attention. But, as Liberty concedes, Opening Br. at 28, these are not our facts.

If an employee were fired on the basis of both her race and her national origin, she would have two causes of action under Title VII: discrimination on the basis of national origin and of race. Similarly, if an employee is fired for her religion and her sex, she would ordinarily have two causes of action under Title VII. Sections 702 and 703 shield religious employers and schools against one—and only one—of those causes of action: religious discrimination. So it is here. Liberty contends that it

would be "powerless" to terminate an employee whose stated goal was to "undermine Liberty's religious mission." Opening Br. at 28. If that difference in religion is the only reason for the termination, Sections 702 and 703 will protect its right to engage in religious discrimination. But where, as here, "[i]t was the manifestation of Zinski's stated religious beliefs *and* [her] announcement that Zinski was identifying with a gender different" than her birth, *id.*, the Sections only insulate Liberty for liability for the former reason.

A contrary rule would involve massive unfortunate consequences. The district court noted that "[t]o decide that sex discrimination is acceptable so long as it is religiously motivated would allow employers to achieve all manner of discrimination under the banner of religion." JA83. Religious organizations will be able to self-certify a religious belief about any characteristic protected by Title VII. For example, a religious non-profit could purport that hiring racial minorities is against their religion. The same reasoning would apply to terminating someone's employment due to what country she comes from, or even her ancestry. Such outcomes are easy to imagine, given the number of religious groups that have upheld racial inferiority, gender inferiority, and national origin inferiority as sincerely held religious beliefs. Fortunately, Sections 702 and 703 provide no protection for such acts.

**IV.    RFRA Does Not Bar Ms. Zinski's Claims.**

Ms. Zinski next turns to Liberty's RFRA defense to exhaust the statutory defenses before proceeding to Liberty's remaining constitutional defenses. *See Billard*, 101 F.4th at 327.

The district court correctly held that RFRA does not apply to suits exclusively between private parties. In the alternative, the district court held that Liberty could not demonstrate a substantial burden on its religious activity, and that in any event RFRA met strict scrutiny in its application to Ms. Zinski's case. Because these holdings are correct, this Court should affirm.

**A.      RFRA Does Not Apply to Suits with Only Private Parties.**

RFRA provides that, if the federal government substantially burdens a person's exercise of religion, the burden must be justified as the least restrictive means of furthering a compelling government interest.[9] 42 U.S.C. § 2000bb-1; *Bostock*, 590 U.S. at 682. A person so burdened may assert RFRA "as a claim or defense in a judicial proceeding and obtain appropriate relief *against a government*." 42 U.S.C. § 2000bb-1(c) (emphasis added); *see also id*. § 2000bb-1(a) ("Government shall not substantially burden a person's exercise of religion . . .");

---

[9] RFRA's least-restrictive means test incorporates the familiar constitutional standard of strict scrutiny. *See Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 99 (4th Cir. 2013).

*id.* § 2000bb-1(b) (requiring the "[g]overnment" to meet its burden under the statute).

When a statute's text is unambiguous, courts must apply the plain and ordinary meaning of its terms. *Bostock*, 590 U.S. at 673. The district court therefore properly dismissed the case because "the terms of RFRA do not appear to authorize suits between private parties, since judicial relief can only be obtained by proceeding against a government." JA85; *accord Listecki*, 780 F.3d at 737; *Gen. Conf. Corp. of Seventh-Day Adventists*, 617 F.3d at 410; *Sutton*, 192 F.3d at 835.[10]

Liberty attempts to avoid this obvious textual result on two grounds: by arguing that the textual construction violates the absurd results canon, Opening Br. at 45 (citing *Comm'r of Internal Revenue v. Brown*, 380 U.S. 563, 571 (1965)), and by arguing that the word "government" in the statute was meant to incorporate the "judiciary" so as to apply the statute to "burdens imposed by the judicial branch in an employment discrimination suit." Opening Br. at 41. Neither argument withstands scrutiny.

---

[10] The Supreme Court did not speak to this issue in *Bostock*, noting only that RFRA "might supersede Title VII's commands in appropriate cases." *Bostock*, 590 U.S. at 682.

33

1.   *Holding that RFRA applies only against the government is not absurd.*

The absurdity canon offers courts some scope to adopt "a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results or would thwart the obvious purpose of the statute." *Brown*, 380 U.S. at 571. But absurdity is a high bar; a result that merely "seem[s] odd . . . is not absurd." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 565 (2005). Rather, the application of the law as written must be "so monstrous, that all mankind would, without hesitation, unite in rejecting the application." *Sturges v. Crowninshield*, 17 U.S. 122, 203 (1819); *see also Hillman v. IRS*, 263 F.3d 338, 342 (4th Cir. 2001).

Interpreting RFRA as written produces nothing monstrous or absurd. The rule is clearly administrable as written; there is no ambiguity about whether the government is a party to a case or not. Liberty protests that "[t]he ability of Liberty to raise defenses under the RFRA cannot vary depending on whether the EEOC or a private party brings an identical claim under an identical statute." Opening Br. at 44.[11] But, under federal law, many defenses and causes of action are available

---

[11] Liberty worries that, if RFRA applies only against the government, "no private plaintiff would ever accept the EEOC bringing such a claim" on their behalf. Br. at 45. But it isn't up to the plaintiff. Plaintiffs are required to submit complaints to the EEOC before filing suit under Title VII and the EEOC decides whether or not it will appear in the case, not the private plaintiff. *See* U.S. E.E.O.C., *Employees & Job Applicants*, https://www.eeoc.gov/employees-job-applicants (last visited Aug. 30,

against the government and not against private parties, and *vice versa*. And as the Western District of North Carolina has noted, "[t]he United States as a nation has always been cautious of governmental overreach" and thus "distinguishing between private and government enforcement is not monstrous or absurd; rather, the distinction is in keeping with both the ideas of the Framers and two hundred years of precedent interpreting the Bill of Rights." *Billard*, 2021 WL 4037431, at *21. This result is thus not as "awkward" as the district court believed, but the district court correctly held that even an awkward result would not justify rewriting the statute in the name of the absurdity canon. JA86.

      2.    *RFRA's references to "government" do not include the judiciary or Ms. Zinski.*

Reading the "government" in RFRA to include the judiciary cannot be squared with the other provisions of RFRA and would lead to absurd results itself. While the judiciary is certainly a "branch" of the government, 42 U.S.C. § 2000bb-2(1), being part of the government is not enough—the "government" in question must be the one that "substantially burdens" the religious exercise of the person invoking RFRA. *Id*. § 2000bb-1(a). Under Liberty's proposed interpretation of RFRA, the judiciary would be the entity burdening the aggrieved person in a case

---

2025); U.S. E.E.O.C., What You Can Expect After a Charge is Filed, https://www.eeoc.gov/employers/what-you-can-expect-after-charge-filed (last visited Aug. 30, 2025).

initiated by a private party and in many cases (as here) pursuant to a statute enacted by Congress that the judiciary is bound to adjudicate.

Even more absurdly, Liberty's construction of the statute would then require the judiciary to "demonstrate" that the application of the burden met strict scrutiny, *id*. § 2000bb-1(b), apparently entering evidence and argument in its own court in order to justify a lawsuit that it did not initiate or control. Nothing in Liberty's brief explains how this would work or how Ms. Zinski would relate to the burden placed on the "government" by the statute, even if it did apply to the judiciary. A reading of the unambiguous text of the statute cannot sustain such a construction.

In *Hankins v. Lyght*, cited by Liberty, the Second Circuit became the only appellate court to squarely hold that RFRA offers a defense in suits with only private parties.[12] 441 F.3d 96 (2d Cir. 2006). But *Hankins* "has proven controversial even within its own court; it was issued over a dissent from then-Judge Sotomayor, and a later panel expressed 'doubts' about its holding on this front." *Billard*, 101 F.4th at 328, n.7 (citations omitted). This later panel "d[id] not understand how [RFRA] can apply to a suit between private parties, regardless of whether the government is

---

[12] Liberty also cites to *EEOC v. Catholic University of America*, 83 F.3d 455 (D.C. Cir. 1996) for the proposition that RFRA applies to cases involving only private parties. But, as the caption implies, the case was brought by the government as a co-plaintiff. The D.C. Circuit does not analyze the question of whether RFRA should apply to private parties, much less opine on whether RFRA would be available as a defense in a case in which the government is not a party.

capable of enforcing the statute at issue." *Rweyemamu v. Cote*, 520 F.3d 198, 203 (2d Cir. 2008). This Court is not bound to follow the Second Circuit's error; instead, it should follow the majority of the circuits and hold that "[t]he plain language of the statute, its legislative history, and its interpretation by courts … demonstrate that RFRA does not apply to suits between private parties." *Hankins*, 441 F.3d at 115 (Sotomayor, J., dissenting).

> B.    At the motion-to-dismiss stage, Liberty cannot show that employing Ms. Zinski substantially burdened its exercise of religion.

Even if this Court finds that RFRA applies to suits between only private parties, Liberty can invoke RFRA only if its religious exercise is "substantially burden[ed]." 42 U.S.C. § 2000bb-1(a). As the district court found, Title VII's bar on sex discrimination is not a substantial burden on Liberty's religious exercise at the motion-to-dismiss stage.

At the motion-to-dismiss stage, the Court is limited to the Complaint and a small universe of relevant documents and is bound to draw all factual inferences in Ms. Zinski's favor. *Mays v. Sprinkle*, 992 F.3d at 299. The current record fails to demonstrate that Liberty's religious exercise has been substantially burdened. As noted above, Ms. Zinski was already a transgender woman at the time she was hired. JA10, JA16. She performed her duties, which were entirely secular in nature, well and to the satisfaction of her supervisors. JA10. She made no demands of accommodation or recognition from Liberty and only informed them of her

transgender status when her impending name change necessitated it. JA11, JA16. As the district court noted, employing Ms. Zinski "does not require Liberty to change its belief, to endorse Zinski's behavior, or to allow Zinski to spread a new message within the organization[.]" JA88. The only thing that changed here was Liberty's knowledge of Ms. Zinski's transgender status.

The asserted burden here is vastly different from the kind of substantial burden borne by the plaintiffs in *Burwell v. Hobby Lobby*, who faced not only dignitary harms but hundreds of millions of dollars in taxes per year if they did not comply with regulations from the Department of Health and Human Services. 573 U.S. 682, 726 (2014). Without demonstrating a similar substantial burden, Liberty is not entitled to a RFRA defense at this stage of the case.

C.     In Any Event, Title VII Is Narrowly Tailored To A Compelling Government Interest.

If Liberty were to prevail on its argument that RFRA applies to suits between private parties, and prevail again on its argument that Title VII's bar on sex discrimination substantially burdened its religious exercise, the burden would then shift to the "government"—in Liberty's reading of the statute, apparently Ms. Zinski—to show that the burden was narrowly tailored to a compelling government interest. *Holt v. Hobbs*, 574 U.S. 352, 357–58 (2015) . Because Title VII *is* narrowly tailored to a compelling government interest, including in the context of this case, Liberty's RFRA defense would fail even at this stage.

"Title VII is an interest of the highest order." *Rayburn*, 772 F.2d at 1169. This Court has routinely held that it would "be difficult to exaggerate the magnitude of the state's interest in assuring equal employment opportunities for all, regardless of . . . sex." *Id.* at 1168; *see also Billard*, 101 F. 4th at 324 ("[A]pplication of Title VII would be justified here by the government's compelling interest in protecting employees from sex discrimination."). This compelling government interest extends to preventing sex discrimination against non-ministerial employees of religious entities. *Roman Cath. Diocese of Raleigh*, 213 F.3d at 795 (citing *Rayburn* at 1169).

Quoting the Supreme Court's opinion in *Hosanna-Tabor*, Liberty asserts that the "interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission" should be weighed against the government's interest as part of the Court's RFRA analysis. Opening Br. at 48 (quoting 565 U.S. at 181). But "[s]uch a balancing test . . . does not form part of the strict scrutiny analysis." *PSINet, Inc. v. Chapman*, 362 F.3d 227, 250 (4th Cir. 2004). Once the government establishes that it has a compelling interest, the only remaining inquiry is whether the challenged law is the least-restrictive means of achieving that interest. *Id.*; 42 U.S.C. § 2000bb-1(b)(2). Liberty's quote from *Hosanna-Tabor* is from the Court's discussion of the ministerial exception, which is the doctrine correctly calibrated to protect a religious employer's religious rights in employment decisions (and, as discussed in Section II above, it does not apply to Ms. Zinski's case).

To apply RFRA's least-restrictive means test, this Court must "look beyond broadly formulated interests" and apply the test "to the person," *Hobby Lobby*, 573 U.S. at 726. Accordingly, this Court must decide if enforcing Title VII is necessary for the government to realize its goal of eliminating discrimination in employment on the specific facts of Ms. Zinski's case. It is. "Failing to enforce Title VII" in an individual case "would be allowing a particular person . . . to suffer discrimination, and such an outcome is directly contrary to the . . . compelling interest in combating discrimination in the workforce." *Harris Funeral*, 884 F.3d at 591. The allegations here show that Ms. Zinski suffered not only the loss of her job, but fear and anxiety so great that, on some nights, it led her to vomit. JA11. The termination led her to feel disbelief, emptiness, and hurt at being ostracized for being transgender, a rejection of who she is on a fundamental, unchangeable level. JA11. Remedying these harms for Ms. Zinski is no less important than it is in the abstract. Thus, "actions brought under Title VII . . . will necessarily defeat RFRA defenses to discrimination made illegal by Title VII." *Harris Funeral* at 591. Because the application of Title VII to Ms. Zinski's case meets strict scrutiny, Liberty's RFRA defense must fail.[13]

---

[13] Liberty cites to *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) for its statement that "upholding constitutional rights serves the public interest." Br. at 50. But this statement was made in the course of the Court's analysis of whether a preliminary injunction should issue in a First Amendment case under § 1983 and thus has no bearing on Liberty's RFRA defense in this case.

**V.     The Ecclesiastical Abstention Doctrine Does Not Bar Ms. Zinski's Claims Because The Court Does Not Have To Decide Any Religious Question.**

Having exhausted Liberty's statutory defenses and the ministerial exception, Ms. Zinski turns to Liberty's argument that the ecclesiastical abstention doctrine bars a court from considering Ms. Zinski's sex discrimination claim. The district court correctly held that Ms. Zinski's sex discrimination claim does not require the resolution of any religious question, so the doctrine does not apply.

The ecclesiastical abstention doctrine, an aspect of church autonomy, requires civil courts "not to intermeddle in internal ecclesiastical disputes" of religious organizations. *Bell v. Presbyterian Church*, 126 F.3d 328, 330 (4th Cir. 1997). Animating this doctrine is the principle that religious organizations should be free from secular control regarding religious questions, such as theological controversy, church discipline, ecclesiastical government, or the conformity of members of the church to standards of morals required of them. *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952); *Watson v. Jones*, 80 U.S. 679, 733 (1871). For example, a civil court is barred from deciding whether the Serbian Orthodox Church correctly followed its canon law when defrocking one of the church's bishops. *Serbian E. Orthodox Diocese for U.S.A. & Canada v. Milivojevich*, 426 U.S. 696, 718-19 (1976).

However, this principle of church autonomy "provides religious associations neither an immunity from discovery nor an immunity from trial on secular matters."

41

*Belya v. Kapral*, 45 F.4th 621, 633 (2d Cir. 2022); *Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1116 (7th Cir. 2024). Moreover, the law is clear that religious organizations may be subject to Title VII scrutiny where the decision does not involve the organization's spiritual functions. *Rayburn*, 772 F.2d at 1171; *Roman Cath. Diocese of Raleigh*, 213 F.3d at 801 ("Where no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to a religious employer unless Congress so provides.").

Ms. Zinski's sex discrimination claim does not ask the Court to decide any question of a religious character. The district court correctly noted that Ms. Zinski "here proceeds in a civil tribunal and invokes no form of law other than civil law." JA112. As discussed above in Section III(D), the question under Title VII is whether Ms. Zinski's sex was a but-for cause of her termination. *Bostock*, 590 U.S. at 656-57. Liberty has already conceded that it was, both in correspondence with Ms. Zinski and in filings before this Court. Opening Br. at 28; JA18-19. No court needs to inquire further into the religious beliefs that may or may not have animated that decision. Therefore, the ecclesiastical abstention doctrine does not bar the courts from hearing Ms. Zinski's case.

Attempting to bring this case within the scope of the ecclesiastical abstention doctrine, Liberty repeatedly (and falsely) asserts that Ms. Zinski "asks this Court to determine that Zinski's interpretation of Scripture is correct, that Liberty's Doctrinal

Statement is incorrect, and that Zinski's interpretation of Scripture entitles Zinski to remain an employee in good standing under the appropriate interpretation of Scripture." Opening Br. at 37; *see also id.* at 40, 42, 44.[14] Ms. Zinski is asking this Court to interpret Title VII, not Scripture. Even if a civil court could somehow decide that Liberty's religious beliefs were "correct" or "incorrect," that would not determine whether or not sex was a but-for cause of Ms. Zinski's termination. A "correct" or "incorrect" religious belief could equally well be the source of such a decision.

As noted in Section II above, religious employers receive constitutional protection for certain employment decisions through the ministerial exception and Sections 702 and 703. However, if the ecclesiastical abstention doctrine were expansive enough to turn *all* employment decisions into religious questions, there would be no need to have the ministerial exception (or Sections 702 and 703), rendering them "effectively swallowed whole and made redundant." JA112. This Court should decline Liberty's invitation to significantly expand constitutional

---

[14] In the district court, Liberty attached to its motion to dismiss correspondence from Ms. Zinski that invokes her religious faith as context for her own personal experience. *See* JA16. Far from "necessarily inject[ing] religious doctrine into the dispute," Opening Br. at 35-36, these references are not relied on by Ms. Zinski in her allegations and were not even part of the record until Liberty introduced them.

immunity for religious institutions beyond the recognized categories of religious questions and the ministerial exception.

## VI.    The Right to Expressive Association Does Not Bar Ms. Zinski's Claims.

Liberty argues that the First Amendment right to expressive association fully applies to the employer/employee relationship, and that its decision to terminate Ms. Zinski on the basis of her sex is protected by her First Amendment right to expressive association. It doesn't, and it isn't, respectively.

The district court erred by following the Second Circuit and holding that the First Amendment right of expressive association had any application to employment relationships. JA103. However, the district court correctly held that Ms. Zinski's continued employment by Liberty does not violate the right to expressive association in employment under the Second Circuit's test. JA108. And even if Liberty were correct that the Court must apply strict scrutiny to regulation of the employment relationship, Title VII's bar on sex discrimination meets that standard, as it does the lesser standard of rational basis.

### A.    The right to expressive association does not apply to employer/employee relationships.

The Supreme Court has never recognized a First Amendment right to engage in employment discrimination under the banner of "expressive association." To the contrary, the Supreme Court has already "rejected the argument that Title VII infringed employers' First Amendment rights." *Wisconsin v. Mitchell*, 508 U.S. 476,

44

487 (1993); *see also Hishon*, 467 U.S. at 78. "[T]here is only minimal constitutional protection of the freedom of commercial association" because "the State is free to impose any rational regulation on the commercial transaction itself." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring in part and concurring in judgment). Thus, "[o]nce a contractual relationship of employment is established, the provisions of Title VII attach and govern certain aspects of that relationship." *Hishon*, 467 U.S. at 74.

The commercial nature of the employment relationship distinguishes Title VII from public accommodation laws regulating a voluntary association's membership or speech. *See, e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) (forced inclusion of volunteer, unpaid scout leader); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 857 (7th Cir. 2006) (forced inclusion of members in student organization that had no employees); *cf. Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995) ("peculiar" application of public accommodations statute to private entity's speech without any connection to "the provision of publicly available goods, privileges, and services"). Applying public accommodation laws to an expressive association's membership policies "directly and immediately affects associational rights." *Dale*, 530 U.S. at 659. Indeed, "[t]here can be no clearer example of an intrusion into the internal structure or affairs of an association than a

regulation that forces the group to accept members it does not desire." *Roberts*, 468 U.S. at 623.

By contrast, when the government prohibits discrimination in employment or other economic transactions, those "acts are not shielded from regulation merely because they express a discriminatory idea or philosophy." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 (1992). To the extent that regulations of those commercial transactions have an "incidental effect" on an organization's expressive message, *Dale*, 530 U.S. at 659, those regulations are evaluated by the more deferential standards of intermediate scrutiny, *see United States v. O'Brien*, 391 U.S. 367 (1968), or rational basis, *see Jacoby & Meyers, LLP v. Presiding Justices, Appellate Div. of the S. Ct. of N.Y.*, 852 F.3d 178, 191 (2d Cir. 2017). Thus, while "religious and philosophical objections are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 631 (2018).

The district court erred in holding that these precedents did not apply to religious employers. Noting that *Hishon* and other precedents held that "plain, private, 'invidious' discrimination cannot be considered an expressive association interest," the district court went on to distinguish this from "discriminatory impulses rooted directly in the First Amendment, such as religions." JA93-108. But this

46

distinction is not relevant to the expressive association analysis. To the extent that Liberty's claim can be distinguished from the free speech-derived claims of the defendants in *Hishon* and its progeny, it receives no higher level of protection under the right of expressive association.

Because *Hishon* bars any separate expressive association right in Liberty's asserted interest in discriminating on the basis of sex, Liberty's expressive association defense in this case is derived solely from its free exercise rights. Opening Br. at 63. As noted above in Sections II and V, the constitutional protections for religious employers do not bar Ms. Zinski's claim. Because expressive association is a derivative right, it would be "anomalous" if the "intertwined rights" in question had a different scope when applied to the same facts. *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 681 (2010) (holding religious group's free speech rights and expressive association rights were coextensive where factual basis for claims was the same); *see also id*. at 697 n.27 (dismissing plaintiff's free exercise claim without performing additional expressive association analysis). Because they arise from the same set of facts, Liberty's derivative right to freedom of association sweeps no more broadly than its claims of religious freedom under the First Amendment.

B.  Even if it the right to expressive association applies to the employment context, it is limited to employees whose actions "threaten the very mission" of the employer—which Ms. Zinski's actions do not.

Liberty cites to only one circuit court that has applied the First Amendment right of expressive association to the employment context: the Second Circuit, in *Slattery v. Hochul*, held that the right to expressive association applied in the employment context. 61 F.4th 278, 288 (2d Cir. 2023).[15] However, even the Second Circuit does not apply the strict scrutiny standard applied by the Supreme Court's voluntary association cases. In a decision issued after *Slattery*, *CompassCare v. Hochul*, the Second Circuit noted that "the Supreme Court's decisions regarding the freedom of expressive association enjoyed by voluntary associations do not apply

---

[15] Liberty also cites to two district court decisions. *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571 (N.D. Tex. 2021), *aff'd in part, vacated in part, and rev'd in part sub nom. Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914 (5th Cir. 2023). *Bear Creek* relies almost exclusively upon *Dale* in holding that expressive association precluded liability under Title VII. For the reasons described above, relying on a decision concerning a voluntary membership association in the context of an employment dispute is misplaced. The Fifth Circuit did not affirm *Bear Creek*'s expressive association rulings.

*Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1184–85 (D. Colo. 2023) suffers from the same flawed application of *Dale* outside its appropriate context, as noted by a district court which subsequently considered the same universal preschool program at issue in the case. *St. Mary Cath. Par. in Littleton v. Roy*, No. 23-CV-2079, 2024 WL 3160324, at *28, *41 (D. Colo. June 4, 2024) (finding *Dale* "cannot and should not be extended to the facts" of the case and noting that the court in Patterson granted a preliminary injunction on the expressive association claim without the benefit of defendant's merits arguments on the issue).

neatly to employers." 125 F.4th 49, 60 (2d Cir. 2025). "[M]eaningful differences" between the two kinds of relationships include that employment relationships are "contractual, with work exchanged for pay, and the employment contract provides mutual guarantees to the parties." *Id*. at 59. Also, "[e]mployees rely on their jobs for their livelihoods, and termination of or refusal to hire an employee can have significantly greater impact than exclusion from a voluntary association." *Id*. "[S]ignificant power imbalances often exist between employers and employees which may not be present in voluntary associations." *Id*. Importantly, in the employment context, courts "must ensure that the right to expressive association does not serve as a shield for unlawful discrimination." *Id*. at 59-60.

Because of these differences, the Second Circuit found that the right to expressive association "does not permit an employer *generally* to discriminate in its employment practices[.]" *Id*. at 61. Rather, the party invoking the right bore the burden of proving that the employment of the person in question "threatens 'the very mission of its organization.'" *Id*. (quoting *Slattery*, 61 F.4th at 288). In doing so, a party bears the burden of demonstrating "the responsibilities of the position, including whether it is client-facing and whether it involves expressly or implicitly speaking for the organization, and (2) the particular conduct or attribute of the employee that renders the employment of that person, in that position, a threat to the employer's mission." *Id*.

Liberty asserts that its continued employment of *any* employee that violates the precepts of its Doctrinal Statement meets this standard and would be "akin to forcing a pro-life pregnancy center to employ a vocal pro-abortion advocate devoted to openly contradicting its message." Opening Br. at 66. If adopted by this Court, the impact of this argument is staggering. Any commercial organization that could position itself as being message-based—whether religious or secular, because the right to expressive association is not limited to religious institutions—could announce a set of criteria applicable to all employees, self-certify those criteria as central to its mission, and enjoy the right to a constitutional challenge to all state and federal employment law for every employment decision it makes going forward. The Second Circuit's *Slattery/CompassCare* test is not susceptible to such an interpretation because "[i]t is not enough for an employer to claim that it holds particular views or interests, or even that it expresses such views through its work . . . Rather, the right to expressive association is implicated only when the employment decision at issue 'goes to the structure and identity of the association as an association." *CompassCare*, 125 F.4th at 61 (quoting *Slattery*, 61 F.4th at 290).

Drawing all factual inferences in favor of Ms. Zinski, the district court correctly held that, based on "the evidence in the record," Liberty cannot meet its burden. JA106. The record does not show that Liberty's "very mission" is to oppose transgender people. Ms. Zinski's role as an IT professional involved only minimal

contact with students, and then only about technological matters. JA10. Nothing in her job performance led to any problems with Liberty. JA11. She was fired, not for any advocacy in contradiction of Liberty's mission, but because Liberty learned of her transgender status. JA11. These facts fail to meet Liberty's burden to show that employing Ms. Zinski threatened the very structure of the organization.

### 1.  *In Any Event, Title VII Is Valid Under Dale and Rational Basis Review.*

Even if this Court finds that the First Amendment right to expressive association applies in the employment context, "[T]he freedom of expressive association, like many freedoms is not absolute" and can be "overridden by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Dale*, 530 U.S. at 640-41 (citing *Roberts*, 468 U.S. at 623). This test is easily met by the law at issue here.

As discussed above in Part IV(C), Title VII's anti-discrimination provisions meet strict scrutiny. The compelling government interest in prohibiting sex discrimination and the narrow tailoring of the remedy apply as strongly to a First Amendment right of expressive association defense as they to do a RFRA defense, both of which are ultimately derived from the same supposed source in Liberty's religious identity. For that reason, even if the right to expressive association applies

to the employment context and Liberty's right is burdened, Ms. Zinski's sex discrimination claim can still proceed under the test in *Dale*.

These arguments also establish that Title VII passes rational basis review. The district court found it necessary to ask if Title VII was justified under rational basis review because of the "minor burdens" it imposed on Liberty's right to expressive association and answered that it did. JA108-109. It does. Any law that passes muster under the demanding strict scrutiny standard must, *a fortiori*, satisfy the far lesser rational basis standard. *See Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 541 (3d Cir. 2011); *Hambsch v. Dep't of Treasury*, 796 F.2d 430, 435 (Fed. Cir. 1986). Regardless of the level of scrutiny applied, the application of Title VII's bar on sex discrimination to the facts of Ms. Zinski's case is justified, and this Court should therefore affirm the district court's holding to that effect.

## <u>CONCLUSION</u>

For the foregoing reasons, Ms. Zinski respectfully requests that the Court dismiss this appeal as improvidently granted and remand to the district court for further proceedings. In the alternative, Ms. Zinski respectfully requests that this Court affirm the district court's denial of Liberty's Motion to Dismiss.

Dated: September 2, 2025                    Respectfully submitted,

                                           /s/ Matthew W. Callahan

MATTHEW W. CALLAHAN                         PAUL M. FALABELLA
WYATT S.M. ROLLA                           SAMANTHA R. GALINA
EDEN HEILMAN                               BUTLER CURWOOD PLC
ACLU FOUNDATION OF VIRGINIA                140 Virginia Street, Suite 302
P.O. Box 26464                             Richmond, VA 23219
Richmond, VA 23261                         (804) 648-4848
(804) 644-8080

                                           *Attorneys for Plaintiff-Appellee*

## **REQUEST FOR ORAL ARGUMENT**

This case involves novel and significant legal issues concerning anti-discrimination law, employment law, and religion. Because the complexity and importance of these issues would benefit from a full hearing before this Court, Ms Zinski respectfully requests oral argument pursuant to Local Rule 34(a).

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with type-volume limits of Fed. R. App. R 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. R 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments), this brief contains <u>12,667</u> words, as determined by the word processing program used to prepare the document.

2.  This brief complies with the typeface and type style requirements because it was prepared in a proportionally-spaced typeface using Microsoft Word for Mac Version 16.64 in 14-point Times New Roman.

*/s/ Matthew W. Callahan*

MATTHEW W. CALLAHAN
WYATT S.M. ROLLA
EDEN HEILMAN
ACLU FOUNDATION OF VIRGINIA
P.O. Box 26464
Richmond, VA 23261
(804) 644-8080

PAUL M. FALABELLA
SAMANTHA R. GALINA
BUTLER CURWOOD PLC
140 Virginia Street, Suite 302
Richmond, VA 23219
(804) 648-4848

*Attorneys for Plaintiff-Appellee*