No. 25-1228

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

Ellenor Zinski,

Plaintiff-Appellee,

v.

Liberty University, Inc.,

Defendant-Appellant.

_____

On Appeal from a Final Judgment of the
United States District Court for the Western District of Virginia
Case No. 6:24-cv-00041, Judge Norman K. Moon

_____

*AMICI CURIAE* BRIEF FOR
METROPOLITAN WASHINGTON
EMPLOYMENT LAWYERS ASSOCIATION AND
NATIONAL EMPLOYMENT LAWYERS ASSOCIATION
IN SUPPORT OF APPELLEE ELLENOR ZINSKI

_____

<div style="margin-left:40%">

Carolyn L. Wheeler
Jessica Westerman
Katz Banks Kumin LLP
11 Dupont Circle, N.W.
Suite 600
Washington, D.C. 20036
(202) 299-1140
wheeler@katzbanks.com
westerman@katzbanks.com

*Counsel for Amici Curiae*

September 9, 2025

</div>

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

(A)    *Parties and Amici.* All parties appearing before the District Court and in this Court are listed in the Appellant's Brief.

(B)    *Rulings Under Review.* References to the rulings at issue appear in the Appellant's Brief.

(C)    *Related Cases.* There are no related cases.

## RULE 29(a)(4)(A) STATEMENT OF *AMICI*

The National Employment Lawyers Association and the Metropolitan Washington Employment Lawyers Association are associations. They do not have any corporate parents. They do not have any stock, and therefore no publicly held company owns 10% or more of the stock of these *Amici*.[1]

## RULE 29(a)(4)(D) STATEMENT OF INTEREST OF *AMICI*

The Metropolitan Washington Employment Lawyers Association ("MWELA"), founded in 1991, is a professional association and is the local chapter of the National Employment Lawyers Association, a national organization of attorneys who specialize in employment law. MWELA conducts continuing legal education programs for its more than 390 members, including an annual day-long conference which usually features one or more

---

[1] In accordance with Fed. R. App. P. 29(a)(4)(E) and Local Rule 29.1, *Amici* state that no party's counsel authored this brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *Amici* or its members—contributed money that was intended to fund preparing or submitting the brief.

judges as speakers. MWELA also participates as *amicus curiae* in important cases in the District of Columbia, Maryland, and Virginia, the three jurisdictions in which its members primarily practice.

MWELA's members and their clients have an important interest in the proper interpretation of the meaning and scope of the exemptions from Title VII afforded to religious entities.  MWELA members represent employees of all religions, races, colors, sexes, and national origins and believe that statutory exemptions from the protections against discrimination must be construed narrowly, in accordance with congressional intent to preserve the intended balance between the rights of religious employers to free expression of their religious beliefs and the rights of non-ministerial employees to be free from all forms of invidious discrimination.

The National Employment Lawyers Association ("NELA"), founded in 1985, is the largest bar association in the country focused on empowering workers' rights attorneys. NELA and its 69 circuit, state, and local affiliates have a membership of over 4,000 attorneys who are committed to protecting the rights of workers in employment, wage and hour, labor, and civil rights disputes. NELA attorneys litigate daily in every circuit, giving NELA a unique perspective on how principles announced by courts in employment cases actually play out on the ground. Many NELA members represent employees who seek religious

accommodations from their secular employers, as well as employees who work in non-ministerial positions for religious employers and have a strong interest in being protected from invidious discrimination rooted in the religious beliefs of their employers.

*Amici* file this brief with the consent of all parties.

<u>**TABLE OF CONTENTS**</u>

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**..........i

**RULE 29 CORPORATE DISCLOSURE STATEMENT OF AMICI** .................i

**RULE 29 STATEMENT OF INTEREST OF AMICI** ............................................i

**TABLE OF CONTENTS**.....................................................................................iv

**TABLE OF AUTHORITIES** ...............................................................................v

**BACKGROUND AND SUMMARY OF THE ARGUMENT** ..............................1

**ARGUMENT** ........................................................................................................4

I.      **Statutory provisions do not permit Liberty's unlawful sex discrimination.** ...........................................................................4

A. **Title VII does not exempt Liberty's unlawful sex discrimination** ...........4

1. **The plain text and legislative history of Title VII demonstrate that Sections 702 and 703 exempt employment decisions based on religion, not sex or any other protected basis.** .....................................................4

2. **Liberty's decision to terminate Ms. Zinski based on her gender identity constitutes discrimination on the basis of sex, not religion.** .....................11

B. **The Religious Freedom Restoration Act ("RFRA") does not protect Liberty's unlawful sex discrimination.** .......................................................16

1. **RFRA applies only if the government is a party to a suit.** .......................16

2. **Even if RFRA applies, Liberty cannot sustain its burden of proving this defense.** ...................................................................................18

II.    **The Constitution provides no shield for Liberty's unlawful sex discrimination.** ...........................................................................20

**A. The ministerial exception does not protect Liberty's decision to fire Ms. Zinski** ..................................................................................**20**

**B. The freedom of association does not protect Liberty's decision to fire Ms. Zinski** ..................................................................................**22**

**C. The "ecclesiastical abstention" or "church autonomy" doctrine does not protect Liberty's decision to fire Ms. Zinski.** ...........................**24**

**CONCLUSION** ...........................................................................................**27**

**CERTIFICATE OF COMPLIANCE** ...........................................................**28**

**CERTIFICATE OF SERVICE** .....................................................................**28**

# TABLE OF AUTHORITIES

**Cases**

*Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316 (4th Cir. 2024) ......2, 11, 21, 24

*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) .................................... 13, 15

*Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020) ...........................11, 12, 18

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ............................................. 22, 23

*Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410 (6th Cir. 1996) ....................9

*Brown v. Alaska Airlines, Inc.*, No. 2:22-CV-668, 2024 WL 2325058

   (W.D. Wash. May 22, 2024) ...................................................................13

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ....................................19

*Conway v. Mercy Hosp. St. Louis*, 146 F.4th 704 (8th Cir. 2025) ..........................10

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*,

   483 U.S. 327 (1987) ................................................................ 24, 26

*DeMarco v. Holy Cross High Sch.*, 4 F.3d 166 (2d Cir. 1993) ................................10

*E.E.O.C. v. Pac. Press Pub. Ass'n*, 676 F.2d 1272 (9th Cir. 1982) .........................10

*E.E.O.C. v. R.G. & G.R. Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018) .. 18, 19

*E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795

   (4th Cir. 2000) .....................................................................................26

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872 (1990) ..............15

*Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529 (7th Cir. 2023) ......................11

*Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402

   (6th Cir. 2010)......................................................................................16

*Hankins v. Lyght*, 441 F.3d 96 (2d Cir. 2006) ........................................................17

*Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136 (1987)..............26

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,

   565 U.S. 171 (2012) ........................................................ 17, 20, 21, 25

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187 (1991) ........................................................13

*King's Garden, Inc. v. F.C.C.*, 498 F.2d 51 (D.C. Cir. 1974) ...................................10

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217 (3d Cir. 2007) ...........10

*Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731 (7th Cir. 2015) .16

*McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972) .....................................10

*Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732 (2020) ...........21

*Peterson v. Wilmur Commc'ns, Inc.*, 205 F. Supp. 2d 1014 (E.D. Wis. 2002) ........15

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164
(4th Cir. 1985).................................................................................. 6, 9, 19, 23

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ............................................ 22, 23, 24

*Rweyemamu v. Cote*, 520 F.3d 198 (2d Cir. 2008).................................................17

*Serbian E. Orthodox Diocese for U.S. of Am. and Canada v. Milivojevich*,
426 U.S. 696 (1976) .......................................................................... 25, 26

*Sherbert v. Verner*, 374 U.S. 398 (1963).................................................................17

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931
(7th Cir. 2022).................................................................................................11

*Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826 (9th Cir. 1999)...............17

*Swartzentruber v. Gunite Corp.*, 99 F. Supp. 2d 976 (N.D. Ind. 2000) ...................14

*U.S. Equal Emp. Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131
(4th Cir. 2017)................................................................................................15

*United States v. Burke*, 504 U.S. 229 (1992) ..........................................................19

*United States v. Menasche*, 348 U.S. 528 (1955) .....................................................6

*United States v. Simms*, 914 F.3d 229 (4th Cir. 2019) ..............................................6

*Wisconsin v. Yoder*, 406 U.S. 205 (1972).................................................................17

*Zdunski v. Erie 2-Chautauqua-Cattaraugus Boces*, No. 1:19-CV-940-GWC, 2022
WL 816010 (W.D.N.Y. Feb. 16, 2022)........................................................13

**Statutes**

42 U.S.C. § 2000bb(b)(1) .................................................................17

42 U.S.C. § 2000bb-1(b) .................................................................18

42 U.S.C. § 2000e(b) .......................................................................4

42 U.S.C. § 2000e(b)(1) ...................................................................4

42 U.S.C. § 2000e(b)(2) ...................................................................4

42 U.S.C. § 2000e-1(a) .....................................................................4

42 U.S.C. § 2000e-1(c) .....................................................................4

42 U.S.C. § 2000e-2(a) .....................................................................5

42 U.S.C. § 2000e-2(e) .....................................................................5

Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241 (July 2, 1964) .............6

**Other Authorities**

110 Cong. Rec. 12722 (1964) .............................................................7

110 Cong. Rec. 12818 (1964) .............................................................8

110 Cong. Rec. 4503 (1972) ...............................................................8

110 Cong. Rec. 4813 (1972) ...............................................................9

110 Cong. Rec. 7564 (1972) ...............................................................8

Civil Rights Act of 1964, H.R. 7152, 88th Cong. ................................6

U.S. Equal Emp. Opportunity Comm'n, <u>Legislative History of Title VII and XI of Civil Rights Act of 1964</u> (1968), *available at* https://catalog.hathitrust.org/Record/001431643 .............................................7, 8

## BACKGROUND AND SUMMARY OF THE ARGUMENT

Liberty University fired Ellenor Zinski, an IT professional with a strong performance record, because she informed Liberty that she is transgender. Liberty does not deny that it fired Ms. Zinski because of her gender identity. Rather, it sought dismissal of her Title VII sex discrimination claim based on its asserted statutory defenses to her claim under the religious exemption provisions of Title VII and the Religious Freedom Restoration Act, and its constitutional rights protected by the ministerial exception, freedom of association, and the ecclesiastical abstention doctrine. The district court properly rejected all of Liberty's asserted defenses to Ms. Zinski's Title VII claim.

Congress did not exempt the conduct alleged in this case. An examination of the text, structure, legislative history, and policy goals of the exemptions Congress crafted for religious entities in Title VII demonstrates that they cannot be expanded to permit the sex discrimination alleged in this case.

The district court correctly concluded that discrimination because of sex is unlawful even when the motivation for the hostility to an individual's gender identity is based in religious ideology. If this were not the case, religious entities would be free to discriminate on any prohibited basis simply by asserting their animus toward particular racial or ethnic groups was rooted in religious or scriptural commands.

The statutory protections of RFRA cannot be invoked in this case because RFRA is inapplicable in cases between private parties. Even if RFRA could be asserted as a defense against a private individual, Liberty cannot demonstrate that its interests are substantially burdened by employing Ms. Zinski. But even if her employment creates a moderate burden, the government (or Ms. Zinski) could show that Title VII serves compelling government interests and that there is no less restrictive means of achieving Title VII's goal of eradicating invidious sex discrimination in employment than to allow its enforcement through litigation.

None of the asserted constitutional barriers to litigation of a Title VII claim of sex discrimination should be allowed to displace the carefully calibrated statutory protections Congress enacted to shield religious employers and their employees from religious discrimination.

The ministerial exception, which assures certain religious employers of the freedom to select ministers without regard to the anti-discrimination mandates of Title VII, is inapplicable in this case because Ms. Zinski's job entailed no duties considered to involve the promulgation of Liberty's core mission. Quite simply, she is not a minister within the definition of that term developed by the Supreme Court and embraced and applied by this Court in *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316 (4th Cir. 2024).

The freedom of association guaranteed by the First Amendment offers no additional protection beyond that already captured by the statutory exemptions. While it is questionable that associational freedom can be invoked by a religious employer (as opposed to a private club or association) even if this constitutional protection applies, the application of Title VII to Liberty's employment decision in this case does not impermissibly burden its associational rights. It does not impair Liberty's ability to convey its own religious message, and to the extent it imposes some burden, that burden is justified by the government's compelling interest in eradicating employment discrimination.

Finally, Liberty invokes the doctrine of ecclesiastical abstention, but this doctrine too cannot be stretched to do the work Liberty asks of it. Congress accounted for the expressive and associational rights protected by the First Amendment when it enacted the exemptions in Title VII and no resort to the Constitution itself can support the creation of additional protections.

All of Liberty's efforts to expand its protections beyond those Congress intended when it enacted Title VII and RFRA amount to an unacceptable assault on the civil rights of all Americans—turning a shield intended to protect legitimate religious interests into a sword to destroy the rights of all workers to be free from all forms of invidious discrimination.

# ARGUMENT

**I.     Statutory provisions do not permit Liberty's unlawful sex discrimination.**

    **A.     Title VII does not exempt Liberty's unlawful sex discrimination.**

        **1.     The plain text and legislative history of Title VII demonstrate that Sections 702 and 703 exempt employment decisions based on religion, not sex or any other protected basis.**

Congress did exempt some employers from compliance with Title VII—employers with fewer than fifteen employees, 42 U.S.C. § 2000e(b), businesses owned by Indian tribes, 42 U.S.C. § 2000e(b)(1), bona fide private membership clubs, 42 U.S.C. § 2000e(b)(2), and foreign persons operating businesses in the United States, 42 U.S.C. § 2000e-1(c).  But when Congress considered how to protect the legitimate religious interests of religious employers choosing to operate businesses in the U.S. economy, it struck a careful balance.  Both the plain language and legislative history of Sections 702 and 703 permit religious entities to use an individual's religion as a basis for their employment decisions—nothing more, nothing less.

Section 702 creates an exemption to Title VII for "a religious corporation, association, educational institution, or society *with respect to the employment of individuals of a particular religion* to perform work connected with the carrying on . . . of its activities."  42 U.S.C. § 2000e-1(a) (emphasis added).  This section thus

authorizes certain religious entities to employ individuals *of a particular religion*, even though Title VII otherwise prohibits employment decisions based on religion. 42 U.S.C. § 2000e-2(a) (identifying religion as prohibited basis for discrimination).

Likewise, Section 703 creates an exemption to Title VII for "a school, college, university, or other educational institution of learning *to hire and employ employees of a particular religion* if such [institution] is . . . owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society. . ." 42 U.S.C. § 2000e-2(e) (emphasis added). The plain language of this section similarly authorizes certain religious institutions to hire and employ employees *of a particular religion*, even though Title VII otherwise prohibits using religion as a basis for employment decisions. 42 U.S.C. § 2000e-2(a). The language of these sections is not ambiguous: they permit religious entities to make employment decisions based on religion, only. This Court could (and should) end its statutory analysis here.

Liberty insists that the prefatory language of Section 702 ("This subchapter shall not apply . . .") entitles it to use any protected trait—not just religion—as a basis for its employment decisions. Appellant's Br. 11-15. But this interpretation violates the well-established rule against surplusage. Courts cannot adopt a reading of a statute that "renders part of the statute superfluous over one that gives effect to its 'every clause and word.'" *United States v. Simms*, 914 F.3d 229, 241

(4th Cir. 2019) (quoting *United States v. Menasche*, 348 U.S. 528, 539 (1955)).  If

the prefatory language of Section 702 exempts employment decisions based on *any*

trait protected by Title VII, not just religion, there would be no need to specify that

Section 702 applies only "with respect to the employment of individuals of a

particular religion."  Liberty's interpretation of Section 702 therefore renders that

modifying clause superfluous, which limits the exemption to employment

decisions based on religion.  This Court should not adopt a statutory interpretation

that violates this well-worn canon of construction.

The legislative history of Section 702 supports the plain language reading of

the statute.  As this Court explained in *Rayburn v. General Conference of Seventh-

Day Adventists*, the original version of Title VII that was passed by the House of

Representatives exempted religious employers altogether.  *Rayburn v. Gen. Conf.

of Seventh-Day Adventists*, 772 F.2d 1164, 1167 (4th Cir. 1985); Civil Rights Act of

1964, H.R. 7152, 88th Cong. § 703 (as passed by House, February 10, 1964).  But

the final version "excluded such employers *only with respect to discrimination

based on religion*, and then only with respect to persons hired to carry out the

employer's 'religious activities.'"  *Rayburn*, 772 F.2d at 1167 (emphasis added)

(quoting Civil Rights Act of 1964, Pub. L. No. 88-352, § 702, 78 Stat. 241 (July 2,

1964)).

Unfortunately, there is no committee report on the compromise version of the bill that emerged from the Senate because the House bill did not go through the usual committee procedure.  U.S. Equal Emp. Opportunity Comm'n, <u>Legislative History of Title VII and XI of Civil Rights Act of 1964</u> 3001 (1968), *available at* https://catalog.hathitrust.org/Record/001431643 [hereinafter EEOC History].  Rather, changes to the House bill were "worked out in a series of conferences among Senate leaders and Justice Department officials."  *Id.* at 3003.  Since the House later accepted the Senate bill as-is, there is also no Senate-House conference report on the differences between the two bills.  *Id.* at 3001.  As a result, "the best available explanations of the intent behind the changes made by the Senate in the House bill are statements made at the opening of the Senate debate by Senators [Everett] Dirksen (R., Ill.) and [Hubert] Humphrey (D., Minn.)."  *Id.*

In his statement of the proposed changes to the House bill, Senator Humphrey explained that the religious exemption "has been amended to *limit the general exemption* of religious groups to those practices *relating to the employment of individuals of a particular religion* to perform work connected with the employer's religious activities[.]"  110 Cong. Rec. 12722 (1964) (statement of Sen. Hubert Humphrey) (emphases added).  Likewise, Senator Dirksen explained in his statement of the proposed changes to the House bill: "The general exemption of a religious corporation, association or society from this title of the bill is *limited by*

7

*the amendment to the employment of individuals of a particular religion* to perform work connected with its religious activities." 110 Cong. Rec. 12818 (1964) (statement of Sen. Everett Dirksen) (emphasis added). The Senators' statements make clear that the general exemption for religious entities contained in the House bill was "limited" by the Senate, *i.e.*, to permit religious entities to make employment decisions on the basis of religion, only. Moreover, based on the Senators' consultation with Justice Department officials, *see supra* EEOC History at 3001, this Court can (and should) infer that the Justice Department believed the narrowed exemption sufficiently protected the First Amendment rights of religious entities.

Later, when Congress amended Section 702 to cover employment decisions related to all a religious entity's activities, not just those considered "religious," it confirmed that religious entities "remain subject to the provisions of Title VII with regard to race, color, sex or national origin." 110 Cong. Rec. 7564 (1972) (section-by-section analysis of H.R. 1946, Equal Employment Opportunity Act of 1972). In voicing his support for the amendment, Senator Samuel Ervin (D., NC) explained: "[T]he amendment would exempt religious corporations, associations, and societies from the application of [Title VII] *insofar as the right to employ people of any religion they see fit is concerned*. That is the only effect of this amendment." 110 Cong. Rec. 4503 (1972) (statement of Sen. Samuel Ervin) (emphasis added).

8

Even those who opposed broadening Section 702 to permit religious employers to consider religion in employment decisions unrelated to the entity's religious activities, such as Senator Harrison Williams (D., NJ), acknowledged that the broadened provision only "exempt[ed] these institutions from the operation of [T]itle VII *insofar as religion is concerned*[.]" 110 Cong. Rec. 4813 (1972) (statement of Sen. Harrison Williams) (emphasis added). The legislative history of Section 702 thus demonstrates Congress's intention in both 1964 and 1972 to enable religious entities to prefer their co-religionists while still prohibiting them from discriminating on the basis of race, sex, color, and national origin.

This Court and every other federal circuit court that has considered the scope of Sections 702 and/or 703 has interpreted those provisions to exempt religious entities only from Title VII's prohibition against discrimination on the basis of religion. *Rayburn*, 772 F.2d at 1166 (holding Section 702 "applies to one particular reason for employment decision—that based upon religious preference"); *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996) (permitting sex discrimination claim to proceed against religious school and holding Section 702 "merely indicates that such institutions may choose to employ members of their own religion without fear of being charged with religious discrimination. Title VII still applies, however, to a religious institution charged with sex discrimination."); *E.E.O.C. v. Pac. Press Pub. Ass'n*, 676 F.2d 1272, 1276

(9th Cir. 1982) (holding Section 702 did not preclude sex discrimination claim against religious entity); *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972) (holding "[t]he language and the legislative history of § 702 compel the conclusion that Congress did not intend that a religious organization be exempted from liability for discriminating against its employees on the basis of race, color, sex or national origin").

Other circuits have assumed this to be the case. *Conway v. Mercy Hosp. St. Louis*, 146 F.4th 704, 708 (8th Cir. 2025) (stating "Title VII generally prohibits employers from discriminating against employees on the basis of their religious beliefs. . . . [But] Congress created a limited exemption for 'religious organizations.'"); *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 226 (3d Cir. 2007) (describing Section 702 as "exempt[ing] religious organizations from Title VII's prohibition against discrimination in employment *on the basis of religion*") (emphasis added); *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 173 (2d Cir. 1993) (stating that "religious institutions that otherwise qualify as 'employer[s]' are subject to Title VII provisions relating to discrimination based on race, gender and national origin"); *King's Garden, Inc. v. F.C.C.*, 498 F.2d 51, 54 (D.C. Cir. 1974) (characterizing Section 702 as enabling religious entities to "*limit employment to members of the sect* without infringing the Civil Rights Act") (emphasis added).

10

Not a single circuit court has adopted the interpretation that Liberty proffers here. *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 328 (4th Cir. 2024) ("No federal appellate court in the country has embraced the . . . argument that Title VII permits religiously motivated sex discrimination by religious organizations."). Indeed, the only support Liberty finds for its strained interpretation of Title VII are two concurring opinions in the Seventh Circuit, the latter of which relies on the former, and both in cases decided based on the ministerial exception, not Sections 702 or 703. *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 945-47 (7th Cir. 2022) (Easterbrook, J., concurring); *Fitzgerald v. Roncalli High Sch., Inc.*, 73 F.4th 529, 534-37 (7th Cir. 2023) (Brennan, J., concurring) (citing *Starkey*).

This Court should not follow Liberty's heretofore untrodden path toward depriving employees of religious entities of all the Title VII protections that Congress intended.

 2. **Liberty's decision to terminate Ms. Zinski based on her gender identity constitutes discrimination on the basis of sex, not religion.**

The most straightforward decisional path in this case is for the Court to determine whether Ms. Zinski's gender identity was a but-for cause of her termination. *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020) (holding that "Title VII's 'because of' test incorporates the 'simple' and 'traditional'

11

standard of but-for causation") (internal quotation marks omitted).  If it was, then Liberty engaged in sex discrimination, which is not permitted by Sections 702 and 703.  *See supra* I.A.

As the Supreme Court articulated in *Bostock*, "a but-for test directs us to change one thing at a time and see if the outcome changes.  If it does, we have found a but-for cause."  *Bostock*, 590 U.S. at 656.  Here, Liberty concedes that Ms. Zinski's gender identity, transgender, was a basis for its decision to terminate her employment.  Appellant's Br. 6 ("Liberty does not and will not permit employees to undertake the efforts you describe to transition away from one's birth gender through hormones and a new name, with or without surgery.").  In fact, Liberty has stated that Ms. Zinski's gender identity is *the reason* that continuing to employ her would violate its sincerely held religious beliefs.  *Id.*  Given Liberty's singular focus on Ms. Zinski's gender identity, her gender identity was a but-for cause of her termination.  As such, she should be allowed to proceed on her claim of sex discrimination.

The fact that Liberty's decision to terminate Ms. Zinski's employment because of her gender identity may have been *motivated by* a sincerely held religious belief does not change this analysis.  An employer's motivation for discriminating on the basis of sex is irrelevant.  *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499

U.S. 187, 199 (1991) (holding absence of malevolent motive does not convert facially discriminatory policy into neutral policy). Indeed, the Supreme Court has long refused to allow religious entities to engage in prohibited discrimination even when their conduct is based on a sincerely held religious belief. *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (affirming denial of tax exemption for religious institution because of racially discriminatory admissions policy even though policy was based on sincerely held religious belief that Bible forbids interracial dating and marriage). This Court should not accept Liberty's invitation to endorse its admitted sex discrimination merely because it is based in Liberty's religious beliefs.

Notably, courts have placed limits on *employees'* exercise of their sincerely held religious beliefs where it would intrude upon the Title VII-protected rights of other employees. *Zdunski v. Erie 2-Chautauqua-Cattaraugus Boces*, No. 1:19-CV-940-GWC, 2022 WL 816010, at *12 (W.D.N.Y. Feb. 16, 2022), *aff'd*, No. 22-547-CV, 2023 WL 2469827 (2d Cir. Mar. 13, 2023) (holding employee not entitled to religious accommodation of forgoing anti-discrimination LGBTQ training based on sincerely held religious belief condemning homosexuality); *see also Brown v. Alaska Airlines, Inc.*, No. 2:22-CV-668, 2024 WL 2325058, at *16, *19 (W.D. Wash. May 22, 2024) (holding employee not entitled to religious accommodation of "express[ing] beliefs motivated by [her] religion" in response to post on

13

employer's website about support for Equality Act); *Swartzentruber v. Gunite Corp.*, 99 F. Supp. 2d 976, 979 (N.D. Ind. 2000) (holding employee not entitled to religious accommodation of permitting him to leave swastika tattoo uncovered at work).  Religious employers should be held to a no less stringent standard than their religious employees.

Importantly, analyzing whether sex (or any Title VII-protected trait other than religion) is a but-for cause of a religious entity's employment decision does not affect an entity's ability to make employment decisions based on, for example, an individual's failure to adhere to its religious beliefs about dietary restrictions, modes of dress and prayer, or other common religious tenets.  It only prohibits a religious entity from making employment decisions based on race, color, sex, or national origin—precisely as Congress intended.  *See supra* I.A.

In support of its argument that the Court should focus on Liberty's religious beliefs, Liberty states unequivocally: "*Liberty's religious beliefs are all that matters*."  Appellant's Br. at 19 (emphasis in original).  This Court should treat Liberty's proclamation as the harbinger that it is: should this Court adopt Liberty's position that any employment decision it makes based on its sincerely held religious beliefs is discrimination on the basis of religion, and therefore permitted by Sections 702 and 703, there would be nothing to stop Liberty—or any other religious employer—from terminating employees on the basis of their race, color,

or national origin, so long as the termination decision is based on a sincerely held religious belief.

Courts generally are reticent to inquire into the sincerity of a person's (or entity's) religious beliefs. *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990) ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.") (cited in *U.S. Equal Emp. Opportunity Comm'n v. Consol Energy, Inc.*, 860 F.3d 131, 142 (4th Cir. 2017) (finding plaintiff had sincerely held religious belief that use of hand-scanning system would result in his being "marked" by the Antichrist)). Courts are thus likely to accept at face value a religious belief that one can demonstrate is sincerely held—even if it is "repugnant to the notions of equality that undergird the very non-discrimination statute at issue." *Peterson v. Wilmur Commc'ns, Inc.*, 205 F. Supp. 2d 1014, 1021-24 (E.D. Wis. 2002) (finding employee had sincerely held religious belief in Creativity religion, central tenet of which is white supremacy); *see also Bob Jones*, 461 U.S. at 580 ("The sponsors of the University genuinely believe that the Bible forbids interracial dating and marriage.").

If this Court agrees with Liberty that its decision to terminate Ms. Zinski's employment because of her gender identity was discrimination on the basis of religion, not discrimination on the basis of sex, because of Liberty's sincerely held

15

religious beliefs about gender identity, it will give religious employers a free pass to discriminate not only on the basis of sex, but also on the basis of race, color, national origin, and ethnicity. Despite Liberty's and other *amici*'s efforts to make it so, this case is no different from one in which a religious employer seeks to justify terminating a Black employee because of her race based on the employer's sincerely held belief that Black people should not work alongside people of other races. Indeed, with race and sex on equal footing under Title VII, there is no principled way to distinguish that case from this one. This Court should resist the temptation to attempt to do so.

### B. The Religious Freedom Restoration Act ("RFRA") does not protect Liberty's unlawful sex discrimination.

#### 1. RFRA applies only if the government is a party to a suit.

The statutory protections of RFRA cannot be invoked in this case because, as the district court correctly held, RFRA is inapplicable in cases between private parties. This is the view of the majority of courts of appeals that have considered the question. *See*, *e.g.*, *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731 (7th Cir. 2015) (holding that if government is not a party, no one can provide appropriate relief); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010) ("The text of the statute makes quite clear that Congress intended RFRA to apply only to suits in which the government is a party."); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834, 837-43

16

(9th Cir. 1999) (same).  Only the Second Circuit has held otherwise.  *See Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006).  The Second Circuit subsequently expressed doubts about its own reasoning, noting that the text makes it plain that "*the government*" has to justify any burden.  *Rweyemamu v. Cote*, 520 F.3d 198, 203 n.2 (2d Cir. 2008) (emphasis in original), *abrogated on other grounds by Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012) (holding ministerial exception is not a jurisdictional bar).  The *Rweyemamu* Court did not decide the issue of RFRA's applicability because the defendant waived the issue.  *Rweyemamu*, 520 F.3d. at 204.  The view of the majority of courts is compelled by the plain language of the statute and Liberty's complaints that this is unfair or illogical are thus unavailing.

RFRA's purpose is specific—it was crafted to "restore the compelling interest test" enunciated in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) "and to guarantee its application in all cases where free exercise of religion is substantially burdened."  42 U.S.C. § 2000bb(b)(1).  RFRA precludes the government from substantially burdening exercise of religion even through a statute of general applicability unless the government "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of

17

furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(1)-(2).

> **2.    Even if RFRA applies, Liberty cannot sustain its burden of proving this defense.**

If RFRA applied in this case, Liberty could not prevail on its asserted defense that Title VII as applied here would substantially burden its religion or that any such burden is not in furtherance of a compelling governmental interest or achieved through the least restrictive means.  Liberty's asserted burden is that compliance with Title VII's prohibition of sex discrimination compels it to tolerate Ms. Zinski's understanding of her sex and gender identity, but, as the Sixth Circuit has held that "as a matter of law, tolerating [an individual's] understanding of her sex and gender identity is not tantamount to supporting it." *E.E.O.C. v. R.G. & G.R. Funeral Homes, Inc.*, 884 F.3d 560, 588 (6th Cir. 2018) (holding that allowing a transgender woman to wear attire at odds with employer's religious beliefs about attire appropriate to each gender "is not a substantial burden under RFRA"), *aff'd on other grounds sub nom Bostock v. Clayton Cty, Georgia*, 590 U.S. 644 (2020).

Even if retaining Ms. Zinski as an employee were considered a substantial burden on Liberty's sincere religious beliefs, the government (or here Ms. Zinski in the government's place) can readily demonstrate a compelling government interest in enforcing the law against sex discrimination in employment.  The Supreme Court has recognized the EEOC's compelling interest in combating discrimination:

"[I]t is beyond question that discrimination in employment on the basis of sex . . . is, as . . . this Court consistently has held, an invidious practice that causes grave harm to its victims." *United States v. Burke*, 504 U.S. 229, 238 (1992); s*ee R.G. & G.R. Funeral Homes*, 884 F.3d at 591 (allowing a particular person to suffer discrimination is "directly contrary to the EEOC's compelling interest in combating discrimination in the workforce"); *Rayburn*, 772 F.2d at 1169 ("Title VII is an interest of the highest order").

Ms. Zinski can also easily demonstrate that the Title VII enforcement regimen is the least restrictive means for the goal of eradicating workplace discrimination to be achieved.  As the Supreme Court observed in *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014), "The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race, and prohibitions on racial discrimination are precisely tailored to achieve that critical goal."  The same must be said of the prohibitions on sex discrimination: there is no less restrictive means to enforce Title VII's ban on sex discrimination than through enforcement actions such as the instant suit Ms. Zinski has brought against Liberty University.

## II.     The Constitution provides no shield for Liberty's unlawful sex discrimination.

### A.     The ministerial exception does not protect Liberty's decision to fire Ms. Zinski.

This Court may decline to address the availability of the ministerial exception affirmative defense because the relevant factual record has not been fully developed at this stage of the litigation.  The district court thought this affirmative defense should be addressed after discovery and in response to a motion for summary judgment but nevertheless considered the defense on the merits and correctly concluded that Liberty cannot avail itself of this defense.  District Court Decision 48-50.

The ministerial exception, which assures certain religious employers of the freedom to select ministers without regard to the anti-discrimination mandates of Title VII, is inapplicable in this case.  This judicially-created exemption is drawn from the two clauses of the First Amendment, which direct that Congress shall make no laws establishing religion or prohibiting its free exercise.  *Hosanna-Tabor,* 565 U.S. at 181.  The Supreme Court concluded that both clauses "bar the government from interfering with the decision of a religious group to fire one of its ministers." *Id.*  To delineate the scope of employees thus denied the protections of the anti-discrimination laws, the Court identified a number of factors related to the elementary school teacher's role in Hosanna-Tabor and concluded that because she

20

had significant religious training, was called a minister, held herself out as a minister, and taught her students religion and led them in prayer, she was "a minister covered by the ministerial exception." *Id.* at 191-92. More recently, the Court determined that two teachers in Catholic schools who shared few of these characteristics were nonetheless "ministers" because "what matters, at bottom, is what an employee does" and educating young people in their faith lies at "the very core of the mission of a private religious school." *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 732, 753-54 (2020). In this case, it is apparent that Ms. Zinski is not a minister. Unlike the teacher in *Billard*, Ms. Zinski performed no "'vital religious duties'" in connection with Liberty's religious mission. *Billard,* 101 F.4th at 330 (*quoting Our Lady of Guadalupe*, 591 U.S. at 756-57).

The district court determined, based on the record before it, that Ms. Zinski performed no religious duties. Her title was entirely secular: she was an "Information Services Apprentice." She worked at the University's IT Helpdesk, "a department with a secular objective." And her work involved "strictly technological and administrative duties. Her work involved no form of teaching—religious or secular." District Court Decision 49. As the court found, what Ms. Zinski does removes her from the scope of the ministerial exception and means she is protected from Liberty's discriminatory decision to fire her because of her sex.

### B.     The freedom of association does not protect Liberty's decision to fire Ms. Zinski.

Although there is a strong argument that the associational expressive interest Liberty University has asserted in this case does not enjoy constitutional protection as a matter of law, *see* District Court Decision 52-60 (commercial association enjoys limited protection and there is no affirmative constitutional protection for invidious private discrimination), if this defense applies at all, we agree with the district court's analysis of the application of the defense in this case.

The freedom of association guaranteed by the First Amendment offers no additional protection beyond that already captured by the statutory exemptions. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (explaining right to associate in any context—"political, social, economic, educational, religious, and cultural"). The Supreme Court has recognized that "[t]he forced inclusion of an unwanted person in a group" may infringe a group's First Amendment rights, but only "if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). Although an association's assessment of "what would impair its expression" is entitled to deference, an association may not "erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Id.* at 653. The freedom of association is not absolute and may be infringed upon by "'regulations adopted to

22

serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'" *Id.* at 648 (quoting *Roberts*, 468 U.S. at 623).

While there is little doubt that Liberty engages in expressive activities, *see* District Court Decision 61-62, it cannot meet its burden of demonstrating that Title VII's application in this case would "significantly burden" its right to freedom of association, as required by *Dale*, 530 U.S. at 653. The lack of burden on Liberty's associational interest is evident because, at least as described in Liberty's brief on appeal, it can articulate no reason that Ms. Zinski's continued employment would undermine its ability to continue to promote its religious views.

To the extent application of Title VII does burden Liberty's associational interests, that burden is justified under the applicable constitutional standard. Title VII's interest in eradicating sex discrimination in employment is "an interest of the highest order." *Rayburn*, 772 F.2d at 1169; *see also Roberts*, 468 U.S. at 623-24 (interest in eradicating discrimination against female citizens justifies impact of application of state public accommodation statute on Jaycees' male members' associational freedoms). As the Supreme Court observed in *Roberts*, the "stigmatizing injury" of denial of equal access "and the denial of equal opportunities that accompanies it, is surely felt as strongly by persons suffering discrimination on the basis of their sex as by those treated differently because of

23

their race." *Id.* at 625.  For the same reason that RFRA provides no safe harbor for the sex discrimination Ms. Zinski alleges in this case, the constitutionally protected freedom of association likewise provides no additional protection for Liberty's discriminatory action.

> ### C.    The "ecclesiastical abstention" or "church autonomy" doctrine does not protect Liberty's decision to fire Ms. Zinski.

If all else fails, Liberty seeks refuge in the "ecclesiastical abstention" or "church autonomy" doctrine.  But this doctrine has no place in the adjudication of statutory claims of sex discrimination under Title VII.  In enacting the statutory exemptions from Title VII's ban on religious discrimination that are afforded to religious entities, Congress implemented the concerns encapsulated in the First Amendment's free exercise and establishment clauses.  *See Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 336-39 (1987) (upholding constitutionality of religious exemption in section 702 as compatible with the Establishment Clause, not creating impermissible entanglement, and not offending equal protection); *Billard*, 101 F.4th at 329 ("Title VII's religious exemptions, though statutory, are also constitutionally inspired" and the "same is true of RFRA").  To the extent the statutory exemptions did not shield the full range of critical decisions of religious entities, the courts developed the ministerial exception as a special application of the ecclesiastical abstention doctrine grounded in First Amendment concerns.  *See Hosanna-Tabor,* 565 U.S. at

24

188 (agreeing with lower courts that have "recognized the existence of a 'ministerial exception,' grounded in the First Amendment, that precludes application of such legislation [as Title VII] to claims concerning the employment relationship between a religious institution and its ministers").

If the statutory exemptions and ministerial exception do not shield Liberty University from Ms. Zinski's sex discrimination claim, as we have demonstrated above, the University can find no solace in the broad claim that its autonomy as a religious school provides a protection Congress did not see fit to provide and that no court has previously recognized in this context.

The religious autonomy doctrine arose in a line of cases prohibiting secular courts from deciding issues involving church disputes over property, polity, and church administration. *See Serbian E. Orthodox Diocese for U.S. of Am. and Canada v. Milivojevich*, 426 U.S. 696, 710 (1976). This principle of abstention from deciding church disputes requires that courts avoid controversies over religious doctrine. But the Supreme Court counseled in *Milivojevich* that disputes between religious employers and their employees do not necessarily turn on questions of religious doctrine requiring courts to turn a blind eye. *Id.* at 709. This Court has held, in addressing the comparable ministerial exception, that "[w]here no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless

Congress so provides." *E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 801 (4th Cir. 2000).

Ms. Zinski seeks to litigate a claim of sex discrimination in violation of Title VII. The district court correctly observed that the court does not need to question the contours of Liberty's faith and doctrine or engage in a prohibited inquiry into "religious law or polity" to adjudicate her claim. District Court Decision 69 (citing *Milivojevich*, 426 U.S. at 709). As the district court here explained,

> [w]e need not glance at scripture, second-guess a religious tribunal, or put a civil stamp on religious doctrine. Furthermore, it is not even clear that Zinski—an employee in the IT department—maintains any "spiritual function" within the institution such that the Court's review of Liberty's decision to fire her would impinge upon Liberty's First Amendment interests.

District Court Decision 69.

If this Court were to accept Liberty's efforts to expand the scope of the ecclesiastical abstention doctrine, it would risk creating an impermissible establishment of religion, prohibited by the First Amendment. As the Supreme Court observed in *Amos*, the Establishment Clause requires "benevolent neutrality" which will permit free religious exercise, but "[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'" *Amos*, 483 U.S. at 334-35 (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 145 (1987)). The unprecedented abstention Liberty seeks would constitute such unlawful fostering of religion. The statutory exemptions enacted by Congress do

not unlawfully foster religion because they exempt only religious discrimination by religious employers, and do not otherwise permit such employers to flout the fundamental prohibitions on discrimination on the basis of race, sex, or national origin, as Liberty seeks authorization to do in this case.

## CONCLUSION

Liberty's myriad arguments for its right to violate Title VII's guarantees of equal employment opportunity are a thinly disguised effort to turn the statutory and constitutional shields protecting religious exercise into a sword that would destroy the rights of all workers to be free from invidious discrimination.  We respectfully urge the Court to affirm the well-reasoned decision of the district court.

Respectfully submitted,

*/s/ Carolyn L. Wheeler*

Carolyn L. Wheeler
Jessica Westerman
Katz Banks Kumin LLP
11 Dupont Circle, N.W.
Suite 600
Washington, D.C. 20036
(202) 299-1140
wheeler@katzbanks.com
westerman@katzbanks.com

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) in that, according to the word-count function of the word-processing system used to generate the brief (Microsoft Word), the brief contains 6,136 words, exclusive of the portions exempted by Rule 32(f).

*/s/ Carolyn L. Wheeler*

Carolyn L. Wheeler

**CERTIFICATE OF SERVICE**

I certify that on this date, September 9, 2025, the foregoing Amici Curiae Brief has been served upon counsel of record via the Court's CM/ECF system.

*/s/ Carolyn L. Wheeler*

Carolyn L. Wheeler