**Nos. 25-1228 and 25-1581**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————————

ELLENOR ZINSKI,

*Plaintiff-Appellee,*

v.

LIBERTY UNIVERSITY, INC.,

*Defendant-Appellant.*

———————————————

On Appeal from the
United States District Court for the Western District of Virginia
Case No. 6:24-cv-0041

**BRIEF OF AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE;
BEND THE ARC: A JEWISH PARTNERSHIP FOR JUSTICE; DIGNITYUSA;
GLOBAL JUSTICE INSTITUTE, METROPOLITAN COMMUNITY CHURCHES;
KESHET; AND SADHANA: COALITION OF PROGRESSIVE HINDUS
AS *AMICI CURIAE* SUPPORTING APPELLEE
AND AFFIRMANCE**

JENNY SAMUELS
ALEX J. LUCHENITSER
Americans United for Separation
  of Church and State
1310 L Street NW, Suite 200
Washington, DC 20005
(202) 466-7308
*samuels@au.org*
*luchenitser@au.org*

*Counsel for* Amici Curiae

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-1228</u>    Caption: <u>Zinski v. Liberty University, Inc.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Ams. United for Separation of Church & State; Bend the Arc: A Jewish P'ship for Just.; DignityUSA;</u>
(name of party/amicus)

<u>Global Just. Inst., Metro. Cmty. Churches; Keshet; Sadhana: Coal. of Progressive Hindus</u>

who is <u>Amici Curiae</u>, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

12/01/2019 SCC    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☐NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Jenny Samuels          Date:     9/9/2025

Counsel for: Amici Curiae

Print to PDF for Filing

# TABLE OF CONTENTS

**Page(s)**

Disclosure Statement.................................................................... i

Table of Authorities .................................................................. iv

Interests of the *Amici Curiae* ...................................................1

Introduction...................................................................................2

Argument.........................................................................................4

I.   The ecclesiastical-abstention doctrine does not shield Liberty from Zinski's Title VII claim..................................................4

    A.   Zinski's claim can be resolved by reference to neutral principles of law without answering religious doctrinal questions. ..........................................................................4

    B.   Granting Liberty's request to expand the ecclesiastical-abstention doctrine would circumvent broad swaths of First Amendment law. .......................................................... 11

II.   The ministerial exception does not bar Zinski's claim............................ 15

    A.   Zinski, an IT Apprentice, is not a ministerial employee. ................. 15

    B.   Deeming Zinski a ministerial employee would encourage gamesmanship without serving the purpose of the ministerial exception. .......................................................... 20

III.  The Religious Freedom Restoration Act does not shield Liberty from liability. .......................................................... 23

Conclusion ........................................................................... 28

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Askew v. Trs. of Gen. Assembly of Church of the Lord Jesus
    Christ of the Apostolic Faith Inc.,*
    684 F.3d 413 (3d Cir. 2012)...................................................................4, 7

*Belya v. Kapral,*
    45 F.4th 621 (2d Cir. 2022) ...............................................................6, 7

*Billard v. Charlotte Cath. High Sch.,*
    101 F.4th 316 (4th Cir. 2024)............................................... 15–20, 22, 26

*Bob Jones Univ. v. United States,*
    461 U.S. 574 (1983) ...........................................................................12, 13

*Bostock v. Clayton Cnty.,*
    590 U.S. 644 (2020) ...........................................................................8, 28

*Bryce v. Episcopal Church in the Diocese of Colo.,*
    289 F.3d 648 (10th Cir. 2002) ...............................................................5

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) ...........................................................................23, 25

*Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.,*
    450 F.3d 130 (3d Cir. 2006).....................................................................7

*Demkovich v. St. Andrew the Apostle Par.,*
    3 F.4th 968 (7th Cir. 2021).........................................................14, 15, 20

*DeWeese-Boyd v. Gordon Coll.,*
    163 N.E.3d 1000 (Mass. 2021) .................................................................7

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,*
    884 F.3d 560 (6th Cir. 2018) ...................................................................28

*EEOC v. Roman Cath. Diocese of Raleigh,*
    213 F.3d 795 (4th Cir. 2000) .....................................................................7

*Emp. Div., Dep't of Hum. Res. v. Smith,*
    494 U.S. 872 (1990) ............................................................. 2, 11, 12, 25

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) .................................................................................12

iv

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Garrick v. Moody Bible Inst.*,
95 F.4th 1104 (7th Cir. 2024)....................................................7

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
617 F.3d 402 (6th Cir. 2010) ..................................................26

*Hankins v. Lyght*,
441 F.3d 96 (2d Cir. 2006).................................................25–27

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012) .............................................. 6, 13–17, 22

*Hutterville Hutterian Brethren, Inc. v. Sveen*,
776 F.3d 547 (8th Cir. 2015) ....................................................7

*Jones v. Wolf*,
443 U.S. 595 (1979) ..................................................................7

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*,
344 U.S. 94 (1952) ...............................................................4, 6

*Kim v. Bd. of Educ.*,
93 F.4th 733 (4th Cir. 2024)...................................................11

*Listecki v. Off. Comm. of Unsecured Creditors*,
780 F.3d 731 (7th Cir. 2015) .............................................24, 26

*Little Sisters of the Poor Saints Peter & Paul Home v.*
*Pennsylvania*,
591 U.S. 657 (2020) .................................................................10

*McCarthy v. Fuller*,
714 F.3d 971 (7th Cir. 2013) .....................................................4

*McMahon v. World Vision*,
147 F.4th 959 (9th Cir. 2025)...................................................18

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*,
966 F.3d 346 (5th Cir. 2020) ..............................................7, 10

*Myhre v. Seventh-Day Adventist Church Reform Movement Am.*
*Union Int'l Missionary Soc'y*,
719 F. App'x 926 (11th Cir. 2018)..............................................7

## TABLE OF AUTHORITIES—continued

Page(s)

*Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*,
522 U.S. 479 (1998) .................................................................27

*O'Connell v. U.S. Conf. of Cath. Bishops*,
134 F.4th 1243 (D.C. Cir. 2025).................................................7

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
591 U.S. 732 (2020) .................................. 2, 3, 11, 13, 15–18, 22

*Palmer v. Liberty Univ., Inc.*,
72 F.4th 52 (4th Cir. 2023)........................................................20

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l
Presbyterian Church*,
393 U.S. 440 (1969) .................................................................5, 6

*Puri v. Khalsa*,
844 F.3d 1152 (9th Cir. 2017) .................................................7, 9

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*,
772 F.2d 1164 (4th Cir. 1985) ..........................................8, 10, 16

*Reynolds v. United States*,
98 U.S. 145 (1878) ...................................................................12

*Rubin v. United States*,
449 U.S. 424 (1981) .................................................................23

*Rweyemamu v. Cote*,
520 F.3d 198 (2d Cir. 2008)...................................................23, 26

*Sanders v. Casa View Baptist Church*,
134 F.3d 331 (5th Cir. 1998) ...................................................10

*Seattle Pac. Univ. v. Ferguson*,
104 F.4th 50 (9th Cir. 2024)......................................................14

*Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*,
426 U.S. 696 (1976) ...........................................................6, 8, 10

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*,
363 F.3d 299 (4th Cir. 2004) ...............................................19, 20

vi

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Sherbert v. Verner,*
374 U.S. 398 (1963) ...................................................25

*Sutton v. Providence St. Joseph Med. Ctr.,*
192 F.3d 826 (9th Cir. 1999) ....................................26

*Tandon v. Newsom,*
593 U.S. 61 (2021) ....................................................12

*Tomic v. Cath. Diocese of Peoria,*
442 F.3d 1036 (7th Cir. 2006) ..................................27

*Tony & Susan Alamo Found. v. Sec'y of Lab.,*
471 U.S. 290 (1985) .................................................13

*UAW v. Johnson Controls,*
499 U.S. 187 (1991) ...................................................9

*United States v. Lee,*
455 U.S. 252 (1982) .................................................13

*Watson v. Jones,*
80 U.S. (13 Wall.) 679 (1871) ..............................5, 6

*Wisconsin v. Yoder,*
406 U.S. 205 (1972) .................................................25

**Statutes, Rules, and Regulations**

42 U.S.C. § 2000bb(b)(1) ...............................................25

42 U.S.C. § 2000bb-1(a) .................................................23

42 U.S.C. § 2000bb-1(b)................................24, 25, 27

42 U.S.C. § 2000bb-1(c)......................................24, 27

42 U.S.C. § 2000bb-2(1)...............................................25

42 U.S.C. § 2000bb-2(3)...............................................24

S. Rep. No. 103-111 (1993)....................................25, 26

## TABLE OF AUTHORITIES—continued

**Page(s)**

### Other Authorities

Christian Legal Society, *Church Guidance for Same-Sex Issues*
(2015), https://perma.cc/DKC2-HPXW ....................................................21

Conner & Winters, *Mitigating Risk with the Ministerial
Exception* (Mar. 2019), https://perma.cc/4WRT-G35Y ...........................21

First Liberty, *Religious Liberty Protection Kit for Christian
Schools* (2016), https://perma.cc/FPC7-WYS9 ...................................21, 22

McGuireWoods, *U.S. Supreme Court Broadens Ministerial
Exemption to Employment Discrimination Claims* (July 10,
2020), https://perma.cc/Q3EB-HV6S ........................................................20

Seyfarth, *US Supreme Court Expands Ministerial Exception
for Religious Organizations* (July 9, 2020),
https://perma.cc/S4TZ-NZ8F......................................................................21

The Bluebook: A Uniform System of Citation (Columbia L. Rev.
Ass'n et al. eds., 22d ed. 2025). .................................................................9

## INTERESTS OF THE *AMICI CURIAE*[1]

*Amici* are religious and civil-rights organizations committed both to ensuring the effective enforcement of our nation's antidiscrimination laws and protecting religious freedom under the First Amendment. From long experience, *amici* believe that religious employers' rights to select their ministers without courts' involvement need not and should not extend to exempting religious employers from complying with all workplace laws that protect employees against discrimination based on sex, race, disability, or any other protected category. *Amici* believe that the right to exercise religion freely is precious and should never be misused to cause harm.

The *amici* are:

- Americans United for Separation of Church and State

- Bend the Arc: A Jewish Partnership for Justice

- DignityUSA

- Global Justice Institute, Metropolitan Community Churches

- Keshet

- Sadhana: Coalition of Progressive Hindus

---

[1] *Amici* affirm that no counsel for a party authored this brief in whole or in part and that no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. The parties have consented to the filing of this brief.

## INTRODUCTION

The First Amendment "does not mean that religious institutions enjoy a general immunity from secular laws." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). Although afforded dominion over matters of faith, religiously affiliated institutions are not, and have never been, above the laws that govern everyone else. Indeed, "[a]ny society adopting such a system would be courting anarchy." *Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 888 (1990).

Despite this, Defendant Liberty University asserts that it had a right to fire Plaintiff Ellenor Zinski because she is transgender—an action that constitutes unlawful discrimination in direct violation of Title VII. Liberty may disagree with the result Title VII requires here, but that does not mean that Title VII's application violates the ecclesiastical-abstention doctrine or the ministerial exception. And Liberty's attempt to invoke the protections of the Religious Freedom Restoration Act, which cannot be raised in suits between private parties, completely misunderstands the text and purpose of that law.

As the district court correctly held, ecclesiastical abstention is a narrow doctrine that simply prevents courts from intervening in religious disputes. JA110–11. It shields religious institutions from civil-court intrusion into purely ecclesiastical matters. Liberty attempts to shoehorn this case into

2

ecclesiastical-abstention territory by claiming, without basis, that the issue here is Liberty's interpretation of Scripture—a topic that, in fact, is completely irrelevant. Then Liberty takes the even bolder step of asking this Court to ignore more than a century of Supreme Court precedent and apply the doctrine whenever a defendant can offer a religious motivation for violating a religiously neutral law. But the protection against courts deciding religious disputes over questions of religious doctrine does not shield religious institutions from judicial application of secular laws to ordinary employment practices. To conclude otherwise would circumvent broad swaths of First Amendment law.

Likewise, Zinski is not subject to the ministerial exception, because Zinski's job as an IT Apprentice was secular and served no religious purpose. Time and again, the Supreme Court and this Court have made clear that the ministerial exception requires a fact-based and functional test. "What matters, at bottom, is what an employee *does*." *Our Lady of Guadalupe*, 591 U.S. at 753 (emphasis added). Zinski's day-to-day duties—fixing computer problems and restocking printer paper—bear no resemblance to the types of important religious roles that are encompassed by the exception. And broadening the ministerial exception to cover completely secular positions like Zinski's, as Liberty advocates, would make

3

it all too easy for an entire class of employers to evade civil-rights laws without serving the purpose of the ministerial exception.

Finally, Liberty's insistence that the Religious Freedom Restoration Act gives it a free pass to discriminate is without basis. RFRA prohibits the government from substantially burdening religious exercise, but the government is not a party here. And, as the majority of circuits that have considered the question have held, RFRA has no application in suits between private parties. This Court should hold the same.

## ARGUMENT

**I.    The ecclesiastical-abstention doctrine does not shield Liberty from Zinski's Title VII claim.**

**A.    Zinski's claim can be resolved by reference to neutral principles of law without answering religious doctrinal questions.**

The ecclesiastical-abstention doctrine protects religious entities' ability to make religious decisions by forbidding courts from taking sides in "matters of church government" and "those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952). Thus, for example, a court cannot question an ecclesiastical body's determination about who qualifies as a nun, *McCarthy v. Fuller*, 714 F.3d 971, 978 (7th Cir. 2013), probe the reasonableness of a church-member's excommunication, *Askew v. Trs. of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413, 419–20 (3d Cir. 2012),

or dictate internal church discussions about religious doctrine, *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 658 (10th Cir. 2002). Simply put, civil courts may not "resolv[e] underlying controversies over religious doctrine." *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969).

The principle of ecclesiastical abstention was first articulated by the United States Supreme Court in *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871). *Watson* concerned a dispute between two congregational factions about the correct interpretation of church doctrine. *Id.* at 713–14. The dispute had been resolved by the church's General Assembly—the church's highest ecclesiastical authority—and then relitigated in the courts by the losing faction. *Id.* at 726–27. The question before the Court was whether it could decide the dispute or whether it had to defer to the General Assembly's decision. The Court, citing the "broad and sound view of the relations of church and state under our system of laws," determined that it had to defer to the General Assembly's decision. *Id.* at 727. "In this class of cases," the Court explained, "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried," courts "must accept such decisions as final, and as binding on them, in their application to the case before them." *Id.*

5

Later recognized as having constitutional dimensions, *see Kedroff*, 344 U.S. at 116, the ecclesiastical-abstention principle articulated in *Watson* has continued to demand deference to religious authorities on "matters of ecclesiastical cognizance and polity," *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 698 (1976).[2] That includes, for example, a church's decision about which congregational faction controls church property, *Watson*, 80 U.S. (13 Wall.) at 726, a church's determination of its internal hierarchy, *Kedroff*, 344 U.S. at 119, a church's interpretation of its own doctrine, *Milivojevich*, 426 U.S. at 724–25, and a church's choice of who teaches and preaches its faith, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188–89 (2012).

"It is obvious, however," that not every dispute touching on a church "jeopardizes values protected by the First Amendment." *Presbyterian Church*, 393 U.S. at 449. "[S]imply having a religious association on one side of the 'v' does not automatically mean a district court must dismiss the case or limit discovery." *Belya v. Kapral*, 45 F.4th 621, 630 (2d Cir. 2022). Legal disputes that can be resolved by reference to "neutral principles of law" and without answering questions about "religious doctrine, polity, and practice"

---

[2] *Watson* was decided before the First Amendment was incorporated against the states and therefore was grounded in common-law, rather than constitutional, principles. *See Kedroff*, 344 U.S. at 115.

can be adjudicated by secular courts. *Jones v. Wolf*, 443 U.S. 595, 602–03 (1979).[3] "So long as a court relies 'exclusively on objective, well-established [legal] concepts,' or neutral principles of law, it steers clear of any violations of the church autonomy doctrine." *O'Connell v. U.S. Conf. of Cath. Bishops*, 134 F.4th 1243, 1254 (D.C. Cir. 2025) (quoting *Jones*, 443 U.S. at 603).

It follows that courts may, and routinely do, consider employment disputes involving religious entities that do not involve any impermissible adjudication of religious doctrinal questions. *See, e.g.*, *Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1106, 1112–13 (7th Cir. 2024); *DeWeese-Boyd v. Gordon Coll.*, 163 N.E.3d 1000, 1018 (Mass. 2021); *see also Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 139 (3d Cir. 2006) ("[W]e note that many claims of discrimination against a religious employer under Title VII will not raise serious constitutional questions."); *EEOC v. Roman Cath. Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000) ("Where no spiritual function is involved, the First Amendment does not stay the

---

[3] This neutral-principles approach has been repeatedly applied by the federal courts of appeals. *See, e.g.*, *Garrick v. Moody Bible Inst.*, 95 F.4th 1104, 1112 (7th Cir. 2024); *Belya*, 45 F.4th at 630; *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 349 (5th Cir. 2020); *Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, 719 F. App'x 926, 928 (11th Cir. 2018); *Puri v. Khalsa*, 844 F.3d 1152, 1167–68 (9th Cir. 2017); *Hutterville Hutterian Brethren, Inc. v. Sveen*, 776 F.3d 547, 553 (8th Cir. 2015); *Askew*, 684 F.3d at 419.

application of a generally applicable law such as Title VII to the religious employer unless Congress so provides."). Religious institutions, "[l]ike any other person or organization, . . . may be subject to Title VII scrutiny." *Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985).

Here, Liberty urges this Court to abstain from deciding the merits of Zinski's claim, even though it rests on an entirely neutral question: whether Zinski's sex was a but-for cause of Liberty's decision to terminate her. *See* JA012. And answering that question does not require any "inquiry by civil courts into religious law and polity." *Milivojevich*, 426 U.S. at 709. Indeed, the reviewing court need only look to Liberty's own admission that it "does not and will not permit employees to undertake the efforts [Zinski] describe[d] to transition away from one's birth gender through hormones and a new name, with or without surgery." JA019. Liberty's statement that it was firing Zinski because of her status as a transgender woman is textbook employment discrimination under *Bostock v. Clayton Cnty.*, 590 U.S. 644, 659 (2020).

Liberty, attempting to distract from its obviously illegal conduct, tries to conjure up religious doctrinal disputes, asserting that "Zinski asks this Court to determine that Zinski's interpretation of Scripture is correct, that Liberty's Doctrinal Statement is incorrect, and that Zinski's interpretation

of Scripture entitles Zinski to remain an employee in good standing under the appropriate interpretation of Scripture." Appellant's Br. 37. But Zinski does no such thing. As the district court correctly found, Zinski "invokes no form of law other than civil law." JA112. Moreover, how Zinski and Liberty interpret Scripture and the correctness of Liberty's Doctrinal Statement are completely irrelevant to Zinski's Title VII claim. The issue here is whether Liberty unlawfully discriminated against Zinski, not whether Liberty correctly interpreted Scripture to justify that discrimination. *Cf. UAW v. Johnson Controls*, 499 U.S. 187, 199 (1991) ("Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on *why* the employer discriminates but rather on the explicit terms of the discrimination." (emphasis added)). Liberty's suit "concerns the defendants' actions, not their beliefs," and there is no need to "pass[ ] judgment on questions of religious faith or doctrine." *Puri v. Khalsa*, 844 F.3d 1152, 1167–68 (9th Cir. 2017) (citation modified).[4]

In an even more extreme twist, Liberty suggests that because its decision to discriminate against Zinski was motivated by "sincerely held religious beliefs," the ecclesiastical-abstention doctrine bars suit. Appellant's Br. 8. Of course, there is no legal support for the contention that

---

[4] *See* The Bluebook: A Uniform System of Citation R. B5.3, at 9 (Columbia L. Rev. Ass'n et al. eds., 22d ed. 2025).

ecclesiastical abstention bars suit anytime a religious justification is proffered. Unless "resolution of the dispute[] cannot be made without extensive inquiry by civil courts into religious law and polity," *Milivojevich*, 426 U.S. at 709, the ecclesiastical-abstention doctrine has no bearing on the matter.

Heeding Liberty's demand to categorically insulate religious employers' treatment of lay employees any time an employer offers up a religious motivation for its actions "would impermissibly place a religious [institution] in a preferred position in our society," allowing it to opt out of the laws necessary to maintain a just and fair civil society. *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346, 348 (5th Cir. 2020) (quoting *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 335–36 (5th Cir. 1998)). The First Amendment neither demands nor permits religious organizations to operate with legal impunity; religious entities "are not—and should not be—above the law." *Rayburn*, 772 F.2d at 1171. "[T]here is no general constitutional immunity, over and above the ministerial exception, that can protect a religious institution from the law's operation." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,* 591 U.S. 657, 706 n.1 (2020) (Kagan, J., concurring).

### B. Granting Liberty's request to expand the ecclesiastical-abstention doctrine would circumvent broad swaths of First Amendment law.

Liberty has contended that, under the ecclesiastical-abstention doctrine, it gets a free pass to violate Title VII because its actions are motivated by sincere religious beliefs. Appellant's Br. 8, 32. For the reasons stated above, Liberty's proposed expansion of ecclesiastical abstention has no support in fact or law. But Liberty's ecclesiastical-abstention defense must be denied for another reason: Expanding the ecclesiastical-abstention doctrine in the way Liberty advocates would circumvent broad swaths of First Amendment law—namely, *Employment Division v. Smith*, 494 U.S. 872 (1990), and the ministerial exception, *see Our Lady of Guadalupe*, 591 U.S. 732 (2020).

Under *Smith*, laws that are religiously neutral and generally applicable are subject only to rational-basis review, meaning that they are valid so long as they are rationally related to a legitimate governmental interest, even when they incidentally burden the exercise of religion. *See Kim v. Bd. of Educ.*, 93 F.4th 733, 747 (4th Cir. 2024). To invoke more exacting judicial scrutiny, a religious objector must show that the challenged law is not neutral and generally applicable because it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way" or "restricts practices because of their

religious nature." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533–34 (2021); *see also Tandon v. Newsom*, 593 U.S. 61, 62 (2021).

Rather than attempt to show that it would win under *Smith*, Liberty proposes a wild expansion of the ecclesiastical-abstention doctrine that, if adopted, would abrogate *Smith*—something this Court cannot do. Under Liberty's theory, religious entities would never need to show that a law isn't neutral or generally applicable, because they could effectively ignore any law that they dislike by stating a religious objection to the law's requirements. The Supreme Court has squarely rejected that approach. To allow religious actors to disregard a law in every instance of conflict between the law and religious belief "would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." *Reynolds v. United States*, 98 U.S. 145, 167 (1878).

Thus, the Supreme Court has long spurned interpretations of the First Amendment that allow noncompliance with a law solely based on a religious objection, without more. Even before *Smith*, when courts were more deferential to free-exercise claims, such claims by religious entities were regularly rejected. For example, the Court rejected bids for religious exemptions in cases challenging civil-rights protections, *Bob Jones Univ. v.*

*United States*, 461 U.S. 574, 603–04 (1983), social-security requirements, *United States v. Lee*, 455 U.S. 252, 254 (1982), and wage-and-hour regulations, *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 305–06 (1985). In each of these cases, a religious entity had a religious justification for violating the law, but that was not enough to bar enforcement of the law under the ecclesiastical-abstention doctrine. Instead, the cases were resolved under then-prevailing Free Exercise Clause caselaw. *Bob Jones*, 461 U.S. at 603–04; *Lee*, 455 U.S. at 259–60; *Tony & Susan Alamo Found.*, 471 U.S. at 303–05. Liberty's view of ecclesiastical abstention cannot be squared with any of these cases.

Liberty's proposed ecclesiastical-abstention expansion would also make the ministerial exception a dead letter. The ministerial-exception doctrine shields religious employers from liability for discrimination against ministerial employees—*i.e.*, those who "perform[] vital religious duties." *Our Lady of Guadalupe*, 591 U.S. at 756. That is because applying antidiscrimination laws to ministers—employees who are "essential to the performance" of religious functions, *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring)—would encroach on a religious group's freedom to "shape its own faith and mission," *id.* at 188 (majority opinion).

Liberty would have this Court create a general and absolute defense to employment-discrimination claims brought by *any* employee—lay or

ministerial—whenever the employer offers a religious explanation for its actions. But the ministerial exception does not protect religious employers from suit by *any* employee, whether ministerial or secular. *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 58 (9th Cir. 2024) ("A religious employer is not given carte blanche with respect to all employees, ministerial and non-ministerial alike."); *Demkovich v. St. Andrew the Apostle Par.*, 3 F.4th 968, 978 (7th Cir. 2021) (en banc) ("Because ministers and nonministers are different in kind, the First Amendment requires that their [employment-discrimination] claims be treated differently."). If the ecclesiastical-abstention doctrine allowed religious employers to disregard employment-nondiscrimination laws simply by citing a religious justification for their unlawful actions, regardless of whether the employees affected by the law carry out ministerial duties, then there would be no need to have a ministerial exception at all.

The Supreme Court has rejected this approach. In *Hosanna-Tabor*, for example, the defendant alleged that it terminated a minister's contract for "a religious reason." 565 U.S. at 180. Despite the defendant's stated religious motivation, the Supreme Court proceeded to apply the fact-intensive ministerial-exception analysis to determine whether the employee was covered by the doctrine. *Id.* at 190. If a religious entity could bar suit merely by proffering a religious justification for its actions, then the

religious justification in *Hosanna-Tabor* would have ended the analysis. The United States Supreme Court had the opportunity to adopt the reasoning Liberty proposes here but declined to do so. This Court should do the same.

## II.     The ministerial exception does not bar Zinski's claim.

### A.     Zinski, an IT Apprentice, is not a ministerial employee.

The ministerial exception protects a religious institution's ability to select which employees will "serve[] as a messenger or teacher of its faith." *Our Lady of Guadalupe*, 591 U.S. at 754 (emphasis omitted) (quoting *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring)). When the exception applies, it strips workers of the ability to succeed on certain employment claims, even if they've suffered blatant "invidious discrimination." *Demkovich*, 3 F.4th at 989 (Hamilton, J., dissenting). Because of its potent effect, the exception applies only to "personnel who are essential to the performance" of religious functions. *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring). The exception must always be "tailored to this purpose." *Id.*[5]

---

[5] Liberty argues (at 50–59) that the ministerial exception should be treated as a jurisdictional bar, but the Supreme Court and this Court have been clear that the ministerial exception operates as an affirmative defense. *Hosanna-Tabor*, 565 U.S. at 195 n.4 (explaining that the ministerial exception "operates as an affirmative defense . . . not a jurisdictional bar"); *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 326 (4th Cir. 2024) (acknowledging that "the exception is a non-jurisdictional affirmative defense").

There is no "rigid formula" for determining whether an employee is covered by the exception. *Id.* at 190. Instead, the analysis is "highly fact-intensive," *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316, 333 (4th Cir. 2024), and requires the reviewing court to "take all relevant circumstances into account," *Our Lady of Guadalupe*, 591 U.S. at 756, 758.[6] The Supreme Court has identified four primary considerations: the employee's job title, the employee's religious or secular training, whether the employee holds themselves out as a minister, and the employee's job responsibilities. *Hosanna-Tabor*, 565 U.S. at 190–92. Of those, the most important is the fourth factor: the employee's day-to-day duties. *See Our Lady of Guadalupe*, 591 U.S. at 753–54. "What matters, at bottom, is what an employee does." *Id.* at 753.

None of these considerations supports Liberty's contention that Zinski's role falls into the ministerial exception. First, nothing about Zinski's proposed title suggests that she served in a religious role. Unlike a "Minister of Religion," *Hosanna-Tabor*, 565 U.S. at 177, or "Associate in Pastoral Care," *Rayburn*, 772 F.2d at 1165, Zinski's job title—"Information Services

---

[6] As the district court correctly observed, because the ministerial-exception analysis is so fact-intensive, it is often evaluated at the summary-judgment stage, "with the benefit of discovery or more extensive briefing." JA090–91. But, as the court also acknowledged, there is no prohibition on courts evaluating the defense earlier, at the motion-to-dismiss stage. JA091.

Apprentice," JA008—was entirely secular and weighs against the application of the ministerial exception. Second, nothing in the record suggests that Zinski received *any* religious training or religious commissioning to become an IT Apprentice, much less "a significant degree of religious training" or "a formal process of commissioning." *Hosanna-Tabor*, 565 U.S. at 191. Third, again weighing against the application of the ministerial exception, Zinski did not hold herself out as a minister at Liberty—she did not "accept[] [a] formal call to religious service," claim benefits only available to ministers, or otherwise ever describe herself as a minister. *Id.* at 191–92. While not decisive, none of these factors weigh in favor of applying the ministerial exception here.

What *is* decisive is the fourth consideration: "what an employee does." *Our Lady of Guadalupe*, 591 U.S. at 753. And what Zinski did as an IT Apprentice was a far cry far from the "vital religious duties" that the ministerial exception is meant to protect. *Billard*, 101 F.4th at 331 (quoting *Our Lady of Guadalupe*, 591 U.S. at 756). Rather, as an IT Apprentice at the IT Helpdesk, Zinski helped students and staff with "computer issues" and "problems with classroom equipment," and she "completed technology related administrative tasks, such as restocking printer paper." JA010 ¶ 11. Zinski did not perform any teaching duties, and her "only contact with students concerned IT issues." JA010 ¶ 11. These are simply not the types

of "responsibilities that lie at the very core of the mission of a private religious school." *Our Lady of Guadalupe*, 591 U.S. at 754.

That Liberty expected its employees to adhere to the Doctrinal Statement does not, as Liberty asserts, mean that all Liberty employees are automatically covered by the ministerial exception. Appellant's Br. 59. "[S]uch an expectation," on its own, would not "bring all such employees within the ministerial exception." *Billard*, 101 F.4th at 332; *McMahon v. World Vision*, 147 F.4th 959, 977 (9th Cir. 2025) ("[A] religious employer's universal requirement that its employees help carry out the organization's religious mission or live consistently with the organization's religious values cannot be enough to qualify for the ministerial exception."). Instead, the critical question is "whether each particular position implicate[s] the fundamental purpose of the [ministerial] exception"—to protect religious entities' choice of who will "perform [the] vital religious duties" that "l[ie] at the core of the [entity's] mission." *Our Lady of Guadalupe*, 591 U.S. at 756–58. Restocking printer paper and fixing computer problems do not, even under the most generous understanding of Zinski's role at Liberty, meet that standard.

Liberty does not even attempt to dispute Zinski's characterization of her day-to-day job duties. Instead, Liberty makes the incredible assertion that that *all* of its employees are covered by the ministerial exception because

18

"*[e]very* position at Liberty . . . [is] critical to advancing Liberty's mission and Christian objective." Appellant's Br. 61 (emphasis added). To be sure, as this Court has observed, even "seemingly secular tasks . . . may be so imbued with religious significance that they implicate the ministerial exception." *Billard*, 101 F.4th at 332. But, to qualify for the ministerial exception, those "seemingly secular tasks" must still be "central" to the employer's religious mission. *Id.*

So, for example, this Court concluded that an English and drama teacher at a Catholic school was covered by the exception because his "duties included conforming his instruction to Christian thought and providing a classroom environment consistent with Catholicism"—duties that were "'vital' to [the school's] religious mission that its teachers bring a Catholic perspective to bear on" their classes. *Id.* at 332. Similarly, this Court found that a kitchen supervisor at a Jewish home for the aged who was responsible for ensuring that meals were kosher was likewise covered by the exception because, "given the importance of dietary laws to the Jewish religion," he "occupied a position that is central to the spiritual and pastoral mission of Judaism." *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 309 (4th Cir. 2004). Here, by contrast, Zinski's day-to-day duties—resolving computer issues and refilling printer paper—are neither "'vital' to

[Liberty's] mission," *Billard*, 101 F.4th at 332, nor "central to [Liberty's] spiritual and pastoral mission," *Shaliehsabou*, 363 F.3d at 309.

In short, "the ministerial exception does not apply to *everyone* employed by a religious entity." *Palmer v. Liberty Univ., Inc.*, 72 F.4th 52, 71 (4th Cir. 2023) (Motz, J., concurring). The ministerial exception is "just that—an exception." *Billard*, 101 F.4th at 333. This Court should not indulge Liberty's attempt to argue otherwise here.

> **B.    Deeming Zinski a ministerial employee would encourage gamesmanship without serving the purpose of the ministerial exception.**

Accepting Liberty's bid to apply the ministerial exception expansively would encourage employers to add religious language to handbooks and job contracts for the sake of avoiding legal liability. This concern is not hypothetical: "[M]any employers with religious affiliations, such as hospitals and schools, are trying to expand the reach of the ministerial exception to cover a much broader range of their employees, such as teachers, nurses, and other health-care workers." *Demkovich*, 3 F.4th at 995 (Hamilton, J., dissenting). Law firms and advocacy groups are advising religiously affiliated employers on how to "squeeze into the cleft" of the ministerial exception to avoid Title VII's requirements for *any* of their employees. McGuireWoods, *U.S. Supreme Court Broadens Ministerial Exemption to Employment Discrimination Claims* (July 10, 2020),

https://perma.cc/Q3EB-HV6S. Far from merely explaining the law, some law firms now advise that "religious institutions should begin to revisit whether their employees *could* be covered under the ministerial exception." Seyfarth, *US Supreme Court Expands Ministerial Exception for Religious Organizations* (July 9, 2020) (emphasis added), https://perma.cc/S4TZ-NZ8F. Employers are being formally advised to reclassify their employees so as to insulate themselves against employment-antidiscrimination laws.

One law firm, for example, suggests that religious employers "distribut[e] religious duties to as many staff members as is reasonably appropriate," so that the employer "can increase the *perception* that employees who have those duties are ministers." Conner & Winters, *Mitigating Risk with the Ministerial Exception* (Mar. 2019) (emphasis added), https://perma.cc/4WRT-G35Y. The Christian Legal Society recommends "inserting statements of faith or other doctrinal language into employee handbooks," in an attempt to get employees classified as ministers. Christian Legal Society, *Church Guidance for Same-Sex Issues* 9 (2015), https://perma.cc/DKC2-HPXW. And First Liberty advises religious schools that for all staff members, regardless of the actual nature and purpose of their job, "each employee's job description and responsibilities should be drafted to emphasize the religious nature of the employee's role as a messenger or teacher of its faith." First Liberty, *Religious Liberty*

21

*Protection Kit for Christian Schools* 34, 36 (2016), https://perma.cc/FPC7-WYS9.

If endorsed by the courts, this kind of gamesmanship could leave millions of workers without basic legal protections at work. Consider custodians, cafeteria workers, landscapers (and, yes, IT apprentices)—if Liberty had its way, these employees would no longer receive protection from discriminatory hiring and firing decisions. By simply requiring all employees to attest to a Doctrinal Statement, or by pointing out that these roles contribute to the day-to-day operations of the employer's business, employers could defeat employment-discrimination claims.

That is not what the First Amendment requires: The ministerial exception protects religious institutions against governmental intrusion into their internal decisions about who will perform "vital religious duties" to fulfill their religious purposes. *Billard*, 101 F.4th at 322. In both *Hosanna-Tabor* and *Our Lady of Guadalupe*, the Supreme Court declined to adopt a ministerial-exception test that would "defer to religious organizations' good-faith claims that a certain employee's position is 'ministerial.'" *Our Lady of Guadalupe*, 591 U.S. at 762–63 (Thomas, J., concurring); *see also Hosanna-Tabor*, 565 U.S. at 196 (Thomas, J., concurring). The exception does not and should not allow employers to opt

out of antidiscrimination laws merely by declaring anyone and everyone a minister.

## III. The Religious Freedom Restoration Act does not shield Liberty from liability.

RFRA does not apply to suits between private parties. The plain text of RFRA—consistent with the Act's history and objectives—makes clear that it applies only when the government is a party to the litigation. Because the government is not a party to this lawsuit, Liberty cannot use RFRA as a defense.

It is a "cardinal canon" of statutory construction "that courts must presume that a legislature says in a statute what it means." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id.* at 254 (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)). "[T]he text of RFRA is plain[.]" *Rweyemamu v. Cote*, 520 F.3d 198, 203 n.2 (2d Cir. 2008). "*Government* shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in" the Act itself. 42 U.S.C. § 2000bb-1(a) (emphasis added). Because RFRA has no bearing on—and nothing to say about—disputes between private parties, it can serve as a legal defense or as a basis for a claim only when the government is a party to the suit.

That plain-language construction is underscored by the fact that RFRA puts the onus on the government to "meet[] the burdens of going forward with the evidence and of persuasion." 42 U.S.C. § 2000bb-2(3). "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The government cannot meet the burdens of production and persuasion if it is not even a party to the litigation. And "[a] private party cannot step into the shoes of the 'government' and demonstrate a compelling governmental interest and . . . the least restrictive means of furthering that compelling governmental interest because the statute explicitly says that the 'government' must make this showing." *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015).

Finally, the relief that RFRA provides "is clearly and unequivocally limited to that from the 'government.'" *Id.* at 737. RFRA allows "[a] person whose religious exercise has been burdened in violation of this section [to] assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief *against a government.*" 42 U.S.C. § 2000bb-1(c) (emphasis added). RFRA defines "government" to include "a branch, department,

agency, instrumentality, [or] official (or other person acting under color of law) of the United States . . . ." 42 U.S.C. § 2000bb-2(1). Private parties are notably absent from that list.

Because the meaning of RFRA is plain, the Court can stop its analysis here. *See Conn. Nat'l Bank*, 503 U.S. at 253–54. But limiting RFRA's application to cases in which the government is a party is also consistent with the Act's history and goals. RFRA was enacted in response to the Supreme Court's holding in *Employment Division v. Smith* that religiously neutral, generally applicable laws are presumptively valid. 42 U.S.C. § 2000bb(b)(1). Unhappy with the Court's ruling, Congress passed RFRA to "restore the compelling interest test set forth in" *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and *Sherbert v. Verner*, 374 U.S. 398 (1963)—the cases that had previously set forth free-exercise standards. S. Rep. No. 103-111, at 3 (1993); *see* 42 U.S.C. § 2000bb-1(b). In doing so, Congress sought to fulfill the Framers' promise of a nation where citizens could practice their religion "free from Government interference" and "Government actions singling out religious activities for special burdens." S. Rep. No. 103-111, at 4. Unsurprisingly, therefore, "[a]ll of the examples cited in the Senate and House Reports on RFRA involve actual or hypothetical lawsuits in which the government is a party." *Hankins v. Lyght*, 441 F.3d 96, 115 n.9 (2d Cir. 2006) (Sotomayor, J., dissenting). "The lack of even a single example of a

25

RFRA claim or defense in a suit between private parties in these Reports tends to confirm what is evident from the plain language of the statute: It was not intended to apply to suits between private parties." *Id.* RFRA was passed to shield individuals from only "government actions." S. Rep. No. 103-111, at 8. Consistent with that history and the plain meaning of the text, the Sixth, Seventh, and Ninth Circuits have held that RFRA applies only when the government is a party to the lawsuit. *See Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010); *Listecki*, 780 F.3d at 736; *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835–36 (9th Cir. 1999); *see also Billard*, 101 F.4th at 324 (observing that "the great weight of court authority" holds that RFRA does not apply to suits between private parties). This Court should do the same.

Only the Second Circuit has diverged from RFRA's plain meaning and history to say it might apply in a dispute between private parties—over the strong dissent of then-Judge Sotomayor. *See Hankins*, 441 F.3d at 103 (majority opinion); *Id.* at 114–15 (Sotomayor, J., dissenting). And the *Hankins* decision has been roundly criticized, including by a later Second Circuit panel, which, per Judge Walker, was forthright in declaring that it "d[id] not understand" how RFRA's language could possibly be read to apply to suits between private parties. *Rweyemamu*, 520 F.3d at 203 & n.2. Writing for the Seventh Circuit, Judge Posner likewise described the

reasoning of *Hankins* as "unsound." *Tomic v. Cath. Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006).

Liberty, seeking an end-run around RFRA's plain meaning and legislative history, argues that RFRA does apply to suits between private parties because "RFRA applies against all branches of government, including burdens imposed by the judicial branch." Appellant's Br. 41. In other words, Liberty's argument goes, when a court applies federal law in a way that burdens religion, it is the government that is burdening religion. But it is an "established canon of construction that similar language contained within the same section of a statute must be accorded a consistent meaning." *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998). So if "government" includes "court" in one part of RFRA, then the same must be true elsewhere in the statute. But then, when Section 2000bb-1(b) imposes the "government['s]" burden of persuasion, that would require the *court* to present evidence—which simply can't be. And under Liberty's interpretation, Section 2000bb-1(c)'s allowance of "appropriate relief against a government" would likewise make little sense, because the court hearing the case would be asked to issue relief against itself.

Liberty contends that it would be "absurd" for Congress to constrain the government but not private citizens, never mind that it is exactly what

Congress does all the time—and what the Constitution itself does. Appellant's Br. 45. Because the government uniquely has the legal authority to enact laws and enforce them, RFRA, like the First Amendment, is concerned with limiting how the government—not one's next-door neighbor—burdens a person's religion. And contrary to what Liberty argues, Appellant's Br. 44, 46, the Supreme Court did not endorse the view that RFRA applies to private parties in *Bostock*, when it said that "other employers in other cases" could attempt to raise RFRA defenses. 590 U.S. at 682. Employers certainly can try to invoke RFRA as a defense when the government sues to enforce Title VII. That is precisely why the Sixth Circuit found that a RFRA claim was available for the employer-defendant in a decision that was affirmed in *Bostock*. *See EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 584 (6th Cir. 2018) (explaining that employer-defendant could invoke RFRA because the government was a party to the suit), *aff'd sub nom.*, *Bostock*, 590 U.S. 644.

Liberty might not like the policy decisions that Congress made and the statute that it wrote. But amending the plain language of RFRA is a job for Congress, not the courts.

## CONCLUSION

The judgment of the district court should be affirmed.

28

Respectfully submitted,

_/s/ Jenny Samuels_

JENNY SAMUELS
ALEX J. LUCHENITSER
Americans United for Separation of
 Church and State
1310 L Street NW, Suite 200
Washington, D.C. 20005
(202) 466-7308
_samuels@au.org_
_luchenitser@au.org_

_Counsel for_ Amici Curiae

September 9, 2025

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that this brief:

(i) complies with the type-volume limitation of Rules 32(a)(7)(B) and 29(a)(5) because it contains 6,269 words including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word 365, set in Century Schoolbook font in a size measuring 14 points or larger.

*/s/ Jenny Samuels*