No. 25-1228 (Lead)

No. 25-1581 (Member)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ELLENOR ZINSKI,

*Plaintiff-Appellee,*

v.

LIBERTY UNIVERSITY, INC.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA, CASE NO. 6:24-CV-00041-NKM-CKM

## BRIEF FOR *AMICI CURIAE* MASSACHUSETTS, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, THE DISTRICT OF COLUMBIA, HAWAIʻI, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW YORK, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND WISCONSIN IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
David C. Kravitz*
  *State Solicitor*
Adam M. Cambier
  *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
david.kravitz@mass.gov
(617) 963-2427
  *Counsel of Record*
*Additional counsel listed on signature page*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTERESTS OF AMICI.............................................................................1

ARGUMENT .............................................................................................3

    I.     The First Amendment Right of Expressive Association Does
         Not Apply to the Employer-Employee Relationship At Issue In
         This Case. ..........................................................................................3

         A.     Precedent does not support the expansion of expressive
               association claims to the context of employment. .....................4

               1.  The *Boy Scouts of America v. Dale* line of cases does
                   not apply here........................................................................4

               2.  Even the Second Circuit's test for expressive
                   association claims does not help Defendant. .......................12

         B.     Courts do not blindly defer to an organization's
                assessment of when its expressive associational rights are
               impaired. ..................................................................................16

         C.     Defendant's theory of expressive association would
                badly undermine employment discrimination laws.................18

         D.     Employment discrimination laws satisfy strict scrutiny...........20

               1.  Governments' interest in eliminating employment
                   discrimination is compelling, and Title VII and similar
                   statutes are narrowly tailored to that goal...........................20

               2.  Defendant's arguments that strict scrutiny is not
                   satisfied fail. ........................................................................23

    II.    The Ministerial Exception Does Not Bar Zinski's Claims. ................25

CONCLUSION.........................................................................................29

CERTIFICATE OF COMPLIANCE.........................................................32

# TABLE OF AUTHORITIES

**Cases**

*Bear Creek Bible Church v. E.E.O.C.*, 571 F. Supp. 3d 571 (N.D. Tex. 2021), *vacated in relevant part sub nom. Braidwood Mgmt., Inc. v. E.E.O.C.*, 70 F.4th 914 (5th Cir. 2023) ..................... 12, 18-19

*Billard v. Charlotte Catholic H.S.*, 101 F.4th 316 (4th Cir. 2024).........................27

*Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537 (1987) ........................................................ 5-7

*Bostock v. Clayton County*, 590 U.S. 644 (2020) ......................................................3

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000)......................................*passim*

*Boy Scouts of Am. v. Wyman*, 335 F.3d 80 (2d Cir. 2003) .................................. 9-10

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ...................................23

*Chicago Area Council of Boy Scouts of Am. v. City of Chicago Comm'n on Hum. Relations*, 748 N.E.2d 759 (Ill. App. 2001)....................................................................10

*Christian Legal Soc. v. Martinez*, 561 U.S. 661 (2010) ...........................................4

*CompassCare v. Hochul*, 125 F.4th 49 (2d Cir. 2025) ............................... 10, 13-16

*Darren Peterson Christian Academy v. Roy*, 699 F.Supp.3d 1163 (D. Colo. 2023) ..................................................................................12

*DeWeese-Boyd v. Gordon College*, 163 N.E.3d 1000 (Mass. 2021), *cert. denied*, 142 S.Ct. 952 (2022)................................................................27

*E.E.O.C. v. Mississippi Coll.*, 626 F.2d 477 (5th Cir. 1980) ...................................21

*E.E.O.C. v. Pacific Press Pub. Ass'n*, 676 F.2d 1272 (9th Cir. 1982), *abrogation on other grounds recognized by Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991) .......................................................................21

*E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018), *aff'd, Bostock v. Clayton County*, 590 U.S. 644 (2020).............................................................................21, 24

*E.E.O.C. v. Roman Cath. Diocese of Raleigh, N.C.*, 213 F.3d 795 (4th Cir. 2000) ...............................................................5, 20, 29

*Hosanna-Tabor Evan. Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171 (2012)..................................................................18, 28

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995) ..............................................7

*Railway Mail Ass'n v. Corsi*, 326 U.S. 88 (1945) ....................................6

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985) .............................................................................5, 20

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ...............................4, 6

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ....................22

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ............................................16

*New York State Club Association v. City of New York*, 487 U.S. 1 (1988)..................................................................................6-7

*N.Y. State Club Ass'n, Inc. v. City of New York*, 505 N.E.2d 915 (N.Y. 1987), *aff'd*, 487 U.S. 1 (1988) ............................................25

*Norwood v. Harrison*, 413 U.S. 455 (1973) ......................................3, 6

*Our Lady of Guadalupe School v. Morrissey-Berru*,
591 U.S. 723 (2020)................................................ 25, 27-28

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) .................... 5-8, 11, 13, 19-20, 23-24

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
547 U.S. 47 (2006)................................................ 17-18

*Runyon v. McCrary*, 427 U.S. 160 (1976) ................................................3

*Schmidt v. Univ. of Northwestern-St. Paul*, No. 23-2199, 2024 WL
477166 (D. Minn. Feb. 7, 2024) ............................................ 27-28

*Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363
F.3d 299 (4th Cir. 2004) ........................................ 28-29

*Simon & Schuster, Inc. v. Members of New York State Crime
Victims Bd.*, 502 U.S. 105 (1991)................................................24

*Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023) ........................................ 12-13, 15

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496
F.Supp.3d 1195 (S.D. Ind. 2020), *app. dism'd*, No. 20-3265,
2021 WL 9181051 (7th Cir. Jul. 22, 2021) ............................................ 11-12

*United States v. Burke*, 504 U.S. 229 (1992)................................................21

## Constitutional Provisions, Statutes, and Rules

42 U.S.C. §2000e-1................................................2

42 U.S.C. §2000e-2................................................ 2-3

U.S. Const., Amend. 1 ................................................*passim*

## Miscellaneous

Samuel R. Bagenstos, *Employment Law and Social Equality*, 112 Mich. L. Rev. 225 (2013) ...........................................................................11

Jenny Bourne, *"A Stone of Hope": The Civil Rights Act of 1964 and Its Impact on the Economic Status of Black Americans*, 74 La. L. Rev. 1195 (2014)..........................................................................2

EEOC, *American Experiences versus American Expectations* (2015), https://www.eeoc.gov/special-report/american-experiences-versus-american-expectations ...................................2

David Freeman Engstrom, *The Lost Origins of American Fair Employment Law: Regulatory Choice and the Making of Modern Civil Rights, 1943-1972*, 63 Stan. L. Rev. 1071 (2011)..........................................................1

Desta Fekedulegn *et al.*, *Prevalence of workplace discrimination and mistreatment in a national sample of older U.S. workers: The REGARDS cohort study*, 8 SSM – Population Health 1 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6612926/pdf/main.pdf ............................................................................22

H. Rep. 102-40, 1991 U.S.C.C.A.N. 549 (Apr. 24, 1991)................................ 21-22

Institute for Women's Policy Research, *The 2023 Weekly Gender Wage Gap by Race, Ethnicity, and Occupation* (Mar. 2024), https://iwpr.org/wp-content/uploads/2024/03/Occupational-Wage-Gap-2024-Fact-Sheet-1.pdf ..............................................23

Amy Elisa Jackson, *New Study: 3 in 5 U.S. Employees Have Witnessed or Experienced Discrimination*, Glassdoor (Oct. 23, 2019),  https://www.glassdoor.com/blog/new-study-discrimination/ .................................................................22

Justia, "Employment Discrimination Laws: 50-State Survey" (Sept. 2022), https://www.justia.com/employment/employment-laws-50-state-surveys/employment-discrimination-laws-50-state-survey ......................................................................1

Liberty University, "About Liberty," https://www.liberty.edu/about ............... 15-16

Liberty University, IRS Form 990, available at https://projects.propublica.org/nonprofits/organizations/54094 6734/202501359349307950/full ................................................15

Liberty University, "Statement of Mission and Purpose," https://www.liberty.edu/about/purpose-and-mission-statement/ ............................................................................16

Michael Stokes Paulsen, *A Funny Thing Happened on the Way to the Limited Public Forum: Unconstitutional Conditions on "Equal Access" for Religious Speakers and Groups*, 29 U.C. Davis L. Rev. 653 (1996) ............................................................11

Brad Sears *et al.*, *LGBTQ People's Experiences of Workplace Discrimination and Harassment*, Williams Institute (Aug. 2024), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Workplace-Discrimination-Aug-2024.pdf..........................23

Elizabeth Sepper, *et al.*, *Expressive Association at Work*, 126 Mich. L. Rev. __ (forthcoming 2026), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5176842 .............. 10-12

Elizabeth Sepper, *The Return of* Boy Scouts of America v. Dale, 68 St. Louis U. L.J. 803 (2024) ..................................................12, 19

U.S. Bureau of Labor Statistics, *Highlights of Women's Earnings in 2023*, at 1 (Aug. 2024), https://www.bls.gov/opub/reports/womens-earnings/2023/home.htm ................................................23

Valerie Wilson & William Darity Jr., *Understanding Black-White Disparities in Labor Market Outcomes Requires Models That Account for Persistent Discrimination and Unequal Bargaining Power*, Econ. Pol'y Inst. (Mar. 25, 2022), https://files.epi.org/uploads/215219.pdf ..................................................... 22

## INTERESTS OF AMICI

The *Amici* States—Massachusetts, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin—share sovereign and compelling interests in protecting workers within our jurisdictions from discrimination in employment. States have long been at the forefront of fighting employment discrimination. "[B]y the time Congress passed Title VII to the Civil Rights Act of 1964, nearly two dozen states had already enacted laws mandating equal treatment in employment and engaged in nearly two decades' worth of enforcement efforts." David Freeman Engstrom, *The Lost Origins of American Fair Employment Law: Regulatory Choice and the Making of Modern Civil Rights, 1943-1972*, 63 Stan. L. Rev. 1071, 1073 (2011).  Today, nearly every State has some form of employment discrimination law in place.[1]

These efforts to level the playing field in the labor market have borne fruit. According to one researcher, "real wages among employed, black, male household heads aged 20 to 60 years old increased sharply during the 1960s across all ages

---

[1] *See* Justia, "Employment Discrimination Laws: 50-State Survey" (Sept. 2022), https://www.justia.com/employment/employment-laws-50-state-surveys/employment-discrimination-laws-50-state-survey/.  All URLs cited in this brief were last visited on September 9, 2025.

and educational levels."  Jenny Bourne, *"A Stone of Hope": The Civil Rights Act of 1964 and Its Impact on the Economic Status of Black Americans*, 74 La. L. Rev. 1195, 1195-96 (2014).  Those gains have continued in more recent years among a wide variety of groups protected by employment discrimination laws.  *See, e.g.*, EEOC, *American Experiences versus American Expectations* (2015) (collecting data from 1965 through 2015 showing that African Americans, Hispanics, Asian Americans, American Indians/Alaskan Natives, and women gained in most, but not all, of nine different job categories), https://www.eeoc.gov/special-report/american-experiences-versus-american-expectations.

We also share interests in upholding the rights protected by the First Amendment.  We respect and do not seek to abridge the right to hold and express views regarding gender identity, including views founded in religious faith.  But Defendant advances extremely broad theories of the First Amendment right of expressive association and the ministerial exception that go well beyond existing precedent and threaten our ability to combat employment discrimination.  We urge this Court to reject them.[2]

---

[2] While this brief focuses on expressive association and the ministerial exception, we join Zinski in urging this Court to reject Defendant's other arguments as well. In particular, the district court's comprehensive and scholarly analysis of Title VII's religious exemptions, 42 U.S.C. §2000e-1(a), *id.* §2000e-2(e), persuasively demonstrates that those exemptions do not apply here.  *See* JA50-84.

## **ARGUMENT**

Upon learning that Zinski, who worked at Defendant's Information Technology Helpdesk, was transgender, Defendant fired her "because of … sex"— an act of invidious discrimination that federal law forbids.  42 U.S.C. §2000e-2(a)(1); *see Bostock v. Clayton County*, 590 U.S. 644 (2020).  Defendant's claimed constitutional justifications for its unlawful action lack merit.  The Supreme Court has repeatedly stated that "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections."  *Norwood v. Harrison*, 413 U.S. 455, 470 (1973); *see also, e.g.*, *Runyon v. McCrary*, 427 U.S. 160, 176 (1976) (quoting *Norwood*).  Nor does the ministerial exception apply on the facts of this case.

## I.    **The First Amendment Right of Expressive Association Does Not Apply to the Employer-Employee Relationship At Issue In This Case.**

Defendant's theory of expressive association is astonishing in its breadth and, if accepted, would dramatically constrict the States' ability to enforce employment discrimination laws.  In Defendant's view, if it determines that having any particular employee on its payroll would impair its expression, that is sufficient to invoke its First Amendment right "to refrain from associating with individuals who do not share its religious interest, regardless of any economic or employment aspect to the relationship."  Def. Br. 63.

3

This radical view of expressive associational rights finds no support in the case law of the Supreme Court or this Court—and would wreak havoc on States' ability to ensure that employment opportunities remain open to all. This Court should reject Defendant's effort to weaponize the First Amendment against fair employment practices designed to further the critical goal of equal employment opportunity.

**A.    Precedent does not support the expansion of expressive association claims to the context of employment.**

**1.    The *Boy Scouts of America v. Dale* line of cases does not apply here.**

Defendant's expressive association claim depends on its misapplication of *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), to the facts of this case. *See* Def. Br. 63-64. *Dale*, like every expressive association case preceding it, is about *group membership*, not *employment relationships*—with one exception, *Hishon v. King & Spalding*, in which the Supreme Court unanimously rejected an employer's expressive association claim. 467 U.S. 69, 78 (1984) (dismissing claim that holding law firm liable for sex discrimination in partnership admission "would infringe constitutional rights of expression or association"); *see also Christian Legal Soc. v. Martinez*, 561 U.S. 661, 682 (2010) ("The expressive-association precedents … involved regulations that compelled a *group* to include unwanted *members*, with no choice to opt out." (citing *Dale*, 530 U.S. at 648) (emphasis

4

added)).  Similarly recognizing that no First Amendment principle (including expressive association) affords religious employers a blanket exemption from Title VII, this Court has explained that "[w]here no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides."  *EEOC v. Roman Cath. Diocese of Raleigh, N.C.*, 213 F.3d 795, 801 (4th Cir. 2000); *see also Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (noting that religious entities' "employment decisions may be subject to Title VII scrutiny, where the decision does not involve the church's spiritual functions").[3]  Review of the relevant cases confirms that *Dale* does not apply here.

The case that coined the phrase "freedom not to associate," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984), concerned "members of a private organization," and held that a law "requiring the [organization] to admit women as full voting members" did not infringe that freedom.  *Id*. at 612, 626-27.  Three years later, *Board of Directors of Rotary International v. Rotary Club of Duarte* again asked whether a state law could require the admission of women to membership in a private organization; again, the Court answered yes.  481 U.S. 537, 548 (1987).

---

[3] As explained *infra* Part II, Zinski's job did not involve any spiritual function, so the ministerial exception does not apply.

The next year, the Court considered "freedom not to associate" in *New York State Club Association v. City of New York*, 487 U.S. 1 (1988) ("*NYSCA*"), in which private clubs challenged New York City's law requiring that membership in most private clubs be open to all. Like *Roberts* and *Rotary International*, *NYSCA* did not concern employment, and also like those cases, it rejected the First Amendment challenge. *Id.* at 11-14. In the course of doing so, the Court recognized that "[i]t may well be that a considerable amount of private or intimate association occurs" in clubs covered by the law, "but that fact alone does not afford the entity as a whole *any constitutional immunity* to practice discrimination *when the government has barred it from doing so*." *Id.* at 12 (emphasis added) (citing *Hishon*, 467 U.S. at 78). Similarly, the Court rejected the notion that "in every setting in which individuals exercise some discrimination in choosing associates, their selective process of inclusion and exclusion is protected by the Constitution." *Id.* at 13 (citing *Hishon*, 467 U.S. at 78; *Norwood*, 413 U.S. at 470; *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93-94 (1945)). The citation to *Norwood* reaffirmed that case's declaration that "[i]nvidious private discrimination … has never been accorded affirmative constitutional protections." *Norwood*, 413 U.S. at 470.

*NYSCA* also declared it "conceivable, of course, that an association might be able to show that … it will not be able to advocate its desired viewpoints nearly as effectively if it cannot *confine its membership* to those who share the same sex, for

example, or the same religion." 487 U.S. at 13 (emphasis added). The Court's linkage of an association's expressive purposes with its ability to "confine its membership" emphasized once again that *NYSCA* (like *Roberts* and *Rotary International*) was about a group's ability to choose its members, not the relationship between employer and employee.

Several years later, in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, the Court held that a state public accommodations law could not mandate a particular contingent's inclusion in a parade because the parade was "inherent[ly] expressive[]," as was the contingent seeking inclusion. 515 U.S. 557, 568, 570 (1995). Thus, state-mandated inclusion would have "requir[ed]" the sponsors "to alter the expressive content of their parade." *Id.* at 572-73. *Hurley* contrasted the situation before it with *NYSCA*, explaining that there, even though the clubs might have been "engaged in expressive activity[,] compelled access … did not trespass on the organization's message itself," but that "a private club could exclude an applicant whose manifest views were at odds with a position taken by the club's existing members." *Id.* at 580-81. Thus, *Hurley* (like *NYSCA*) allowed for the possibility that *membership* decisions could implicate expressive associational rights, but never suggested that *employment* decisions could.

That brings us to *Boy Scouts of America v. Dale*—which, like *Roberts*, *Rotary International*, *NYSCA*, and *Hurley* before it, had nothing to do with

employment, but rather concerned a private organization's membership and leadership decisions. In *Dale*, the Boy Scouts had "revoked" Dale's "adult membership" together with his "volunteer" position of "assistant scoutmaster," upon learning that he was "an avowed homosexual and gay rights activist." 530 U.S. at 644, 651; *see also id.* at 645 (noting that Dale had received a letter stating "that the Boy Scouts 'specifically forbid *membership* to homosexuals'" (quoting the record appendix) (emphasis added)). The question in the case was whether applying a state antidiscrimination law to the Boy Scouts' decision to exclude Dale violated their "freedom not to associate"; the Court held that it did. *Id.* at 644. In support of its holding, the Court stated that governmental enforcement of a "'regulation that forces the group to *accept members* it does not desire'" may unconstitutionally burden expressive associational rights. *Id.* at 648 (quoting *Roberts*, 468 U.S. at 623) (emphasis added).

The record in *Dale* was especially clear that the issue was *membership* and *leadership* within the organization, as opposed to employment. For example, the Court looked to a "position statement" declaring that "'[t]he Boy Scouts of America is a private, membership organization and leadership therein is a privilege and not a right.'" *Id.* at 651-52. A later "position statement" declared that the organization "'do[es] not allow for the registration of avowed homosexuals as *members* or as *leaders*.'" *Id.* at 652 (emphasis added). And the record was

8

similarly clear that the Boy Scouts regarded persons in the (volunteer) position of assistant scoutmaster as "leaders" responsible for transmitting the organization's "values." *See, e.g.*, *id.* at 649-50 ("During the time spent with the youth members, the scoutmasters and assistant scoutmasters inculcate them with the Boy Scouts' values—both expressly and by example.").

In contrast, the Boy Scouts had acknowledged that "'it would be necessary for the Boy Scouts of America to obey'" any law that "'prohibits discrimination against individual's employment upon the basis of homosexuality.'" *Id.* at 672 (Stevens, J., dissenting) (quoting Boy Scouts' position statement in the record appendix). Thus, while the Boy Scouts argued strenuously that the First Amendment guaranteed the organization the right to make any membership and leadership decisions it liked, the Boy Scouts also acknowledged that the organization could lawfully be subjected to state or federal employment discrimination laws—despite its stated view that "homosexual[s]" should be terminated from employment "in the absence of any law to the contrary." *Id.*

In short, *Dale*—like its predecessor cases—has little to say about the interplay between expressive associational rights and employment discrimination laws. Indeed, the result in *Dale* arguably depended on its focus on "leadership" within the organization. *See, e.g.*, *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 91 (2d Cir. 2003) (noting that "under any reading of *Dale*" the Boy Scouts' exclusion

of "gay activists from leadership positions" would be "constitutionally protected");
*Chicago Area Council of Boy Scouts of Am. v. City of Chicago Comm'n on Hum. Relations*, 748 N.E.2d 759, 768-69 (Ill. App. 2001) (discussing "nonexpressive positions within [the Boy Scouts] where the presence of a homosexual would not 'derogate from [their] expressive message'" (quoting *Dale*, 530 U.S. at 661)).  But employment is different from group membership: even if an employee is in an organization's "leadership," the "significant differences between voluntary associations and employment relationships, and the long and complex history of regulation of employment relationships," mean that "the Supreme Court's decisions regarding the freedom of expressive association … do not apply neatly to employers." *CompassCare v. Hochul*, 125 F.4th 49, 60 (2d Cir. 2025).  Recent scholarship has examined key aspects of employment that are generally absent from group membership, including "coercion through economic benefits" and "control under a hierarchical relationship," and concluded that the "[f]acts of economic coercion and workplace control support a general conclusion that employers and employees do not form expressive associations."  Elizabeth Sepper, *et al.*, *Expressive Association at Work*, 126 Mich. L. Rev. __ (forthcoming 2026),

*available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5176842, at 37, 62.[4]

The foregoing discussion shows that Defendant's effort to extend the *Roberts-Dale* line of cases mechanically to employees misreads those cases and should be rejected. As another court observed, "[t]he freedom of association cases relied upon in *Dale* reveal the doctrine's applicability to parade groups, political parties, and other non-employment contexts." *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 496 F.Supp.3d 1195, 1209 (S.D. Ind. 2020) ("*Dale* did not arise from the employment context. The plaintiff sought

---

[4] Earlier commentators from across the ideological spectrum also recognized that employment differs meaningfully from group membership, and that principles applicable in one context do not necessarily carry over to the other. *See, e.g.*, Samuel R. Bagenstos, *Employment Law and Social Equality*, 112 Mich. L. Rev. 225, 260-61 (2013) ("[A] commercial enterprise's hiring and retention of an employee—at least where the employee is not hired specifically to express a message—seems a far cry from an expressive association's decision to admit an individual to membership."); Michael Stokes Paulsen, *A Funny Thing Happened on the Way to the Limited Public Forum: Unconstitutional Conditions on "Equal Access" for Religious Speakers and Groups*, 29 U.C. Davis L. Rev. 653, 675-76, 693 (1996) (arguing that "where the alleged exclusion or discrimination in *membership* is the consequence of a sincere religious belief, the exclusion must (outside of a commercial context) be permitted as part of the group's First Amendment free speech right of expressive disassociation," but also that "[f]ew these days would take seriously an *employer's* argument that racially discriminatory employment practices are protected as 'free speech'" (emphasis added)).

membership in a private organization."), *app. dism'd*, No. 20-3265, 2021 WL 9181051 (7th Cir. Jul. 22, 2021).[5]

> ### 2. Even the Second Circuit's test for expressive association claims does not help Defendant.

Defendant's heavy reliance on *Slattery v. Hochul*, 61 F.4th 278 (2d Cir. 2023), *see* Def. Br. 64-66, does not advance its cause. That case, even if correctly decided on its own peculiar facts,[6] has little relevance here, where the factual scenario is easily distinguished. The plaintiff in *Slattery* was a so-called "crisis pregnancy center" that "discourage[d] abortion and provide[d] pregnant women

---

[5] Nor does Defendant find support in *Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571 (N.D. Tex. 2021); *see* Def. Br. 65-66. *Bear Creek* bases its holding that "for-profit businesses … may pursue a right of association claim" solely on *Dale*'s comment that the relevant right "'is not reserved for advocacy groups,'" *id.* at 615 (quoting *Dale*, 530 U.S. at 648), but nothing about this language suggests that the right extends past group membership to employment, nor did the *Bear Creek* court engage at all with this distinction. Also distinguishable is *Darren Peterson Christian Academy v. Roy*, 699 F.Supp.3d 1163 (D. Colo. 2023), which preliminarily concluded—apparently with no opposition, *see id.* at 1183—that a school stated an expressive association claim with respect to hiring teachers. Most of the court's merits analysis focused on the ministerial exception, *see id.* at 1184; the analysis of *Dale* was unnecessary given the court's conclusion on the ministerial exception and was little more than a cursory afterthought, *id.* at 1184-85.

[6] *Amici* States do not agree that *Slattery* was correctly decided (among other things, the opinion assumes without analysis that the Supreme Court's expressive association precedents apply to employment, thereby ignoring the significant differences between group membership and employment, *see* Elizabeth Sepper, *The Return of* Boy Scouts of America v. Dale, 68 St. Louis U. L.J. 803, 818-21 (2024); Sepper *et al.*, *Expressive Association at Work*, *supra*), but need not address its merits in detail here.

with ultrasounds, counseling, and information on adoption," and whose operator was "opposed to abortion." 61 F.4th at 284. The case asked whether New York could prohibit the plaintiff from taking adverse employment actions against "employees who, among other things, seek abortions." *Id.* at 283. The court held that the plaintiff had stated an expressive association claim because "[t]he statute forces [the center] to employ individuals who act or have acted against the very mission of its organization." *Id.* at 288. A subsequent Second Circuit case (which Defendant ignores) emphasized that, under *Slattery*, expressive associational rights are burdened only where the law "forc[es]" the employer "to 'employ individuals who act or have acted against' its '*very mission*.'" *CompassCare*, 125 F.4th at 62 (quoting *Slattery*, 61 F.4th at 288; emphasis added by *CompassCare*). *CompassCare* further explained that under "*Slattery*, [the employer] must show that the [employment discrimination law] threatens its very mission not only in a vague and generalized sense, but in the context of a specific employment decision." *Id.* at 61. "In short," the court explained, "an employer must plausibly allege that the [law]'s impact on the specific employment decision 'will impede the organization's ability to engage in ... protected activities or to disseminate its preferred views.'" *Id.* (quoting *Roberts*, 468 U.S. at 627).

Thus, the Second Circuit holds that "[i]n the workplace, expressive association rights are not unlimited; the right to expressive association does not

13

permit an employer *generally* to discriminate in its employment practices—potentially violating the statutory or constitutional rights of employees and applicants." *Id.* (emphasis in original). But a *general* right to discriminate is exactly what Defendant here is looking for by claiming that expressive association gives it "the right to restrict the individuals it employs to those individuals who share its religious beliefs, values, convictions, and interpretations of Scripture," regardless of the position any particular employee holds. Def. Br. 66. *CompassCare* makes clear that even in the Second Circuit, employers do not enjoy such broad expressive associational rights. Rather, the employer must satisfy a two-factor test: an employer's expressive association claim regarding a particular employee "require[s] assessment of (1) the responsibilities of the position at issue, including whether it is client-facing and whether it involves expressly or implicitly speaking for the organization, and (2) the particular conduct or attribute of the employee that renders the employment of that person, in that position, a threat to the employer's mission." *CompassCare*, 125 F.4th at 61.

Defendant's expressive association claim flunks this test. Zinski's position was "Information Services Apprentice at the university's Information Technology Helpdesk." JA46. In that role, she "assisted students and staff who came to the helpdesk with computer issues, troubleshooted problems with classroom equipment, offered on-call assistance for IT issues that arose during class, and

managed technology-related administrative tasks, such as restocking printer paper. Zinski's *only contact with students* concerned IT issues, and a significant portion of her time was spent speaking with other staff." JA47 (citation and internal quotation marks omitted; emphasis added). Thus, even if Zinski was technically "client-facing" in that she spoke with students regarding their IT issues, there can be no argument (and Defendant makes none) that her role "involves expressly or implicitly speaking for the organization," or that "the employment of that person, *in that position*," constitutes "a threat to the employer's mission." *CompassCare*, 125 F.4th at 61 (emphasis added).

The facts of *Slattery* stand in sharp contrast, where the court found that a crisis pregnancy center whose *raison d'etre* is opposition to abortion plausibly alleged that it could not constitutionally be required to employ counselors who seek or have had abortions. *See Slattery*, 61 F.4th at 288. Here, the defendant is a multibillion-dollar university[7] whose "very mission" extends—by its own words— far beyond transgender issues.[8] Thus, even assuming that Zinski, as a transgender

---

[7] See Liberty University's IRS Form 990, available at https://projects.propublica.org/nonprofits/organizations/540946734/202501359349 307950/full.

[8] *See, e.g.*, Liberty University, "About Liberty," https://www.liberty.edu/about ("Liberty University is an accredited evangelical liberal arts institution with 15 colleges and schools, including a law school, medical school, and school of divinity" featuring "more than 700 programs of study from the certificate to the

(footnote continued)

person, has acted inconsistently with Defendant's "Doctrinal Statement," *see* Liberty University, "Doctrinal Position," https://www.liberty.edu/about/doctrinal-statement/, that is not enough for an expressive association defense in the Second Circuit, when Zinski has no role in "expressly or implicitly speaking for" Defendant, and nothing about employing a transgender person as an IT Apprentice plausibly threatens Defendant's "very mission." *CompassCare*, 125 F.4th at 61.

### B.     Courts do not blindly defer to an organization's assessment of when its expressive associational rights are impaired.

Under *Dale*, courts have an obligation to independently scrutinize a claimed infringement of expressive associational rights.  Even in the membership context, *Dale* squarely rejected the notion that "an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message."  530 U.S. at 653. While *Dale* does indicate that courts "give deference to an association's view of what would impair its expression," *id.*, "deference does not imply … abdication," *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  *Dale* accepted the Boy Scouts' view only after independently concluding that "Dale's presence in the Boy Scouts

---

doctoral level"); Liberty University, "Statement of Mission and Purpose," https://www.liberty.edu/about/purpose-and-mission-statement/ ("Liberty University develops Christ-centered men and women with the values, knowledge, and skills essential to impact the world" and "educates men and women who will make important contributions to their workplaces and communities, follow their chosen vocations as callings to glorify God, and fulfill the Great Commission").

would, at the very least, force the organization to send a message" that it did not

wish to send. 530 U.S. at 653. And *Dale* did not address whether similar

"deference" applies at all in the employment context.

The Court further clarified this point in *Rumsfeld v. Forum for Academic &*

*Institutional Rights, Inc.*, 547 U.S. 47 (2006), in which a group of law schools

claimed that a law requiring them to allow military recruiters on their campuses

violated their expressive associational rights. The Court rejected the claim,

emphasizing the "critical" distinction between *Dale* and situations not involving a

law that "force[s]" an organization "'to *accept members* it does not desire.'" *Id.* at

69 (quoting *Dale*, 530 U.S. at 648) (emphasis added). Under *Rumsfeld*, when

outsiders are not "trying … to become *members* of the [organization]'s expressive

association," *id.* at 69 (emphasis added), associational rights are not implicated—

even if the association itself believes otherwise. Thus, the Court explained, "[t]he

law schools *say* that allowing military recruiters equal access impairs their own

expression by requiring them to associate with the recruiters, but just as saying

conduct is undertaken for expressive purposes cannot make it symbolic speech, so

too a speaker cannot 'erect a shield' against laws requiring access 'simply by

asserting' that mere association 'would impair its message.'" *Id.* (quoting

*Dale*, 530 U.S. at 653) (emphasis in original; citation omitted). Similarly, here,

Defendant *says* that employing Zinski as an IT apprentice responsible for

providing technical assistance would impair its expression, but under *Rumsfeld*, that is not sufficient where no law is forcing Defendant to accept Zinski as a "member" or to place her in a leadership position with responsibility for inculcating or transmitting organizational values.

### C.     Defendant's theory of expressive association would badly undermine employment discrimination laws.

*Amici* States are deeply concerned that Defendant's theory of expressive association, if accepted, would hamstring their ability to ensure equal employment opportunity within their jurisdictions.  "The right to freedom of association is a right enjoyed by religious and secular groups alike."  *Hosanna-Tabor Evan. Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171, 189 (2012).  If *any* employer could invoke an "expressive purpose" not to employ certain types of people, and thereby claim exemption from antidiscrimination laws under the "freedom not to associate," the results could be catastrophic and widespread.

This concern is not hypothetical.  One federal court recently certified a nationwide class of ordinary businesses—"for-profit entities producing a secular product"—whose leaders do not wish to employ LGBTQ+ individuals, and concluded that all such employers have the expressive associational right to discriminate against LGBTQ+ persons in employment notwithstanding Title VII. *Bear Creek Bible Church v. E.E.O.C.*, 571 F.Supp.3d 571, 600, 615-16 (N.D. Tex. 2021), *vacated in relevant part sub nom. Braidwood Mgmt., Inc. v. E.E.O.C.*, 70

F.4th 914, 940 (5th Cir. 2023). Although the Fifth Circuit reversed the class

certification and resolved the plaintiffs' individual claims on statutory grounds, it

is difficult to overstate the threat that the expansive theory of expressive

associational rights adopted in *Bear Creek* and similar cases poses to the States'

ability to enforce employment discrimination laws.[9] Again, both religious and

non-religious groups enjoy expressive associational rights. The reasoning in such

cases is therefore not limited to business owners who wish not to employ LGBTQ+

persons for religious reasons; *any* sincerely-held expressive purpose of not wishing

to "associate" with *any* type of person would seem to suffice.[10] Under this view,

nothing would stop a business owner who sincerely believes in white supremacy

from invoking his "freedom not to associate" in refusing to hire Black employees.

Defendant's theory of expressive association thus threatens to make a mockery of

employment discrimination laws by rendering them unenforceable in precisely the

situations where they are most needed.

---

[9] *See* Sepper, *supra* n.6, at 815-21 (summarizing recent cases).

[10] Indeed, most expressive association cases have involved claims based not on religion, but rather on a claimed secular "expressive purpose" that requires excluding certain kinds of people from group membership. *See, e.g.*, *Dale*, 530 U.S. at 654; *Roberts*, 468 U.S. at 628.

### D.     Employment discrimination laws satisfy strict scrutiny.

Even if the employment relationship at issue here implicates the right to expressive association, Title VII and similar laws forbidding employment discrimination on the basis of sex and other protected characteristics pass constitutional muster.  Infringements upon the right to expressive association are justified where they "serve compelling state interests[] unrelated to the suppression of ideas" and where that interest cannot be vindicated "through means significantly less restrictive of associational freedoms."  *Roberts*, 468 U.S. at 623.  That standard is easily met here.

### 1.     Governments' interest in eliminating employment discrimination is compelling, and Title VII and similar statutes are narrowly tailored to that goal.

It is beyond dispute that federal and state governments have a compelling interest in prohibiting discrimination in employment.  This Court has already recognized as much, holding in litigation over the Free Exercise Clause that "Title VII is an interest of the highest order," such that the statute is "properly applied to the secular employment decisions of a religious institution, such as those relating to a secular teacher in a church-approved school."  *Rayburn*, 772 F.2d at 1169; *see also Roman Cath. Diocese*, 213 F.3d at 801 (noting "the profound state interest in assuring equal employment opportunities for all, regardless of race, sex, or national origin") (citation and internal quotation marks omitted).  So too have numerous

other circuits.  *See, e.g.*, *E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 591 & n.12 (6th Cir. 2018) (noting EEOC's "compelling interest in combating discrimination in the workforce"; collecting cases), *aff'd*, *Bostock v. Clayton County*, 590 U.S. 644 (2020); *E.E.O.C. v. Pacific Press Pub. Ass'n*, 676 F.2d 1272, 1280 (9th Cir. 1982) ("Congress' purpose to end employment discrimination is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions."), *abrogation on other grounds recognized by Am. Friends Serv. Comm. Corp. v. Thornburgh*, 951 F.2d 957, 960 (9th Cir. 1991); *E.E.O.C. v. Mississippi Coll.*, 626 F.2d 477, 488 (5th Cir. 1980) ("[T]he government has a compelling interest in eradicating discrimination in all forms.").

This universally recognized governmental interest in combating employment discrimination is grounded in the "grave harm" such discrimination creates for both individuals and the marketplace.  *United States v. Burke*, 504 U.S. 229, 238 (1992).  For individuals, employment discrimination "depriv[es an affected employee or applicant] of her livelihood and harm[s] her sense of self-worth." *Harris Funeral*, 884 F.3d at 592.  Congress has noted that employment discrimination leads to "humiliation; loss of dignity; psychological (and sometimes physical) injury; resulting medical expenses; damage to the victim's professional reputation and career; loss of all forms of compensation and other consequential

injuries." H. Rep. 102-40, 1991 U.S.C.C.A.N. 549, 603 (Apr. 24, 1991). But laws prohibiting employment discrimination serve "societal as well as personal interests." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973). Left unchecked, racially discriminatory employment practices "foster[] racially stratified job environments to the disadvantage of minority citizens"; the same is true of sex discrimination. *Id.* at 800.

Unfortunately, in the States' experience, "workplace discrimination remains a pervasive problem."[11] Over 60% of American workers report that they have experienced or witnessed discrimination in the workplace based on race, age, gender, or LGBTQ+ status.[12] Research indicates that Black workers experience higher unemployment and underemployment rates than white workers across education levels.[13] Similarly, studies report a substantial wage gap between men

---

[11] Desta Fekedulegn *et al.*, *Prevalence of workplace discrimination and mistreatment in a national sample of older U.S. workers: The REGARDS cohort study*, 8 SSM – Population Health 1, 1 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6612926/pdf/main.pdf.

[12] Amy Elisa Jackson, *New Study: 3 in 5 U.S. Employees Have Witnessed or Experienced Discrimination*, Glassdoor (Oct. 23, 2019), https://www.glassdoor.com/blog/new-study-discrimination/.

[13] Valerie Wilson & William Darity Jr., *Understanding Black-White Disparities in Labor Market Outcomes Requires Models That Account for Persistent Discrimination and Unequal Bargaining Power*, Econ. Pol'y Inst. (Mar. 25, 2022), at 5, https://files.epi.org/uploads/215219.pdf.

and women,[14] especially for some women of color.[15]  And nearly a quarter of LGBTQ workers in a recent survey reported having suffered adverse treatment at work because of their sexual orientation or gender identity within the last five years—a figure that nearly doubles for transgender and nonbinary workers.[16]

As for tailoring, the Supreme Court has observed that prohibitions on "discrimination in hiring" are "precisely tailored to achieve" the government's interest in "providing an equal opportunity to participate in the workforce." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014); *see also Roberts*, 468 U.S. at 628-29.  Just so here.

### 2. Defendant's arguments that strict scrutiny is not satisfied fail.

Defendant's claim that the government does not have a "compelling interest in requiring [it] to employ individuals who openly, intentionally, and unrepentantly contradict its doctrinal positions and religious employment requirements," Def. Br.

---

[14] U.S. Bureau of Labor Statistics, *Highlights of Women's Earnings in 2023*, at 1 (Aug. 2024), https://www.bls.gov/opub/reports/womens-earnings/2023/home.htm.

[15] Institute for Women's Policy Research, *The 2023 Weekly Gender Wage Gap by Race, Ethnicity, and Occupation*, at 7 (Mar. 2024), https://iwpr.org/wp-content/uploads/2024/03/Occupational-Wage-Gap-2024-Fact-Sheet-1.pdf.

[16] Brad Sears *et al.*, *LGBTQ People's Experiences of Workplace Discrimination and Harassment*, Williams Institute, at 13-15 (Aug. 2024), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Workplace-Discrimination-Aug-2024.pdf.

49 (discussing compelling interest test under the Religious Freedom Restoration Act), flips the compelling interest test on its head.  The question is not whether the government has "an interest in disturbing a company's workplace policies" or "in requiring … organizations to act in a way that conflicted with their religious practice," *Harris Funeral*, 884 F.3d at 591, but whether the government has a compelling interest that *justifies* a regulation affecting such policies and practices. *See Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 120 (1991) (rejecting argument that "take[s] the *effect* of the statute and posit[s] that effect as the State's interest" (emphasis original)).  By conflating the effects of a statute with the interest giving rise to the statute in the first place, Defendant attempts to transform the compelling interest test into a tautology that can never be satisfied.  The ample case law (*supra* Part I-D-1) recognizing and defining the compelling interest served by Title VII and its ilk—namely, fighting employment discrimination—refutes this maneuver.

Finally, Defendant does not contend that Title VII or other statutes barring employment discrimination are animated by a government interest in the "suppression of ideas"—nor could it.  *See Roberts*, 468 U.S. at 623.  As with the public accommodations law at issue in *Roberts*, employment discrimination statutes reflect a "strong historical commitment to eliminating discrimination," which is a "goal … unrelated to the suppression of expression."  468 U.S. at 624;

24

*see also, e.g.*, *N.Y. State Club Ass'n, Inc. v. City of New York*, 505 N.E.2d 915, 921 (N.Y. 1987) (noting that "the City's strong public policy to eliminate discrimination against women and minorities" is a "compelling governmental interest[] unrelated to the suppression of ideas"), *aff'd*, 487 U.S. 1 (1988).

## II.    The Ministerial Exception Does Not Bar Zinski's Claims.

Defendant's expansive interpretation of the ministerial exception is, for the reasons explained below, wrong.  Moreover, it would render large categories of employment decisions completely exempt from antidiscrimination laws—unlike infringements on the right of expressive association, which can be justified under strict scrutiny, *see supra* Part I-D.  The near-total withdrawal of the crucial protection of employment discrimination laws from the thousands of people employed by religious organizations in both ministerial and non-ministerial capacities, as Defendant would have it, would effectively confer upon religious organizations the broad immunity that the Supreme Court specifically denied them. *Our Lady of Guadalupe School v. Morrissey-Berru*, 591 U.S. 723, 746 (2020) ("This does not mean that religious institutions enjoy a general immunity from secular laws…").  And it would inflict enormous harm on American workers, and on *Amici* States' efforts to ensure equal employment opportunity, as discussed *supra* Parts I-C and I-D.

The ministerial exception exists to shield a religious institution's ability to selecting individuals to fill "certain key roles" from potential liability under Title VII and other employment discrimination laws. *Id.*; *see also id.* (ministerial exception applies to "certain important positions"). This carve-out from liability serves to "protect [religious institutions'] autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.* Determining whether a religious institution may invoke the exception is a highly context-dependent inquiry that, "at bottom," hinges on "what an employee does." *Id.* at 753.

Looking at what Zinski actually did during her employment at Liberty University makes abundantly clear that the ministerial exception does not apply here. As the district court observed, she had a secular job title ("Information Services Apprentice") and worked in the secular IT Helpdesk department. JA92. She had purely secular technological and administrative duties, such as helping students and staff with computer issues, troubleshooting technical equipment, and restocking printer paper. JA47, 92. And Zinski had no teaching duties whatsoever. JA93. As the district court correctly concluded, "here there is *no* record evidence that Zinski performed 'vital religious duties' or 'religious duties' at all." JA93.

Perhaps recognizing the futility of claiming that *Our Lady*'s emphasis on "what an employee does" could render Zinski a minister, Defendant instead says that "*[a]ll* Liberty employees cooperatively work together to fulfill the University's religious mission" and that "*[e]very* position at Liberty … [is] critical to advancing Liberty's mission and Christian objective." Def. Br. 60-61 (emphasis added). That is not how the ministerial exception works. The touchstone of the analysis is "whether *each particular position* implicate[s] the fundamental purpose of the ministerial exception," because the exception protects only "certain key roles" or "certain important positions." *Our Lady*, 591 U.S. at 746, 758 (emphasis added). And as this Court recently observed, "[t]he ministerial exception remains just that—an exception—and each case must be judged on its own facts to determine whether a 'particular position' falls within the exception's scope." *Billard v. Charlotte Catholic H.S.*, 101 F.4th 316, 333 (4th Cir. 2024) (quoting *Our Lady*, 591 U.S. at 758); *see also DeWeese-Boyd v. Gordon College*, 163 N.E.3d 1000, 1017 (Mass. 2021) (rejecting Christian college's effort to exempt "all its employees" from state antidiscrimination law as a "significant expansion of the ministerial exception well beyond" existing doctrine), *cert. denied*, 142 S.Ct. 952 (2022); *cf. Schmidt v. Univ. of Northwestern-St. Paul*, No. 23-2199, 2024 WL 477166, at *4-5 (D. Minn. Feb. 7, 2024) (denying motion to dismiss based on ministerial exception where defendant college pointed to doctrinal affirmation

27

required of all applicants, students, and employees, pending further factual development about plaintiff's specific role).

Defendant protests that it should be allowed to determine for itself who qualifies as a minister for purposes of the ministerial exception, Def. Br. 59-62, but no case supports such a sweeping abdication of the judicial role.[17]  While courts may not look into a religious employer's reasons for firing a minister, *see, e.g.*, *Our Lady*, 591 U.S. at 746-47, courts can and do look at a given employee's responsibilities to determine whether that person *qualifies* as a minister.[18]  Indeed, each of Defendant's cases involves close judicial analysis of the responsibilities of the employee in question, and only once the court is satisfied that the religious nature of the individual's role qualifies them for the ministerial exception does it decline to analyze the reasons for the religious employer's adverse action.  *See, e.g.*, *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 307, 309 (4th Cir. 2004) (observing that courts are "familiar and comfortable with examining the primary duties of an employee when determining the scope of exceptions under the FLSA" and that the FLSA and constitutional ministerial

---

[17] Only two Justices have adopted the view that "civil courts" must unquestioningly defer to a religious organization's "good faith" view of who constitutes a minister.  *See Our Lady*, 591 U.S. at 763 (Thomas, J., concurring).

[18] That is exactly what the Supreme Court did in *Our Lady*, *see* 591 U.S. at 756-57, and *Hosanna-Tabor*, *see* 565 U.S. at 191-92.

exceptions are "coextensive"); *Roman Cath. Diocese*, 213 F.3d at 802 (noting that application of ministerial exception "requires a fact-specific examination of the function of the position").  Allowing religious employers unfettered deference in determining that every one of their employees qualifies for the ministerial exception would contradict this uniform precedent and would allow the exception to swallow Title VII whole.

## CONCLUSION

The decision below should be affirmed.

Respectfully submitted,

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*

*/s/ David C. Kravitz*
David C. Kravitz*
  *State Solicitor*
Adam M. Cambier
  *Assistant Attorney General*
One Ashburton Place
Boston, MA 02108
david.kravitz@mass.gov
(617) 963-2427
    *\*Counsel of Record*

ROB BONTA
*Attorney General of California*
1300 I Street
Sacramento, CA 95814

PHILIP J. WEISER
*Attorney General of Colorado*
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General for*
*the District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

ANNE E. LOPEZ
*Attorney General of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
*Attorney General of Illinois*
115 South LaSalle Street
Chicago, IL 60603

AARON M. FREY
*Attorney General of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
*Attorney General of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General of New York*
28 Liberty Street
New York, NY 10005

DAN RAYFIELD
*Attorney General of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General of Vermont*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
*Attorney General of Washington*
P.O. Box 40100
Olympia, WA 98504

JOSHUA L. KAUL
*Attorney General of Wisconsin*
17 W. Main Street
Madison, WI  53703


Dated: September 9, 2025

## CERTIFICATE OF COMPLIANCE

1.　　This Brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B), because it contains 6,493 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.　　This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman style, 14-point font.

/s/ David C. Kravitz
*Counsel of Record*

32