**NO. 25-1228 (Lead)**
**NO. 25-1581 (Member)**

---

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

---

ELLENOR ZINSKI,
*Plaintiff-Appellee,*

v.

LIBERTY UNIVERSITY, INC.,
*Defendant-Appellant.*

---

On Appeal from the United States District Court for the Western
District of Virginia, Case No. 6:24-cv-00041-NKM-CKM

---

**DEFENDANT-APPELLANT'S REPLY BRIEF**

---

Mathew D. Staver, *Counsel of Record*
Anita L. Staver
Horatio G. Mihet
Daniel J. Schmid
Avery B. Hill
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
(407) 875-0770
court@LC.org
hmihet@LC.org
dschmid@LC.org
ahill@LC.org
*Attorneys for Defendant-Appellant*

## DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1(a) and Local Rule 26.1(a), Defendant-Appellant, Liberty University, Inc., a nonstock corporation incorporated under the laws of the Commonwealth of Virginia, hereby states that it does not issue stock and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT…………………………………………………i

TABLE OF CONTENTS ..........................................................................ii

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION .................................................................................5

ARGUMENT .......................................................................................7

I.   This Court's decision in *Kennedy*, and its prior order in this appeal, require rejection of Zinski's third attempt to dismiss this appeal because the Court has already held that the requirements of Section 1292(b) are satisfied and nothing has changed.................................7

    A.   The requirements of Section 1292(b) are clearly satisfied because this case involves a controlling question of law, with no undisputed facts, and resolution of the appeal would terminate the case.......................................................................................7

    B.   Neither constitutional avoidance nor any other canon counsels against resolving *undisputed* facts like those before the Court. 8

    C.   Dismissing Liberty's appeal would waste judicial resources. ....9

II.  Zinski admittedly is not a co-religionist, knowingly and openly defied Liberty's Doctrinal Statement, and this undisputed fact alone ends the inquiry under Title VII. ...............................................................10

    A.   Title VII permits Liberty to employ *only* co-religionists who subscribe to its Doctrinal Statement. .........................................10

    B.   Zinski's admission to not being a co-religionist with Liberty is fatal and requires dismissal of the claim. .................................11

III. Even leaving Zinski's fatal admissions aside, the Court should decide Liberty's appeal on Sections 702 and 703 of Title VII and dismiss Zinski's claims...................................................................................12

    A.   Sections 702 and 703 provide blanket protection for Liberty to make employment decisions based on its religious beliefs and Doctrinal Statement. .................................................................12

    B.   Zinski's contention that only the claimant's religion is relevant under Sections 702 and 703 inquiry is incorrect.......................15

    C.   Zinski's reliance on *Bostock* as deciding the ultimate question here is plainly incorrect because *Bostock* specifically noted that Sections 702 and 703 exempt religious employers like Liberty. .......................................................................................18

D. Liberty's decision to terminate an employee who fraudulently affirmed its religious beliefs and then defied its Doctrinal Statement by identifying with a gender different than biological and chromosomal reality was based on religion and as such this action is exempted under Sections 702 and 703. ...................... 19

IV. Zinski's claims against Liberty University necessarily require the Court to adjudicate the proper interpretation of who is a co-religionist. ................................................................................ 22

    A. Contrary to Zinski's contentions, *Bostock* has no relevance to the ecclesiastical abstention doctrine. ............................................... 22

    B. Compelling Liberty to maintain an employee in open violation of its religious beliefs necessarily requires the Court to impose decisions on the conformity of members to the standards required of them. ........................................................................ 23

V. The ministerial exception bars Zinski's claims, even at this stage. 25

    A. The Supreme Court's latest iteration of the ministerial exception spoke of it in terms of a jurisdictional prohibition, not an affirmative defense. ................................................................... 25

    B. The question of who counts as a minister belongs exclusively to Liberty. ........................................................................................ 28

VI. The Religious Freedom Restoration Act bars Zinski's claims against Liberty. ................................................................................................ 31

    A. Zinski admits that Article III courts are a "branch" of government under RFRA. .......................................................... 31

    B. Judicial orders can, and here do, impose a substantial burden on Liberty's sincere religious beliefs. .............................................. 32

VII. Liberty maintains the First Amendment right not to associate with individuals who undermine its core mission. ................................... 33

    A. Zinski admits that the First Amendment right of association provides *some* protection in the commercial or employment context. ........................................................................................ 33

    B. Forcing a religious employer, such as Liberty, to employ individuals openly espousing behavior and engaging in conduct directly contrary to its mission is no incidental burden but undermines its entire existence. .............................................. 35

CONCLUSION ........................................................................................ 37

# TABLE OF AUTHORITIES

**Cases**

*Alexander* v. *United States*, 509 U.S. 544 (1993) ................................... 33

*Bostock* v. *Clayton County*, 590 U.S. 644 (2020) ..................... 6, 7, 19, 20

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ................................... 38

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day
Saints v. Amos*, 483 U.S. 327 (1987) ................................................ 14

*Democratic Party of the United States v. Wisconsin*,
450 U.S. 107 (1981) ......................................................................... 35

*E.E.O.C.* v. *Pac. Press Publ'g Ass'n*,
482 F. Supp. 1291 (N.D. Ca. 1979) ................................................. 12

*EEOC* v. *Roman Cath. Diocese of Raleigh*,
213 F.3d 795 (4th Cir. 2000) ......................................................27, 29

*Fitzgerald* v. *Roncalli High Sch. Inc.*, 73 F.4th 529 (7th Cir. 2023) ...... 17

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in
N. Am.*, 344 U.S. 94 (1952) .............................................................. 28

*Kennedy* v. *St. Joseph's Ministries, Inc.*,
657 F.3d 189 (4th Cir. 2011) ........................................................ passim

*Little v. Wuerl*, 929 F.2d 944 (3d Cir. 1991) ..................................11, 18

*Navy Seal 1* v. *Austin*, 588 F. Supp. 3d 1276 (M.D. Fla. 2022) ............. 33

*Palmer* v. *Liberty University*, 72 F.4th 52 (4th Cir. 2023) ...................... 28

*Rayburn* v. *Gen. Conf. of Seventh-Day Adventists*,
772 F.2d 1164 (4th Cir. 1985) ......................................................... 11

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ........................34, 35, 36, 37

*Seattle's Union Gospel Mission* v. *Woods*, 142 S. Ct. 1094 (2022).........25

*Serbian E. Orthodox Diocese for U.S. of Am. & Can. v. Milivojevich*,
426 U.S. 696 (1976) .....................................................................25, 28

*Slattery v. Hochul*, 61 F.4th 278 (2nd Cir. 2023) ................................... 37

*Sprint Commc'ns, Inc.* v. *Jacobs*, 571 U.S. 69 (2013)............................... 9

*Watson v. Jones*, 13 Wall. 679 (1872) ...............................................7, 23

**Statutes**

42 U.S.C. 2000bb-1(1)............................................................................32

42 U.S.C. 2000bb-3(a)............................................................................33

42 U.S.C. 2000e(j) ..................................................................................14

**Other Authorities**

*Black's Law Dictionary* (12th ed. 2024)................................................26

## INTRODUCTION

The plain textual reading of Sections 702 and 703 of Title VII clearly favors Liberty University ("Liberty"). The protestation of Plaintiff–Appellee are not supported by the text nor by legal precedent.

*First*, Zinski wrongly assumes *Bostock* v. *Clayton County*, 590 U.S. 644 (2020), provides the answer to every question before the Court. But *Bostock* did not address the issues raised here.

*Second*, *Bostock* noted that it was "deeply concerned with preserving the promise of free exercise of religion enshrined in our Constitution," 590 U.S. at 681, and that Congress included explicit statutory exemptions in Title VII, namely Sections 702 and 703, as a means of protecting religious organizations. *Id.* at 682. Thus, in deciding the broader issues involving an individual whose beliefs, behavior, and conduct openly defies Liberty's Doctrinal Statement, the Supreme Court specifically noted that Sections 702 and 703 would impact the result reached in *Bostock*. And the Court left no question that it was not deciding those issues because "how these doctrines protecting religious liberty interact with Title VII are questions for future cases[.]" *Id.* This is that case, and Liberty's defenses require "careful consideration." *Id.*

*Third*, *Bostock* noted that it was addressing a *narrow and singular question*. 590 U.S. at 681 ("The *only question* before us is whether an employer who fires someone *simply* for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'" (emphasis added)). Liberty's termination of Zinski for flagrantly, openly, and unrepentantly violating Liberty's Doctrinal Statement and religious employment requirements presents a question that was not before the Court. *Id.* at 682 ("[N]o other religious liberty claim is now before us.").

*Fourth*, Liberty's arguments comport with the protections the Supreme Court has recognized for more than a century. *Watson* v. *Jones*, 80 U.S. (13 Wall.) 679, 729 (1871) ("All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed.").

The district court should be reversed, and the Complaint dismissed.

## ARGUMENT

I.  **This Court's decision in *Kennedy*, and its prior order in this appeal, require rejection of Zinski's third attempt to dismiss this appeal because the Court has already held that the requirements of Section 1292(b) are satisfied and nothing has changed.**

Zinski, for the third time in this appeal, suggests that this Court should dismiss the case as incorrectly granted. Brief of Plaintiff-Appellee ("Zinski Br.") 12–14. This Court has already rejected that precise argument *in this appeal*. No. 25-142, *Liberty Univ., Inc.* v. *Zinski*, Doc. 17. There is no reason to revisit that decision.

Moreover, in prior appeals, this Court has likewise rejected attempts to remand a certified appeal to the district court without decision. See, *e.g.*, *Kennedy* v. *St. Joseph's Ministries, Inc.*, 657 F.3d 189 (4th Cir. 2011). Zinski's argument lacks merit and now borders on being frivolous.

A.  **The requirements of Section 1292(b) are clearly satisfied because this case involves a controlling question of law, with no undisputed facts, and resolution of the appeal would terminate the case.**

As this Court noted in *Kennedy*, "there is nothing in the record before us that was unavailable at the time certification was granted[.]" 657 F.3d at 195. First, "the requirements of §1292(b) are clearly satisfied in this case." *Id*. As both this Court and the district court recognized, this appeal

7

involves a controlling question of law, for which there is substantial ground for difference of opinion and resolution of which would terminate the case. No. 25-142, *Liberty Univ., Inc.* v. *Zinski*, Doc. 17; JA35. As in *Kennedy*, "[w]e are faced with a pure question of law and our resolution of it terminates the case. It was thus properly within our discretion to permit the appeal. Nothing has changed since we granted permission to appeal which causes §1292(b) to be inapplicable." 657 F.3d at 195. The same is true here.

### B. Neither constitutional avoidance nor any other canon counsels against resolving *undisputed* facts like those before the Court.

Zinski contends that "judicial restraint" counsels against deciding this appeal, as the Court should purportedly "decide less" and refrain from any decision, Zinski Br. 13–14, because this appeal involves "difficult issues." Zinski Br. 12. "Jurisdiction existing," which it does here, "a federal court's obligation to hear and decide a case is virtually unflagging." *Sprint Commc'ns, Inc.* v. *Jacobs*, 571 U.S. 69, 77 (2013) (citation modified). See also *Kennedy*, 657 F.3d at 195 (same). "[T]here is no doctrine counseling courts to avoid ruling on legal issues involving *undisputed* facts before them. To the contrary, that is the crux of Article

III power[.]" *Id.* And that is what is before the Court now—an appeal involving undisputed facts. JA036 ("These facts <u>were not even in dispute</u>."). There is nothing counseling in favor of modifying this Court's prior rejection of Zinski's attempts to avoid this Court's review.

Zinski's contention (at 12–13) that the doctrine of constitutional avoidance counsels against adjudicating this appeal has also been rejected. See *Kennedy*, 657 F.3d at 195–96. Zinski's "proposed course would lead to an anomalous result," where the Court addresses the First Amendment defense prior to adjudicating a statutory defense and that the Court "should not address [the statutory defenses] when . . . properly before us." *Id.* at 196.

## C. Dismissing Liberty's appeal would waste judicial resources.

Instead of conserving judicial resources, as Zinski contends (at 13), dismissing the appeal would "waste judicial resources by mandating that [the court] remand a case which lacks any substantial merit for further proceedings and costly discovery," *Kennedy*, 657 F.3d at 196 (citation modified), if "it is possible that the [plaintiff] will lose on the merits at some indeterminate point in the future." *Id.* That would essentially mandate dismissing all appeals, which "wastes judicial resources." *Id.*

## II. Zinski admittedly is not a co-religionist, knowingly and openly defied Liberty's Doctrinal Statement, and this undisputed fact alone ends the inquiry under Title VII.

Zinski admits to not being a co-religionist with Liberty. Zinski Br. 29–30 ("Liberty's repeated insistence that Zinski is somehow demanding status as a co-religionist under Title VII is untrue. Nowhere has Zinski alleged that Zinski is a co-religionist with Liberty[.]" (citation modified)). That ends the inquiry. Under Title VII, Liberty is entitled to employ only co-religionists, and Zinski admittedly does not qualify.

### A. Title VII permits Liberty to employ *only* co-religionists who subscribe to its Doctrinal Statement.

Section 702's exemption expressly "allows religious institutions to favor co-religionists in hiring[.]" *Billard* v. *Charlotte Cath. High Sch.*, 101 F.4th 316, 322 (4th Cir. 2024). See also *Kennedy*, 657 F.3d at 192 (Section 702 permits religious organizations "to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer[.]"); *Rayburn* v. *Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985) ("[T]he language of §702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences[.]"); *Little* v. *Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991) ("Congress intended the explicit exemptions to Title VII to enable

religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices."). Indeed, "Congress intended that §702 permits a religious institution to discriminate only in favor of co-religionists." *EEOC* v. *Pac. Press Publ'g Ass'n*, 482 F. Supp. 1291, 1303 (N.D. Ca. 1979).

### B. Zinski's admission to not being a co-religionist with Liberty is fatal and requires dismissal of the claim.

The candid admission to not being a co-religionist is fatal to Zinski's claims against Liberty. Zinski contends that the claims against Liberty "in no way rel[y] on being a co-religionist with Liberty[.]" Zinski Br. 30. Title VII permits Liberty to employ *only co-religionists*. If Liberty made its employment decision on the basis that Zinski is not a co-religionist, it is exempt. *End of story*.

This is precisely what Liberty did here. When Zinski announced an intention to live in a manner openly defiant of Liberty's Doctrinal Statement, Liberty informed Zinski that it was terminating Zinski's employment for failure to abide by its religious beliefs. JA018 ("Employing a person who takes the measures you describe to deny the biological and chromosomal sex God assigned at birth would not be consistent with Liberty University's values or advance its religious

11

mission."). Over and again throughout its explanation to Zinski, Liberty made clear that its decision was religious. JA018–019. And it summed up its religious decision as follows: "***Active and unrepentant patterns of sin, including sinful behaviors regarding sexual expression and/or gender expression, would be incompatible with our Christian workplace***." JA019 (emphasis added). Simply put, Liberty made clear to Zinski that it "must select the path most consistent with what we understand God would have us take, based on our Doctrinal Statement." JA019. Liberty's decision was wholly religious and based on Zinski's conduct that openly defied Liberty's Doctrinal Statement. Its termination of Zinski is therefore exempt under Sections 702 and 703, regardless of how Zinski styles the claims.

## III. Even leaving Zinski's fatal admissions aside, the Court should decide Liberty's appeal on Sections 702 and 703 of Title VII and dismiss Zinski's claims.

### A. Sections 702 and 703 provide blanket protection for Liberty to make employment decisions based on its religious beliefs and Doctrinal Statement.

Section 702 is titled, "Inapplicability of subchapter to certain aliens and employees of religious entities," and provides that the whole of Title VII "shall not apply to a religious * * * educational institution * * * with

12

respect to the employment of individuals of a particular religion[.]" 42 U.S.C. 2000e-1(a). Section 702 "exempts religious organizations from Title VII's prohibition against discrimination in employment on the basis of religion." *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U.S. 327, 329 (1987).

And "this subchapter" means all of Title VII. See *Kennedy*, 657 F.3d at 192. The question then becomes, against whom does "this subchapter" not apply? The answer: religious educational institutions, among others. Liberty qualifies, and no one disputes that fact. JA066.

The only inquiry is whether Liberty made its employment decision "with respect to the employment of individuals of a particular religion." 42 U.S.C. 2000e-1(a). "[E]mployment" includes a religious employer's decision to terminate an employee. *Kennedy*, 657 F.3d at 193. So, the question can be reduced to whether Liberty (a religious institution) made an employment decision (termination of Zinski) based on Zinski's "particular religion." And what does it mean to make a decision on the basis of religion? Under Title VII, a religious decision is one that involves "all aspects of religious observance and practices, as well as belief[.]" 42 U.S.C. 2000e(j).

13

Thus, the final question becomes: did Liberty make a religious employment decision (to terminate Zinski) because Zinski's religious observance, practice, or belief violated Liberty's Doctrinal Statement? *It did* and *Liberty said so plainly*.

*As to practice*: The "path most consistent with what [Liberty] understood God would have [it] take" was to terminate Zinski for "***[a]ctive and unrepentant patterns of sin***." JA019 (emphasis added). As Liberty made clear, one cannot be in conformance with Liberty's religious beliefs and Doctrinal Statement (*i.e.*, practicing Liberty's religious beliefs) while living in active, flagrant, and unrepentant sin. JA019.

*As to religious beliefs*: Liberty made clear that its decision was based on Zinski's demonstration that he did not share Liberty's beliefs. JA018 ("I recognize that some have come to faiths that are different than Liberty's [but] we strive to be clear about ours and employ a workforce that acts in accordance with it in order to protect our religious mission."). Lest there be any doubt, Liberty made clear that  Zinski's stated beliefs "are out of step with Liberty's clearly defined and publicly posted Doctrinal Statement." JA018.

*As to observance*: Liberty made clear that it "does not and will not permit employees to undertake the efforts you describe to transition away from one's birth gender." JA019. *Liberty made its decision on the basis of its religious beliefs and employment requirements.* Thus, under the proper construction of Sections 702 and 703, which the district court called "the most textually faithful," JA074, Liberty's religiously based employment decision was entitled to the blanket protection for religious discrimination that Title VII explicitly provides. See Brief of Amici Brigham Young University, et al., 6–10; Brief of Amici Cardinal Newman Society, et al., 4–13; Brief of Amici The Church of Jesus Christ of Latter-day Saints, et al., 4–12.

### B. Zinski's contention that only the claimant's religion is relevant under Sections 702 and 703 inquiry is incorrect.

Zinski wrongly contends that the only "relevant religion referred to in Sections 702 and 703 is the religion of the 'individual,' not the religion of the employer." Zinski Br. 25. This is Zinski's answer to the district court's rhetorical question of "*whose religion is it anyway.*" JA071. To put it more succinctly, Zinski contends that Title VII's exemptions "focus on the attributes of the individual," not the employer's motivations. Zinski Br. 23. Zinski is not the first to press this interpretation. See *Fitzgerald*

v. *Roncalli High Sch. Inc.*, 73 F.4th 529, 535 (7th Cir. 2023) (Brennan, J.,

concurring). In *Fitzgerald*, the plaintiff likewise noted "that the 'religion'

referenced in the exemption is the individual's religion." *Id.* "But, were

that the focus, the exemption would read differently, as the 'individual's

religion.'" *Id.* "Instead, the exemption states, "individuals *of* a particular

religion." *Id.*

> As Judge Brennan observed,
>
> [t]he term "particular" in the phrase "individuals of a particular religion" already hints *at a religious employer's selectivity in employment*. Considered as a whole, the exemption's text applies only to a religious employer and only "with respect to the employment of individuals to perform work connected with the carrying on by such [religious employer] of its activities." This context shows that the §702(a) exemption is concerned with "alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions." The focus is on a religious employer's ability to perform its religious activities. This conclusion is reinforced by prior, narrower enactments of the exemption, which read "to perform work connected with the carrying on by such [religious employer] of its *religious* activities." All arrows point one way: "Of" is descriptive, and "individuals of a particular religion" means individuals whose beliefs, observances, or practices align with the employer's religious expectations.

*Id.* (emphasis added) (quoting 42 U.S.C. 2000e-1(a) and *Amos*, 483 U.S.

at 339).

16

Judge Brennan's concurrence is borne out by this Court's decision in *Kennedy*. "[P]ermission to employ persons 'of a particular religion' includes permission to employ only persons whose beliefs and conduct are consistent with *the employer's religious precepts*." 657 F.3d at 194 (emphasis added) (quoting *Little*, 929 F.2d at 951). *See also* Liberty Br. 18–23; Brief of Amici Cardinal Newman Society, et al., 4–7.

Even if Zinski's construction was correct, which it is not, it is fatal to Zinski's claims. Zinski's contentions are curious. Assuming *arguendo* that Title VII's exemptions in Sections 702 and 703 focus solely on the individual employee's religious beliefs, then a religious employer (like Liberty) would be entitled to terminate an employee (like Zinski) whose individual religious beliefs are admittedly inconsistent with the employer's. In other words, an employee who admits he is not a co-religionist of the employer is necessarily not an employee "of a particular religion." 42 U.S.C. 2000e-1(a). Zinski admits to not being a co-religionist and thus admits to not being an "individual of [Liberty's] particular religion." *Id.* Under Zinski's own incorrect interpretation of Sections 702 and 703, Liberty still prevails.

17

Moreover, that the exemptions apply to Liberty's employment decisions relating to *its* religious beliefs is consistent with the statute and materially identical provisions of other statutes. As Amici Cardinal Newman Society, et al. notes (at 6–7), the statute provides broad exemptions from the applicability of Title VII's prohibitions.

**C. Zinski's reliance on *Bostock* as deciding the ultimate question here is plainly incorrect because *Bostock* specifically noted that Sections 702 and 703 exempt religious employers like Liberty.**

Zinski wrongly contends that *Bostock* begins and ends the inquiry in this matter. Zinski Br. 28–29. As demonstrated in Liberty's Opening Brief (at 23–27), *Bostock* specifically left open the precise scenario at issue here. The Supreme Court noted that "the employers [in *Bostock*] fear that complying with Title VII's requirement *in cases like ours* may require some employers to violate their religious convictions." 590 U.S. at 681 (emphasis added). While noting that it was "deeply concerned with preserving the promise of the free exercise of religion enshrined in our Constitution," *id.*, the Court stated that there are "express statutory exception[s] for religious organizations" when it comes to—as the Court said—"cases like ours." *Id.* at 681–82. Further, the Court stated that the religious exemption arguments would merit "careful consideration"

18

when—as here—"Title VII will infringe their own religious libert[y] in any way." *Id.* at 682.

*Bostock* specifically stated that it was not addressing anything other than typical run-of-the-mill sex discrimination case, 590 U.S. at 681, and it stated that defenses such as Sections 702 and 703 were not being decided but would "merit careful consideration" in the future. *Id.*

**D. Liberty's decision to terminate an employee who fraudulently affirmed its religious beliefs and then defied its Doctrinal Statement by identifying with a gender different than biological and chromosomal reality was based on religion and as such this action is exempted under Sections 702 and 703.**

Zinski wrongly contends that, under *Bostock*, once a claimant alleges sex discrimination, nothing else matters under Title VII. Zinski Br. 28. But as *Bostock* noted, "[t]he *only question* before us is whether an employer who fires someone *simply* for being homosexual or transgender[.]" 590 U.S. at 681 (emphasis added). Liberty did not terminate Zinski's employment *simply* for Zinski's rejection of his biological and chromosomal reality, but rather terminated Zinski because he deceptively and fraudulently affirmed conformance with Liberty's Doctrinal Statement and religiously based employment requirements while knowing he was living in open and unrepentant violation of those

19

religious requirements, as evidenced by Zinski's behavior, practices, and beliefs. As Liberty stated:

> I would like to remind you that all employees are provided a copy of the Doctrinal Statement and acknowledge it as part of the onboarding process. Our records show you were no exception when you began full-time employment in February of 2023, only five months ago and apparently four months into your hormone regimen.

JA018. In other words, Zinski fraudulently stated to Liberty that Zinski fully agreed with Liberty's Doctrinal Statement and acknowledged the requirement to abide by it and did so while already four-months into the process of openly and flagrantly disregarding those very same employment requirements.

To remove all doubt as to why Liberty was terminating Zinski, it noted that "[a]ctive and unrepentant patterns of sin, including sinful behaviors regarding sexual expression and/or gender expression, would be incompatible with our Christian workplace. At Liberty, these are indeed part and parcel of job performance and workplace conduct," JA019, and are vital to Liberty carrying out its religious mission. JA018. Liberty's religious decision was based on Zinski's defiant conduct in open violation of its Doctrinal Statement. See Brief of Amici Brigham Young University, et al., 11–23.

20

Liberty's entire communication and explanation to Zinski articulated the religious basis for its decision to terminate Zinski's employment. Liberty's letter is 41 sentences long and its religious beliefs, religious mission, religious Doctrinal Statement, or other religious values, faith, message, or requirements are mentioned 38 times in those 41 sentences. In virtually every statement Liberty made to Zinski concerning its decision to terminate Zinski's employment, Liberty referenced its religion. If that does not articulate a religious basis for Liberty's decision, nothing would ever suffice. Liberty's decision was religious, plain and simple. Zinski knew what Liberty's religious beliefs are, knew acceptance, agreement, and conformity with those religious beliefs was a condition of employment, and fraudulently stated that Zinski did accept, agree, and comported with Liberty's beliefs. JA018–019. Zinski did not, and then openly defied the Doctrinal Statement. Liberty was therefore permitted to terminate him on that basis.

**IV. Zinski's claims against Liberty University necessarily require the Court to adjudicate the proper interpretation of who is a co-religionist.**

**A. Contrary to Zinski's contentions, *Bostock* has no relevance to the ecclesiastical abstention doctrine.**

"[C]ivil courts exercise no jurisdiction [over] a matter which concerns theological controversy, church discipline, ecclesiastical government, or *the conformity of the members of the church to the standards of morals required of them*[.]" *Watson* v. *Jones*, 80 U.S. (13 Wall.) 679, 733 (1871) (emphasis added). Zinski does not contest that the Court is prohibited from making such an inquiry. See Zinski Br. 41. Nevertheless, Zinski wrongly contends that the claims against Liberty do not require resolution of any religious question. Zinski Br. 41. Zinski's claims necessarily require adjudication of a purely ecclesiastical question: whether an employee who rejects his biological and chromosomal reality in defiance of God-given design and identifies as a different gender can conform with Liberty's Doctrinal Statement and meet the standards of morals required of its members. Simply put, whether Zinski is a co-religionist.

Zinski again resorts to *Bostock* to contend that no religious question is at issue. Zinski Br. 42. Zinski suggests that *Bostock* absolves the Court

of the jurisdictionally prohibited inquiry into Liberty's religious beliefs because there need be no inquiry into the "religious beliefs that may or may not have animated" Liberty's decision to terminate Zinski. Zinski Br. 42. Zinski is wrong again. In essence, Zinski asks this Court to use *Bostock* to severely curtail ecclesiastic autonomy, arguing that its holding evaporates constitutional protections afforded religious institutions, so long as the institution's discipline or standards of morality involve "sex." Zinski Br. 42. That cannot be. Again, *Bostock* explicitly reserved the determination of the application of the Free Exercise Clause doctrines, including ecclesiastical abstention, open for this precise scenario. 590 U.S. at 682.

**B.   Compelling Liberty to maintain an employee in open violation of its religious beliefs necessarily requires the Court to impose decisions on the conformity of members to the standards required of them.**

Zinski's purported sex-discrimination claim is inextricably interwoven into Liberty's religious decision. *Bostock* does not magically bestow Article III courts with some newfound jurisdiction over matters of ecclesiastic discipline merely because they relate to "sex." Again, as Liberty made clear, its decision to terminate Zinski was based entirely on the fact that Zinski's religious observance, practices, and beliefs were

23

not in conformity with Liberty's religious beliefs and Doctrinal Statement. JA018 ("The idea that man has the final say when it comes to sex or gender is simply inconsistent with the part of Liberty's Doctrinal Statement which recognizes that the God of creation chooses gender."). Liberty stated that Zinski admittedly did not conform to the "standard of morals required" of Liberty's employees, *Serbian E. Orthodox Diocese for U.S.A. & Can.* v. *Milivojevich*, 426 U.S. 696, 714 (1976), and its decision to terminate Zinski is therefore one over which the Court can "exercise no jurisdiction." *Id.* at 714.

The claim that no religious question needs be resolved here defies logic. If Liberty is required to maintain employees in "active and unrepentant patterns of sin," its entire mission would be undermined. *Seattle's Union Gospel Mission* v. *Woods*, 142 S. Ct. 1094, 1096 (2022) (Alito, J., Statement) ("To force religious organizations to hire messengers and other personnel who do not share their religious views would undermine not only the autonomy of many religious organizations but also their continued viability. If States could compel religious organizations to hire employees who fundamentally disagree with them, many religious non-profits would be extinguished from participation in

24

public life—perhaps by those who disagree with their theological views most vigorously."). See Br. of Amici Law Professors, 16–26. The First Amendment prohibits that threat and requires dismissal of Zinski's claims.

## V. The ministerial exception bars Zinski's claims, even at this stage.

### A. The Supreme Court's latest iteration of the ministerial exception spoke of it in terms of a jurisdictional prohibition, not an affirmative defense.

Zinski's argument that the ministerial exception is merely an affirmative defense is based on an isolated, and now substantially undermined, footnote in *Hosanna-Tabor Evagelical Lutheran Church & School* v. *EEOC*, 565 U.S. 171, 195 n.4 (2012). See Zinski Br. 15. The Supreme Court's subsequent decisions regarding the ministerial exception treated the issue as a jurisdictional prohibition. In *Our Lady of Guadalupe School* v. *Morrisey-Beru*, 591 U.S. 732 (2020), the Supreme Court referred to claims that fall under the ministerial exception as "barred" under the First Amendment. *Id.* at 750. When a claim is "barred" there is a "barrier to or [a] destruction of a legal action or claim[.]" *Bar, Black's Law Dictionary* (12th ed. 2024). This is why *Our Lady of Guadalupe* instructs that "courts are *bound to stay out of*

25

*employment disputes* involving those holding certain important positions with churches and other religious institutions." 591 U.S. at 746. *See also Billard* v. *Charlotte Cath. High Sch.* 101 F.4th 316, 326 (4th Cir. 2024) (same).

This language of prohibiting civil courts from inquiring into the religious motives of Liberty's employment decisions is no mere defense to liability, it is a prohibition from inquiry. It is a "shelter" from "the scrutiny of civil authorities." *Billard*, 101 F.4th at 329 (quoting *EEOC* v. *Roman Cath. Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000)).

In *Our Lady of Guadalupe*, neither the majority, nor concurrence, nor dissent so much as mentioned the word "affirmative defense." Rather, the Court stated "that the First Amendment *barred a court from entertaining* an employment discrimination claim * * * against the religious school[.]" *Our Lady of Guadalupe*, 591 U.S. at 737 (emphasis added). And, speaking of its decision in *Hosanna-Tabor*, the Court explicitly noted that it "unanimously recognized that the Religion Clauses *foreclose* certain employment discrimination claims brought against religious organizations." *Id.* at 747 (emphasis added). In other words, the ministerial exception is no ordinary defense—it is a

constitutionally grounded and required jurisdictional prohibition. "[J]udicial intervention into [employment] disputes between the school and the [employee] threatens the school's independence in a way the First Amendment does not allow." *Id.* at 762.

And that makes sense. If the ministerial exception is not a jurisdictional bar, then religious institutions would be subject to court-ordered discovery into the "internal governance of the church[.]" *Hosanna-Tabor*, 565 U.S. at 188. For over a century, the Supreme Court has consistently been concerned with court intrusion into the religious decisions of religious institutions. See, *e.g.*, *Watson*, 80 U.S. (13 Wall.) 679; *Kedroff* v. *St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952); *Milivojevich*, 426 U.S. 696; *Our Lady of Guadalupe*, 591 U.S. at 747. The intrusion into internal church governance does not arise merely from final judgment imposing liability, but rather begins at the inception of Article III judges probing into religious decisions. As Judge Richardson put it in *Palmer* v. *Liberty University*, 72 F.4th 52 (4th Cir. 2023), the First Amendment prohibits "*the very process of inquiry*" into Liberty's employment decisions. *Id.* at 76 (Richardson, J., concurring).

**B.    The question of who counts as a minister belongs exclusively to Liberty.**

Zinski's only other claim as to why the ministerial exception is inapplicable is that Zinski is no "minister." Zinski Br. 17. This is incorrect. Though Zinski (at 17) looks to this Court's decision in *EEOC* v. *Roman Cath. Diocese of Raleigh*, 213 F.3d 795 (4th Cir. 2000) for the contention that administrative personnel are not included in the ministerial exception, the Supreme Court's decision in *Our Lady of Guadalupe* makes no such limitation. In fact, what the Court said was that "*any employee*" who, *inter alia*, "serves as a messenger or teacher of its faith" qualifies under the ministerial exception. 591 U.S. at 754 (emphasis added). Moreover, one of the reasons the Court found the exception applicable in *Our Lady of Guadalupe* was that the "schools expressly saw them as playing a vital part in carrying out the mission of the church[.]" *Id.* at 757.

So, too, here with Zinski. As the district court noted, the publicly available facts from which the Court can take judicial notice demonstrates that Liberty's mission is to "develop[] Christ-centered men and women," and it desires to "infuse the campus community with the Christian faith." JA067. Moreover, using that same publicly available

28

information from which the district court took judicial notice, Liberty's mission is not restricted to administrators, teachers, professors, or pastors. Liberty's mission is to "educate men and women * * * to glorify God and fulfill the Great Commission," which is accomplished not solely in the classroom, but also through "*services*, facilities, and collaborations[.]" *Statement of Mission and Purpose*, Liberty Univ. (March 7, 2014), https://www.liberty.edu/about/purpose-and-mission-statement/ (emphasis added). Thus, Liberty's IT, janitorial, maintenance, landscaping, and every employee necessarily ministers to the students at the University. It is, as Liberty said, "part and parcel of job performance" at Liberty. JA019. Liberty made clear to Zinski: *every* employee is critical to Liberty's religious mission. JA018.

Contrary to Zinski's contentions, his own view of his role is immaterial, but Liberty's understanding of the ministerial role of each employee is critical. "A religious institution's explanation of the role of such employees in the life of the religion in question is important," *Our Lady of Guadalupe*, 591 U.S. at 757, and is, in fact, constitutionally required. *Id.* at 763 (Thomas, J., concurring) ("[T]he Religion Clauses

29

require civil courts to defer to religious organizations' good-faith claims that a certain employee's position is ministerial.").

The Ninth Circuit's recent decision in *McMahon* v. *World Vision, Inc.*, 147 F.4th 959 (9th Cir. 2025) is instructive. There, the plaintiff was offered a job as a "remote customer service representative" for a religious organization. *Id.* at 965. After learning that the applicant who had been offered a job was in a same-sex marriage, the religious organization revoked its offer. *Id.*  The employee sued claiming sex discrimination under *Bostock*. *Id.* at 973. The religious organization contended that such claims were barred by the ministerial exception, and the Ninth Circuit agreed. *Id.* at 977.

Much like Zinski here (at 17), the plaintiff in *McMahon* argued that the ministerial exception was inapplicable because the offered job was primarily administrative. See 147 F.4th at 976. The Ninth Circuit rightly rejected that contention. "[A]n employee's job duties cannot be viewed in isolation from the religious organization's mission." *Id.* at 973. Even though the "job posting primarily lists secular and administrative duties[,]" the religious aspects of the job were to "'help carry out our Christian organization's mission, vision, and strategies,' and 'personify

30

the ministry of *World Vision* by witnessing to Christ and ministering to others through life, deed, word and sign.'" *Id.* at 975 (citation modified). Importantly, the court noted that World Vision required its employees to minister to people in order to carry out its mission. *Id.* at 975.

So, too, here. Zinski's IT job duties required direct interaction with students, faculty, and staff, and Zinski was required to live a "distinctly Christian lifestyle" so to further the mission of "Training Champions for Christ." JA018. This is identical to World Vision's requirements that its employees "personify" its mission. 147 F.4th at 977. Thus, Zinski's contention that the IT role Zinski fulfilled precludes a finding of the applicability of the ministerial exception is incorrect.

## VI. The Religious Freedom Restoration Act bars Zinski's claims against Liberty.

### A. Zinski admits that Article III courts are a "branch" of government under RFRA.

Zinski suggests that the word "government" in RFRA does not apply to the judiciary under RFRA. Zinski Br. 35. Under the plain terms of the statute, "the term 'government' includes a *branch* of the United States." 42 U.S.C. 2000bb-1(1) (emphasis added). Indeed, "RFRA includes specific and unequivocal commands to the government, defined to include every

branch," *Navy Seal 1* v. *Austin*, 588 F. Supp. 3d 1276, 1279 (M.D. Fla. 2022). "Obviously, RFRA includes everyone from the President to a park ranger, from the Chief Justice of the United States to a probation officer[.]" *Id.* This is why Zinski is forced to admit, as he must, that the judicial branch is indeed "a branch of government." Zinski Br. 35.

## B. Judicial orders can, and here do, impose a substantial burden on Liberty's sincere religious beliefs.

Zinski claims the judiciary is not the one substantially burdening a claimant's religious exercise. Zinski Br. 35. Judicial orders can and do burden First Amendment rights. *E.g.*, *Alexander* v. *United States*, 509 U.S. 544, 550 (1993) (judicial orders can infringe constitutional liberties in a manner prohibited by the First Amendment). There is no reason to treat substantial burdens on free exercise any different under RFRA. Indeed, RFRA "applies to all Federal law, *and the implementation of that law, whether statutory or otherwise.*" 42 U.S.C. 2000bb-3(a) (emphasis added). The statute specifically contemplates burdens imposed by any branch in the implementation and enforcement of any federal law. This includes the judicial branch and Title VII.

Because judicial orders that would burden Liberty's religious belief would come from a branch of the government implementing federal law, RFRA is available to Liberty. See Liberty Br. 40–50.

## VII. Liberty maintains the First Amendment right not to associate with individuals who undermine its core mission.

### A. Zinski admits that the First Amendment right of association provides *some* protection in the commercial or employment context.

Zinski strangely contends that religious institutions abandon their First Amendment rights to expressive association in an employer-employee relationship, Zinski Br. 45, but Zinski references numerous opinions which hold that commercial entities enjoy, at least, *some* associational protections under the First Amendment. Zinski Br. 45 (quoting *Roberts* v. *U.S. Jaycees*, 468 U.S. 609, 634 (1984) (O'Connor, J., concurring in part and concurring in the judgement)) (noting the "constitutional protection of the freedom of commercial association"). Zinski's reliance on *Roberts* is misplaced.

In fact, *Roberts* suggests, and Liberty argues (at 62–66), this Court should apply strict scrutiny. 468 U.S. at 623. There, the Court noted that the First Amendment right to associate includes economic and religious relationships. *Id.* at 622. It noted a range of associations for which the

33

First Amendment is applicable. The highest level of protection is familial relationships. *Id.* at 619–20. On the other end, large business enterprises which "seem[] remote from the concerns giving rise to this constitutional protection." *Id.* at 620. But the size of a business enterprise is not dispositive of its right to association. Indeed, even the National Democratic Party (a nationwide organization) was entitled to First Amendment associational rights. *Democratic Party of the U.S.* v. *Wisconsin*, 450 U.S. 107, 121 (1981). The reason was simple: "The First Amendment freedom to gather in association for the purpose of advancing shared beliefs is protected [and] necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only." *Id.* at 121–22. And "the courts may not interfere on the ground that they view a particular expression as unwise or irrational." *Id.* at 124. Liberty gets to make that decision.

Zinski's entire claim is centered on the attempt to compel Liberty to associate with "individuals with ideologies or philosophies different from those of its existing members." *Roberts*, 468 U.S. at 627. But the Court is prohibited from doing so. *Id.* Indeed, as Amici Brigham Young University, et al. note (at 27–30), there is "no clearer example" of an

34

intrusion into the freedom of association than to force acceptance of an unwanted member. See also *Roberts*, 468 U.S. at 623. Certainly, Liberty, expressing First Amendment freedoms in its worship and education, must be provided *at least* the same protections afforded political parties, thus requiring the Court apply strict scrutiny in this case. *Democratic Party*, 450 U.S. at 124.

### B. Forcing a religious employer, such as Liberty, to employ individuals openly espousing behavior and engaging in conduct directly contrary to its mission is no incidental burden but undermines its entire existence.

Liberty is not attempting to generally discriminate in its employment. Rather, Liberty's focus is on "employ[ing] a workforce that acts in accordance with it[s] [Doctrinal Statement] in order to protect its religious mission." JA018. The First Amendment gives Liberty that right. As Amici Council for Christian Colleges and Universities, et al. state (at 28–29), for religious institutions like Liberty, "personnel *is* policy." This is why Liberty views adherence to its Doctrinal Statement as "part and parcel" of its vital religious mission. JA019. As the Court noted in *Roberts*, the right "to worship * * * could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Id*. at 622.

35

In another curious reference, Zinski cites *CompassCare* v. *Hochul*, 125 F.4th 49 (2d Cir. 2025) to suggest that the First Amendment right of association provides no refuge for Liberty. Zinski Br. 49. But, as the Second Circuit noted, when an employer plausibly alleges "that the Act's impact on the specific employment decision 'will impede the organization's ability to engage in * * * protected activities or to disseminate its preferred views'" then the right of association provides protection. *CompassCare*, 125 F.4th at 61 (quoting *Roberts*, 468 U.S. at 627). Liberty has done so here. Any employee that openly espouses behavior and choices directly contrary to Liberty's mission threatens "the very mission" of Liberty and impedes its ability to disseminate its preferred views. *Slattery* v. *Hochul*, 61 F.4th 278, 288 (2nd Cir. 2023).

To demonstrate the fatal flaw of Zinski's rationale, one need only look at Zinski's statements to see why continued employment at Liberty would undermine Liberty's mission. Zinski contends that, despite rejecting biological and chromosomal reality and engaging in what Liberty considers "active and unrepentant sin," JA019, Zinski is nevertheless fully in compliance with and shares Liberty's mission. JA016. Liberty

sees the matter fundamentally differently, and Liberty's view of its religious mission is all that matters. JA019.

Zinski's only retort to this inescapable conclusion is to claim that "oppos[ing] transgender people" is not "Liberty's very mission." Zinski Br. 50. That contention misses the mark because "transgender people" is not the issue. Maintaining a workforce whose conduct complies with its Doctrinal Statement is the issue and is vital to Liberty's religious mission. Continuing to employ someone who is out of compliance and openly and unrepentantly rejects its religious mission would necessarily and unquestionably undermine and substantially burden that mission in a way the First Amendment prohibits. *Boy Scouts of Am.* v. *Dale*, 530 U.S. 640, 648 (2000)).

## CONCLUSION

For the foregoing reasons, and for all those more fully articulated in Liberty's Opening Brief, the district court should be reversed and Zinski's Complaint dismissed.

/s/ Daniel J. Schmid
Mathew D. Staver, *Counsel of Record*
Anita L. Staver
Horatio G. Mihet
Daniel J. Schmid
Avery B. Hill
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
(407) 875-0770
court@LC.org
hmihet@LC.org
dschmid@LC.org
ahill@LC.org
*Attorneys for Defendant-Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPE-FACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This document complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A). Not counting the items excluded from the length by Fed. R. App. P. 32(f), this document contains 6,490 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). This document has been prepared using Microsoft Word in 14-point Times New Roman font.

/s/ Daniel J. Schmid
Daniel J. Schmid
*Attorney for Defendant-Appellant*

39

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of September, 2025, a true and correct copy of the foregoing was filed via the Court's ECF filing system and therefore service will be effectuated by the Court's electronic notification system upon all counsel or parties of record.

<u>/s/ Daniel J. Schmid</u>
Daniel J. Schmid
*Attorney for Defendant-Appellant*